Case: 1:22-mj-00192
Assigned To : Magistrate Judge Meriweather, Robin M.
Assign. Date : 8/22/2022
Description: Complaint w/ Arrest Warrant

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Joy Gallante, being duly sworn, depose and state as follows:

## I.   INTRODUCTION AND SUMMARY OF PROBABLE CAUSE

1.   Based upon my participation in the investigation, I have become familiar with a scheme to facilitate illegal access to the U.S. financial system by entities affiliated with the Democratic People's Republic of Korea (DPRK) a/k/a North Korea, including the state-operated Foreign Trade Bank (FTB). The scheme was carried out by Chinese national JIN Guanghua and others.

## II.   AGENT BACKGROUND

2.   I am a Special Agent with the Federal Bureau of Investigation ("FBI"), currently assigned to the FBI Phoenix Field Office. I have been a Special Agent with the FBI since 2002. Since approximately 2002, I have principally been involved in national security investigations. Specifically, I have been involved in investigations involving counterintelligence, export violations, sanctions violations, and illicit finance. I have received training in the laws and regulations relating to the International Emergency Economic Powers Act ("IEEPA"), pursuant to Title 50, United States Code, Sections 1701 through 1707. Additionally, I have received training in, among other things, criminal investigative techniques, and I have participated in investigations involving the violation of IEEPA, including laundering illegal proceeds, by causing funds to be transferred through U.S. banks for the benefit of prohibited entities.

3.   The facts set forth in this affidavit are based on information that I have obtained from my personal involvement in the investigation and from other law enforcement officers who have been involved in this investigation, on documents that I have reviewed, and on my training

and experience. Where I have reported statements made by others or from documents that I have reviewed, those statements are reported in substance and in part, unless otherwise indicated.

4.      This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Because this affidavit is being submitted for a limited purpose, I have not set forth all of the information known to me concerning this investigation. Instead, I have set forth information that I believe to be sufficient to establish probable cause in support of the government's application for an arrest warrant.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that JIN Guanghua and other co-conspirators known and unknown, have violated 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 1344 (Bank Fraud), 31 U.S.C. § 5322 (the Bank Secrecy Act), 50 U.S.C. § 1705 (IEEPA), and 18 U.S.C. §§ 1956(a)(2)(A) and (h) (Money Laundering).

## III.     VENUE

6.      As discussed more fully below, acts or omissions (*i.e.*, the failure to obtain a license from the Department of the Treasury) in furtherance of the offenses under investigation occurred within Washington, D.C. *See* 18 U.S.C. § 3237.

## IV.     RELEVANT LEGAL BACKGROUND

### A.     Sanctions Against North Korea

7.      The Trading with the Enemy Act ("TWEA") of 1917, codified at 12 U.S.C. § 95 and 50 U.S.C. § 4301 *et seq.*, authorized the President to restrict trade between the United States and countries to which it is adverse. On December 16, 1950, the President designated the Democratic People's Republic of Korea ("DPRK" or "North Korea"), under TWEA. North Korea remained designated as such until June 26, 2008.

8.      Under TWEA, U.S. financial institutions were barred from conducting transactions for the benefit of North Korea, to include "[a]ll transfers of credit and all payments between, by, through, or to any banking institution or banking institutions wheresoever located, with respect to any property subject to the jurisdiction of the United States or by any person (including a banking institution) subject to the jurisdiction of the United States." 31 C.F.R. § 500.201 (2006 ed.).

### B.      United Nations Sanctions

9.       In December 1985, North Korea ratified the Nuclear Non-Proliferation Treaty ("NPT"). On January 10, 2003, North Korea withdrew from the NPT. On October 14, 2006, the United Nations ("UN") Security Council passed Resolution 1718 condemning North Korea's first nuclear test and imposing sanctions on North Korea, including the supply of heavy weapons and select luxury goods. After successive nuclear tests by North Korea, the UN Security Council strengthened or imposed additional sanctions in 2009, 2013, 2016 and 2017.

### C.      IEEPA

10.      The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50 U.S.C. § 1701 *et seq.*, enacted in 1977, authorized the President to impose economic sanctions in response to an unusual or extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat.

11.      The Departments of the Treasury, Commerce, and State enforce and administer economic sanctions under their respective authorities, to accomplish U.S. foreign policy and national security goals. In particular, the Department of the Treasury publishes a publicly available list of individuals and entities ("Specially Designated Nationals and Blocked Persons" or "SDNs") targeted by U.S. economic sanctions. An SDN's property and interests in property, subject to U.S.

jurisdiction or in the possession and control of U.S. persons, are blocked when the SDN is placed

on the SDN list. U.S. persons, including U.S. financial institutions, are generally prohibited from

dealing with SDNs and their property and interests in property.

12.     Using the powers conferred by IEEPA, the President and the Executive Branch

have issued orders and regulations governing and prohibiting certain transactions with countries,

individuals, and entities suspected of proliferating Weapons of Mass Destruction ("WMD"). On

November 14, 1994, the President issued Executive Order ("EO") 12,938, finding "that the

proliferation of nuclear, biological, and chemical weapons ('weapons of mass destruction') and of

the means of delivering such weapons, constitutes an unusual and extraordinary threat to the

national security, foreign policy, and economy of the United States, and [declaring] a national

emergency to deal with that threat."

13.     On June 28, 2005, the President, to take additional steps with respect to the national

emergency described and declared in EO 12,938, issued EO 13,382 ("Blocking Property of

Weapons of Mass Destruction Proliferators and Their Supporters") to target proliferators of WMD

and their support networks and to deny designated proliferators access to the U.S. financial and

commercial systems. EO 13,382 authorized the U.S. Secretary of the Treasury, in consultation

with the U.S. Secretary of State, "to take such actions, including the promulgation of rules and

regulations, as may be necessary to carry out the purposes" of the EO. Pursuant to that authority,

on April 13, 2009, the Secretary of the Treasury promulgated the "Weapons of Mass Destruction

Proliferators Sanctions Regulations." *See* 31 C.F.R. § 544.101 *et seq*. EO 13,382 and the Weapons

of Mass Destruction Proliferators Sanctions Regulations prohibit transactions or dealings by any

U.S. person or within the United States with individuals and entities placed on the SDN list, unless

exempt or authorized by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), which is located in Washington, D.C.

