## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) No. 23CR91-CKK |
| | ) |
| GUANGHUA JIN. | ) |

### MOTION FOR A *FRANKS* HEARING AND TO SUPPRESS
### THE FRUITS OF EMAIL SEARCH WARRANT

Guanghua Jin, through counsel, hereby respectfully moves the Court, pursuant to Fed. R. Crim. Proc. 12(b)(3), and the Fourth Amendment to the United States Constitution, to order an evidentiary hearing and to issue a pretrial ruling barring the government from admitting evidence seized in connection with the execution of search and seizure warrant pertaining the email account "jinguanghua2014@gmail.com."

### BACKGROUND

At the end of 2019, FBI Agent Joy Gallante sought to seize and search the contents of five email accounts hosted by Google, including the account "jinguanghua2014@gmail.com." ("Target Account 1"). FBI Special Agent Joy Gallante swore out an affidavit setting forth the putative probable cause for the search of the foregoing email address, along with others. Ex. 1–Search Warrant Materials, at 15,[1] ¶1. The affidavit alleged that the investigation centered on potential violations of the International Economic Emergency Powers Act (IEEPA), in violation of 50 U.S.C. §§ 1701-1707, and money laundering statute, in violation of 18 U.S.C. § 1956. *Id.* at 19, ¶15. On December 10, 2019, the Honorable Robin M. Meriwhether approved the warrant. *Id.* at 2.

---

[1]     Page numbers referred to are those in the top right corner of the document.

In the search warrant affidavit, SA Gallante made a number of allegations with respect to

Cooperating Company 1[2]:

- "Cooperating Company 1 is a company that sells unrefined tobacco products." *Id.* at 20, ¶18.

- "Subpoena returns revealed that between 2009 and 2017, Cooperating Company 1 also conducted approximately $27 million in wire transactions with Winney International Trading Co. Ltd and Winney Trading (collectively "Winney"). Subsequent to U.S. correspondent banks freezing Cooperating Company 1's U.S. dollar transactions, Cooperating Company 1 agreed to meet with the government to account for these transactions." *Id.* ¶19.

- "Cooperating Company 1 provided bills of lading and invoices from Winney. From 2013 to 2016, Winney's bills of lading stated the ultimate customer for these sales were companies in North Korea, including the official North Korean state-owned business that manufactures cigarettes. In 2016, Winney changed its bills of lading to falsely reference sales to China and non- North Korean locations/customers." *Id.* ¶20.

- SA Gallante further averred that "Cooperating Company 1 further stated that Winney was represented by James Han and Jin Guanghua." *Id.* ¶21.

The search warrant affidavit presented evidence gathered during the course of the

government's undercover investigation, as follows:

"Undercover agents posing as Cooperating Company 1 employees subsequently began communicating with Winney." *Id.* ¶22. "In those conversations James Han (Han) and Jin Guanghua (Jin) discussed laundering payments via front companies." *Id.* ¶23.. In one correspondence, Jin described himself as the General Manager of Winney. Other documents describe Han as the director of Winney." *Id.* ¶24.

The affidavit then discussed a number of sanctioned entities and alleged that these

sanctioned entities engaged in millions of dollars of transactions with alleged "front companies"

---

[2]    Cooperating Company 1 is a company cooperating with the government in this matter. Based on information from the government, Cooperating Company 1 has asked not to be identified in these proceedings. For this reason, Cooperating Company 1 is not referred to by name. Furthermore, given the extent of redactions required to remove the name of Cooperating Company 1, its employees, and other identifying information from the exhibits, we have filed the exhibits under seal pending this Court's resolution of Cooperating Company 1's request for secrecy until this matter is resolved by the Court. Undersigned counsel anticipates opposing Cooperating Company 1's request for anonymity.

and that these transactions were processed through the U.S. financial system. *Id.* at 21-23, ¶¶26-29.

