IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 23CR91-CKK |
| | ) | |
| GUANGHUA JIN. | ) | |

## MOTION FOR DISCLOSURE OF GRAND JURY MATERIALS

Guanghua Jin, through counsel, and pursuant to the Fifth Amendment to the United States Constitution and Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), respectfully moves this Court to order the government to produce the testimony and legal instructions it provided to the grand jury with respect to the charges set forth in the indictment.

### BACKGROUND

Guanghua Jin was indicted on March 21, 2023. During the course of the investigation, the government obtained a search warrant to search emails addresses, including his email address. As discussed elsewhere and below, the government provided false information and material omissions in the probable cause affidavit, submitted on December 10, 2019. Ex. 1–Search Warrant Materials[1]. Similarly, in seeking to obtain an arrest warrant on August 22, 2022. Ex. 2–Criminal Complaint Affidavit. The government submitted information with material falsities and omissions regarding the evidence in this case. Then, on May 2, 2023, in seeking Mr. Jin's extradition from Australia, the government submitted an affidavit that likewise contained false representations and material omissions. Exhibit 3–Request for Extradition Affidavit.

As discussed below, there is evidence that the government similarly presented false and misleading information to the grand jury in obtaining the indictment in this case, along with

---

[1] Pages referred to for this exhibit are in the top right corner.

1

inaccurate instructions on the law. Pursuant to the Fifth Amendment, the Court should order disclosure of the grand jury materials in this case.

## ARGUMENT

The grand jury functions as a "protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor." *United States v. Dionisio*, 410 U.S. 1, 17 (1973). This historic role is enshrined in the Fifth Amendment, which provides that no prosecution may commence except on "a presentment or indictment of a grand jury." U.S. Const. amend. V. The modern day grand jury, however, entirely depends upon the prosecutor to furnish it with evidence and applicable law, and it cannot perform its constitutional function if it is presented with false evidence or misleading law. As one court has explained,

> Interposing a grand jury between the individual and the government serves the intended purpose of limiting indictments for higher crimes to those offenses charged by a group of one's fellow citizens acting independently of the prosecution and the court. In this independent position, a grand jury performs two distinct roles. It serves as an accuser sworn to investigate and present for trial persons suspected of wrongdoing. At the same time—and equally important—it functions as a shield, standing between the accuser and the accused, protecting the individual citizen against oppressive and unfounded government prosecution.

*United States v. Hogan*, 712 F.2d 757, 759 (2d Cir. 1983) (internal citation omitted). *See also United States v. Serubo*, 604 F.2d 807, 816 (3d Cir. 1979) ("In federal criminal proceedings, the right to indictment by an unbiased grand jury is guaranteed by the fifth amendment. When the framers of the Bill of Rights placed that requirement in the fifth amendment, 'they were not engaging in a mere verbal exercise.'") (internal citation omitted).

Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) empowers the Court to order disclosure of grand jury materials when a defendant "shows that a ground *may exist* to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii) (emphasis added). Although a party seeking disclosure bears the burden of

showing a "particularized need" for the grand jury materials "even when the grand jury whose transcripts are sought has concluded its operations," disclosure is appropriate "where the need for it outweighs the public interest in secrecy." *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222-23 (1979).

U.S. Supreme Court precedent establishes that "the standard" for obtaining disclosure under Rule 6(e) "is not an excessive one but rather 'is a highly flexible one, adaptable to different circumstances and sensitive to the fact that the requirements of secrecy are greater in some situations than in others.'" *In re Grand Jury Proceedings GJ-76-4 & GJ-75-3*, 800 F.2d 1293, 1299 (4th Cir. 1986) (quoting *United States v. Sells Engineering, Inc.*, 463 U.S. 418, 445 (1983)). All that needs to be shown is a "particularized need" for disclosure of the grand jury materials. *Sells Engineering, Inc.*, 463 U.S. at 445.

