**Exhibit 3**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case Number: 1:23-cr-91 |
| v. | ) | |
| | ) | AFFIDAVIT IN SUPPORT OF |
| JIN GUANGHUA, | ) | REQUEST FOR EXTRADITION |
| | ) | |
| Defendant. | ) | |
| | ) | |

I, Steven B. Wasserman, being duly sworn, depose and state:

1.  I am a citizen of the United States of America and a resident of the Eastern District of Virginia.

2.  I submit this affidavit in support of the request by the United States for the extradition of Jin Guanghua ("Jin") from Australia to the United States for the purpose of prosecuting him on the charges contained in a Indictment filed in the United States District Court for the District of Columbia in Criminal Case No. 23-cr-91, which charges Jin with (a) conspiracy to commit bank fraud between February 2009-March 2019, (b) conspiracy to violate the International Emergency Economic Powers Act ("IEEPA") between March 2016-March 2019, (c) substantive violations of IEEPA in 2018 and 2019, (d) a conspiracy to launder monetary instruments between February 2009-March 2019, and (e) laundering monetary instruments in 2018.

3.  This affidavit is organized as follows:

1

Part I contains a recitation of my background and experience in the area of criminal prosecution in the United States of America as well as a brief description of my duties and responsibilities as an Assistant United States Attorney;

Part II sets forth a summary of U.S. sanctions laws against North Korea and the facts supporting the Indictment filed in Criminal Case No. 23-cr-91 relating to unlawful activity engaged in by Jin;

Part III sets forth the law and the charges pertaining to the Indictment filed in Criminal Case No. 23-cr-91 relating to unlawful activity engaged in by Jin. It is subdivided as follows:

        a. Charging Process;

        b. Procedural History of the Case;

        c. Identification of Offenses and Penalties;

        d. Elements of the Offenses Charged;

        e. Statute of Limitations; and

        f. Status of the Case.

Part IV sets forth descriptive information relating to Jin; and

Part V is an index and certification of the exhibits attached to this affidavit.

## PART I

### Background and Experience

4.     I graduated from The George Washington University School of Law in 1994. I have worked for the Department of Justice ("DOJ") from 1996 until the present. From 1996 to 1997, I was a Trial Attorney at DOJ for the Criminal Division's Office of Enforcement Operations. From 1997 to 2003, I was a Trial Attorney at DOJ for the Criminal Division's Organized Crime and Racketeering Section. Beginning in January of 2003 up to the present, I

have worked as an Assistant United States Attorney for the United States Attorney's Office for the District of Columbia, serving in the Office's Superior Court and Criminal Divisions. From November of 2022 through the present, I have served as an Assistant United States Attorney in the National Security Section of the Office's Criminal Division. My duties are to prosecute persons charged with criminal violations of the laws of the United States and represent the United States in court. During my practice as an Assistant United States Attorney, I have become knowledgeable about the criminal laws and procedures of the United States, particularly with regard to the criminal law that relates to the conspiracy, bank fraud, and money laundering statutes, as well trade sanctions and export laws and regulations, including IEEPA.

5.      In the course of my duties, I have become familiar with the charges and evidence in the case of United States v. Jin Guanghua, Criminal Case No. 1:23-cr-91. The defendant named in this Indictment, Jin Guanghua, is the subject of this extradition request.

6.      These charges arose out of an investigation by the United States Federal Bureau of Investigation ("FBI") and the Department of Homeland Security ("DHS"), which revealed that between approximately February 2009 and March 2019, Jin and several co-conspirators engaged in a conspiracy to commit bank fraud by, among other things, using multiple front companies to purchase tobacco products from an international tobacco company located outside of Asia and other goods for North Korean customers. After the imposition of country-wide sanctions against North Korea in March 2016, Jin and the co-conspirators also engaged in a conspiracy to evade these sanctions.[1]  The same conduct (*i.e.*, the bank fraud conspiracy and

---

[1] As summarized below, North Korea has been subject to United Nations sanctions since 2006. Additionally, the United States imposed sanctions against North Korea in August of 2009 against Korea Kwangson Bank Corporation ("KKBC"), in March of 2013 against Foreign Trade Bank of Korea ("FTB"), and in March of 2016 against the entire country of North Korea, which effectively cut North Korea off entirely from accessing the U.S. financial system. As set forth below, the basis for charges against Jin arise from evasion of sanctions during this period by

3

sanctions conspiracy) also constituted a conspiracy to launder monetary instruments. To effect

these conspiracies, Jin and the co-conspirators committed substantive sanctions and money

laundering violations in furtherance of their scheme.

## PART II

### Factual Basis

#### A.   Relevant U.S. Sanctions Laws Against North Korea

7.     Under United States law, the President of the United States has the authority to

deal with any unusual and extraordinary threat, which has its source in whole or substantial part

outside the United States, to the national security, foreign policy, or economy of the United

States, if the President declares a national emergency with respect to such threat. The U.S.

Departments of the Treasury, Commerce, and State enforce and administer economic sanctions

under their respective authorities, to accomplish U.S. foreign policy and national security goals.

In particular, the Department of the Treasury publishes a publicly available list of individuals

and entities ("Specially Designated Nationals and Blocked Persons" or "SDNs") targeted by U.S.

economic sanctions. An SDN's property and interests in property, subject to U.S. jurisdiction or

in the possession and control of U.S. persons, are blocked when the SDN is placed on the SDN

list. U.S. persons, including U.S. financial institutions, are generally prohibited from dealing

with SDNs and their property and interests in property.

8.     Using the powers conferred by IEEPA, the President and the Executive Branch

have issued orders and regulations governing and prohibiting certain transactions with countries,

individuals, and entities suspected of proliferating Weapons of Mass Destruction ("WMD"). On

November 14, 1994, the President issued Executive Order ("EO") 12938, finding "that the

---

unlawfully accessing the U.S. financial system through the conduct of tobacco sales and other
products using U.S. dollars.

proliferation of nuclear, biological, and chemical weapons ('weapons of mass destruction') and of the means of delivering such weapons, constitutes an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and [declaring] a national emergency to deal with that threat."

9.    On June 28, 2005, the President, to take additional steps with respect to the national emergency described and declared in EO 12938, issued EO 13382 ("Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters") to target proliferators of WMD and their support networks and to deny designated proliferators access to the U.S. financial and commercial systems. EO 13382 authorized the U.S. Secretary of the Treasury, in consultation with the U.S. Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the EO. Pursuant to that authority, on April 13, 2009, the Secretary of the Treasury promulgated the "Weapons of Mass Destruction Proliferators Sanctions Regulations." *See* 31 C.F.R. § 544.101 *et seq.* EO 13382 and the Weapons of Mass Destruction Proliferators Sanctions Regulations prohibit transactions or dealings by any U.S. person or within the United States with individuals and entities placed on the SDN list, unless exempt or authorized by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), which is located in Washington, D.C.

10.    EO 13382 also provides that: "Any transaction or dealing by a United States person or within the United States in property or interests in property blocked pursuant to this order is prohibited, including, but not limited to, (i) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of, any person whose property and interests in property are blocked pursuant to this order, and (ii) the receipt of any contribution or provision of funds, goods, or services from any such person."

11.     On August 11, 2009, the Department of the Treasury designated the North Korean bank Korea Kwangson Banking Corp. ("KKBC") under EO 13382 for providing financial services in support of both Tanchon Commercial Bank and Korea Hyoksin Trading Corporation, both of which were previously identified by the President as WMD proliferators. All three entities had been designated by the UN pursuant to UN Security Council Resolution 1718 for their roles in North Korea's WMD and missile programs.

12.     On March 11, 2013, the Department of the Treasury designated the Foreign Trade Bank ("FTB"), North Korea's primary foreign exchange bank, pursuant to EO 13382, for providing financial services that assisted in the proliferating of WMD. On March 15, 2016, the President, to take additional steps with respect to the previously described national emergency, issued EO 13722 to address the Government of North Korea's continuing pursuit of its nuclear and missile programs. Pursuant to that authority, on March 16, 2016, the Secretary of the Treasury promulgated the "North Korea Sanctions Regulations." *See* 31 C.F.R. § 510.101 *et seq.* EO 13722 and the North Korea Sanctions Regulations prohibit the export of financial services from the United States or by any U.S. person to North Korea, unless exempt or authorized by OFAC. Under these orders, U.S. financial institutions were barred from providing correspondent banking services to North Korea entities.

