**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | } | |
| | } | |
| **v.** | } | **Criminal No. 23-CR-91-CKK** |
| | } | |
| **GUANGHUA JIN,** | } | |
| | } | |
| **Defendant.** | } | |
| | } | |
| _____ | } | |

**DEFENDANT'S MOTION TO DISMISS COUNTS ONE THROUGH SIX FOR**
**FAILURE TO STATE AN OFFENSE AS TO EXTRATERRITORIAL CONDUCT**

Pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure, Defendant Jin Guanghua ("Mr. Jin.") respectfully moves the Court to dismiss Count One, which charges him with conspiracy to commit bank fraud, 18 U.S.C. § 1344, and Counts Two through Six, which charge him with conspiracy and substantive violations of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1705.

**INTRODUCTION**

"It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Autsl. Bank Ltd.*, 561 U.S. 247, 255 (2010). "This principle finds expression in a canon of statutory construction known as the presumption against extraterritoriality: Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco v. European Community*, 579 U.S. 325, 335 (2016)(quoting *Morrison*). "When a statute gives no clear indication of an extraterritorial application, it has none." *Id.*

1

Neither the bank fraud statute nor IEEPA, underlying Counts One through Six of the indictment, contains any clear expression of congressional intent that they apply to foreign conduct. That alone is sufficient for this Court to hold, under the presumption against extraterritoriality, that the two statutes apply only to domestic activity. But the IEEPA in fact goes further. By its express terms, IEEPA applies only to persons and property "subject to the jurisdiction of the United States." While the phrase "subject to the jurisdiction of the United States" is susceptible to many meanings, we respectfully submit that it does not mean "a foreign person acting in a foreign country."

The charged conduct is quintessentially foreign. The statutes allegedly violated are fully domestic. The mere fact that a U.S. bank may become incidentally involved when a foreign person makes a wire transfer in international commerce does not thereby subject that foreigner "to the jurisdiction of the United States." The indictment fails to state a violation of either the bank fraud statute or of IEEPA, and this Court should so hold.

## BACKGROUND

### A. The International Emergency Economic Powers Act

The International Emergency Economic Powers Act authorizes the President, upon the declaration of a national emergency, to "investigate, regulate, or prohibit" transactions with foreign countries or foreign nationals "by any person, or with respect to any property, <u>subject to the jurisdiction of the United States</u>" and to prescribe regulations to that effect. 50 U.S.C. § 1702 *et seq.* (emphasis added). The statute also provides the following as penalties:

> "(a) Unlawful Acts
> It shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter.
> …
> (c) Criminal Penalty

> A person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) shall, upon conviction, be fined not more than $1,000,000, or if a natural person, may be imprisoned for not more than 20 years, or both."

50 U.S.C. § 1705.

Pursuant to this authority, the President prescribed the North Korea Sanctions Regulations as part of an economic sanctions regime on North Korea.  30 C.F.R. § 510.201 et seq. The pertinent regulation, section 206, provides the following:

> "(a) The exportation or reexportation, directly or indirectly, from the United States, or by a <u>U.S. person</u>, wherever located, of any goods, services, or technology to North Korea is prohibited."

31 C.F.R. § 510.206 (emphasis added)

The regulation then goes on to define a "U.S. person" as:

> "any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States."

31 C.F.R. § 510.326.

## B. The alleged conspiracy

The defendant, Mr. Jin, is a Chinese National and Australian resident who, according to the indictment, ran a group of companies founded in Dubai and other locations outside the United States with several co-defendants in this case.[1] *Indict.* ¶¶4, 39.  The indictment alleges that these companies were part of a "multi-year scheme" that ran from 2009 to 2019 "to assist North Korean entities to acquire raw tobacco and other products on the international market".  *Id.* ¶ 6

---

[1]    Given the procedural posture of this motion, we recite the background facts by accepting the allegations in the indictment as true.  This does not mean, however, that Mr. Jin agrees with the indictment or the truth of the allegations.