14.     On August 11, 2009, the Department of the Treasury designated the North Korean bank Korea Kwangson Banking Corp. ("KKBC") under EO 13,382 for providing financial services in support of both Tanchon Commercial Bank and Korea Hyoksin Trading Corporation, both of which were previously identified by the President as WMD proliferators. All three entities had been designated by the UN pursuant to UN Security Council Resolution 1718 for their roles in North Korea's WMD and missile programs. At the time of the designation, the Department of the Treasury Under Secretary for Terrorism and Financial Intelligence stated, "North Korea's use of a little-known bank, KKBC, to mask the international financial business of sanctioned proliferators demonstrates the lengths to which the regime will go to continue its proliferation activities and the high risk that any business with North Korea may well be illicit."

15.     On March 11, 2013, the Department of the Treasury designated the Foreign Trade Bank ("FTB"), North Korea's primary foreign exchange bank, pursuant to EO 13,382, for providing financial services that assisted in the proliferating of WMD. In the designation, Treasury stated, "North Korea uses FTB to facilitate transactions on behalf of actors linked to its proliferation network, which is under increasing pressure from recent international sanctions. . . . By designating FTB, the Treasury Department is targeting a key financial node in North Korea's WMD apparatus and cutting it off from the U.S. financial system. FTB is a state-owned bank established in 1959. FTB acts as North Korea's primary foreign exchange bank and has provided key financial support to [KKBC]."

16.     On March 15, 2016, the President, to take additional steps with respect to the previously described national emergency, issued EO 13,722 to address the Government of North

Korea's continuing pursuit of its nuclear and missile programs. Pursuant to that authority, on March 16, 2016, the Secretary of the Treasury promulgated the "North Korea Sanctions Regulations." *See* 31 C.F.R. § 510.101 *et seq*. EO 13,722 and the North Korea Sanctions Regulations prohibit the export of financial services from the United States or by any U.S. person to North Korea, unless exempt or authorized by OFAC. Under these orders, U.S. financial institutions were barred from providing correspondent banking services to North Korea entities.

17.     EO 13,466 and 13,722, and North Korea Sanctions Regulations also prohibited any transaction by any U.S. person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in these regulations.

### D.     Bank Secrecy Act

18.     Foreign financial institutions maintain U.S. dollar bank accounts ("correspondent accounts") at banks in the United States ("correspondent banks"). Correspondent accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions, such as currency conversions, related to such foreign financial institution. *See* 31 C.F.R. § 1010.605. Correspondent banks serve to support international wire transfers for foreign customers in a currency that the foreign customer's overseas financial institution normally does not hold on reserve, such as U.S. dollars, and to conduct currency conversions to/from U.S. dollars. It is through these correspondent accounts that the funds used in U.S. dollar transactions clear and/or are converted into other currencies.

19.     According to the U.S. Department of the Treasury, the global financial system relies on correspondent banking relationships. Nearly all U.S. dollar wire transactions conducted by foreign financial institutions are processed through correspondent bank accounts held in the United

States. Foreign financial institutions include not only banks, but also dealers of foreign exchange and money transmitters. *See* 31 C.F.R. § 1010.605(f).

20.     The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures to ensure that correspondent bank accounts established by foreign financial institutions are not used to finance terrorism or to avoid sanctions programs administered by OFAC.

21.     The Treasury Department's Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system. The Bank Secrecy Act gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns. *See* USA PATRIOT Act § 311, codified at 31 U.S.C. § 5318A. One such special measure imposed under Section 311 protects the integrity of the U.S. financial system by prohibiting financial institutions from causing U.S. financial instructions to engage in any type of financial transaction with any entity within the jurisdiction deemed an area of money laundering concern.

22.     In June 2016, FinCEN determined that the entire North Korean financial sector was a primary money laundering concern. Federal Register, Vol. 81, No. 107 (June 3, 2016). On November 9, 2016, FinCEN implemented a special measure, barring all U.S. financial institutions from maintaining a correspondent bank account for any North Korean financial institution or any party acting on its behalf. A second special measure required U.S. financial institutions to exercise "enhanced due diligence" and take reasonable steps to not process transactions for correspondent accounts of foreign financial institutions in the United States if such transaction involved a North Korean financial institution. In effect, FinCEN barred all North Korean financial institutions and entities acting on their behalf from engaging in U.S. dollar transactions through correspondent

banking transfers in the United States. Failure to comply with the special measure resulted in civil and criminal penalties for U.S. financial institutions.

23.     As a result of the North Korea Sanctions Regulations, the FinCEN 311 action, and overall risk management, correspondent banks refused to knowingly process any U.S. dollar wire transactions involving entities in North Korea.

**E.     Money Laundering**

24.     18 U.S.C. § 1956(h) criminalizes a conspiracy to violate § 1956.

25.     18 U.S.C. § 1956(a)(2)(A) (the international promotional money laundering statute) criminalizes transporting, transmitting, and transferring, and attempting to transport, transmit, and transfer a monetary instrument or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity.

26.     Pursuant to 18 U.S.C. § 1956(c)(7)(A), the term "specified unlawful activity," includes violations of 18 U.S.C. § 1344 (relating to bank fraud).