The affidavit then discussed the individual target accounts to be searched. As to Target Account 1, the affidavit averred that "[a]n undercover agent communicating with Winney asked Han for e-mail contact information for Jin, in order to have additional conversations about the illicit activity" and "Han provided Target Account 1 as the contact information for Jin." *Id.* at 23, ¶¶31-32. As evidence that the account was controlled by Mr. Jin, the affidavit further averred based on 18 U.S.C. § 2703(d) returns that the account was subscribed to by "JH Jin" and resolved to an address in Shenyang, China. *Id.* ¶33.[3] The affidavit then stated that based on § 2703(d) returns, the address corresponded with "multiple accounts with Chinese-based domains" and, specifically, that

> Target Account 1 communicated at least ten times between December 2018 and June 2019 with an account on a Chinese-based domain, which e-mail account is publically [sic] listed by multiple Chinese companies as their contact address. One such company using this address is Dandong Xinlu International Freight Forwarding Co. Ltd. (Xinlu). According to its website, Xinlu is a freight and shipping company located in Dandong, China. Xinlu's website publically [sic] advertises "...the company's business is based in North Korea... It provides services for many countries and cities in North Korea... The company's main business includes: North Korea, South Korea's import and export agent, transit cargo transport agent and trade, supervision of cargo transport... Our company has a special person in the railway to pick up the station, send the station, arrange goods from Dandong to Pyongyang railway express mail."

*Id.* ¶33

## ARGUMENT

A search warrant application must be supported by probable cause to believe that (1) a crime has been committed and (2) evidence of the crime would be found in the place to be

---

[3]     By contrast to Han, the government did not allege that Target Account 1 was accessed through use of a VPN. *See Id.* ¶41.

searched. *Zurcher v. Stanford Daily*, 436 U.S. 547, 554 (1978); *Illinois v. Gates*, 462 U.S. 213, 238-239 (1983); *see also United States v. Smith*, 1989 U.S. App. LEXIS 21468 at * 10 (4th Cir. No. 88-5026) ("the question before the magistrate is whether probable cause exists to believe that a crime has been committed and that evidence of the crime will be recovered.").

The Fourth Amendment applies to protect people from unreasonable searches and seizures. One test for determining whether the Fourth Amendment applies in a particular situation is the so-called "reasonable expectation of privacy test," which requires that: (1) the person has a subjective expectation of privacy in the place or thing searched; (2) and society is prepared to recognize that expectation of privacy as reasonable. *United States v. Katz*, 389 U.S. 347, 361(1967). Federal courts have concluded that the Fourth Amendment applies to email communications. *United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010) (individuals enjoy a reasonable expectation of privacy in emails). Given that the Fourth Amendment protects the content of email communications not shared with the public, the government needs a valid search warrant in order to search and seize information in his account. Thus, Mr. Jin has standing to contest the search and seizure warrant at issue. *Rakas v. Illinois*, 439 U.S. 128 (1978).

The Fourth Amendment provides that " . . . no warrants shall issue, but upon probable cause . . . and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. "The Supreme Court has described the assessment of probable cause for purposes of a search warrant as 'a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Wilkins*, 538 F. Supp. 3d 49, 90 (D.D.C. 2021) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76

4

L.Ed.2d 527 (1983)). "It is the duty of a reviewing court to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed." *Id.* (internal quotations omitted). "[A] conclusory legal allegation is insufficient to establish the existence of probable cause sufficient to support the issuance of a search warrant." *United States v. Rutherford*, 71 F. Supp. 3d 386, 392 (S.D.N.Y. 2014).

"When the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." *Franks v. Delaware*, 438 U.S. 154, 164-65 (1978) (internal quotation omitted). Where a defendant makes a preliminary showing that "a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 155-56.

In this context, material omissions are treated the same as false statements. *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008). *See also United States v. Locklear*, No. 7:12-CR-62-F-1, 2012 WL 5845459, at *2 (E.D.N.C. Nov. 19, 2012) ("omissions of potentially exculpatory information may warrant a *Franks* hearing if the omissions are '*designed to mislead, or . . . are made in reckless disregard of whether they would mislead.*'" (citing *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir.1990) (emphasis in original); *United States v. Owens*, 882 F.2d 1493, 1489–99 (10th Cir.1989); *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir.1986)).

"To exclude evidence under *Franks*, the defendant must meet two requirements. First, the defendant must establish by a preponderance of the evidence that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit. Second, with the affidavit's false material set to one side, the affidavit's

5

remaining content must be insufficient to establish probable cause." *United States v. Cardoza*, 713 F.3d 656, 658 (D.C. Cir. 2013) (cleaned up). In order to obtain a *Franks* hearing, the defendant must make a "substantial showing" that he could satisfy these standards through an "offer of proof." *United States v. Maynard*, 615 F.3d 544, 550 (D.C. Cir. 2010), *aff'd in part sub nom. United States v. Jones*, 565 U.S. 400 (2012).

Here, the false statements and material omissions in the search warrant affidavit easily amount to a substantial showing, and compel a *Franks* hearing.