The failure to present accurate factual information and legal instructions to the grand jury may require dismissal of the indictment. "[W]here a prosecutor's legal instruction to the grand jury seriously misstates the applicable law, the indictment is subject to dismissal if the misstatement casts 'grave doubt that the decision to indict was free from the substantial influence' of the erroneous instruction." *United States v. Stevens*, 771 F. Supp. 2d 556, 567 (D. Md. 2011) (quoting *United States v. Peralta*, 763 F. Supp. 14, 21 (S.D.N.Y. 1991), and citing *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988)). Likewise, factual misstatements may merit dismissal of the indictment. *United States v. Bari*, 750 F.2d 1169, 1176 (2d Cir. 1984) (A prosecutor should of course inform a grand jury of any substantial evidence of which the prosecutor is aware that negates an accused's guilt, and should respond candidly to a grand jury's inquiries.") (internal citation omitted).

I. **THE GOVERNMENT HAS DEMONSTRATED A PATTERN OF PRESENTING MISLEADING INFORMATION REGARDING THE FACTS OF THIS CASE.**

As detailed in the contemporaneously-filed Motion to Suppress, the government made misrepresentations to the magistrate judge issuing the email search warrant regarding key aspects of the evidence in this case while applying for a search warrant. Those misrepresentations related to (1) critical information bearing on the reliability and truthfulness of Cooperating Company 1[2] and its representatives; (2) what occurred during its undercover investigation and what this reflected regarding Mr. Jin's conduct and intent, and (3) the extent of Mr. Jin's involvement in prior dealings with Cooperating Company 1. As set forth in that motion, the false statements and omissions presented to the magistrate were all to the detriment of Mr. Jin. However, the misrepresentations in this case were not confined to the search warrant affidavit. As shown below, they were part of a larger pattern of suppressing or omitting evidence favorable to the accused.

### A. False claims and material omissions in the extradition affidavit.

On May 2, 2023, the government submitted an affidavit in support of Mr. Jin's extradition from Australia to the United States. Ex. 3. In that affidavit, the government purported to summarize the evidence against Mr. Jin and his co-defendants. However, like the search warrant affidavit, the extradition affidavit contained misleading information relating to Cooperating Company 1. By way of background, Cooperating Company 1 sold tobacco to Winney for nearly a decade, and is cooperating with the government in this case. Ex. 1, at 20,

---

[2] Cooperating Company 1 is a company cooperating with the government in this matter. Based on information from the government, Cooperating Company 1 has asked not to be identified in these proceedings. For this reason, Cooperating Company 1 is not referred to by name. Furthermore, given the extent of redactions required to remove the name of Cooperating Company 1, its employees, and other identifying information from the exhibits, we have filed the exhibits under seal pending this Court's resolution of Cooperating Company 1's request for secrecy until this matter is resolved by the Court. Undersigned counsel anticipates opposing Cooperating Company 1's request for anonymity.

¶19. Cooperating Company 1 assisted the government in carrying out an undercover investigation relating to the charges in this case. The false statements and material omissions in the extradition affidavit relate to both Cooperating Company 1, and the undercover investigation.

The extradition affidavit contained the following representation with respect to Confidential Source-1's (CS-1) account of shipping documents for tobacco purchased by Winney:

> CS-1 was able to provide further details about the Winney Entities' conduct. When business between Company 1 and the Winney Entities was first initiated, shipping documents listed the North Korean buyer of the goods with its associated North Korean address. However, the port of discharge was still listed as Dalian, China. CS-1 confirmed the Winney Entities were responsible for all the changes on the bills of lading, which ultimately removed all references to North Korea from vital shipping documents.

Ex. 3 ¶38.