13.     On March 15, 2016, the United States imposed country-wide sanctions on North Korea. On that date, the President, in order to take additional steps with respect to the previously described national emergency, issued EO 13722, addressing the Government of North Korea's continuing pursuit of its nuclear and missile programs. EO 13722 prohibited the export and reexport, directly or indirectly,[2] of goods, services, and technology to North Korea from the

---

[2] Indirect transactions include, as described further herein, transactions made by others on behalf of sanctioned entities.

United States or by a U.S. person, wherever located, including financial services, unless exempt or authorized by OFAC. Pursuant to this authority, U.S. financial institutions were barred from providing correspondent banking services to or on behalf of any North Korea individuals or entities.

14.    EO 13382, 13466, and 13722 and the North Korea Sanctions Regulations also prohibited any transaction by any U.S. person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in these regulations.

**B.    Overview of the Scheme**

15.    Between February 2009-March 2019, Jin and his co-conspirators engaged in a multi-year scheme to assist two North Korean tobacco companies and other North Korean entities to acquire raw tobacco and other products on the international market and to illegally access the U.S. financial system to pay for the same in U.S. dollars. Regarding the tobacco procurement, Jin's companies (described further herein) would contact international producers of raw tobacco, arrange for the purchase of the tobacco and its shipment to their clients in North Korea, and arrange for the invoices for the purchases to be paid in U.S. dollars through the U.S. financial system. Jin and his co-conspirators effected this scheme by using Chinese front companies, false shipping records, and other means of deception to make it appear to U.S. financial institutions and others that the raw tobacco was being shipped to China, not to North Korea, and that payments for the tobacco were being made in furtherance of legitimate trade with China, not prohibited trade with North Korea..

16.    Between February 2009-March 2019, as a result of United Nations ("UN") sanctions, U.S. sanctions against North Korea, and overall risk management concerns, correspondent banks would freeze, block, investigate, and/or decline to knowingly process any

U.S. dollar wire transactions involving entities in North Korea. Jin and his co-conspirators' scheme appeared aimed to avoid bank oversight into their transactions for North Korea, and to cause payments to be made without delay.

    17.    Companies discussed in this document and related to the scheme are in two subsets.

    a.   The first group of companies are those established directly by Jin and his co-conspirators (described herein as the "Winney Entities," as most had the name Winney in the title). Jin was listed as a shareholder of most of these entities and they were used directly in the furtherance of the scheme to make payments to tobacco suppliers and to receive funds from North Korean related entities. These companies were created to act as a middleman on North Korean purchases as North Korean banks lost the ability to transact internationally. Jin was involved in creating new Winney companies and also in changing company names of two Winney companies that he oversaw. The repeated reincorporation of the companies appear aimed to deal with issues that the Winney companies had with the U.S. financial system. Jin and his co-conspirators operated the day-to-day functions of these front companies; the investigation has revealed that employees operated under Jin's direction. Jin has been in a leadership role of these companies since the inception of the conspiracy, and was referred to by his co-conspirator as the "boss" of the Winney Entities.

    b.   The second group of companies, mainly Chinese entities (not established by Jin and his co-conspirators),were used by North Korean businesses and banks

to make payments to and on behalf of the Winney Entities. One set of these Chinese front companies were investigated previously and found to be front companies of the U.S. and UN sanctioned North Korean bank KKBC. Another set of front companies were being instructed to make payments to the Winney Entities by a representative of a second sanctioned North Korean bank called FTB. Communications related to these instructions were reviewed by the investigators, and it was determined that these front companies were not involved with the Winney Entities previously and only made payments to the Winney Entities because of the instructions from the sanctioned FTB bank representative.

**B.    Jin's Role in the Winney Entities**

18.    Jin, along with his co-conspirators, operated and ran a series of companies, most including the name of "Winney" (the Winney Entities). The Winney Entities brokered sales of products for North Korean customers, where Jin played a pivotal role in the daily operations and management of the companies.

19.    The indictment refers to several co-conspirators, including:

    a.    North Korea Tobacco Company 1 ("NKTC1"), a tobacco company owned by North Korea's Ministry of People's Armed Forces ("MPAF"), which was designated by OFAC in June 2017.

    b.    North Korea Tobacco Company 2 ("NKTC2"), a North Korean state-owned tobacco company, headquartered in Pyongyang, North Korea.

    c.    Sim Hyon-Sop, a North Korean national employed by FTB to act as its representative in Dubai, UAE.

9

        d.  Qin Guoming, a Chinese national from Liaoning Province in China, and resident of China. Qin was Jin's business partner, an owner and senior executive of the Winney Entities.

        e.  Han Linlin, a Chinese national from Liaoning Province in China, and resident of China. Han was employed by the Winney Entities.

20.    The Winney Entities included eight corporate entities associated with Jin and his co-conspirator (Qin Guoming). According to their corporate registry records, Jin was listed as a beneficial owner/principal shareholder for most of the Winney Entities, including Entity 4. This was further corroborated by a senior executive ("Confidential Source 1" or "CS-1") who worked for Company 1. CS-1 stated the Winney Entities were controlled by Jin and a co-conspirator, with Jin being the superior. Additionally, Jin's co-conspirator (Han) described Jin as the "boss" of the Winney Entities. Jin met with an undercover officer from DHS, Special Agent (SA) Erick Tarango, during which Jin purported to negotiate on behalf of the Winney Entities, further showing his control and ownership interest. Email evidence obtained in the case shows Jin directing employees of the Winney Entities, including Entity 4. Thus, the evidence supports that the Winney Entities were under the control and management of Jin.

21.    Jin and co-conspirators registered the Winney Entities through four different countries—the United Arab Emirates ("UAE"), China, England, and New Zealand. The Winney Entities frequently recycled the same addresses further connecting the entities together. Additionally, bank records showed three of the eight corporations of the Winney Entities had received U.S. dollar correspondent account wire transfers from at least one documented North Korean front company and used the same address as a now-sanctioned North Korean front company in Dandong, China. Furthermore, records from an email account for one of the co-

conspirator's revealed that two of the eight corporations were simply renamed but were the same entity.

22.    From 2008-2019, the Winney Entities controlled and utilized at least eleven bank accounts in the conduct of this scheme ("the Winney Bank Accounts"). During that time period, the Winney Bank Accounts were involved in approximately 310 U.S. dollar transactions totaling approximately $74,000,000. Specifically, the Winney Bank Accounts originated approximately 240 U.S. dollar transactions totaling approximately $45,562,675 and received approximately 70 U.S. dollar transactions totaling approximately $28,466,956. The majority of the aforementioned transactions related to payments for tobacco products which were shipped to North Korea. Jin's leadership role in the Winney Entities and communications retrieved from a search warrant executed on Jin's email account establish that he was aware of and involved in directing the payments made to and from the Winney Bank Accounts.

23.    As discussed in paragraph 65 below, under the law of conspiracy in the United States, Jin is criminally liable both for acts that he personally committed in furtherance of the conspiracy and any acts committed in furtherance of the conspiracy by co-conspirators provided such acts are a reasonable foreseeable consequence of the overall conspiracy. Furthermore, in general, evidence admitted against one defendant charged in a conspiracy is admissible against all other members of the conspiracy. Additionally, as discussed in paragraph 80 below, under the law of aiding and abetting in the United States, Jin, as a supervisor and owner of the Winney Entities, is criminally responsible for all the acts he caused his employees to take on behalf of the Winney Entities. Thus, under these theories, Jin is criminally responsible for all of the conduct of his co-conspirators and employees, as well as for his own conduct.

24.    All of the charges discussed herein relate to Jin's management, ownership, and control of the Winney Entities, including Winney Entity 4, the funding of the Winney Entities by North Korea, and the Winney Entities procurement of goods for North Korea.

### C.    The Winney Entities Were Funded by North Korean Entities Through U.S. Dollar Transactions

25.    Between February 2009-March 2019, the Winney Entities were funded by North Korean entities, in order for them to procure items for North Korea. The investigation revealed two such sources of funding: (i) Payments to the Winney Entities from known North Korean Front Companies located in China; and (ii) Payments to the Winney Entities made by a North Korean FTB banker.

26.    As the shareholder of the Winney Entities, Jin benefitted directly from the payments made by North Korea for the Winney Entities.