As part of the alleged scheme, Mr. Jin and his co-defendants allegedly purchased tobacco from international suppliers, shipped the tobacco to North Korea, and used "front companies, false shipping records, and other means of deception" to conceal the fact that the tobacco was destined for North Korea. *Id.* North Korean entities, in turn, allegedly paid Mr. Jin's companies by sending money through "Chinese front companies." *See generally id.* ¶¶ 49-51.

The indictment also alleges that, during the relevant time period, U.S. banks would routinely block or refuse to process transactions involving North Korean entities as a result of U.S. sanctions and laws then in place. *Id.* ¶14. However, as a result of the defendant's alleged concealment of North Korean involvement in the tobacco purchases, U.S. banks processed "at least 310 transactions…that they otherwise would have frozen, blocked, investigated, and/or declined." *Id.* ¶7.

**C. The defendant's arrest and prosecution in the instant case**

At some point during the course of this alleged conspiracy, the FBI came to suspect the defendant of violating U.S. sanctions laws. Through the assistance of a cooperating company in a foreign country, the FBI conducted an undercover operation, and two of its agents met with Mr. Jin in person, in July 2019. The details of that meeting and the operation is discussed in more detail in other motions. Shortly after that meeting, the defendant's companies apparently stopped doing business with North Korea, as the indictment alleges that the conspiracy ended in 2019.

Almost four years later, in March 2023, the government obtained an indictment in this district. When the indictment was issued, the defendant was residing in Australia with his family. The government, with the cooperation of Australian authorities, arrested Mr. Jin on an extradition request. Then on September 30, 2024, Mr. Jin was brought before this Court.

The indictment charges the defendant with one count of conspiracy to commit bank fraud (Count One), one count of conspiracy to violate the International Emergency Economic Powers Act ("IEEPA")(Count Two), four counts of IEEPA violations (Counts Three through Six), one count of conspiracy to commit money laundering (Count Seven), and five more counts of money laundering (Counts Eight through Twelve). The allegations as to each count are largely duplicated, and all of the counts are predicated upon the transactions described in the foregoing paragraphs.

## ARGUMENT

## I.    GENERAL PRINCIPLES GOVERNING RULE 12(b) MOTIONS

Defects in the indictment, including the failure to state an offense, must be raised by pretrial motion. Fed. R. Crim. P. 12(b)(3). When reviewing such a motion, the Court presumes that the allegations of the indictment are true. *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015). "The operative question is whether [those] allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed." United States v. Sanford Ltd., 859 F. Supp. 2d 102, 107 (D.D.C. 2012).

## II.    COUNTS TWO THROUGH SIX MUST BE DISMISSED BECAUSE IEEPA DOES NOT REACH FOREIGN CONDUCT BY FOREIGN DEFENDANTS

The Supreme Court in *RJR Nabisco* established a "two-step framework for analyzing extraterritoriality issues." *Id.* at 337. The first step asks "whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* If the presumption is not rebutted, then courts must proceed to the second step, by asking "whether the case involves a domestic application of the statute." *Id.*

Here, there is nothing in the IEEPA that comes remotely close to the kind of clear, "unmistakable congressional intent" required to rebut the presumption against extraterritoriality. Thus, it has no extraterritorial effect under *Nabisco*'s step one. Furthermore, the instant case, predicated upon foreign conduct by foreign defendants acting on foreign soil, plainly involves a foreign application of IEEPA under *Nabisco*'s step two. Finally, neither conspiracy nor aiding and abetting liability can extend a domestic statute's reach and convert it into an extraterritorial one. Therefore, Counts Two through Six must be dismissed for failure to state an offense.

### A. The IEEPA is not an extraterritorial statute because there is nothing in the text of the statute that rebuts the presumption against extraterritoriality.

Under step one of the *Nabisco* framework, a court must determine whether the text of the statute gives a "clear, affirmative indication that it applies extraterritorially." *Nabisco*, 579 U.S. at 337. Most frequently, such "clear, affirmative indication" is found when the statute expressly states that it applies to extraterritorial conduct. *See id.* at 338 (finding certain RICO predicates to be extraterritorial where statutory text includes phrases such as: "tak[e] place outside the United States," "There is extraterritorial jurisdiction over the conduct prohibited by this section," "occurred outside the United States," or "while such national is outside the United States."). While "an express statement of extraterritoriality is not essential," it is "the rare statute that clearly evidences extraterritorial effect despite lacking an express statement of extraterritoriality." *Id.* at 340.