27.     Pursuant to 18 U.S.C. § 1956(c)(7)(D), the term "specified unlawful activity," includes violations of IEEPA.

28.     As noted above, U.S. financial institutions are barred, pursuant to the section 311(a) special measure, from engaging in financial transactions with North Korean financial institutions. As the FinCEN finding noted, North Korea makes "extensive use of deceptive financial practices, including the use of shell and front companies to obfuscate the true originator, beneficiary, and purpose behind its transactions," in part "to evade international sanctions." *See* Federal Register, Vol. 81, No. 217 at 78716, 78718. Your affiant is aware that North Korean entities have attempted to circumvent the section 311(a) ban by using foreign front companies to engage in financial transactions on their behalf. These financial transactions would be in violation of 22 U.S.C. § 9214,

if the parties openly acknowledged the involvement of the North Korean entities. Instead, the true North Korean counterparties to these transactions remain concealed in order to allow the U.S. dollars to be processed. This constitutes wire fraud, as the false transactions occur via wire, and are done in part to defraud the Treasury Department, which has forbidden such transactions. This also constitutes bank fraud, as the false transactions occur , in part, to defraud U.S. financial institutions, which are barred from conducting such transactions and could face civil and criminal penalties for not detecting these transactions. But for this scheme to defraud, the North Korean entities would not be able to gain property and funds in question, totaling millions of dollars.

29.     One of the primary means U.S. financial institutions use to comply with national anti-money laundering procedures is through regular consultation of listings of designated parties, to include OFAC's SDN list. OFAC's SDN list contains a number of persons (individuals and entities) designated under various North Korean sanctions programs.

30.     Based on my training and experience, I am aware that North Korean financial facilitators are aware of these designation lists and that U.S. financial institutions are obligated to conduct due diligence of their clients, in an attempt to prevent sanctioned parties from transacting in U.S. dollars. In turn, these North Korean entities have a documented practice of using front companies to avoid the imposition of designations and blockings, which may occur pursuant to IEEPA. These opaque U.S. dollar transactions by front companies promote IEEPA violations.

F.      **North Korea Banking and Use of Front Companies**

31.     The North Korean financial sector is comprised of state-controlled financial institutions that use "front companies to conduct international financial transactions that support the proliferation of WMD and the development of ballistic missiles in violation of international and U.S. sanctions," and are subject to "little or no bank supervision or anti-money laundering or combating the financing of terrorism controls." 81 Fed. Reg. at 78,715.

32.     The United Nations Panel of Experts found that once North Korea could register a front company without overt links to the country through the assistance of foreign nationals, it became significantly easier for its firms to pass rudimentary due diligence checks by financial institutions and open and maintain bank accounts.

33.     North Korean entities used front companies to pay their counterparties in U.S. dollars. The use of front companies and stripping material information, such as the true counterparties to the transaction, from wire transfer instructions influence the decision making of the correspondent banks into processing transactions that they otherwise normally would not, and thus constitutes bank fraud.

G.      **North Korean Tobacco Market**

34.     North Korea has been engaged in the production and trafficking of counterfeit cigarettes since 1992. Such trafficking is in part for the purpose of advancing procurement and financial activity for the benefit of the DPRK's WMD programs in contravention of U.S. prohibitions on such activity. According to the 2015 U.S. Department of State report titled The Global Illicit Trade in Tobacco: A Threat to National Security, cigarette smuggling "fuels transnational crime, corruption, and terrorism." I know from prior investigations that cigarettes—

especially counterfeit cigarettes—may be one of North Korea's largest single sources of hard currency revenue.

V.      **FACTS ESTABLISHING PROBABLE CAUSE**

    **A.      Summary of Scheme**

35.     From at least on or about February 2009 until on or about March 2019, JIN, COCONSPIRATOR 1, COCONSPIRATOR 3, and others known and unknown, engaged in a conspiracy to commit bank fraud by, among other things, using multiple front companies to purchase tobacco products from Company 1 and other goods for North Korean customers. The co-conspirators used false shipping records to smuggle tobacco and other goods into North Korea, and front companies to launder related U.S. dollar payments for these shipments. In so doing, the co-conspirators deceived correspondent banks in the United States, who would not have otherwise processed these transactions had they known about the nexus to North Korea.

36.     Additionally, from on or about March 15, 2016, until on or about March 14, 2019, JIN, COCONSPIRATOR 1, COCONSPIRATOR 3, and others known and unknown, engaged in a conspiracy to violate U.S. sanctions barring trade with North Korea, and did violate those sanctions, by purchasing tobacco from Company 1 and other products, and reselling the same to North Korean customers, all in U.S. dollars. Indeed, the coconspirators discussed ways of circumventing the sanctions to allow the trade to continue, including the use of false shipping records and front companies.

37.     Specifically, the coconspirators executed the conspiracy by:

        a.     JIN, COCONSPIRATOR 1, and COCONSPIRATOR 3 operated and ran a series of companies under the name of "Winney" ("the WINNEY ENTITIES"). The WINNEY ENTITIES brokered sales of products for

North Korean customers. JIN and COCONSPIRATOR 1 ran the companies and COCONSPIRATOR 3 was employed by the companies.

b.  According to bank records, from in or about November 2008 to in or about April 2019, the WINNEY ENTITIES operated at least eleven bank accounts as part of this scheme (the "WINNEY BANK ACCOUNTS"). During that time period, the WINNEY BANK ACCOUNTS were involved in approximately 336 U.S. dollar transactions totaling approximately $84,300,000. The WINNEY BANK ACCOUNTS originated approximately 263 U.S. dollar transactions totaling approximately $54,000,000 and received approximately 73 U.S. dollar transactions totaling approximately $30,300,000.

**B.    Individuals and Entities**

38.    JIN is a Chinese national from Liaoning Province in China. JIN is believed to currently reside in Australia.

39.    COCONSPIRATOR 1 is a Chinese national from Liaoning Province in China. COCONSPIRATOR 1 is believed to currently reside in China.