## I.    THE SEARCH WARRANT AFFIDAVIT CONTAINED FALSE STATEMENTS AND MATERIAL OMMISSIONS, REQUIRING A *FRANKS* HEARING.

The affidavit in support of the search warrant of Target Account 1 contains numerous false statements and material omissions. Without these statements, there would have been no probable cause on which to authorize the search of Target Account 1. A *Franks* hearing is necessary to develop these facts, and will show that the evidence from Target Account 1 must be suppressed.

### 1.  False statements and material omissions regarding Cooperating Company 1.

#### a.  *Cooperating Company 1's strong financial motive to curry favor with the government.*

The affidavit presents Cooperating Company 1 innocuously as agreeing to meet with the government "[s]ubsequent to U.S. correspondent banks freezing Cooperating Company 1's U.S. dollar transactions . . . to account for these transactions." Ex. 1, at 20, ¶19. The government's report of its May 1, 2019 meeting with Cooperating Company 1 at the United States Attorney's Office tells a different story. Ex. 2–FD-302 meeting on 5-1-2019. The employee representing Cooperating Company 1 was accompanied by attorneys at the meeting. The employee explained that the company was undergoing "extreme difficulties" due to the US government's freezing of

6

its funds, and was meeting with the DOJ to "propose[] the potential release of the $1.9 million from [a US tobacco company]." *Id.* at 2. Cooperating Company 1 "estimated that [it] faced default within the next two weeks without some kind of resolution between [Company 1] and DOJ." *Id.* The employee elaborated on his company's dire financial situation to DOJ, noting that

[Cooperating Company 1's] inability to conduct dollar transactions had prevented [Cooperating Company 1] from receiving approximately $11 million dollars. Of that $11 million, approximately $3 million had already been blocked by DOJ, while [Cooperating Company 1] was waiting on remittances of $8 million more which had not been made in anticipation they would be blocked. In addition, [Cooperating Company 1] has a line of credit of approximately $3 million from a private equity firm called Old Hill Partners which they were now unable to draw upon.

*Id.*

These circumstances show that, rather than meeting with the government to "account for" transactions, what actually prompted Cooperating Company 1's meeting with the government was its immediate need for the release of $1.9 million in frozen funds. In turn, the government, through an AUSA, informed Cooperating Company 1 that "the potential release of any funds would first depend on the information provided by [Cooperating Company 1] and their potential willingness to cooperate." *Id.*

Thus, Cooperating Company 1 was facing its imminent financial demise, and the government was its lifeline. Cooperating Company 1's efforts to get the money it needed for its survival would "depend on" the information it provided to the DOJ, and its willingness to cooperate. This critical information was entirely omitted from the affidavit. "[A]n experienced investigator . . . would surely know that reliability is 'key' to a magistrate's probable cause analysis when the search warrant application contains information provided by an informant." *United States v. Lull*, 824 F.3d 109, 116 (4th Cir. 2016) (citing *United States v. Wilhelm*, 80 F.3d 116, 119 (4th Cir. 1996)). "[I]nformation about the informant's credibility or potential bias is

7

crucial," and therefore withholding such information from the magistrate "undermine[s] the issuing magistrate's ability to perform his role as a neutral arbiter of probable cause." *United States v. Glover*, 755 F.3d 811, 814, 816 (7th Cir. 2014) (omission of informant's record and expectation of payment "impaired the neutral role of the magistrate deciding whether to issue the warrant.") (citing *United States v. Bell*, 585 F.3d 1045, 1050 (7th Cir. 2009)). *See also United States v. Simmons*, 771 F. Supp. 2d 908, 922 (N.D. Ill. 2011) ("while a motive to curry favor does not necessarily render an informant unreliable, it is a factor that is highly relevant to the analysis of the reliability of an informant's statement.").

The failure to disclose Company 1's strong financial motive to curry favor with the government, and its understanding that the government would determine[4] whether Company 1 would survive or fail, is a material omission. *See, e.g., United States v. Velazquez*, 2019 WL 3816722, at *1 (D. Ariz. Aug. 14, 2019) (ordering a *Franks* hearing where an informant providing information in support of a wiretap application had been investigated by the IRS in connection with a tax lien and the tax lien was then discharged shortly after the affidavit was filed) ("the omission of the confidential informant's $100,000 federal tax lien and its release as satisfied in whole one month after the wiretap warrant was granted was material to credibility.").