But as noted in the Motion to Suppress, this account is misleading. In reality, during the meeting, CS-1 made highly implausible claims in which he denied knowing that Cooperating Company 1's products were being shipped to North Korea. Ex. 4–FD-302 Meeting on 5-1-2019, at 4. He continued to deny knowing this even after being confronted with multiple documents showing the consignee as being located in North Korea. *Id.* He claimed not to notice these entries, also denied knowing what a "consignee" is. *Id.* He also claimed, in contradiction to the emails his company had provided to the government, that his company had no role in preparing the shipping documents. *See Id.* at 4-5; *See* discussion in Motion to Suppress, at 9-10.

But if there were any doubt that CS-1 was lying to the government to minimize Cooperating Company 1's exposure, an interview that occurred in May of 2022 dispels any doubt. Ex. 5–FD-302 Meeting on 5-5-2022; Ex. 6–Meeting Notes 5-5-2022. The notes and 302 of that meeting reflect that contrary to CS-1's claim in 2019, Cooperating Company 1

employees, rather than Winney, prepared the shipping documents at issue, allegedly based on information provided by Winney:

> [Cooperating Company 1] completed all the shipments to Winney via ship, which required specific documentation to be prepared and sent to the various port authorities. These documents included an invoice, bill of lading, and [Cooperating Company 1]'s permit authority to export the items listed in the other documents. As typical, Han provided all the information (consignee, purchaser, and other information required) for the bill [sic] of lading, which included shipping the tobacco to Dalian Port in China.

Ex. 5, at 5. Although this interview occurred a year prior to the date of the extradition affidavit, this 180-degree reversal in Cooperating Company 1's story, which undercuts Cooperating Company 1's credibility, was not mentioned in the affidavit. Further, the notes of that interview reflect that contrary to its earlier claims that it had no knowledge of what a "consignee" is, the employee, when shown a shipping document, called "export invoice," (marked as "Bates 0001539")[3] displayed complete knowledge of all of the fields in the shipping documents denoted, as Cooperating Company 1 actually prepared the shipping documents. *See* Ex. 6, at 9. This is important because it reflected not only Cooperating Company 1's motive, but its actual prior efforts to falsely minimize[4] its own knowledge in order to avoid criminal charges. *See, e.g., United States v. Lawrence*, 698 F. Supp. 3d 790, 800 (M.D. Pa. 2023) (finding that a "transparent attempt" by an informant who was charged with serious crimes to help himself by helping law enforcement undercut his credibility).

---

[3]   Notably, while discussion of other documents shown to the witness is documented in the 302, the discussion of this specific document is omitted from the 302.

[4]   The government's omission here stands in contrast to its discussion of another company interviewed during the course of its investigation. That company, distinct from "Cooperating Company 1," is referred to as "Company 1" in the search warrant affidavit. The search warrant affidavit reflects that the company denied doing business with North Korea, but "relented" when confronted with evidence to the contrary. Ex. 1, at 22, ¶29. But as to Cooperating Company 1, in contrast, the government omitted any statements regarding Cooperating Company 1's false statements and the evidence of its knowledge that its products were shipped to North Korea.

Moreover, the government failed to disclose in the extradition affidavit, as it did in the search warrant affidavit, that CS-1, as Cooperating Company 1's representative, was beseeching the government to release millions of dollars to his company in order to prevent its imminent demise. Ex. 4, at 2. And like the search warrant affidavit, there was no disclosure of the fact that Cooperating Company 1 was being induced by the government to provide information and cooperate in exchange for the release of these funds. *Id. See, e.g., United States v. Velazquez*, 2019 WL 3816722, at *1 (D. Ariz. Aug. 14, 2019) (finding it significant that the government appeared to have discharged a $100,000 tax lien for a cooperator) ("the omission of the confidential informant's $100,000 federal tax lien and its release as satisfied in whole one month after the wiretap warrant was granted was material to credibility.").