#### *North Korean Payments to Winney Entities Facilitated by Front Companies*

27.    Sanctioned North Korea bank KKBC funded the Winney Entities through U.S. dollar financial transactions made by Chinese front companies. Between in or around December 2009 and in or around January 2016, Jin and his co-conspirators caused North Korean front companies to wire to the Winney Entities approximately $16,989,863 to fund the Winney Entities' transactions on behalf of North Korea and North Korean entities, all of which were processed by U.S. financial institutions.

#### *North Korean Payments to Winney Entities by FTB & Its Employee, SIM*

28.    Sanctioned North Korean entity FTB also funded the Winney Entities, on behalf of North Korean tobacco companies, through U.S. dollar financial transactions made by FTB. An identified employee of FTB (Sim Hyon-Sop ("Sim")) paid or caused to be paid to the Winney

Entities approximately $2.9 million in U.S. dollars through U.S. financial institutions for the North Korean tobacco procurement done by the Winney Entities.

29.    On or about December 22, 2017, Sim sent an email to an unknown recipient, stating, "I can provide USD accounts overseas in some area such as Hong kong [sic] and Turkish, and also provide the documents such as invoice and contract, which are necessary for you to apply to the correspondent bank to transfer outside in USD."

30.    On or about June 16, 2018, Sim's email account received an email from a North Korean email address with a user whose email information stated they were located in Dandong, a Chinese city on the Chinese-North Korean border. Attached to the email was a document on one of the Winney Entities' letterhead, which described how to make payments to one of the Winney Entities, listed the Winney Entities' bank account details in Dubai, UAE, and listed an amount to be remitted to the account. The bank account listed on the form was a U.S. dollar bank account in the name of a Winney Entity ("Bank Account A").

31.    Between June-July 2018, Sim sent several emails to an unknown recipient 1 ("UR1") about sending money from various financial accounts to the Winney Entities. Several of the communications described splitting up the payments to be "safe," an apparent effort to avoid bank oversight. These payments were, at the direction of Sim, split into smaller transactions around $350,000.

32.    After these transactions, in or around July 2018, Sim updated a spreadsheet that contained a detailed list of financial transactions made to the Winney Entities in 2018. The spreadsheet also referred to the name of a North Korean Tobacco Company, discussed furthered herein, stating that the company had "recalled the bal[a]nce" of money fronted to Sim for transfer to the Winney Entities, and listed the date of the recall action as "12.10."

13

33.     In total, Sim caused to be sent approximately $2.9 million to the Winney Entities in 10 payments, all of which were processed by U.S. financial institutions and originated from a North Korean entity (*i.e.*, FTB). Had these banks known the true origin of the payments, they would not have processed them.

### D.     The Winney Entities' Tobacco Procurement

34.     Using the funds sent to the Winney Entities by North Korea, the Winney Entities operated as a middleman and procured tobacco for two North Korean Tobacco Companies ("NKTC1" and "NKTC2"). Paperwork of the Winney Entities shows that Jin and his co-conspirators knew that these North Korean companies were the customers for tobacco transactions, and that Jin and his co-conspirators knew these entities were located in North Korea.

> a.  North Korea Tobacco Company 1 ("NKTC1") was a tobacco company owned by North Korea's Ministry of People's Armed Forces ("MPAF"), which was designated by the United States in June 2017.
>
> b.  North Korea Tobacco Company 2 ("NKTC2") was a North Korean state-owned tobacco company, headquartered in Pyongyang, North Korea.

35.     The tobacco was procured from Company 1, a tobacco company located outside of Asia. Company 1 no longer does business with the Winney Entities, but was the sole supplier of tobacco related to this scheme.

36.     During the span of the charged conspiracy, the Winney Entities, from their various accounts, paid Company 1 approximately $35 million for tobacco products destined for North Korea which was sent through 102 wire transactions, all of which were processed by U.S. financial institutions. The investigation has also determined that Chinese front companies

additionally made payments directly to Company 1 on behalf of the Winney Entities'
procurement efforts. There are more than $1,000,000 worth of payments related to these front
company funds movements directly to Company 1. The payments from the Winney Entities and
the Chinese front companies, all on behalf of NKTC1 and NKTC2, appear designed to mask
from U.S. financial institutions the involvement of a North Korean entity in these transactions.

37.    Although the U.S. financial institutions were deceived about who the ultimate
payor of the goods were, the documentation of the Winney Entities and Company 1 shows that
these tobacco purchases were in fact for NKTC1 and NKTC2. Throughout the conspiracy, the
Winney Entities provided to Company 1 the information about where the shipments should be
sent.

    a.  Between February 2009-May 2016, shipping records related to the sales
by Company 1 to the North Korean customers typically listed a North
Korean purchaser.

    b.  However, after the imposition of U.S. sanctions against the country of
North Korea in March 2016, between in or around May 2016 and in or
around March 2019, the Winney Entities supplied false information to
Company 1 in order to remove references to North Korea from shipping
records related to Company 1's tobacco sales, for instance:

        i.  On or about August 1, 2016, Company 1 issued a bill of lading
related to sales, which listed the customer as "China Consignee
Company A," a Chinese logistics company in Dalian, and the port
of destination as Dalian, China.

ii.  On or about September 21, 2018, Jin's co-conspirator emailed
Company 1, stating that one of the Winney Entities, with an
address in China, would itself serve as the consignee on the
shipping records.

iii.  On or about February 17, 2019, Company 1 issued a bill of lading,
which listed the customer Entity 8, a Chinese "supply chain
management" company in Ganzhou, and the port of destination as
Dalian, China.

iv.  On or about March 18 2019, Company 1 issued a bill of lading,
which listed the customer "China Consignee Company B," a
Chinese "international trade" company in Shenzhen, and the port
of destination as Dalian, China.

38.  CS-1 was able to provide further details about the Winney Entities' conduct.
When business between Company 1 and the Winney Entities was first initiated, shipping
documents listed the North Korean buyer of the goods with its associated North Korean address.
However, the port of discharge was still listed as Dalian, China. CS-1 confirmed the Winney
Entities were responsible for all the changes on the bills of lading, which ultimately removed all
references to North Korea from vital shipping documents.

39.  Jin and his co-conspirators knew that the ultimate destination of these tobacco
products was North Korea. For instance, on December 24, 2018, an employee of the Winney
Entities emailed Jin a set of attachments related to a shipment of goods from Dalian, China, to
Nampo, North Korea. These documents included an invoice from the Winney Entities addressed
to NKTC1 for $220,000 of goods that would ship on December 28, 2018, and showed the

movement of tobacco from Dalian, China, to North Korea. Thus, Jin was directly involved in the management of this scheme and the movement of tobacco into North Korea.

40.  Jin and his co-conspirators discussed ways of circumventing the bank oversight and sanctions to allow the trade to continue, including the use of false shipping records and front companies.

     a.  One example of these discussions and Jin's involvement in the scheme is a meeting that took place in July 2019.[3] This meeting was in Company 1's home country and included Jin, Company 1 representatives and an undercover agent posing as an individual hired by Company 1 to help resolve the banking issues that had arisen with U.S. financial institutions. In the meeting, the undercover agent told Jin the U.S. banking problems prompted the in-person meeting. Jin responded (in Chinese), "No problem. Even though the account was frozen, if he [Company 1's executive] wants to do business with us we have a lot of ideas." Thereafter, Jin suggested that Company 1 could "register as a company and open a new account overseas such as in Dubai, Hong Kong or even Singapore." Jin continued, "These are the approaches we can do. It's not a problem." Jin further noted that, in such a scenario, Company 1 was "the ones committing fraud, I'm simply buying merchandise." Jin continued, "Don't you want to

---

[3] Although this meeting occurred after the aforementioned sales of tobacco to North Korea, the meetings show that Jin was involved in a manager of the Winney Entities and knew about how to work around U.S. sanctions. Subsequent statements of a defendant are admissible in U.S. court as evidence of Jin's knowledge and identity, or for any other reason as long as relevant to the finder of fact.

continue to do business with us? Then we can avoid the investigation by setting up another company in between."

41.    The investigation revealed multiple instances in which financial institutions exercised oversight on the Winney Entities' transactions. In investigations by financial institutions, it is routine for the institution to request paperwork related to the transaction and ask questions about the nature of the business. The investigations revealed several instances in which Jin's co-conspirator and employee, who conducted much of the bank communication for the Winney Entities, provided false information to financial institutions about the Winney Entities transactions. This included the employee denying that the transaction had any relation to North Korea.