In this case, there is nothing in IEEPA that comes close to the kind of clear, affirmative indication required to overcome the presumption against extraterritoriality. To the contrary, IEEPA's use of the term "subject to the jurisdiction of the United States" appears to indicate just the opposite. *See* 50 U.S.C. § 1702(a)(1)(A)(authorizing President to regulate "by any person, or with respect to any property, subject to the jurisdiction of the United States."). By limiting its

application to persons and property "subject to the jurisdiction of the United States," Congress demonstrated a clear intent that IEEPA should be confined to domestic applications only.

The North Korea Sanctions Regulation, promulgated under IEEPA, adheres to this domestic limitation by confining its prohibitions to (1) acts occurring within the United States by either a U.S. person or a foreign person, and (2) acts occurring outside the United States by a "U.S. person, wherever located." 31 C.F.R. § 510.206.  Just as with IEEPA, there is nothing in the North Korea Sanctions Regulations that allows it to reach acts accruing outside the United States by foreign persons.  In any event, a regulation promulgated pursuant to a statute cannot apply more broadly than the statute; and agency interpretations of their governing statutes are no longer entitled to any deference. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).  Thus, the text of the Sanctions Regulations cannot be relied upon as "evidence" of Congressional Intent for purposes of determining IEEPA's extraterritorial reach.

### B. A previous decision by a different judge in this District to the contrary is non-binding and wrongly decided.

Neither the Supreme Court nor any federal court of appeals has had occasion to decide whether IEEPA has extraterritorial reach.  However, the D.C. Circuit has interpreted the Arms Export Control Act ("AECA") and its implementing regulations as not reaching foreign conduct by foreign defendants. *United States v. Yakou*, 428 F.3d 241, 253 (D.C. Cir. 2005). The implementing regulations of the AECA, like the regulations implementing IEEPA, expressly apply only to "U.S. person[s] wherever located" and "foreign person[s] located in the United States." *See id.* at 252-3 (citing 22 C.F.R. § 129.3(a)).  The reasoning of *Yakou* fully controls here, and supports this Court holding that IEEPA has no extraterritorial effect.

We recognize that another judge of this District has previously held that IEEPA has extraterritorial reach.  *See United States v. Tajideen*, 319 F. Supp. 3d 445, 457 (D.D.C.

2018)(Walton, J.).  We respectfully submit that *Tajideen* was wrongly decided and should not be followed.  *See United States v. Rao*, 123 F.4th 270, 281 (5th Cir. 2024)("a district court opinion is not binding on another judge of the same court.").

*Tajideen* is based upon Second Circuit law that is in clear conflict with the law of this Circuit, as well as the law of the Supreme Court.  Specifically, *Tajideen* relied on a case from the Southern District of New York, *United States v. Zarrab*, 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016).  *See Tajideen*, 319 F. Supp. 3d at 457 ("[a]dopting this reasoning in full, this Court agrees with the *Zarrab* court…").  *Zarrab*, in turn, relied upon Second Circuit caselaw holding that the presumption against extraterritoriality does not apply to cases involving "the right of the government to defend itself."  *See Zarrab*, 2016 WL 6820737 at 8 ("statutes prohibiting crimes against the United States government may be applied extraterritorially even in the absence of clear evidence that Congress so intended.").

Setting aside for now whether Second Circuit law is in conflict with Supreme Court precedent (it clearly is), that line of reasoning has been expressly rejected by the D.C. Circuit.  In *United States v. Garcia Sota*, 948 F.3d 356, 360 (D.C. Cir. 2020), the government made this very argument to the Court of Appeals: "that 'criminal statutes that protect the United States government from harm should not be construed' to apply only within the United States."  *Id.* The Court of Appeals explicitly rejected the argument, reasoning that "such an analysis requires treating almost all the discussion in [Supreme Court and D.C. Circuit precedents] as surplusage and would purport to rebut the presumption against extraterritoriality in broad swaths of the U.S. Code."  *Id.*  The Court then held that 18 U.S.C. § 1114, which prohibits the killing of U.S. officers and employees, does not have extraterritorial reach, and in so doing expressly noted that it was in conflict with Second Circuit authority to the contrary.  *See id.* at 360.