40.    COCONSPIRATOR 3 is a Chinese national from Liaoning Province in China. COCONSPIRATOR 3 is believed to currently reside in the United Arab Emirates.

41.    The WINNEY ENTITIES include eight corporate entities operated by JIN, COCONSPIRATOR 1, and COCONSPIRATOR 3.[1]  According to corporate registry records, JIN

---

[1]  Based on my training and experience, I know that using companies in multiple countries with frequent name changes is common practice for entities attempting to avoid detection by law enforcement. Legitimate businesses typically work to establish a corporate brand, which then has an attendant reputation. Frequent name changes prevent the establishment of a brand or reputation.

and COCONSPIRATOR 1 are the beneficial owners/principal shareholders of the relevant WINNEY ENTITIES, and COCONSPIRATOR 3 has acted as a representative for several of the WINNEY ENTITIES.

    i.    Winney Entity 1 was registered in New Zealand in 2008. According to bank records, the majority of Winney Entity 1's incoming U.S. dollar wire transfers were from documented North Korean front companies.

    ii.    Winney Entity 2 was registered in England in 2013. According to bank records, in 2013 Winney Entity 2 began sending and receiving U.S. dollar correspondent account wire transfers. Winney Entity 2 used addresses in China, Hong Kong, and the United Kingdom as part of these transactions. The Hong Kong address used by Winney Entity 2 matched an address previously used by Winney Entity 1. According to bank records, as with Winney Entity 1, the majority of Winney Entity 2's incoming U.S. dollar wire transfers were from documented North Korean front companies.

    iii.    Winney Entity 3 was registered in China in 2013. According to bank records, Winney Entity 3 was used on a limited basis, but also received U.S. dollar correspondent account wire transfers from at least one documented North Korean front company. The address for Winney Entity 3 on these bank records was the same office building as a now-sanctioned North Korean front company in Dandong, China.

    iv.    Winney Entity 4 was registered in UAE in 2017.

---

JIN, COCONSPIRATOR 1, and COCONSPIRATOR 3 operated under variations of the "Winney" name for several years, but eventually changed their company names completely.

> v. Winney Entity 5 was registered in UAE in 2017.
>
> vi. Winney Entity 6 was registered in UAE in 2019 as a successor to Winney Entity 4. According to email records in HAN's and COCONSPIRATOR 2's email account, in 2019, Winney Entity 4 changed its name to Winney Entity 6.
>
> vii. Winney Entity 7 was registered in UAE in 2019 as a successor to Winney Entity 5. According to email records in HAN's and COCONSPIRATOR 2's email account, in 2019, Winney Entity 5 changed its name to Winney Entity 7.
>
> viii. Entity 8 was registered in Ganzhou, China in 2017.

42. Company 1 is an international tobacco company located outside of Asia that sold tobacco to WINNEY ENTITIES between February 2009 and March 2019. Business records of Company 1 show Company 1's business with WINNEY ENTITIES. These documents reveal that Company 1's goods first shipped to Dalian, China, and the goods were subsequently sent to North Korea.[2]

## C. Evidence of Knowledge

43. JIN was aware that sanctions and bank regulations prohibited his companies from transacting for the benefit of North Korean customers in U.S. dollars without a license.

44. According to email records from JIN's email account, on January 3, 2019, JIN received a copy of the WINNEY ENTITIES "2018 work summary," which was addressed to JIN as "president." The document discussed a "challenging year for the development of trade with the DPRK [North Korea]." It further noted that WINNEY ENTITIES had "respond[ed] to

---

[2] Based on my training and experience, such transshipment of goods is a common practice to avoid sanctions, and Dalian, China is a major smuggling point for goods entering North Korea due to the ability of North Korean-bound goods to go relatively undetected as Dalian has a very high volume of shipments clearing the port every day.

international sanctions" and the increase in shipping costs dating back to May 2018. The summary concluded by praising "the wise decisions and correct leadership of the two leaders of the company [JIN and COCONSPIRATOR 1]" and noting the business decisions that "gradually returned to the right track," including moving the operations to Dubai.

45.     JIN knew about WINNEY ENTITIES' North Korean business. For instance:

- Shipping records obtained from Company 1 show that WINNEY ENTITIES and Company 1 engaged in business in 2013 to supply North Korean Tobacco Company 1 ("NKTC1"), a North Korean tobacco company that banks with FTB. NKTC1's North Korean business address was listed on the shipping documents.

- On December 24, 2018, JIN received an e-mail from a WINNEY ENTITIES' employee with an invoice related to a shipment being handled by WINNEY ENTITIES. The recipient of the goods was listed as an entity discovered in the investigation to be based in North Korea and showed that the goods were being shipped from Dalian, China to "Nampo, DPRK." (This is the second half of the shipping transaction that is not seen in paperwork given to financial institutions, in order to obscure the final destination of the goods involved.) The invoice was for $220,000. The packing list for the order stated that the goods that will be shipped to "Nampo, North Korea."

- On December 28, 2018, JIN received an e-mail from a WINNEY ENTITIES' employee with an attachment that tracked roughly six months of business between WINNEY ENTITIES and one of their North Korean customers. The spreadsheet shows that over that six-month period, WINNEY ENTITIES sold roughly $28,000,000 of goods, mostly tobacco products, to the North Korean entity.

- JIN was also knowledgeable about WINNEY ENTITIES' use of KKBC, the sanctioned North Korean bank. On February 17, 2019, JIN received an email from a WINNEY ENTITIES' employee with the subject of the email translated as "Create Account Information." Two of the documents attached to this email were blank power of attorney forms. One of the other attachments was an account opening application for a bank account at KKBC.[3]

---

[3]  This was roughly ten years after KKBC was sanctioned. According to my experience gained in similar sanctions evasion schemes, a foreign entity would establish a bank account at a North Korean bank, such as KKBC or FTB, in order to allow those North Korean banks to be able to deposit trade settlement funds directly into these bank accounts. The funds could then be moved at a later point by WINNEY ENTITIES' employees in manners such as bulk cash smuggling.