---

[4] "A prosecutor is obligated to disclose any benefit conferred on any witness." *United States v. Ramsey*, 165 F.3d 980, 989 (D.C. Cir. 1999), *as amended* (Apr. 1, 1999) (citing *Giglio v. United States,* 405 U.S. 150 ,153-55 (1972)). Here, the government has not disclosed whether it ultimately released the $1.9 million and/or other funds to Company 1 in exchange for the "information" and "cooperation" on which the release of this money was conditioned. Given Company 1's representations regarding its immediate need for the release of money, and the fact that Company 1 is alive and well all these years later, there is a strong inference that the government released the frozen funds to Company 1. But whether Company 1 was paid is not the issue; instead, it is Company 1's *expectation or belief* that its survival and ability to do business was in the government's hands. *See, e.g., Tassin v. Cain*, 482 F. Supp. 2d 764, 773 (E.D. La. 2007), *aff'd,* 517 F.3d 770 (5th Cir. 2008) ("Representations made to witnesses need not guarantee them a benefit in order to motivate their testimony, and *Giglio* does not require such a guarantee.").

But this is not the only material omission from the search warrant affidavit, nor even the only material omission as to Cooperating Company 1.

### b. Cooperating Company 1's motive to avoid criminal charges and efforts to minimize its criminal exposure through false statements.

The affidavit also failed to disclose another set of key facts that go to the heart of Cooperating Company 1's credibility: its motive to curry favor with the government in order to avoid criminal charges, as shown by its efforts to falsely minimize its knowledge that its products were shipped to North Korea.

The affidavit alleges that Cooperating Company 1 sold its products to Winney for nearly a decade. Ex. 1, at 20, ¶19. Yet, the affidavit fails to disclose that the employee representing Cooperating Company 1 in the meeting claimed not to have understood that some of its shipments were going to North Korea until the problems with payments began. Ex. 2, at 4. The government showed the employee several sales contracts and bills of lading which Cooperating Company 1 had provided. For example, Cooperating Company 1's employee was shown several bills of lading listing Winney as the buyer, "Complant" as the "notify party," and the Ryugyong Corporation in Pyongyang, North Korea as the "consignee." *Id.* Cooperating Company 1's employee claimed not to be familiar with the meaning of "consignee" and claimed that their focus was on the destination of their shipments, which was Dalian, China. *Id.* Considering that Cooperating Company 1 was founded over fifty years ago, and has been exporting tobacco for Winney for nearly a decade, these implausible claims were obvious attempts to minimize Cooperating Company 1's knowledge, and to shift all blame to Winney. Cooperating Company 1's employee also claimed that Winney prepared all shipping documents, to include all bills of lading. *Id.* But the government was in possession of communications that showed this claim by

9

Cooperating Company 1 to be false. *See* Ex. 3, at 4–Emails Regarding Shipments. These emails clearly show that Cooperating Company 1 prepared the shipping documents. *Id.*

The affidavit's failure to disclose facts showing Cooperating Company 1's criminal exposure arising from its knowing sale of tobacco destined for North Korea, over a period of nearly a decade, is a material omission. A motive to curry favor to avoid charges or obtain leniency is material to the credibility determination of cooperators and informants. *See United States v. Lawrence*, 698 F. Supp. 3d 790, 800 (M.D. Pa. 2023) (finding that a "transparent attempt" by an informant who was charged with serious crimes to help himself by helping law enforcement undercut his credibility); *Cf. United States v. Medina–Reyes*, 877 F.Supp. 468, 475 (S.D. Iowa 1995) (finding that the failure to disclose motivation resulting from an agreement with the government that offered leniency in exchange for the defendant providing a prosecutable case was a material omission).

Moreover, Cooperating Company 1's attempt to distance itself from business with North Korea through false denials is a closely related but distinct issue under the *Franks* analysis. Courts have recognized that when a cooperator's reliability is unknown, the fact that the cooperator made a statement against his own penal interest can serve to establish his reliability. *See, e.g.*, *United States v. Matthews*, 753 F.3d 1321, 1325 (D.C. Cir. 2014). But here, Cooperating Company 1's false statements have the opposite effect. Accordingly, the omission of this fact is material as to Cooperating Company 1's credibility. *See, e.g., Lawrence*, 698 F. Supp. 3d at 800 (M.D. Pa. 2023); Fed. R. Evid. 608(b) (recognizing that specific instances of dishonesty may be probative to truthfulness).