The government also materially mischaracterized the evidence garnered in the undercover investigation. In the government's telling:

> Jin and his co-conspirators discussed ways of circumventing the bank oversight and sanctions to allow the trade to continue, including the use of false shipping records and front companies. . . One example of these discussions and Jin's involvement in the scheme is a meeting that took place in July 2019. This meeting was in Company 1's home country and included Jin, Company 1 representatives and an undercover agent posing as an individual hired by Company 1 to help resolve the banking issues that had arisen with U.S. financial institutions. In the meeting, the undercover agent told Jin the U.S. banking problems prompted the in-person meeting. Jin responded (in Chinese), "No problem. Even though the account was frozen, if he [Company 1's executive] wants to do business with us we have a lot of ideas." Thereafter, Jin suggested that Company 1 could "register as a company and open a new account overseas such as in Dubai, Hong Kong or even Singapore." Jin continued, "These are the approaches we can do. It's not a problem." **Jin further noted that, in such a scenario, Company 1 was "the ones committing fraud, I'm simply buying merchandise." Jin continued, "Don't you want to continue to do business with us? Then we can avoid the investigation by setting up another company in between."**

Ex. 3 at 17, ¶40 (emphasis added).

In providing the foregoing description, the government omitted that (1) the "individual hired by Company 1," and undercover agent, repeatedly sought Winney's participation in the payment of a bribe, and Winney repeatedly refused; (2) that Mr. Jin repeatedly stated in his interactions with the undercover that all business must be done in accordance with the law, and (3) when the undercover agent subsequently sent an email detailing the violations of federal law and urging payment of the bribe, Mr. Jin stopped dealing with him and Cooperating Company 1.[5] Ex. 7–Government translations and transcriptions of 7-11-2019 meeting; Ex. 8 Email from UCA to Jin. This set of facts certainly casts doubt on the claim that the intent behind Mr. Jin's statements in this meeting was to discuss "ways of circumventing the bank oversight and sanctions to allow the trade to continue, including the use of false shipping records and front companies." Ex. 3 at 17, ¶40. As detailed in the Motion to Suppress, these omissions are material, and result in a gross distortion of the evidentiary picture that emerged from the undercover investigation.

But that is not all. Beyond excluding facts that entirely change the character of what occurred during this meeting, the government claimed—not one but twice—that Mr. Jin made a highly incriminating statement *that he never actually made*. *Id.* ("Jin further noted that, in such a scenario, Company 1 was 'the ones committing fraud, I'm simply buying merchandise.'")

---

[5] These omissions are highly material because the are circumstantial evidence of Mr. Jin's intent. Every offense with which Mr. Jin is charged requires proof of intent. The core of the charged conduct, a scheme to evade sanctions, requires proof of willfulness. "[I]n order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" *Bryan v. United States*, 524 U.S. 184, 191–92 (1998) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)). Similarly, as to the bank fraud offenses, "[a] defendant's mistake of law or subjective belief that he was not acting fraudulently precludes conviction." *United States v. Young-Bey*, No. CR 21-661 (CKK), 2025 WL 660821, at *4 (D.D.C. Feb. 28, 2025) (citing *See United States v. Hunter*, 554 F. App'x 5, 9 (D.C. Cir. 2014)). The required proof on the money laundering charges hinges, in turn, on the intent to promote illegal activity. *United States v. Stoddard*, 892 F.3d 1203, 1214 (D.C. Cir. 2018) ("[T]o violate the promotion prong, a defendant must have intended to promote the illegal activity by engaging in the financial transaction or conspiring to do so.").

Mr. Jin never made the above statement. Instead, the statement was made by an interpreter, who was clearly misstating Mr. Jin's actual words. This is obvious from the face of the translation that the government produced, excerpted here:

| Mr. Jin | 我们没有洗钱，我们在买货，有没有搞错？什么叫洗钱？ | We are not money laundering. We're buying goods. Are you sure? What is money laundering? |
|---|---|---|
| Interpreter 2 | Ustedes son lo que están cometiendo fraude yo estoy comprando una mercadería | You guys are the ones committing fraud, I'm simply buying merchandise |

Ex. 7, at 18. As shown above, what Mr. Jin *actually* said reflects his disagreement with the claim that the transactions constitute money laundering, and this is highly exculpatory. Moreover, this same statement was presented to the grand jury as having been made by Mr. Jin, which is reflected in the indictment returned by the grand jury. ECF-13, at 26, ¶66. In view of this evidence, there is no serious dispute that the government presented false testimony to the grand jury.