42.    In one instance, a U.S. financial institution directly inquired about a transaction related to this scheme that was sent to Company 1. On or about May 5, 2019, Jin's employee sent an e-mail to Company 1, saying that the "payer" contacted the employee about an inquiry received from a U.S. financial institution related to payments involving Company 1. The "payer" was actually a front company that was making a payment directly to Company 1 for the Winney Entities procurement.

    a.    Jin's employee wrote in the email that the "payer" must respond within three days or else their bank account would be blocked. Jin's employee stated he contacted Company 1 for information related to the inquiry but had not received a response from Company 1. Jin's employee further said that in order to solve the account problem of Company 1, all parties "must share and keep in close contact with each other and coordinate in order to successfully pass the bank enquiries."

b. Jin's employee went on to say that the bank would independently ask Company 1 the same questions and compare answers in order to make sure both sides were responding in the same manner. Jin's employee stated "[t]herefore, we need to fully know what bank inquiries and what you have responded and coordinate other enquiries [sic] and upcoming responses before any submission to the bank. We hope that you can tell me the enquires & answers and documents which have been submitted to the bank so that the payer can provide consistent documents through the bank's enquiry [sic]." Jin's employee then produced the list of questions the "payer" received from the bank.

F.    **Examples of Jin's Knowledge and Involvement**

43.    As discussed above, Jin is criminally responsible for all of the conduct of his co-conspirators and employees. Additionally, the investigation revealed various examples of Jin's own personal conduct related to the scheme and his knowledge.

44.    According to email records from Jin's email account, on January 3, 2019, Jin received a copy of the Winney Entities "2018 work summary," which was addressed to Jin as "president." The document discussed a "challenging year for the development of trade with the DPRK [North Korea]." It further noted that Winney Entities had "respond[ed] to international sanctions" and the increase in shipping costs dating back to May 2018. The summary concluded by praising "the wise decisions and correct leadership of the two leaders [Jin and a co-conspirator] of the company" and noting the business decisions that "gradually returned to the right track," including moving the operations to Dubai. This email serves as an example of Jin's

knowledge of sanctions against North Korea and the Winney Entities' business dealings with North Korean entities.

45.    On December 24, 2018, Jin received an e-mail from a Winney Entities employee with an invoice related to a shipment being handled by Winney Entities. The recipient of the goods was listed as an entity discovered in the investigation to be based in North Korea and showed that the goods were being shipped from Dalian, China to "Nampo, DPRK." This shipping record relates to the latter half of the shipping transaction that is not reflected in paperwork provided to financial institutions in order to obscure that North Korea was the final destination for the goods involved. The invoice was for $220,000. The packing list for the order stated that the goods will be shipped to "Nampo, North Korea." This email is another example of Jin's knowledge of the Winney Entities' business dealings with North Korea as well as efforts to conceal those business dealings.

46.    On December 28, 2018, Jin received an e-mail from a Winney Entities employee with an attachment that tracked roughly six months (July through December 2018) of business between Winney Entities and one of their North Korean customers. The spreadsheet shows that over that six-month period, Winney Entities sold roughly $28,000,000 of goods, mostly tobacco products, to the North Korean entity. This is yet another example of Jin's knowledge of tobacco sales by Winney Entities to North Korean customers, and the aforementioned email was dated only a few days before Jin received the email on January 3, 2019 (paragraph 44 above), which discussed "challenges" in trade with North Korea and "international sanctions."

47.    Jin was knowledgeable about Winney Entities' use of KKBC, a North Korean bank that was sanctioned in August of 2009. On February 17, 2019, Jin received an email from a Winney Entities' employee with the subject of the email translated in English as "Create

Account Information." Two of the documents attached to this email were blank power of attorney forms. One of the other attachments was an application to open an account at KKBC.

48.    On July 2, 2019, an employee of the Winney Entities emailed Jin a chart of historical payments and amounts paid related to tobacco purchases by NKTC1. The chart showed 15 payments arranged by the Winney entities. Two of those payments related to purchases of Company 1's tobacco productions, including a March 24, 2019 payment in the amount of $220,000.00, which was blocked by the U.S. financial institution on or about April 3, 2019. Bank records were able to show these payments were routed through United States financial institutions via a series of front companies, which otherwise had no other connection to the transactions.

49.    In July 2019, Jin traveled to Company 1's headquarters to engage in direct negotiations related to the tobacco trade. At the request of law enforcement, Company 1 introduced an undercover agent ("UCA-1")[4] into their communications Jin, with UCA-1 posing as a Company 1 representative. Prior to the meeting, UCA-1 engaged in conversations with Jin's co-conspirator and employee, during which the employee referred to Jin as "the boss" of the Winney Entities and stated that Jin was going to visit Company 1 in person in July to help resolve some of the problems Company 1 was having related to blocking of funds for the Winney Entities transactions.

50.    On or about July 11, 2019, UCA-1 met with Jin in person in the city where Company 1 is located. UCA-1 told Jin the aforementioned bank freeze prompted the in-person meeting. Jin responded (in Chinese), "No problem. Even though the account was frozen, if he [Company 1's executive] wants to do business with us we have a lot of ideas." Thereafter, Jin

---

[4] UCA-1 is Special Agent Erick Tarango of DHS.

suggested that Company 1 could "register as a company and open a new account overseas such as in Dubai, Hong Kong or even Singapore." Jin continued, "These are the approaches we can do. It's not a problem." Jin further noted that, in such a scenario, Company 1 was "the ones committing fraud, I'm simply buying merchandise." Jin continued, "Don't you want to continue to do business with us? Then we can avoid the investigation by setting up another company in between."

51.    The investigation is unaware of any instances of Jin being present in the United States throughout the investigative timeframe.

### G.    The Winney Entities' Conduct Violates Multiple U.S. Statutes

52.    As described, between February 2009-March 2019,[5] Jin and his co-conspirators engaged in bank fraud through their efforts to mask from U.S. financial institutions the true nature of the financial transactions on behalf of North Korea. During this time period, as a result of United Nations' (UN) sanctions, U.S. sanctions against North Korea, and overall risk management concerns, correspondent banks would freeze, block, investigate, and/or decline to knowingly process any U.S. dollar wire transactions involving entities in North Korea. The scheme was motivated by concerns that the true nature of the transactions would impact the ability to do business in U.S. dollars, a currency in which Company 1 required payment.

53.    Jin and his co-conspirators defrauded U.S. financial institutions by causing those institutions to process tens of millions of dollars' worth of transactions that they would not have

---

[5] Even before the country-wide sanctions on North Korea, U.S. banks avoided conducting any transactions involving North Korea and would freeze, block, investigate, or decline such transactions if they knew that the transactions were connected to trade with North Korea, as alleged in the Indictment. Thus, Jin and his co-conspirators had a motive to hide the nature of their transactions from U.S. banks even before the imposition of sanctions. The evidence shows that Jin and his co-conspirators purposefully avoided having the true identity of the funds (i.e., North Korean entities) be disclosed to the banks processing U.S. dollar transactions.

processed if they had known the transactions were for the benefit of UN and U.S. sanctioned

North Korean banks that are controlled by the North Korean government. Specifically, if U.S.

financial institutions had known that the majority of inbound payments to the Winney Entities

were being made by entities operating as front companies for KKBC dating back to December

2009, these transactions would have been blocked and held for attempted sanctions violations.

54.     Similarly, the payments made pursuant to the instructions of an FTB employee

would have been blocked by the U.S. financial institutions beginning in 2013 if they were aware

of the true nature of the payment.[6] These payments related to the FTB employee (Sim) were

made directly to Winney Entities in 2018 and totaled nearly $3 million. The FTB employee

communicated with a third-party payment facilitator in order to have payments made to the

Winney Entities by Chinese front companies that had no prior ties to this procurement network.

This was one way that the North Korean tobacco purchasers were able to move money to the

Winney Entities from North Korea while disguising this fact from the U.S. financial institutions

involved in clearing the funds.

55.     The misrepresentations made to the U.S. financial institutions by the Winney

Entities, under the leadership of Jin, would be the use of entities (front companies) other than the

true parties involved in these transactions. If KKBC, FTB or their customers in North Korea

would have attempted to move the funds themselves, they would have been blocked by the U.S.

financial institutions; however, by inserting front companies on both sides of the transactions, the

banks were unaware of the North Korean connections to the payments.

---

[6] As discussed more fully below, on March 15, 2016, country-wide sanctions against North
Korea were initiated that served to cut off access to the U.S. financial system for all of North
Korea, including third parties acting on behalf or for the benefit of North Korea.