The Second Circuit law upon which *Tajideen* is founded is clearly in conflict with the law of this Circuit, and this Court is bound to follow the decisions of the D.C. Circuit. As explained above, the D.C. Circuit's decision in *Yakou*, which interpreted an analogous statute prohibiting weapons exports as regulating only domestic conduct, fully compels this Court in finding that IEEPA has no extraterritorial reach, and this Court should so hold.

### C. Conspiracy and aiding and abetting liability do not extend the reach of IEEPA.

Mr. Jin is charged with both conspiracy and substantive violations of IEEPA. Furthermore, while the indictment does not invoke the aiding and abetting statute, the law of this circuit does not require an indictment to plead aiding and abetting. *See United States v. Kegler*, 724 F.2d 190, 200–01 (D.C. Cir. 1983)("The indictment need not specially charge a violation of 18 U.S.C. § 2. An aiding and abetting instruction may be given in a case where the indictment does not allege violation of the aiding and abetting statute."). Thus, the government could conceivably proceed on a theory that the defendant somehow "aided and abetted" a violation of IEEPA even though he did not himself violate it (as a result of him not being a U.S. person).

That logic is foreclosed by D.C. Circuit precedent. The D.C. Circuit has squarely held that aiding and abetting liability does not expand the extraterritorial reach of a statute. *United States v. Yakou*, 428 F.3d 241, 252 ("absent an indication from Congress to the contrary, the crime of aiding and abetting 'confer[s] extraterritorial jurisdiction to the same extent as the offense [] that underlie[s it].'")(brackets in original). Similarly, it has also held that for conspiracy offenses, the extraterritorial reach is "coterminous with that of the underlying criminal statute." *United States v. Thompson*, 921 F.3d 263, 265 (D.C. Cir. 2019)(quoting *United States v. Ballestas*, 795 F.3d 134 (D.C. Cir. 2015)). Thus, the government cannot attempt to expand IEEPA to reach conduct otherwise outside its scope by relying on conspiracy or aiding and abetting liability.

**D.  This case involves a foreign application of IEEPA.**

Assuming this Court holds, under step one of the *Nabisco* framework, that IEEPA has no extraterritorial reach, it must then consider whether the charged offense involves a foreign or domestic application of IEEPA.  "Courts make this determination by identifying the statute's 'focus' and asking whether the <u>conduct</u> relevant to that focus occurred in United States territory." *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 413 (2018)(emphasis added). Applying that standard here, the answer is simple: this case plainly involves a foreign application of IEEPA, because the indictment alleges *no* domestic conduct whatsoever.

The defendant is not a citizen or permanent resident of the United States.  *See Indict.* ¶ 39 (alleging that the defendant is "Chinese national").  None of the companies that he allegedly founded were in the United States.  *See Indict.* ¶ 43.  The tobacco that he allegedly purchased for North Korea was grown in a foreign country, and from there was shipped to China, and eventually to North Korea, without an allegation that it ever reached U.S. shores.  *See id.* at ¶¶ 48, 53.  There is also no allegation that the defendant entered the United States at any point during the alleged conspiracy.

The indictment claims in conclusory fashion that the defendant committed "overt acts" in the District of Columbia, *Indict.* ¶49, but fails to identify a single act performed in the United States, by the defendant or anyone else (let alone in the District of Columbia as alleged).  *See Indict.* ¶¶ 50-51, 53-54 (describing funds transfers between foreign entities using foreign bank accounts); *id at* ¶ 52 (describing foreign entity registrations in foreign countries); *id.* at ¶¶ 55-56, 60-61, 71-75 (emails between foreign persons); *id.* at ¶¶ 57-59 (shipping records relating to foreign sales); *id.* at ¶¶ 62-66 (meetings and phone calls in a foreign country); *id.* at ¶¶ 67-70 (a helicopter

transaction between foreign entities). The allegations, even if true, do not convert wholly foreign conduct into domestic conduct.