D.      **Payments to WINNEY ENTITIES from DPRK**

46.      During the relevant time period, the WINNEY ENTITIES received payments from known DPRK front companies.

47.      Dandong Hongxiang Industrial Development ("DHID") was a Chinese front company that between August 2009 and August 2016 laundered hundreds of millions of dollars for KKBC, after KKBC's designation in August of 2009, which led to a criminal indictment in the District of Columbia. *See generally* Case No. 2:19-cr-00514 (D.D.C.). As alleged in the indictment, DHID and its related entities received goods, such as coal, from North Korea. In lieu of paying North Korea for these goods, KKBC directed DHID to pay third parties in U.S. dollars for commodities that North Korea wanted to obtain. On September 26, 2016, the OFAC sanctioned DHID and also noted DHID acted on behalf of KKBC.

48.      According to bank records, between April 2012 to January 2016, DHID and its front companies wired the WINNEY ENTITIES approximately $17,789,857. As described herein, your Affiant believes there is probable cause that these payments were in reference to North Korean transactions, including transactions related to Company 1's sales, as described further herein.

| Date | Originator | Beneficiary | Amount |
|------|------------|-------------|--------|
| 12/02/09 | DHID Front Company 1 | Winney Entity 1 | $206,506.00 |
| 12/28/09 | DHID Front Company 1 | Winney Entity 1 | $231,238.02 |
| 12/28/09 | DHID Front Company 1 | Winney Entity 1 | $43,809.00 |
| 12/28/09 | DHID Front Company 1 | Winney Entity 1 | $128,609.91 |
| 12/30/09 | DHID Front Company 1 | Winney Entity 1 | $32,998.10 |
| 01/08/10 | DHID Front Company 1 | Winney Entity 1 | $626,309.27 |
| 01/20/10 | DHID Front Company 1 | Winney Entity 1 | $197,139.43 |
| 01/20/10 | DHID Front Company 1 | Winney Entity 1 | $91,492.16 |
| 02/25/10 | DHID Front Company 1 | Winney Entity 1 | $252,323.00 |
| 02/25/10 | DHID Front Company 1 | Winney Entity 1 | $253,694.00 |
| 02/26/10 | DHID Front Company 1 | Winney Entity 1 | $63,919.00 |
| 03/02/10 | DHID Front Company 1 | Winney Entity 1 | $101,317.00 |

| | | | |
|---|---|---|---|
| 03/18/10 | DHID Front Company 1 | Winney Entity 1 | $602,568.00 |
| 06/01/10 | DHID Front Company 1 | Winney Entity 1 | $113,920.00 |
| 08/23/10 | DHID Front Company 2 | Winney Entity 1 | $51,958.00 |
| 10/21/10 | DHID Front Company 2 | Winney Entity 1 | $818,986.50 |
| 04/23/12 | DHID | Winney Entity 1 | $1,607,534.00 |
| 06/13/12 | DHID | Winney Entity 1 | $1,132,871.00 |
| 04/25/13 | DHID | Winney Entity 1 | $1,838,712.00 |
| 06/03/13 | DHID | Winney Entity 1 | $1,499,984.20 |
| 06/07/13 | DHID | Winney Entity 1 | $1,006,538.00 |
| 11/01/13 | DHID Front Company 3 | Winney Entity 2 | $999,998.00 |
| 11/04/13 | DHID Front Company 3 | Winney Entity 2 | $546,532.00 |
| 02/25/14 | DHID | Winney Entity 2 | $2,693,825.00 |
| 05/19/14 | DHID | Winney Entity 1 | $799,994.00 |
| 05/19/14 | DHID | Winney Entity 1 | $799,994.00 |
| 08/12/14 | DHID Front Company 4 | Winney Entity 1 | $5,200.00 |
| 11/05/14 | DHID Front Company 4 | Winney Entity 1 | $33,082.00 |
| 01/21/15 | DHID Front Company 4 | Winney Entity 1 | $41,952.00 |
| 04/28/15 | DHID Front Company 5 | Winney Entity 1 | $57,238.00 |
| 05/20/15 | DHID Front Company 4 | Winney Entity 1 | $29,854.00 |
| 09/29/15 | DHID Front Company 5 | Winney Entity 1 | $209,982.00 |
| 10/22/15 | DHID Front Company 4 | Winney Entity 1 | $49,797.00 |
| 01/11/16 | DHID Front Company 4 | Winney Entity 3 | $619,982.00 |
| | | | $17,789,856.59 |

### E.      WINNEY ENTITIES' Tobacco Procurement

#### 1. Purchases of Company 1's Tobacco Products

49.      Bank records and business records of Company 1 show that between February 2009 and March 2019, WINNEY ENTITIES procured tobacco products for North Korean customers from Company 1. During this time period, Company 1 received at least $42 million in wire transactions with WINNEY ENTITIES, all of which were processed in U.S. dollars. Between February 2009 and May 2016, Company 1's bills of lading typically listed a North Korean buyer. From May 2016 until March 2019, references to North Korea were removed from the bills of lading, However, the goods were all shipped to Dalian, China, a known point of smuggling for goods to North Korea. Thus, your affiant believes that most, if not all, of the $42 million in wire

transactions between Company 1 and WINNEY ENTITIES during this time period were related to sales to North Korea.

50.    According to banking records and business records of Company 1:

- *Winney Entity 1.* Analysis of bank records from February 2009 to December 2017 show that roughly 85% of Winney Entity 1's outgoing U.S. dollar correspondent account wire payments related to purchasing tobacco from Company 1 as listed on the wire transfer memorandums.