The sum of the false statements and material omissions regarding Cooperating Company 1 deprived the magistrate of key information regarding its reliability. As we discuss below, the

10

government depended heavily on Cooperating Company 1, and information supplied by Cooperating Company 1 should be excised from the affidavit. But as discussed next, the false statements and omissions in the affidavit were not limited to Cooperating Company 1.

## 2. False statements and material omissions relating to the undercover investigation.

The search warrant affidavit states that "[u]ndercover agents posing as Cooperating Company 1 employees subsequently began communicating with Winney. In those conversations James Han (Han) and Jin Guanghua (Jin) discussed laundering payments via front companies." Ex. 1, at 20, ¶22-23. This claim, which leaves room for no conclusion other than that Mr. Jin plotted to commit money laundering with an undercover agent, is false.

We begin with the material omissions regarding the premise of the undercover operation. The affidavit fails to disclose that the undercover operation centered on a fake employee of Cooperating Company 1 who was actually a federal agent—one "Roberto Gonzalez"—who sought Winney's agreement to pay a share of a bribe to a putative insider-employee of a bank who would act to ensure that no further transactions would be frozen by banks. Given that Winney was supposedly engaged in sanctions violations and money laundering for nearly a decade, and made no secret of its business with North Korea based on the information it provided to Cooperating Company 1, one would expect–and the government surely did–that Winney would gladly agree to pay the price to prevent any further blocking of funds.

The government was wrong. In fact, Winney repeatedly refused to pay the bribe proposed by Gonzalez. When Mr. Jin met with Gonzalez and other employees of Cooperating Company 1 in the city where Cooperating Company 1 is based on July 11, 2019, he continued to refuse to pay the bribe. *See, e.g.*, Ex. 4 at 26 ("My biggest concern now is not that $10,000 USD. My biggest concern now is he think we're doing thing that violate [redacted] law. If that's the

11

case, we can stop doing business."). One would expect the affidavit to disclose this fundamental fact about the undercover operation to the magistrate. But this is only the tip of the iceberg.

The affidavit's claim that Mr. Jin and Mr. Han "discussed laundering payments via front companies" is also misleading. Ex. 1, at 20, ¶22-23. To make this claim, SA Gallante presumably relied on statements by Mr. Jin suggesting that different companies could be set up to avoid investigations and the freezing of funds. *See, e.g.*, Ex. 4 at 13 ("What I'm going to say is that [REDACTED] and I are friends for ten years. He represents [REDACTED] If they would like to cooperate with us, I have a lot of ideas. For example, they use Siete Jota company. They have a company in Uruguay. They can register as a company and open a new account oversea such as in Dubai, Hong Kong or even in Singapore. These are the approaches we can do it. It's not a problem."). But to conclude that this was a proposal to illegally launder money or to engage in the evasion of sanctions requires ignoring a slew of other statements that add critical context and explain that Mr. Jin's intent was always to act legally.[5] First, specifically as to money laundering, Mr. Jin denied the intent to launder any funds. Second, more generally, Mr. Jin repeatedly stated that all business must be done in accordance with the law. For example, in response to Gonzalez asking for a "guarantee" and "protection," Mr. Jin responded:

---

[5]    Intent comes down to circumstantial evidence. Every offense with which Mr. Jin is charged requires proof of intent. The core of the charged conduct, a scheme to evade sanctions, requires proof of willfulness. "[I]n order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" *Bryan v. United States*, 524 U.S. 184, 191–92 (1998) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)). Similarly, as to the bank fraud offenses, "[a] defendant's mistake of law or subjective belief that he was not acting fraudulently precludes conviction." *United States v. Young-Bey*, No. CR 21-661 (CKK), 2025 WL 660821, at *4 (D.D.C. Feb. 28, 2025) (citing *See United States v. Hunter*, 554 F. App'x 5, 9 (D.C. Cir. 2014)). The required proof on the money laundering charges hinges, in turn, on the intent to promote illegal activity. *United States v. Stoddard*, 892 F.3d 1203, 1214 (D.C. Cir. 2018) ("[T]o violate the promotion prong, a defendant must have intended to promote the illegal activity by engaging in the financial transaction or conspiring to do so.").

12

I don't know what he said. First assume [U/I] we sell the tobacco, we [U/I]don't violate Unite Nation…[U/I] So we didn't violate international Law. Second, we didn't violate any law either. I don't understand what he said. You just said that we violate the law. If that's the case, we don't want to deal business with him. Why will we do something violate the law?