Further, while (according to the transcript produced by the government) Mr. Jin did make the second part of the statement, "[t]hen we can avoid the investigation by setting up another company in between," Ex. 3 at 17, ¶40, the government *omitted the second part of his statement*, which clearly reflects that he was making this suggestion consistent with his refusal to pay the proposed illegal bribe urged by Gonzalez: "[b]esides, we don't have to pay $10,000 or ten thousand USD." Ex. 7, at 24.

| Mr. Jin | 那就要规避调查，那就要在中间设立一个公司，我们还可以免付一万块或几万块美金。[32:37] | Then we can avoid the investigation by setting up another company in between. Besides, we don't have to pay $10,000 or ten thousand USD. |
|---|---|---|

9

### B. False claims and material omissions in the affidavit supporting the criminal complaint.

Likewise, the affidavit in support of the criminal complaint for Mr. Jin falsely claimed that Mr. Jin made incriminating statements that he never actually made. Here again, the affidavit omitted the mountain of mitigating facts and statements from the undercover operation. Instead, it employed highly selective quotations to paint a picture at odds with reality.

> The affidavit claimed that:
>
> UCA-1 stated, "Okay, let's talk about something; first, we are all lying to the bank, we are committing fraud, right? And that is from both us and you guys. We are laundering money." JIN argued and said, "You are the ones committing fraud, I'm simply buying merchandise."

Ex. 2, at 28, ¶68. However, as shown above, Mr. Jin never made this statement and this statement was plainly not a correct translation of what he actually said.

> The affidavit also averred that JIN stated that he was not violating any laws and asked, "why will do something violate the law?" UCA-1 asked if JIN was doing everything legal, why did he change to another company? Why couldn't they do business directly with Company 1 instead of using companies from Hong Kong, Dubai, or Uruguay?

*Id*. However, the government chose not to provide Mr. Jin's response to this question, in which he explained the reason he was proposing using companies in a different country is because he would not engage in conduct that required paying an illegal bribe:

| Speaker | | |
|---|---|---|
| Interpreter 1 | 如果你做的事都是正当的那你为什么要换到另外一家公司用另外一家公司的名义来跟他做生意呢？也就是说之前你直接跟 *SI TJ* 不行，因为出了问题，银行账号被冻结，所以你从香港，杜拜，乌拉圭还是巴 | If you had done everything legal, why you changed to other company? Used other company's name to do business with them? You couldn't do business directly with ▮▮ before, because bank account was frozen. So, you used another company from Hong Kong, Dubai, Uruguay or Paraguay, |

Page 22 of 79

| SPEAKER | SPANISH/MANDARIN TRANSCRIPTION | ENGLISH TRANSLATION |
|---|---|---|
|  | 拉圭，巴拉圭，用另外一个公司，为什么你要这么做？ | [Paraguay, sound came from Interpreter 2]. Why you did that? |
| Mr. Jin | 因为他不是说了吗，如果继续用我们维尼公司的话，我必须要付他一万美金，我为什么要付他一万美金呢？我有很多解决方法，我不用付他一万美金。[31: 11] | Because he said if do business as original company We Need, we had to pay him $10,000 USD. Why should I pay him $10,000USD? I have many solutions. I don't want to pay him $10,000USD. |

Ex. 7, at 22-23.

The affidavit again falsely attributed incriminating statements to Mr. Jin that he did not actually make in the following paragraph:

> UCA-1 told JIN he guessed the Americans started to ask questions which is why they were in the current situation. JIN responded, "My biggest concern is where the goods will end up, meaning its final destination. The US will surely investigate that. In fact, it has nothing to do with me whether I violate [redacted] law or not. I do not have any problem with that. The fact is that the US has been investigating, so it is necessary to guard against the US side." JIN again argued his business was "Legal."