56.     Thus, the bank fraud conduct also violated U.S. sanctions against North Korea and Jin and his co-conspirators were knowledgeable about the imposition of sanctions. As such, the Indictment also charges Jin and his co-conspirators with violating U.S. country-wide sanctions against North Korea from on or about March 15, 2016, until on or about March 14, 2019. It is noted that even before March 2016, Jin and his co-conspirators were engaged in transactions with a KKBC front company after the time that KKBC was sanctioned, further evidencing their motive for the scheme. The Indictment also charges Jin and his co-conspirators with several substantive counts of sanctions violations, wherein U.S. financial institutions exported services for the benefit of North Korea after the imposition of U.S. country-wide sanctions against North Korea.

57.     Likewise, the financial transactions in furtherance of the scheme also constituted laundering of money instruments. As such, the Indictment charges Jin and his co-conspirators with conspiring to commit money laundering, and several instances of money laundering transactions.

## PART III

### The Charges and Pertinent United States Law

### A.     Procedural History of the Case

58.     On August 22, 2022, Special Agent Joy Gallante of the Federal Bureau of Investigation filed an affidavit in support of a criminal complaint, Crim. No. 1:22-mj-00192, before United States Magistrate Judge Robin M. Meriweather of the District of Columbia, formally charging Jin with criminal offenses against the laws of the United States. As discussed in paragraph 61 below, in cases involving offenses punishable by more than one-year of imprisonment (felony offenses), after a criminal complaint is filed, the United States must

formally charge the defendant by indictment, which may include different and/or additional offenses not included in the criminal complaint. Accordingly, in felony cases, a criminal complaint is used as a preliminary process for charging a defendant with a criminal offense.7

59.    On August 22, 2022, based on the complaint filed with the court, United States Magistrate Judge Robin M. Meriweather signed a warrant of arrest for Jin. It is the practice of the United States District Court for the District of Columbia to retain the original arrest warrant and file it with the records of the court. Therefore, I have obtained a copy of the arrest warrant from the clerk of the court and attached it to this statement as **Exhibit 2**.

60.    On March 21, 2023, an Indictment was returned by a Grand Jury sitting in the District of Columbia. I have obtained a copy of the Indictment from the clerk of the court and attached it to this statement as **Exhibit 1**.

### B.    The Charging Process

61.    Under the federal laws of the United States, a defendant may be formally charged by the filing of an indictment in a United States District Court. An indictment is a charging document that sets for the criminal offenses charged against a defendant. Under U.S. law, where the United States seeks to charge a defendant with a criminal offense punishable by a term of imprisonment exceeding one year, a defendant is entitled to be charged by indictment, even where a criminal complaint involving the same or similar offenses was initially filed. The indictment may contain the same offenses as charged in the criminal complaint, or it may include different or additional offenses. Once an indictment against the defendant is returned and filed, it supersedes the charges in the criminal complaint. An indictment is returned after the prosecution

---

7 Here, the criminal complaint charged conspiracy under 18 U.S.C. § 371, with bank fraud as an underlying offense that was the object of the conspiracy. In the indictment, the grand jury did not charge conspiracy under 18 U.S.C. § 371, but rather charged a bank fraud conspiracy under separate statutes, 18 U.S.C. §§ 1344, 1349.

presents evidence to a grand jury, which consists of between 16 and 23 jurors who are selected to listen to evidence in a criminal case. The sole purpose of the grand jury is to determine whether the prosecutor has presented sufficient evidence to establish that probable cause exists to believe that an offense has been committed and that the defendant named in the indictment committed it. If satisfied that the prosecution has presented sufficient evidence to establish probable cause, the grand jury votes to return the indictment against the defendant. At least 12 grand jurors must vote in favor of returning the indictment in order for the indictment to be returned. Once an indictment against a defendant is returned and filed, a United States Magistrate Judge may, at the government's request, issue a warrant for the arrest of the defendant named in the indictment. In a matter where an arrest warrant on a criminal complaint has been issued before an indictment is returned but that arrest warrant is not executed prior to the return of the indictment, the unexecuted arrest warrant remains valid unless and until the court issues an order quashing the unexecuted arrest warrant or issues a new arrest warrant pursuant to the indictment. So long as the arrest warrant issued pursuant to the criminal complaint is based upon the same facts upon which the indictment is returned, the validity of the arrest warrant is not impacted because the indictment charges different offenses than those alleged in the criminal complaint. The arrest warrant issued pursuant to the criminal complaint against Mr. Jin is still unexecuted and remains valid.

### C.    Identification of Offenses and Penalties

62.    The Indictment charges in 12 counts that Jin committed the following offenses:

Count 1:    conspiracy to commit bank fraud, in violation of Title 18, United States Code (U.S.C.), Sections (§) 1344 (1) and (2) and 1349, carrying a maximum penalty of 30 years imprisonment;

Count 2:    conspiracy to violate IEEPA, in violation of 50 U.S.C. § 1705, carrying a maximum penalty of 20 years imprisonment

Counts 3-6:    IEEPA, in violation of 50 U.S.C. § 1705, carrying a maximum penalty of
20 years imprisonment;

Count 7:    conspiracy to commit laundering of monetary instruments, in violation of
18 U.S.C. § 1956(a)(2)(A) and (h), carrying a maximum penalty of 20
years imprisonment; and

Counts 8-12:    Laundering monetary instruments, in violation of 18 U.S.C.
§ 1956(a)(2)(A), carrying a maximum penalty of 20 years imprisonment

63.    The United States requests the extradition of Jin for all of these offenses. Each

count charges a separate offense. Each offense is punishable under a statute that (1) was the duly

enacted law of the United States at the time the offense was committed, (2) was the duly enacted

law of the United States at the time the complaint was filed, and (3) is currently in effect. Each

offense is punishable under United States law by more than one year of imprisonment. Copies of

the pertinent sections of these statutes are attached as **Exhibit 3**.

D.    **Elements of the Offenses Charged**

**Count 1**

64.    Count 1 charges Jin with conspiracy to commit bank fraud, in violation of Title

18, United States Code (U.S.C.), Sections (§§) 1344, 1349, specifically, to execute scheme or

artifice to: defraud a financial institution or to obtain any of the moneys, funds, credits, assets,

securities, or other property owned by, or under the custody or control of, a financial institution,

by means of false or fraudulent pretenses, representations, or promises. Conspiracy to commit

bank fraud is a conspiracy for which the United States may extradite under its laws.

65.    Under United States law, a conspiracy is simply an agreement to commit one or

more criminal offenses, in this instance to commit bank fraud. The agreement on which the

conspiracy is based need not be written or even verbal. It may be simply a tacit understanding by

two or more persons to do something illegal. The conspirators enter into a partnership for a

criminal purpose in which each member or participant becomes a partner or agent of every other member. A person may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the identities of all the other members of the conspiracy. If a person has an understanding of the unlawful nature of a plan and knowingly and willfully agrees to it, joining in the plan, that is enough to convict him for conspiracy even though he did not participate previously and/or played only a minor part. In fact, a conspirator can be held criminally responsible for all reasonably foreseeable actions undertaken by other conspirators in furtherance of the criminal partnership. Moreover, because of this partnership, statements made by a conspirator in the course of and while he is a member of the criminal conspiracy are admissible in evidence not only against that conspirator, but also against all other members of the conspiracy. This is so because, as stated earlier, a conspirator acts as an agent or representative of the other conspirators when he is acting in furtherance of their illegal scheme. Therefore, statements of conspirators made in furtherance of the conspiracy may be deemed to be the statements of all conspirators.

66.    Under United States law, the crime of conspiracy is an independent offense, separate and distinct from the commission of any specific "substantive crimes." Consequently, a conspirator can be found guilty of a crime of conspiracy to commit an offense even where the substantive crime that was the purpose of the conspiracy is not committed. The Congress of the United States has deemed it appropriate to make conspiracy, standing alone, a separate crime, even if the conspiracy is not successful, because collective criminal planning poses a greater threat to the public safety and welfare than individual conduct and increases the likelihood of success of a particular criminal venture.

67.    To satisfy its burden of proof and convict Jin on Count 1, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements: (1) two or more persons entered an agreement to commit bank fraud; (2) that Jin knowingly became a member of the conspiracy to commit the underlying offense; and (3) that at least one co-conspirator committed at least one overt act in furtherance of the conspiracy. The overt acts relevant to the bank fraud conspiracy are alleged in the Indictment (see ¶ 50-74). An overt act is any action taken to further the objective of the conspiracy, and need not itself be a criminal act. The maximum penalty for this offense is 30 years in prison.