The only nexus to the United States appears to be the allegation that, when wire transfers were made using U.S. dollar denominations, U.S. banks acting as correspondent banks "processed" those transactions.[2]  In the government's view, this was a "financial service." *Id.* at ¶ 78. Furthermore, because the wire transfers ultimately benefited North Korean entities, they became prohibited "exports" of "financial services" to North Korea, or so the argument goes. *Id.*  The government's reading of IEEPA is as unnatural as it is expansive, and sets United States sanctions laws on a collision course with the rest of the world. The defendant did not "export" financial services "from the United States," and the Court should reject such an interpretation here.

The absurd consequences of adopting the government's view of IEEPA is readily apparent. Suppose a car is manufactured in Germany, using German parts. The paint for the car employs pigments sourced from the United States. A German citizen, without ever entering the U.S., buys the car and sells it to North Korea.   Under the government's view, that would be an "export" of U.S. paint to North Korea, in violation of IEEPA.   Or suppose (for an analogy closer to this case) a Chinese citizen makes a video. The video is made of scenes shot in China and other locations, but never from within the United States. The video is then edited, in China, with software made by a U.S. company. According to the government, this would apparently be an "export" of "video editing services" from the United States. Adopting the government's view effectively converts

---

[2]    As described in the defendant's Motion to Dismiss Count One, a correspondent bank in a wire transfer does not transact directly with either the sender or recipient. Instead, the bank simply performs a series of accounting entries for the two banks that are above and below it in a chain of transactions. The process is usually automated and instantaneous.

IEEPA into an extraterritorial statute, despite there being no clear Congressional intent for it to apply extraterritorially, and makes an end run around the presumption against extraterritoriality.

Nothing in IEEPA, Supreme Court precedent, or D.C. Circuit precedent requires this Court to adopt such a reading of IEEPA. The D.C. Circuit's decision in *Yakou* would counsel a contrary approach. In *Yakou*, after concluding that the Arms Export Control Act has no extraterritorial reach, the D.C. Circuit then held that AECA did not reach the defendant's alleged acts of negotiating and arranging for the sale of "six armored patrol boats for the government of Iraq" where the defendant performed the negotiations in Iraq. *Yakou*, 428 F.3d 241, 245.

If anything, the government had a stronger case for applying AECA to the defendant in *Yakou* than it does here. The defendant in *Yakou* was at least a former permanent resident of the United States, and resided in this country from 1986 until 1993. *See id.* Even after leaving the United States, the *Yakou* defendant continued to visit his family in the United States on at least ten occasions. And Yakou's alleged co-conspirator—his son—was in the United States during the alleged conspiracy. *Id.* Here, by contrast, Mr. Jin did not have citizenship or permanent resident status, did not enter the United States, and there is not even an act performed by an alleged co-conspirator in the United States.

This case involves a foreign application of IEEPA, contrary to its domestic scope. Because IEEPA has no extraterritorial reach, Counts Two through Six fail to state an offense and must be dismissed.

## III.    COUNT ONE MUST BE DISMISSED BECAUSE BANK FRAUD DOES NOT REACH FOREIGN SCHEMES BY FOREIGN DEFENDANTS.

Applying *Nabisco*'s two step framework to Count One, the bank fraud statute is not extraterritorial, and Count One is an extraterritorial application of bank fraud. Accordingly, Count One must also be dismissed.

**A.  Bank fraud has no extraterritorial reach**.

The bank fraud statute, codified at 18 U.S.C. § 1344, provides the following:

"Whoever knowingly executes, or attempts to execute, a scheme or artifice--

> **(1)** to defraud a financial institution; or
> **(2)** to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

18 U.S.C.A. § 1344.

There is nothing in the bank fraud statute's text to indicate Congressional intent for extraterritorial application.  Therefore, it has none.  *RJR Nabisco*, 579 U.S. at 335 ("When a statute gives no clear indication of an extraterritorial application, it has none."); *Bascunan v. Elsaca,* 927 F.3d 108, 124 (2d Cir. 2019)("The bank fraud statute does not purport to apply to extraterritorial conduct."); *See also United States v. Elbaz*, 52 F.4th 593, 602 (4th Cir. 2022)(holding that wire fraud is not extraterritorial); *United States v. Sidorenko*, 102 F. Supp. 3d 1124 (N.D. Cal. 2015)(holding that wire fraud does not apply to extraterritorial conduct of foreign defendant who accepted bribes in a UN program partly funded by the U.S.).