- *Winney Entity 2.* According to bank records, as with Winney Entity 1, the majority of Winney Entity 2's outgoing U.S. dollar wire transfers were to Company 1 for tobacco purchases, as listed on the wire transfer memorandums, and related incoming transfers from documented North Korean front companies.

51.    Company 1's employee, CS-1,[4] a senior executive who worked for Company 1 during the relevant time period, stated that the WINNEY ENTITIES were controlled by COCONSPIRATOR 3 and JIN. CS-1 met with COCONSPIRATOR 3 and JIN on different occasions.

52.    Company 1's records related to the Company 1's business dealings with WINNEY ENTITIES between February 2013 and March 2019 show:

- Bills of lading and invoices from WINNEY ENTITIES dated between February 2013 and March 2019 listed Dalian, China, as the destination of the goods purchased.

---

[4]    The information received from CS-1 is corroborated by bank and e-mail records obtained in this investigation.

- In early 2013, the invoices listed NKTC1 as a consignee, or buyer, of Company 1 products. NKTC1's address in North Korea was also listed on the invoices. From prior investigations, I know that NKTC1 is a North Korean state-owned tobacco company that conducts financial transactions through and with the FTB.

- A Company 1 invoice dated September 18, 2014, for a purchase of tobacco from Company 1 by WINNEY ENTITIES, listed the destination as Dalian, China, and the invoice amount as $365,904. The consignee of the goods was listed as NKTC1 with an address in "Pyongyang, D.P.R.K (Democratic People's Republic of Korea)." This shipment was covered under a two-year contract between WINNEY ENTITIES and Company 1 worth approximately $9,000,000 and the contract specifies payment terms in U.S. dollars. Bank records show that on March 25, 2013, WINNEY ENTITIES made a payment to Company 1 that transited a U.S. bank in New York totaling approximately $1,047,103.20. CS-1 confirmed this payment was associated with the shipment being discussed.

53.    Additionally, CS-1 provided information about how the WINNEY ENTITIES attempted to evade North Korean Sanctions. CS-1 stated that the WINNEY ENTITIES used multiple different shipping companies from 2014 to 2015. CS-1 also stated that the WINNEY ENTITES were responsible for all the information listed on the bills of lading. For instance, in March 2016, instead of listing NKTC1 as the consignee, the WINNEY ENTITIES began listing a new consignee that your Affiant knows was later investigated for smuggling goods into North Korea. This change in practice coincided with the March 2016 imposition of country-wide sanctions on North Korea by the U.S. government. According to CS-1, the WINNEY ENTITIES

were responsible for changes on the bills of lading, which removed all references of North Korea from vital shipping documents.

## 2. Bank Transactions Related to DPRK Tobacco Procurement

### *Payments from DHID Front Company 6 to Company 1*

54.    Company 1 records show that WINNEY ENTITIES purchases of Company 1's products was facilitated by the use of DHID Front Company 6. In 2013, Company 1 made various shipments to North Korean customers that were brokered by WINNEY ENTITIES, for which Company 1 was paid by DHID Front Company 6.

- From February 25, 2013, to June 13, 2013, Company 1 sent five shipments for DHID Front Company 6, located in Hong Kong. On the bill of lading, the Consignee is listed as DHID Front Company 6 with the word "Korea" in front of the company name and an address in Shenyang, China. According to British corporate business registration documents, DHID Front Company 6 was incorporated in England in September 2006 by DHID's CEO.[5]

---

[5] Through a separate investigation, I know that DHID Front Company 6 was used to make a payment to a British tobacco company. Based on my review of bank and email records in that case, there is probable cause to believe that DHID Front Company 6 was used as a front company by DHID to aid KKBC in their attempts to process U.S. dollar transactions while being sanctioned by the U.S. government. For example, in a similar tobacco scheme involving a different international tobacco company that sold tobacco to North Korea, DHID made several payments to the company for tobacco that was shipped to North Korea. At times, DHID would move funds from an associated front company, evidenced by the registered agents, to make a payment for DHID. DHID Front Company 6 was one of the front companies used to pay this company for tobacco as they were used in this case.

Your affiant notes that the use of front companies is common with North Korean transactions. DHID itself was being used as a front company for North Korea, but to help hide the true number of transactions that DHID was performing, DHID would make and use its own front companies. This practice would cause US banks, that would not realize the front company

- All shipping documents related to these sales listed Dalian, China as the final destination of the goods. As stated, Dalian is a known hub for transshipment of goods to North Korea.

- Company 1 showed the bills associated with the goods delivered for DHID Front Company 6 were $593,406. DHID Front Company 6 and another front company established by DHID/KKBC ("DHID Front Company 7"), combined to make six payments to Company 1 totaling $593,370 between January 25, 2013, and August 8, 2013. Payments associated with these five shipments transited the U.S. financial system, as follows:

| Date | Originator | Beneficiary | Amount |
|------|-----------|-------------|--------|
| 01/25/13 | DHID Front Company 6 | Company 1 | $35,604.36 |
| 03/15/13 | DHID Front Company 7 | Company 1 | $83,058.84 |
| 04/11/13 | DHID Front Company 6 | Company 1 | $118,681.20 |
| 05/23/13 | DHID Front Company 7 | Company 1 | $118,663.20 |
| 06/21/13 | DHID Front Company 6 | Company 1 | $118,681.20 |
| 08/08/13 | DHID Front Company 6 | Company 1 | $118,681.20 |
| | | | $593,370.00 |

*Purchases of Company 1's Products for North Korean Trade Company 2*

55.     Emails of JIN showed that WINNEY ENTITIES brokered sales of Company 1's tobacco product for a North Korean buyer, North Korean Trade Company 2 ("NKTC2"). Open-source information shows that NKTC2 was a state-owned entity that is operated by North Korea's

---

relationship, to not have the full financial activity of DHID and would cause less of a spotlight to be shined on DHID for higher volumes of financial activity.