Ex. 4, at 21

Later, when one of the interpreters stated to Gonzalez that Mr. Jin believes there is nothing wrong because the frozen funds were released, and Gonzalez stated "is not what you believe is the facts okay?" *Id.* at 24 Mr. Jin then responded:

What's the fact? The fact is that we never violate the law. That's the foundation for today's conversation. If he thinks we violate law, no reason to continue this talk. There is no reason we'll violate the law of [REDACTED], China and International.

*Id.* Thus, the only way for the government to suggest that Mr. Jin's proposals to structure the transactions through different entities was a plan to launder money is to ignore his multiple other statements evincing an intent to abide by the law. Moreover, Mr. Jin made clear that he was perfectly willing to use any other form of currency to conduct business, and had no specific interest in using dollar transactions. All of this information was deceptively omitted from the affidavit, leaving the impression that the undercover operation unequivocally showed that Mr. Jin, Mr. Han, and Winney planned with an undercover agent to launder money.

But there is more. Some days after this meeting, the government, under the guise of Gonzalez acting on behalf of Cooperating Company 1, sent an email to Mr. Jin.[6] Ex. 5–Email from UCA to Jin. The government failed to disclose here that Mr. Jin did not respond to the email, ceased all contact with Cooperating Company 1, and that Winney no longer did business with Cooperating Company 1. Of course, knowing that Mr. Jin repeatedly insisted that all

---

[6]     The "interpreter" who was supposedly working with Gonzalez was likewise an undercover agent.

business activity must be in accordance with law, this result is not surprising. But these facts bearing on intent, too, were kept from the magistrate judge issuing the warrant.

"[C]onsistent with the Fourth Amendment, 'a police officer cannot make unilateral decisions about the materiality of information, or, after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence.'" *United States v. Ali*, 870 F. Supp. 2d 10, 29 (D.D.C. 2012) (quoting *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000)). Courts have not looked kindly on situations in which the government grossly misrepresents the facts of an investigation, omitting favorable evidence and drawing all potential inferences against the defendant in order to secure a warrant. In *Rainsberger v. Benner*, for example, the Seventh Circuit relied on *Franks* to hold that a police officer who presented materially false evidence and omissions in an arrest warrant affidavit was not entitled to qualified immunity in an 42. U.S.C. § 1983 action. 913 F.3d 640, 642 (7th Cir. 2019). In that case, the detective sought an arrest warrant for Rainsberger, on the suspicion that Rainsberger murdered his elderly mother. *Id*. The detective's omissions and representations included the following:

- While knowing that a particular phone call was actually placed by Rainsberger an hour later, the detective included the earlier timestamp, suggesting that the defendant was in his mother's apartment around the time she was murdered. *Id*. at 646;

- Included a description of Rainsberger discarding "a straight object" and acting furtive (to imply disposing of the murder weapon) when the surveillance video appeared to show the defendant discarding a can and acting normal. *Id*.;

- Claiming in the affidavit that Rainsberger showed lack of concern for his mother, including for example when he went outside to wait for an ambulance "leaving her unattended." But the defendant had explained that he went outside to wait for the ambulance because his mother's apartment was difficult to locate. *Id*.;

- Falsely claiming that Rainsgerber "stormed out" when asked to take a polygraph. *Id*.

14

Denying qualified immunity, Seventh Circuit held that no reasonable officer would assume that he is permitted to lie in a probable cause affidavit, and likewise acts in violation of the law where "it would have been clear to a reasonable officer that the omitted fact was material to the probable-cause determination." *Rainsberger*, 913 F.3d at 654.

Had the affidavit in this case contained merely an incomplete account of the statements and actions of Winney and Mr. Jin, there may be an argument that it was the result of mere negligence. But the pattern in this case is similar to that in *Rainsberger*: the one-sided exclusion of all potentially exculpatory facts and innocent explanations in favor of the most incriminating version possible. Such a pattern evinces "false statements and omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead" the magistrate. *United States v. Ali*, 870 F. Supp. 2d 10, 27 (D.D.C. 2012).