Ex. 2, at 29, ¶68. But the statement attributed to Mr. Jin–which *if true* would suggest that he had no problem with violating the law–*was never made by Mr. Jin*. It was made by an interpreter

11

who was *translating the statement of the undercover agent*. This is obvious from the transcript produced by the government:

| Roberto | No, eso está bien y él lo que no entiende el a lo mejor, a donde... cuando... los productos van al destino final a lo mejor ay es la situación, como le digo los americanos comenzaron a hacer preguntas pore so estamos en esta situación, a mí no me importa si violamos las leyes locales eso para mi no es nada. Lo que me preocupa es | No, that's fine, but what he doesn't understand; maybe is that, where, or when the product's head to their destination maybe that's where the problem is. I mean how I can say it... I guess the American's started to ask questions, therefore we are in this situation; I don't care if we violate ▇▇▇▇ local laws, for me that is nothing. What I am worry about is that the |

Page 27 of 79

| SPEAKER | SPANISH/MANDARIN TRANSCRIPTION | ENGLISH TRANSLATION |
|---|---|---|
|  | que los Argén... los americanos van a tener mas a acceso a otras posibilidades [37:19] | ▇▇▇▇ the Americans will have more access or possibilities |
| Interpreter 2 | 我最担忧的是我们的货物最终是到达哪里，它的最终目的地。这些美国是会调查的。事实上对我来说有没有触犯阿根廷法律，跟我没有关系，对我来说没有问题。事实是美国一直在调查，要防一下美国方面。 | My biggest concern is destination of our goods. US will investigate these things. In fact, it's nothing to do with me whether violate ▇▇▇▇ law. I don't have any problem with that. That's US investigates all the time. Just be careful about US. |
| Mr. Jin | 那刚才提我们给银行提供文件又说是有违法的可能，这又是什么意思？ | Why he said the document we sent to bank might violate the law? What does that mean? |

Ex. 7, at 27-28. In reality, as reflected above, Mr. Jin was asking why the undercover agent was claiming that documents sent to a bank violate the law. This is materially different from the false claim that he had "no problem" with violating US law.

And there is additional false testimony in the affidavit in support of the criminal complaint that is also reflected in the indictment. The indictment alleges as follows:

12

> On or about May 21, 2019, UCA-1 conducted a telephonic call with JIN, with a Chinese translator as JIN did not speak English. UCA-1 confronted JIN about his products going to North Korea, which had caused the bank freeze. JIN told UCA-1 that the ENTITIES had done business with North Korea for 10 years prior but claimed that the ENTITIES had recently stopped doing business in North Korea. QIN joined the call later and introduced himself as the ENTITIES president.

ECF-13, at 26, ¶66; Ex. 2, at 26. But the defense review of this recording plainly reflects that this allegation is contrary to the recording. First of all, the statements were made by Mr. Qin, not Mr. Jin.[6] Contrary to the allegation in the indictment, Mr. Qin never said that they've "stopped doing business with North Korea." The only reference to stopping business of any sort comes when Qin says words to the effect that they don't care if they stop doing business with Cooperating Company 1 because there are other tobacco suppliers. Qin then follows up by saying given their relationship of 10 years with Cooperating Company 1, he wants to send his "general manager" over to meet with Cooperating Company 1's executives to see if they could resolve the differences.

The fact that this false information is presented in the affidavit and also appears in the indictment shows not only that the grand jury was presented with this specific false information, but more generally that the falsities in this affidavit and others were carried forward into the grand jury proceedings.

## II. MR. JIN HAS SHOWN A PARTICULARIZED NEED FOR THE DISCLOSURE OF GRAND JURY MATERIALS.

Mr. Jin is required to show a "particularized need" for the grand jury materials at issue, *United States v. Sells Eng'g, Inc.*, 463 U.S. at 418, and he has made that showing here. Under the "particularized need" standard, district courts have ordered disclosure of grand jury materials where: government attorneys may have misstated the law, *see United States v. Stevens*, 771 F.