68.    Specifically, Count 1 alleges that between February 2009 and March 2019, Jin and his co-conspirators engaged in a conspiracy to execute a scheme or artifice (i) to defraud a financial institution; and (ii) to obtain money, funds, credits, assets, securities, and other property owned by and under the custody and control of, a financial institution by means of false and fraudulent pretenses, representations, and promises. Count 1 alleges that Jin and his-coconspirators did so by concealing from a financial institution that it was engaged in financial transactions for the benefit of North Korea and North Korean entities and through use of Chinese front companies. (See Indictment ¶ 47.)

69.    Count 1 alleges that Jin and his co-conspirators used various methods to perpetrate the fraud on the banks, including:

> a.  The co-conspirators and others caused payments to be sent by Chinese front companies to obfuscate North Korea's nexus to the transactions.
>
> b.  The co-conspirators and others split large payments so as to avoid bank oversight.
>
> c.  The co-conspirators and others listed and caused to be listed false information on bills of lading and other transaction-related documents, including the names and

locations of Chinese front companies, to hide North Korea's connection to those transactions.

d.  The co-conspirators and others transmitted and caused to be transmitted to U.S. financial institutions false information, including the involvement of Chinese front companies, about U.S. dollar transactions that were actually made on behalf of North Korea and North Korean entities.

e.  The co-conspirators caused goods to be shipped to Dalian, China, a point of smuggling for goods to North Korea, and onward to North Korea.

f.  JIN, QIN, and HAN repeatedly changed the names of their companies in an effort to evade oversight into their conduct.

g.  The co-conspirators and others used e-mail accounts to communicate about the payment schemes, use of Chinese front companies, and provision of false information, including to U.S. financial institutions.

70.    Under conspiracy law in the United States, Jin is responsible both for his own conduct, and for the conduct of his co-conspirators. The Winney Entities received numerous payments from front companies related to North Korean procurement, front companies which Jin and his employees knew were in no way related to the transaction. Moreover, the Winney Entities procured tobacco and arranged for front companies to pay for the same, directly. Jin is responsible for the actions of all his co-conspirators that are in furtherance of the conspiracy, even those he did not personally take. It is noted that Jin's co-conspirator, Sim, received from the Winney Entities payment instructions for how to send money to the Winney Entities' bank account. These instructions were on Winney Entities' letterhead, and thus evidence Winney Entities involvement in causing the transfers of millions of dollars to the company account.

71.    The United States, at trial, will establish these elements beyond a reasonable doubt primarily through the evidence as described *supra,* in paragraphs 69-70 and 96, *infra.*

**Count 2**

72.    Count 2 charges Jin with conspiracy to violate IEEPA, in violation of Title 50, U.S.C.§ 1705, which criminalizes violations of statutes and regulations passed pursuant to its authority, including those described further herein. Violation of IEEPA is grounds for which the United States may extradite under its laws.

73.    To satisfy its burden of proof and convict Jin for conspiracy to violate IEEPA, as charged in Count 2, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements: (1) two or more persons entered an agreement to violate IEEPA; (2) that Jin knowingly became a member of the conspiracy to commit the underlying offense; and (3) that at least one co-conspirator committed at least one overt act in furtherance of the conspiracy. The overt acts relevant to the bank fraud conspiracy are alleged in the Indictment (see ¶ 51-53, 55-74). An overt act is any action taken to further the objective of the conspiracy, and need not itself be a criminal act. The maximum penalty for this offense is 20 years in prison.

74.    Under United States law, a conspiracy is simply an agreement to commit one or more criminal offenses, in this instance to violate IEEPA. The agreement on which the conspiracy is based need not be written or even verbal. It may be simply a tacit understanding by two or more persons to do something illegal. The conspirators enter into a partnership for a criminal purpose in which each member or participant becomes a partner or agent of every other member. A person may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the identities of all the other members of the conspiracy. If a person has an understanding of the unlawful nature of a plan and knowingly and willfully agrees

to it, joining in the plan, that is enough to convict him for conspiracy even though he did not participate previously and/or played only a minor part. In fact, a conspirator can be held criminally responsible for all reasonably foreseeable actions undertaken by other conspirators in furtherance of the criminal partnership. Moreover, because of this partnership, statements made by a conspirator in the course of and while he is a member of the criminal conspiracy are admissible in evidence not only against that conspirator, but also against all other members of the conspiracy. This is so because, as stated earlier, a conspirator acts as an agent or representative of the other conspirators when he is acting in furtherance of their illegal scheme. Therefore, statements of conspirators made in furtherance of the conspiracy may be deemed to be the statements of all conspirators.

75.     Under United States law, the crime of conspiracy is an independent offense, separate and distinct from the commission of any specific "substantive crimes." Consequently, a conspirator can be found guilty of a crime of conspiracy to commit an offense even where the substantive crime that was the purpose of the conspiracy is not committed. The Congress of the United States has deemed it appropriate to make conspiracy, standing alone, a separate crime, even if the conspiracy is not successful, because collective criminal planning poses a greater threat to the public safety and welfare than individual conduct and increases the likelihood of success of a particular criminal venture.

76.     As described in the indictment, the co-conspirators were already involved in a conspiracy to commit bank fraud at the time that the United States imposed country-wide sanctions on North Korea. Their conspiracy quickly evolved thereafter to include also a conspiracy to evade U.S. sanctions, as is evidence by their conduct. Specifically, prior to March 2016, the Winney Entities supplied information to Company 1 for the shipping documentation

that included the true identity of the North Korean purchasers and their addresses. However, after

the imposition of sanctions, the Winney Entities changed the information on the paperwork to

avoid references to North Korea, despite that the contracts with Company 1 were all of the same

purchaser (according to Company 1). (See Indictment ¶ 57-58.) Thus, the indictment alleges that

the conspiracy to commit sanctions violations began in or around March 15, 2016. As described

herein (see *infra* ¶ 83), additional evidence supports that Jin and his co-conspirators were

knowledgeable about U.S. sanctions and acting to avoid the same.

77.    Under conspiracy law in the United States, Jin is responsible both for his own

conduct, and for the conduct of his co-conspirators. The Winney Entities received numerous

payments from front companies related to North Korean procurement, front companies which Jin

and his employees knew were in no way related to the transaction. Moreover, the Winney

Entities procured tobacco and arranged for front companies to pay for the same, directly. Jin is

responsible for the actions of all his co-conspirators that are in furtherance of the conspiracy,

even those he did not personally take. It is noted that Jin's co-conspirator, Sim, received from the

Winney Entities payment instructions for how to send money to the Winney Entities' bank

account.

78.    The United States, at trial, will establish these elements beyond a reasonable a

doubt primarily through the evidence as described *supra,* in paragraphs 37 through 50 and 96,

*infra.*

### Counts 3 through 6

79.    Counts 3 through 6 charge Jin with violation of IEEPA, in violation of Title 50,

U.S.C.§ 1705. Violation of IEEPA is grounds for which the United States may extradite under its

laws.

80.    As stated, Title 18, U.S.C. § 2 states that "whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal" and "whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." Aiding and abetting liability is a theory under which the government may show that a defendant is criminally responsible, and it does not need to be plead in the indictment (although it is listed in this Indictment, *see* **Exhibit 1 at 1**).

81.    As previously described, EO 13382 also provides that: "Any transaction or dealing by a United States person or within the United States in property or interests in property blocked pursuant to this order is prohibited, including, but not limited to, (i) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of, any person whose property and interests in property are blocked pursuant to this order, and (ii) the receipt of any contribution or provision of funds, goods, or services from any such person." On March 15, 2016, the United States imposed country-wide sanctions on North Korea. EO 13722 prohibited the export and reexport, directly or indirectly,[8] of goods, services, and technology to North Korea from the United States or by a U.S. person, wherever located, including financial services, unless exempt or authorized by OFAC. Pursuant to this authority, U.S. financial institutions were barred from providing correspondent banking services to or on behalf of any North Korea individuals or entities.