**B.  Count One is an extraterritorial application of the bank fraud statute.**

Under the second step of the *Nabisco* framework, the Court must determine whether the alleged conduct relevant to the statute's "focus" occurred in the United States.  *WesternGeco LLC,* 585 U.S. at 413.

The Fourth Circuit's decision in *United States v. Elbaz*, 52 F.4th 593 (4th Cir. 2022), applying the *Nabisco* test to wire fraud, is helpful in illustrating how the analysis should proceed. *Id.* at 602.  After finding that wire fraud is not extraterritorial, the *Elbaz* court determined that the relevant conduct for wire fraud's "focus" is the wire transmission.  It reached that conclusion by

13

noting that "the wire transmission itself is 'the actus reus that is punishable by federal law' and that "each wire transmission" is a "separate offense." *Id.*

The statutory text of bank fraud, of course, differs in important ways from wire fraud. *Compare* 18 U.S.C. § 1343 ("Whoever, having devised or intending to devise any scheme…transmits or causes to be transmitted") *with* 18 U.S.C. § 1344 ("Whoever knowingly executes…a scheme or artifice"). Unlike wire fraud, where each wire transmission forms the actus reus, in bank fraud the actus reus is the execution of a scheme. *See United States v. Molinaro*, 11 F.3d 853, 860 (9th Cir. 1993)(unit of offense for bank fraud is "each execution or attempted execution of the scheme to defraud.") Thus, the relevant question for purposes of *Nabisco* step two is the location for the execution of the scheme. *See Bascunan*, 923 F.3d at 124 ("the conduct that [bank fraud] seeks to regulate, and its focus, is a scheme to obtain property owned or controlled by a bank under false or fraudulent pretenses.").

In this case, the location where the scheme was executed was unquestionably outside the United States. As discussed previously under Part I, the indictment does not allege that the defendant or any co-conspirator performed any acts in the United States. The only connection to the United States is the allegation that U.S. banks performed correspondent banking functions in connection with payments for foreign purchases of tobacco. This lone allegation is insufficient to transform Count One into a domestic application of bank fraud.

First, the indictment does not allege that any U.S. bank was even in the United States when such bank "processed" an alleged wire transfer; the processing could conceivably have been performed by any foreign branch of a U.S. bank, and so the indictment has not even alleged this basic fact.

More importantly, assuming that there was a U.S. bank located in the United States when it processed the transfer, this fact does not mean that the scheme was therefore executed *in* the United States.  Consider an analogy: if a person makes fraudulent representations from within the United States to a victim in Italy, we would say that such person executed a scheme in the United States, against an Italian victim. It would be anomalous to say, however, that such a person executed a scheme in Italy, because the victim was in Italy.

In this case, the indictment does not allege that any defendant was in the United States when any allegedly fraudulent statements were made, or when any part of the alleged scheme was executed.  Count One therefore alleges only extraterritorial conduct.  Given that bank fraud has no extraterritorial reach, Count One therefore fails to state an offense and must be dismissed.

## CONCLUSION

This Court should dismiss Counts One through Six of the indictment.


Respectfully submitted,

By: /s/ Eugene Gorokhov
Eugene Gorokhov, Esq.
D.C. Bar No. 979785
Burnham & Gorokhov, PLLC
1634 I Street NW, Suite 575
Washington, D.C. 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com

## CERTIFICATE OF SERVICE

A copy of the foregoing motion was filed via ECF, which automatically sends a copy to all counsel of record.

Respectfully submitted,

By: /s/ Eugene Gorokhov
Eugene Gorokhov, Esq.
D.C. Bar No. 979785
Burnham & Gorokhov, PLLC
1634 I Street NW, Suite 575
Washington, D.C. 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com