Ministry of People's Armed Forces and tasked with producing North Korean cigarettes. In 2016, two different subordinates of the Ministry of Peoples Armed Forces were sanctioned by OFAC. Both entities had ties to North Korea's nuclear and ballistic missile programs.

56.     On July 2, 2019, a WINNEY ENTITIES employee emailed JIN a chart of historical payments and amounts paid to NKTC2's suppliers by WINNEY ENTITIES and related companies. The chart reflected as follows:

| № | Remittance Date | Amount Received (USD) | Beneficiary | Note |
|---|---|---|---|---|
| 1 | 2019/3/14 | 144,343.62 | AG | 3/14지불한USD250,000$중에서USD105,656.38$는 종전건 확인서<N19-0327-1Y> USD1,385,750.4$에 포함하며  USD144,343.62$는  이번건에  포함 |
| 2 | 2019/3/24 | 220,000.00 | AG | 은행에  걸림,  실제접수못했음 |
| T3 | 2019/4/9 | 254,000.00 | HK | |
| 4 | 2019/4/22 | 260,000.00 | HK | |
| 5 | 2019/4/30 | 67,500.00 | Dubai | |
| 6 | 2019/5/6 | 14,701.00 | HK | HK$ 115,500.00로 접수함 |
| 13 | 2019/5/10 | 120,346.00 | HK | HK$ 945,000.00로 접수함 |
| 14 | 2019/5/14 | 295,400.00 | HK | |
| 15 | 2019/5/20 | 120,933.18 | HK | 5/20지불한USD320,934$중에서USD120,933.18 $는 이번건에  포함하며USD200,000.82$는 다음건USD1,811,577.12$에  포함할것 |

57.     Bank records show that the above payments routed through United States financial institutions via a series of front companies, including:

- *Payment No 1.* The note for the payment indicates that this payment was part of a larger U.S. dollar transfer, stating: "From 250,000 USD payment made on 3/14, 105,656.38 USD is part of the previous confirmation <N19-0327-1Y> 1,385,750.40 USD, and 144,343.62 USD is for this one." Bank records matched this information to a payment made to Company 1 (identified in the chart as "AG") by a front company ("Front Company A"). Bank records show that Front Company

A made six payments to Company 1 from January to March of 2019 totaling $1,460,300.

- *Payment No. 2.* The note states that the payment was stopped by the bank and that Company 1 failed to receive it. Bank records show that a payment of $220,000 from Front Company B to Company 1 was stopped by a U.S. correspondent bank on April 3, 2019.

### F.      WINNEY ENTITIES' Helicopter Procurement

58.     In March 2019, WINNEY ENTITIES procured a Russian helicopter for North Korean customers. Specifically, on March 1, 2019,

- A Russian-based email address sent five documents to an intermediary.

- The intermediary thereafter forwarded the documents to Email Account 1, used by a suspected FTB employee, the same day.

- Email Account 1 forwarded the documents to COCONSPIRATOR 3 approximately one hour later.

59.     The documents forwarded from Email Account 1 to COCONSPIRATOR 3 on March 1, 2019, all related to a helicopter purchase by the WINNEY ENTITIES.

- One document, a 2018 sales contract, states that the helicopter was purchased by Company 2. The contract further states that a "partner" of the buyer, a third party ("Company 3") in Hong Kong, would fund the purchase of the helicopter for $424,000.

- Another document, a sales contract dated February 1, 2019, sent to COCONSPIRATOR 3 on March 1, 2019 showed the helicopter was subsequently sold from Company 2 to Winney Entity 5. The contract stated the helicopter was

located in Khabarovsk, Russia and would be delivered to a port in North Korea. The contract listed a price of $300,000 that would be paid in advanced. COCONSPIRATOR 1 was listed on the contract as the representative for Winney Entity 5.

60.     On March 4, 2019, Email Account 1 received an e-mail with the subject line "FW: Sign contract." There was no content in the e-mail body, but attached were two pages of a loan contract.

- The first page showed that an individual was being named as a lender and that a law firm located in Zimbabwe was listed as the borrower of funds. The amount of the loan was $300,000, which is the amount the helicopter was purchased for later that month. The lender agreed to move the funds to the Zimbabwe law firms' bank account.

- The second page of the contract stated, "Upon receipt to above account, the Borrower transfer the designated amount after deducting 9.5% of deposited amount to the below account of the Lender within 24 hours." The account listed as the end destination of the funds belongs to Winney Entity 5.

- The loan contract was signed by both the lender and the borrower.

61.     Based on the aforementioned documents, it appears that the WINNEY ENTITIES, with assistance from FTB employees, procured for North Korea a helicopter and that U.S. dollar funds were sent via a U.S. correspondent banking account from a Zimbabwean law firm to a WINNEY ENTITY as the payment for the same.

G.      **Undercover Communications with WINNEY ENTITIES**

62.      At the request of law enforcement, Company 1 introduced an undercover agent (UCA-1) into their communications with COCONSPIRATOR 3 and JIN. UCA-1 was provided contact information in order to communicate with JIN and COCONSPIRATOR 3 on Company 1's behalf. UCA-1 claimed to be an employee of Company 1 in these communications. On or around May 13, 2019, COCONSPIRATOR 3 (using the same contact information as that used with Company 1) telephonically discussed with UCA-1 the frozen funds. COCONSPIRATOR 3 informed UCA-1 that his "cigarette company" had attempted to prepay Company 1 for tobacco but the funds were stopped at the "intimidate bank" [sic]. COCONSPIRATOR 3 stated he was waiting for more than three months for his tobacco shipment from Company 1. UCA-1 told COCONSPIRATOR 3 he had a meeting with his banker and UCA-1 advised COCONSPIRATOR 3 that future payments to Company 1 needed to come from a new company. COCONSPIRATOR 3 indicated he could use different shipping companies to make the payment.