Similarly, *Jordan v. Town of Waldoboro*, 943 F.3d 532, 541 (1st Cir. 2019), *abrogated on other grounds by Thompson v. Clark*, 596 U.S. 36 (2022), was also a section 1983 action brought by a suspect who was charged based on a false affidavit. There, Jordan had been charged with stealing from his elderly father, the First Circuit found that the probable cause affidavit contained the following false statements and omissions:

- The affidavit suggested that Jordan foisted a power of attorney on his father, and omitted evidence that the father's own lawyer prepared the affidavit and gave it to Jordan at his father's behest. *Id.* at 541;

- The affidavit omitted the fact that the power of attorney "expressly provided for the type of self-dealing in which Jordan engaged, and which Jordan claimed was his father's basic purpose in granting the POA." *Id.*; and

- The affidavit discussed the fact that Jordan took and would not return his father's firearms, and while "the affidavit acknowledged Jordan's claim that he took his father's firearms because he feared that his father might harm himself, it omitted the highly corroborating fact that Jordan offered to turn over the firearms to the police for safekeeping." *Id.*

The First Circuit held that the affiant was not entitled to qualified immunity. Stripped of the combination of false statements and omissions, the court found, "would have painted a fundamentally different picture of Jordan's actions." *Jordan*, 943 F.3d at 543.

Similarly here, the omitted facts and false statements presented a grossly distorted picture of what actually occurred during the undercover investigation. The affidavit frames Mr. Jin's statements in the most sinister possible way, stripping away all context and evidence of his intent. As in *Jordan*, the affidavit in this case "sought to diminish the exculpatory weight" of Mr. Jin's statements and actions in the course of the undercover investigation. However, the fact that Mr. Jin repeatedly refused to pay a bribe, that he repeatedly stated that Winney would not violate the law, and that he ceased contact with Cooperating Company 1 "painted a fundamentally different picture" of what occurred and puts Mr. Jin's conduct "in a very different, markedly benign light." As in *Jordan*, the uniform exclusion of all contextual and exculpatory information reflects here, at minimum, reckless disregard for the possibility of misleading the magistrate. *Ali*, 870 F. Supp. 2d at 27.

## 3. False statements and material omissions relating to Mr. Jin's prior involvement in dealings with Company 1.

The affidavit states "Cooperating Company 1 stated that Winney was represented by James Han and Jin Guanghua." Ex. 1, at 6, ¶22. However, the report of the meeting, and contemporaneous notes, reflect that this is false. When the government showed a photograph of Mr. Jin to Cooperating Company 1's employee, and asked if he was the man who traveled with Han to meet with Cooperating Company 1 in the country where Cooperating Company 1 was located, that employee stated he was "unsure but did not believe it was." Ex. 2, at 3. The employee went on to state that in prior dealings with Winney, Han has represented himself as if he were an independent buyer who controls Winney and its cigarette production facilities.

16

Cooperating Company 1's employee gave an example of when discussing Winney's factory, Han called it "my factory." *Id.*

Therefore, the affidavit misrepresented Cooperating Company 1's statements regarding Mr. Jin's prior involvement with Cooperating Company 1, as the employee did not even recognize Mr. Jin's photograph. And as with the other false statements and omissions, this false statement again favors the government, and harms Mr. Jin.

This clearly false statement is part of a larger pattern, and is further proof that the falsities and omissions in the affidavit were "designed to mislead, or . . . [were] made in reckless disregard of whether they would mislead." *United States v. Matthews*, 172 F. Supp. 3d 1, 6 (D.D.C. 2012), *aff'd*, 753 F.3d 1321 (D.C. Cir. 2014) (international quotation omitted). This is important, because a probable cause inquiry does not take each fact in isolation; it depends on the totality of the circumstances." *Rainsberger*, 913 F.3d at 648 (citing *District of Columbia v. Wesby*, 138 S.Ct. 577, 588 (2018)).

## II. ABSENT THE FALSE STATEMENTS AND MATERIAL OMISSIONS, THE AFFIDAVIT FAILS TO ESTABLISH PROBABLE CAUSE.

Having shown the material false statements and omissions, the question is whether the affidavit presents probable cause to search the email account when those false statements and omissions are excised from the warrant affidavit. *Cardoza*, 713 F.3d at 658.

We begin by purging the affidavit of its material false representations and omissions. First, given the affidavit's thoroughly misleading account of the undercover operation, the Court should strike the claim that Mr. Jin "discussed money laundering" in the course of the operation. The Court should also strike the allegation that Mr. Jin previously engaged with Cooperating Company 1 *at all*–a claim belied by the notes and report of what Cooptarating Company 1 actually said. Further, given Cooperating Company 1's incentives to curry favor with the

17

government, and its obvious false statements regarding its knowledge, any statement in the affidavit that relies on Cooperating Company 1–such as the fact that Winney "changed its bills of lading to falsely reference sales to China and non- North Korean locations/customers"-- should similarly be struck from the affidavit.