---

[6] Notably, unlike the other conversations and meetings in this case, the government failed to produce a transcript of this conversation.

Supp. 2d 556, 564 (D. Md. 2011); the case agent's testimony may have misled the grand jury, *see United States v. Naegele*, 474 F. Supp. 2d 9, 11-12 (D.D.C. 2007); or the case agent may have given false testimony. *West v. United States*, 2010 U.S. Dist. LEXIS 33315 at * 14, No. 08-CR-669 (D.N.Ill. April 5, 2010).

The government's pattern of false representations and material omissions regarding the facts of this case is clearly established, and there is evidence that the government presented such statements to the grand jury. *See supra* at 9, 11-12 (reflecting the government's attribution to Mr. Jin of a statement he never made, which is also attributed to him in the indictment). While the government is not required to present exculpatory evidence to the grand jury, the government is not permitted to present evidence in a manner that "substantially influence[s] the grand jury's decision to indict." *Bank of Nova Scotia*, 487 U.S. at 256. *See also United States v. Basurto*, 497 F.2d 781, 785 (9th Cir.1974) (Due process forbids forcing a defendant to stand trial based on an indictment that "the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached.").

Furthermore, there is also a substantial question as to whether the government's instructions on the law to the grand jury were accurate. On Count 1, for example, the extradition affidavit fails to incorporate the elements of substantive bank fraud, and specifically that this requires an intent to obtain money or property from a bank. Ex. 3, at 27-31; *United States v. Quinn*, 416 F. Supp. 2d 133, 135 (D.D.C. 2006) ("in order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself.") (quoting *United States v. Feola*, 420 U.S. 671, 686 (1975). Likewise, the extradition affidavit fails to reflect that Count 2–the IEEPA conspiracy—omits the element of willfulness, which is an element of the object offense

and therefore extends to the conspiracy as well. *Id.* at 31-33; *Feola*, 420 U.S. at 686. More generally, given the government's strained interpretation of bank fraud and IEEPA counts, as explained in motions to dismiss those counts, there is a genuine concern that the government failed to adequately instruct the grand jury on the elements of the charged offenses.

Mr. Jin's particularized need for disclosure outweighs any limited public interest in secrecy that might remain at this late stage of the proceedings. The government has already obtained its indictment, and the charges against Mr. Jin and his-co-defendants are now public. courts have also recognized that when an investigation is over, "most of the policies which warrant maintaining the secrecy of the grand jury proceeding…are no longer present." *United States v. Twersky*, 1994 U.S. Dist. LEXIS 8744 at *15 (S.D.N.Y. June 29, 1994)(citing *United States v. Moten*, 582 F.2d 654 (2d Cir. 1978)). Thus, after an indictment has issued, "a party asserting a need for grand jury transcripts will have a lesser burden in showing justification." *Petrol Stops NW. v. Continental Oil*, 647 F.2d 1005, 1008 (9th Cir. 1981); *see also United States v. Consortium de Realisation S.A.(in re Grand Jury)*, 117 F. Appx. 527, 530 (9th Cir. 2004)(a judge may order disclosure of grand jury material where "the close of the grand jury investigation mitigated much of the need for continued secrecy.").

## CONCLUSION

For all of the foregoing reasons, the Court should order the disclosure of the testimony and legal instructions provided to the grand jury in this case.

Respectfully submitted,

By:/s/ Eugene Gorokhov
Eugene Gorokhov, Esq.
DC Bar No. 979785
BURNHAM & GOROKHOV, PLLC

1634 I Street NW, Suite 575
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I served a copy of the foregoing motion via ECF which automatically sends a copy to all counsel of record.

Respectfully submitted,

By:/s/ Eugene Gorokhov
Eugene Gorokhov, Esq.