82.    To satisfy its burden of proof and convict Jin for violation of IEEPA, as charged in Counts 3 through 6, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements: (1) That the Jin or a co-conspirator exported, attempted to

---

[8] Indirect transactions include, as described further herein, transactions made by others on behalf of sanctioned entities.

export, or caused the export directly or indirectly, U.S. goods or services (*i.e.*, financial services of U.S. banks – here, wire U.S. dollar wire transfers that were processed by U.S. banks) to or for the benefit of a North Korean entity; (2) that the goods or services required a license from the U.S. Department of Treasury before Jin could export them; (3) that the necessary license or authorization was not obtained before conducting the transaction; and (4) that Jin acted willfully. The maximum penalty for this offense is 20 years imprisonment.

83.     The indictment alleges specific facts related to each of the substantive IEEPA counts, and specifies which co-conspirator caused the origination of the funds. (Indictment ¶¶ 51 & 53.) The indictment alleges that no license was obtained for any of these transactions. (Indictment ¶ 8, 78, 80, 84.)

84.     The United States will establish the four elements of the IEEPA violation at trial by, among other things, the testimony of FBI and DHS investigators, records from the respective financial institutions, testimony from representatives of the respective financial institutions, records from Google, including records of communications between Jin and his co-conspirators, testimony of representatives from Google, and testimony from representatives from Company 1. In addition, DHS SA Erick Tarango, met Jin in person during an undercover operation as part of the investigation and can identify Jin and as a participant in the charged offenses.

85.     This evidence will establish that Jin had direct control over the Winney Entities and their business operations. It will also show that Jin engaged in numerous overt acts of creating different front companies to limit the ability of U.S. financial institution to detect the fraudulent activity being conducted by Jin and co-conspirators. Finally, this evidence will establish Jin's effort to evade sanctions by altering or falsifying, and causing others to alter or falsify, the bills of lading for each shipment that was destined for North Korea. The

communications, wire transfers, falsification of shipping documents, and establishment of front
companies by Jin and his co-conspirators demonstrate Jin's knowledge of the fraudulent nature
of the business transactions conducted by the Winney Entities and his willful evasion of
sanctions. Examples include:

    a.  Winney Entities' decision to change bills of lading and other shipping
documents after March 2016 in order to hide the fact of the North Korean
purchasers.

    b.  Email searches by co-conspirator Sim in 2017 related to Treasury
Department Sanctions.

    c.  Winney Entities responses to banking inquiries in May 2018, August
2018, May 2019 in which the company supplied false information in
response to questions about transactions related to sanctioned countries.

    d.  Emails between Jin and Winney Entities employees that listed the identity
of the North Korean purchasers in December 2018, and showing that
shipments were being sent through Dalian with false information on the
shipping documents.

    e.  A 2018 work summary for Winney Entities, received by Jin in January
2019, stating that Winney had a "challenging year for the development of
trade with DPRK" and that Winney had "responded to International
sanctions" and their move to Dubai.

    f.  The repeated and otherwise unnecessary changing of the Winney Entities
name, resulting in fees and loss of consistent business identity, including

in June 2019, which was done after inquiries from banks related to sanctions.

g.  Comments made by Jin in June-July 2019 related to working in the future with Company 1 and how to avoid sanctions.

86.     Under conspiracy law in the United States, Jin is responsible both for his own conduct, and for the conduct of his co-conspirators. The Winney Entities received numerous payments from front companies related to North Korean procurement, front companies which Jin and his employees knew were in no way related to the transaction. Moreover, the Winney Entities procured tobacco and arranged for front companies to pay for the same, directly. Jin is responsible for the actions of all his co-conspirators that are in furtherance of the conspiracy, even those he did not personally take. It is noted that Jin's co-conspirator, Sim, received from the Winney Entities payment instructions for how to send money to the Winney Entities' bank account.

### Count 7

87.     Count 7 charges Jin with a conspiracy to launder monetary instruments, in violation of Title 18, U.S.C.§ 1956(a)(2)(A) and (h). The offense of conspiracy to launder monetary instruments is a ground for which the United States may extradite under its laws.

88.     To satisfy its burden of proof and convict Jin for conspiracy to launder monetary instruments, as charged in Count 7, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements: (1) two or more persons entered an agreement to commit the underlying offense of (*i.e.*, money laundering); and (2) that Jin knowingly became a member of the conspiracy to commit the underlying offense.  The maximum penalty for this offense is 20 years of imprisonment.

37

89.    As described in the indictment and further herein, the money laundering conspiracy involves payments made to or from Entity 4, of which Jin was the executive officer. See ¶ 19. The conspiracy involves the wire transfer of U.S. dollar funds from outside the United States, processed through a bank in the United States (specifically, New York), and then sent to the recipient outside the United States. Jin and his co-conspirators made wire transfers and caused others to do the same, all of which transited from outside the United States and then through the U.S. financial system, all in furtherance of the scheme. The indictment refers to specific acts of money laundering (*i.e.*, international wire payments) at various points (see Indictment ¶¶ 50(a)-(gg), 51(a)-(q), 53(a)-(i), 54(b)-(c), 56).

90.    That Jin and the co-conspirators had agreed to commit money laundering seen through the structuring of the transactions. The co-conspirators set up transactions of funds going into and out of the Winney Entities. This added additional unnecessary transactions to the procurement funding. Moreover, the transactions were in the names of front companies that had nothing to do with the tobacco product sales, further showing an effort to launder funds. This sophisticated financial structuring, arranged by Jin and his co-conspirators,[9] evidences the agreement between them.

91.    The United States, at trial, will establish these elements beyond a reasonable doubt primarily through the evidence as described *supra,* in paragraphs 25 through 50 and 96, *infra.*

---

[9] It is noted that Jin's co-conspirator, Sim, received from the Winney Entities payment instructions for how to send money to the Winney Entities' bank account.

**Counts 8 through 12**

92.    Counts 8 through 12 charge Jin with laundering monetary instruments, in violation of Title 18, U.S.C.§ 1956(a)(2)(A). The offense of laundering monetary instruments is a ground for which the United States may extradite under its laws.

93.    To satisfy its burden of proof and convict Jin for laundering monetary instruments, as charged in Counts 8 through 12, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements: (1) that Jin or a co-conspirator transported, transmitted, transferred or attempted to do so, or caused the same, monetary instruments or funds; (2) from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States; and (3) with the intent to promote the carrying on of specified unlawful activity. For each substantive count, both bank fraud and violation of IEEPA are "specified unlawful activities" pursuant to 18 U.S.C. 1956(a)(2)(A).  The maximum penalty for this offense is 20 years of imprisonment.

94.    As described in the indictment and further herein, each of the substantive violations involve payments made to or from Entity 4, of which Jin was the executive officer. See ¶ 19. Each substantive violation involves the wire transfer of U.S. dollar funds from outside the United States, processed through a bank in the United States (specifically, New York), and then sent to the recipient outside the United States. The Indictment specifies which co-conspirator caused the origination of the funds. (Indictment ¶ 51.) It is noted that Jin's co-conspirator, Sim, received from the Winney Entities payment instructions for how to send money to the Winney Entities' bank account.

95.    The United States, at trial, will establish these elements beyond a reasonable

doubt primarily through the evidence as described *supra,* in paragraphs 25 through 50 and 96,

*infra.*

E.    **Evidence Relevant to Each Offense**

96.    The indictment alleges multiple crimes, but all involve the same set of facts and

conducts.

a.  ***Count 1: Bank Fraud Conspiracy.*** Between February 2009 and March

2019 ("the bank fraud time period"), Jin and co-conspirators created

multiple front companies and used false shipping records to purchase

tobacco and other goods (specifically, a helicopter) for North Korea. Jin

then utilized these Chinese front companies to launder the related U.S.

dollar payments for these shipments, which caused U.S. banks to process

transactions unknowingly for North Korea, in violation of the law. As

stated, the defendants effected this scheme by using front companies, false

shipping records, and other means of deception to make it appear to U.S.

financial institutions and others that the raw tobacco was being shipped to

China, not to North Korea, and that payments for the tobacco were being

made in furtherance of legitimate trade with China, not prohibited trade with

North Korea. Thus, Jin and his co-conspirators deceived correspondent

banks in the United States, who would not have otherwise processed these

transactions had they known about the nexus to North Korea. As a result of

this fraud, U.S. financial institutions processed at least 310 transactions of

approximately $74 million that they otherwise would have investigated or

not have processed, had they known that the transactions were being conducted in furtherance of trade with North Korea. The indictment describes the relevant conduct at Paragraphs 49-74.