63.      On or around May 15, 2019, UCA-1 called COCONSPIRATOR 3 and informed him that JIN had sent a message to Company 1 and it was very "threatening." UCA-1 asked if JIN was his supervisor. COCONSPIRATOR 3 stated JIN was the "boss of Winney Tobacco."

64.      On or around May 16, 2019, COCONSPIRATOR 3 called UCA-1 and informed UCA-1 that "his boss [JIN]"was going to the city in which Company 1 is located in July to help resolve some of the problems Company 1 was having.

65.      On May 21, 2019, UCA-1 and UCA-2 conducted a telephonic call with JIN. UCA-2 acted as a Chinese translator for UCA-1 as JIN did not speak English. UCA-1 confronted JIN about his products going to North Korea which is what caused the bank freeze. JIN stated WINNEY ENTITIES had done business with North Korea 10 years prior but not recently. UCA-

1 tried to discuss prior conversations between Company 1 employees and JIN related to changing bills of lading but JIN continued with repeated denials of doing business with North Korea.

66.     On or around June 16, 2019, UCA-1 wrote JIN and stated "Mr. Jin Good evening, have you reviewed the contract that was sent to [COCONSPIRATOR 3]? Secondly, The price agreed, was increased due to the Banking problems that you have caused. Your company is flagged and our banker said it is because of Sanctions. The new company you sent is clear for now but I have to pay someone to check this before every wire transfer. This is a small price to pay for the very large risk. It is not profit it is going to our person inside the bank. This will be added to every order if you do not accept this then do not sign the contract and find another supplier. I have done everything I said I would. You have your products and your money. I am finished negotiating this if you don't want to pay then tell your Buyer this is the problem he caused and get the money from him. I will no longer keep negotiating with this."

67.     On or around June 16, 2019, JIN responded, "Mr. [UCA-1] Good morning, I had reviewed the contract from [COCONSPIRATOR 3], I don't agree with the terms of the price increase. Our cooperation is based on reciprocity, we believe that the business problems in your bank should be resolved by you, let us bear the related costs is unreasonable, we will not bear unreasonable costs. Best Regards, [JIN]."

68.     On or around July 11, 2019, UCA-1 met with JIN in the city in which Company 1 is located. UCA-1 told JIN that he wanted to continue doing business with WINNEY ENTITIES and JIN agreed. UCA-1 told JIN the bank freeze prompted the meeting. JIN responded, "No problem. Even though the account was frozen, if he wants to do business with us we have a lot of ideas." UCA-1 asked JIN to discuss his ideas.

- JIN stated that Company 1 had a company in Uruguay and suggested Company 1 could "register as a company and open a new account overseas such as in Dubai, Hong Kong or even Singapore." JIN continued, "These are the approaches we can do. It's not a problem."

- UCA-1 stated, "Okay, let's talk about something; first, we are all lying to the bank, we are committing fraud, right? And that is from both us and you guys. We are laundering money." JIN argued and said, "You are the ones committing fraud, I'm simply buying merchandise."

- UCA-1 stated they were committing fraud by giving documents to banks showing the merchandise was going to different countries. JIN responded, "I have no idea where the goods destination. I was in China and bought goods from them. I sold the goods to third party. I have no idea where the third-party sell."

- JIN stated that he was not violating any laws and asked, "why will do something violate the law?" UCA-1 asked if JIN was doing everything legal, why did he change to another company? Why couldn't they do business directly with Company 1 instead of using companies from Hong Kong, Dubai, or Uruguay?

- UCA-1 stated that Company 1's bank account was frozen because the bank found out the source of the money was illegal. UCA-1 asked JIN to explain how to avoid future bank freezes. JIN stated, "So I said you don't have firewall. If you wire money directly to Company 1 account, that'll cause problem easily. Why? It's not because of money laundering, not because of North Korea government problem. Its large amount of money transfer triggering the suspicion of money laundering from US government. Why they investigated [Company 1] account then ok now?

Because they cleared the wrongdoing." JIN continued, "Don't you want to continue to do business with us? Then we can avoid the investigation by setting up another company in between.

- UCA-1 told JIN he guessed the Americans started to ask questions which is why they were in the current situation. JIN responded, "My biggest concern is where the goods will end up, meaning its final destination. The US will surely investigate that. In fact, it has nothing to do with me whether I violate Argentina's law or not. I do not have any problem with that. The fact is that the US has been investigating, so it is necessary to guard against the US side." JIN again argued his business was "legal."

- UCA-1 wanted JIN to recap how they intended on solving their problems. JIN stated, "It's very simple. I wire fund to you to buy your goods. If you think WINNEY ENTITIES is too popular, we can find another company to buy your good. Let's simplify the situation." UCA-1 and JIN agreed to continue business but wanted to execute two to three smaller contracts to make sure there were no additional problems.

69.     A week after the meeting with UCA-1, JIN, and COCONSPIRATOR 3, UCA-2 wrote a detailed message to JIN, in Chinese, about the illicit nature of the work that Company 1 and WINNEY ENTITIES would be entering into and explained all of the risks involved in the transactions, including U.S. and UN sanctions violations. JIN did not respond to this message.

## VI.    CONCLUSION

70.     Based on facts described above, there is probable cause to believe that JIN Guanghua and co-conspirators known and unknown, have committed violations of 18 U.S.C. § 371

(Conspiracy), 18 U.S.C. § 1344 (Bank Fraud), 31 U.S.C. § 5322 (The Bank Secrecy Act), 50

U.S.C. § 1705 (IEEPA), and 18 U.S.C. §§ 1956(a)(2)(A) and (h) (Money Laundering).

_____
Joy Gallante
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to
before me this 22nd day of August, 2022

_____
The Honorable Robin M. Meriweather
Magistrate Judge for the District of Columbia