The only remaining allegation regarding Target Account 1 is the following:

Target Account 1 communicated at least ten times between December 2018 and June 2019 with an account on a Chinese-based domain, which e-mail account is publically [sic] listed by multiple Chinese companies as their contact address. One such company using this address is Dandong Xinlu International Freight Forwarding Co. Ltd. (Xinlu). According to its website, Xinlu is a freight and shipping company located in Dandong, China. Xinlu's website publically [sic] advertises "...the company's business is based in North Korea... It provides services for many countries and cities in North Korea... The company's main business includes: North Korea, South Korea's import and export agent, transit cargo transport agent and trade, supervision of cargo transport... Our company has a special person in the railway to pick up the station, send the station, arrange goods from Dandong to Pyongyang railway express mail."

Ex. 1, at 9-10, ¶35.

Here, the evidence proffered in the affidavit does nothing to establish probable cause to search Target Account 1. Winney was operating in China and is not prohibited by Chinese law from doing business with North Korea, so the fact that it contains communications with a shipping company that sends goods to North Korea fails to establish probable cause. Moreover, the affidavit makes no assertion that any of the listed communications had any connection to the transactions at issue in this case. The affidavit also makes no assertion that the shipping company at issue was in any way implicated or related to the transactions or shipments at issue in this case. Nor does the affidavit state that the shipping company at issue engaged in dollar transactions cleared through U.S. banks. As such, there is insufficient evidence to establish a connection between the crimes investigated and the place to be searched (Target Account 1), and insufficient evidence of a nexus between the crimes under investigation and the contents of the account. This is fatal to the probable cause showing.

For a search warrant to be valid, it must be supported by probable cause that a legitimate object of the search *will be located in the place to be searched* (here, Target Account 1). *See United States v. Griffith*, 867 F.3d 1265, 1271 (D.C. Cir. 2017) (citing *Steagald v. United States*, 451 U.S. 204, 212-13 (1981)). "An arrest warrant rests on probable cause to believe that the suspect committed an offense . . . A search warrant, by contrast, is grounded in probable cause to believe that the legitimate object of a search is located in a particular place." *Id.* (internal citations omitted). Further, the items sought to be seized must bear a logical relationship to the crime under investigation. This is called the "nexus" requirement. *See Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967) ("There must, of course, be a nexus...between the item to be seized and criminal behavior."); *Griffith*, 867 F.3d at 1273 (explaining that a warrant failed to establish a connection between any potential phone and the murder under investigation); *See also United States v. Lyles*, 910 F.3d 787 (4th Cir. 2018) (holding a warrant to seize and search cell phones invalid because "the warrant application lacked any nexus between cell phones and marijuana possession.").

Moreover, the affidavit states that this evidence was obtained from returns pursuant to 18 U.S.C. § 2703(d) pertaining to Target Account 1. Ex. 1 at 23, ¶34. As the magistrate would have been aware, § 2703(d) authorizes the government to obtain non-content information relating to email accounts, including header information that reveals information such as the sender and recipient of email communications. This raises significant questions about evidence that was conspicuous by its absence, including: the absence of any allegations showing Target Account 1's nexus to the offenses being investigated; the absence of evidence to show the account corresponded with any alleged co-conspirator, and the absence of evidence that the account communicated with Cooperating Company 1 or any of its employees. Given that

Cooperating Company 1 did business with Winney for nearly a decade, but the affidavit failed to set forth evidence of any relevant communications in Target Account 1 significantly undercuts any potential probable cause showing that evidence of the suspected crimes would be found in Target Account 1. Further, while alleging that certain of Han's accounts were linked to each other, and alleging there was evidence that Han used a VPN to conceal his location, there were no such allegations with respect to Target Account 1. In sum, the affidavit, stripped of its falsities and material omissions, failed to set forth probable cause to search Target Account 1.

## CONCLUSION

For all of these reasons, a *Franks* hearing is required in this case. Such a hearing will establish that the contents of Target Account 1 were seized in violation of the Fourth Amendment, and must be suppress.

Respectfully Submitted,

By:/s/ Eugene Gorokhov
Eugene Gorokhov VSB # 73582
BURNHAM & GOROKHOV, PLLC
1634 I Street NW, Suite 575
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I served a copy of the foregoing motion via ECF which automatically sends a copy to all counsel of record.

Respectfully submitted,

By:/s/ Eugene Gorokhov
Eugene Gorokhov, Esq.