b. ***Count 2: Conspiracy to Commit Sanctions Violations.*** Additionally, the indictment further charges that, between March 15, 2016 until March 2019 ("the sanctions time period"), Jin and his co-conspirators also violated U.S. sanctions barring trade with North Korea by engaging in the same conduct. After the imposition of country-wide sanctions against North Korea by the United States in 2016, Jin and his co-conspirators discussed ways of circumventing the sanctions to allow the trade to continue, including the use of false shipping records, false destinations, and front companies. The same conduct relevant to the bank fraud conspiracy (Indictment ¶¶ 51-53, 54-74) is relevant to the conspiracy to commit sanctions violations.

c. ***Count 3-6: Substantive Sanctions Violations.*** The indictment alleges that, during the time period of the sanctions conspiracy, Jin and his co-conspirators committed substantive acts of sanctions violations. The same conduct relevant to the sanctions conspiracy (Indictment ¶¶ 49-74) is relevant to the proving the sanctions violations, including:

    i. Count 3: June 20, 2018 – FTB funds to Winney Entity, processed by a U.S. bank (see also Indictment ¶ 51(e))

    ii. Count 4: June 20, 2018 – FTB funds to Winney Entity, processed by a U.S. bank (see also Indictment ¶ 51(f))

     iii.  Count 5: July 12, 2018 – FTB funds to Winney Entity, processed by a U.S. bank (see also Indictment ¶ 51(m)-(n))

     iv.  Count 6: June 1, 2019 – Winney Entity funds (from North Korean source and for North Korean entity) to Company 1, processed by a U.S. bank (see also Indictment ¶ 53(i))

d.  ***Count 7: Money Laundering Conspiracy.*** The aforementioned conspiracy offenses (bank fraud and sanctions) are also conduct underlying the money laundering conspiracy. Jin and his co-conspirators made wire transfers and caused others to do the same, all of which transited from outside the United States and then through the U.S. financial system, all in furtherance of the scheme. The same conduct relevant to the bank fraud conspiracy and sanctions conspiracy (¶¶ 49-74) is relevant to the conspiracy to commit money laundering. Specially, the indictment refers to acts of money laundering (*i.e.*, international wire payments) at various points (see Indictment ¶¶ 50(a)-(gg), 51(a)-(q), 53(a)-(i), 54(b)-(c), 56). The underlying offenses for the money laundering conspiracy are:

     i.  February 2009 and March 2019 – Money Laundering and Conspiracy to Commit Money Laundering in furtherance of a Bank Fraud conspiracy.

     ii.  March 2016 until March 2019 – Money Laundering and Conspiracy to Commit Money Laundering in furtherance of sanctions conspiracy and sanctions violations.

e. ***Count 8-12: Substantive Money Laundering Offenses.*** The indictment alleges that, during the time period of the money laundering conspiracy, Jin and his co-conspirators committed substantive acts of money laundering.: The same conduct relevant to the sanctions conspiracy (Indictment ¶¶ 49-74) is relevant to the proving the sanctions violations, including:

  i. Count 8: June 22, 2018 – FTB funds to Winney Entity, processed through the United States and a U.S. bank (see also Indictment ¶ 51(h))

  ii. Count 9: June 26, 2018 – FTB funds to Winney Entity, processed through the United States and a U.S. bank (see also Indictment ¶ 51(i))

  iii. Count 10: July 16, 2018 – FTB funds to Winney Entity, processed through the United States and a U.S. bank (see also Indictment ¶ 51(p))

  iv. Count 11: September 24, 2018 – Winney Entity funds (from North Korean source and for North Korean entity) to Company 1, processed by a U.S. bank (see also Indictment ¶ 53(g))

  v. Count 12: October 10, 2018 – Winney Entity funds (from North Korean source and for North Korean entity) to Company 1, processed by a U.S. bank (see also Indictment ¶ 53(h))

97.     Thus, the bank fraud, sanctions, and money laundering conspiracies all overlap, though the sanctions conspiracy has a shorter time period. The indictment alleges relevant the

43

evidence in Count 1, and then realleges that same evidence in counts 2 and 7. The substantive violations are a subset of each of the conspiracies.

98.    It is noted that the bank fraud conspiracy (and thus money laundering conspiracy) time period is more extensive than the sanctions conspiracy time frame. Jin and his coconspirators were committing bank fraud prior to and regardless of any sanctions against North Korea. After the imposition of country-wide sanctions, they also engaged in a conspiracy to avoid sanctions.

### F.    Statute of Limitations

99.    The statute of limitations applicable to the offense charged in Count 1 is 18 U.S.C. § 3293(1), which allows prosecution to commence within ten (10) years after the offense is committed. The statute of limitations for Counts 2-12 is 18 U.S.C. § 3282, which allows the prosecution to commence within five (5) years after the offense is committed. With respect to the conspiracy offenses charged in Counts 1, 2, and 7, the statute of limitations does not begin to run until the last overt act was committed in furtherance of the conspiracy. A copy of the statutes are attached as **Exhibit 3**. The indictment is dated March 21, 2023. and Count 1 charges an offense that began in February of 2009 and continued until March of 2019. Count 2 charges an offense that began on March 15, 2016 and continued until March 2019. Counts 3 through 12 charge offenses that occurred between June 20, 2018 and March 1, 2019. Count 7 charges an offense that began in February 2009 and continued through March of 2019. Counts 8 through 12 charge offenses that occurred between June 22, 2018 and October 10, 2018. Therefore, the charges were filed within the prescribed time.

### F.    Status of the Case

100.    On April 25, 2023, a motion filed by the United States to unseal the indictment against Jin was granted.

## PART IV

### Identification and Location of Jin

101.    Jin is a citizen of China who was born in Liaoning, China on November 26, 1971. He is an Asian male. He has black hair and dark colored eyes. His height and weight are unknown. His China passport number is E16294787. As of August 22, 2022, Jin is believed to reside in Victoria, Australia. I have attached to this affidavit as **Exhibit 4** a photograph of Jin, which U.S. law enforcement authorities obtained from a search warrant executed on an email address linked to Jin. As discussed earlier in this affidavit, Special Agent Erick Tarango, DHS, met with Jin in Argentina and has identified the person depicted in the photograph as both (a) the person SA Tarango knows as Jin, and (b) the person SA Tarango knows to have committed the offenses described in this affidavit.

102.    Pursuant to the United States' request for a Provisional Arrest, Jin was arrested in Melbourne, Australia on or about March 21, 2023.  Jin is presently in custody.

## PART V

### Index to Exhibits and Certification

103.    I have attached to this statement the following documents:

**Exhibit 1.**    a certified copy of the Indictment;

**Exhibit 2.**    a certified copy of the arrest warrant;

**Exhibit 3.**    a copy of the relevant legal provisions, including pertinent sections of the following:

> Rule 4, Federal Rules of Criminal Procedure;
> Title 18, United States Code, § 2;
> Title 18, United States Code, § 20;
> Title 18, United States Code, § 1344;
> Title 18, United States Code, § 1349;
> Title 18, United States Code, § 1956;

Title 18, United States Code, § 1961;
Title 50, United States Code, § 1705;
Executive Order 13382 of June 28, 2005;
Executive Order 13466 of June 26, 2008;
Executive Order 13722 of March 18, 2016;
Title 31, Code of Federal Regulations, Subtitle B, Chapter V, Part 510, Subpart B;
Title 31, Code of Federal Regulations, Subtitle B, Chapter X, Part 1010, Subpart F;
Title 18, United States Code, § 3282;
Title 18, United States Code, § 3293;
Title 18, United States Code, § 981;
Title 18, United States Code, § 982;
Title 21, United States Code, § 853; and
Title 26, United States Code, § 2461.

**Exhibit 4.**     a photograph of Jin Guanghua.

## CONCLUSION

104.    This affidavit, including its exhibits, contains sufficient evidence to support the request of the United States of America that Jin Guanghua be extradited from the Commonwealth of Australia to the United States of America, District of Columbia, for prosecution on the above-cited offenses, and that he be detained pending the determination of his extradition, and any appeal thereof.

May 2, 2023
Washington, D.C.
United States of America

_____
Steven B. Wasserman
Assistant United States Attorney
United States Attorney's Office
for the District of Columbia

I hereby certify that this is the original affidavit sworn to and subscribed to before me by Steven B. Wasserman on May 2, 2023, in Washington, D.C., United States of America.

_____
G. MICHAEL HARVEY
Magistrate Judge
United States District Court for the District of Columbia
UNITED STATES OF AMERICA