IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 23CR91-CKK |
| | ) | |
| GUANGHUA JIN. | ) | |

**REPLY IN SUPPORT OF MOTION TO SUPPRESS AND FOR A *FRANKS* HEARING**

Mr. Jin replies to the government's opposition to his motion to suppress and for a *Franks* hearing, as follows:

**INTRODUCTION**

The Supreme Court explained nearly 80 years ago that law enforcement agents are not free to pick and choose the evidence they present to the magistrate:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.... When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

*Payton v. New York,* 445 U.S. 573, 586 n. 24 (1980) (quoting *Johnson v. United States,* 333 U.S. 10, 13–14 (1948)). *United States v. Ali*, 870 F. Supp. 2d 10, 28–29 (D.D.C. 2012) (quoting *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000)) ("a police officer cannot make unilateral decisions about the materiality of information, or, after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence.").

The government's position–that the agent was free to exclude evidence she deemed "self-serving"–seeks to justify just what the Constitution prohibits. *See, e.g*., ECF 64, Gov't Resp. to Motion to Suppress Fruits of Email Search Warrant, at 8 (defending the Agent's "failure

1

to include Jin's self-serving claims of innocence and lack of knowledge."); *Id*. at 18 ("Jin's self-serving statements to the UC regarding his belief that their business dealings were legal, nor his refusal to pay the so-called "bribe" constituted exculpatory evidence"). It places the authority to draw the "usual inferences…from the evidence" in the "zealous officer" instead of the "neutral…magistrate." *Payton*, 445 U.S. at 586. The government's response leaves no doubt that the email searches in this case violated the Fourth Amendment, and a *Franks* hearing is required.

A. **The false representations and material omissions regarding Cooperating Company 1.**

The government's defense of the affidavit's false statements and omissions regarding Cooperating Company 1 is a game of semantics. The argument goes like this: the affidavit disclosed that "[s]ubsequent to U.S. correspondent banks freezing Cooperating Company 1's U.S. dollar transactions, Cooperating Company 1 agreed to meet with the government," and the affidavit also disclosed "*why* Cooperating Company 1 agreed to meet with the government, which was to 'account for these transactions.'" ECF 64 at 10. Thus, claims the government, Mr. Jin's objection is no more than a quibble regarding the affidavit's "choice of language." *Id*. at 11.

Let us engage this claim briefly. The first sentence explains the basic reason motivating Cooperating Company 1 to meet with the government: the freezing of its transactions. The second sentence says only that this meeting was "to account" for the frozen transactions. The relevant definition of "account" is "a statement explaining one's conduct."[1] Thus, all the affidavit says is that Cooperating Company 1 met with the government to explain its conduct as a result of the fact that its transactions were frozen. Nothing more.

---

[1] Merriam-Webster Dictionary Online, https://www.merriam-webster.com/dictionary/account.

2

But try as the government might to argue that one plus one equals five, the two sentences to which it clings fail to disclose that: (1) Cooperating Company 1 had approximately $11 million dollars in payments frozen; (2) Cooperating Company 1 was on the brink of financial collapse; (3) rather than simply "account for" transactions, Cooperating Company 1 in fact beseeched the government to release nearly $2 million dollars in funds; (4) the prosecution team reached a *quid pro quo* with Cooperating Company 1 to potentially release millions of dollars but only on the condition that information and assistance Cooperating Company 1 provided was deemed useful by the government, and (5) Cooperating Company 1 lied to the government. The English language fails to support the government's claims, and the cases it cites fare no better.

In *United States v. Shabazz*, the defendant argued that the affidavit failed to adequately allege the qualifications and reliability of a drug-sniffing dog, but the Court found the representation that it was "a canine who is trained in narcotics detection" sufficient. *United States v. Shabazz*, No. 3:12-CR-64, 2012 WL 2871801, at *5 (M.D. Pa. July 12, 2012). A similar argument was made in *United States v. Berry*, but there, the Sixth Circuit "found that references to the dog as a 'drug sniffing or drug detecting dog' and statements that the dog was trained and qualified to detect drugs reasonably implied reliability and rejected that argument." *Id.* (citing *United v. Berry*, 90 F.3d 148, 153 (6th Cir. 1996)).

Both *Shabazz* and *Berry* concern merely the level of detail required. Neither case deals with a situation where facts calling the reliability of the dogs into question had been suppressed (such as, *e.g.*, that a dog failed a certification test). But here, the prosecution team withheld from the magistrate a deal with a cooperating witness in which that witness (1) stood to gain millions of dollars at the behest of the government in exchange for cooperating with the government; (2) needed such funds to avoid financial ruination, and (3) lied to the government. By contrast to the

cases cited by the government, the authorities cited in Mr. Jin's motion to suppress hew more closely to the falsities and omissions regarding Cooperating Company 1. ECF 46, Motion to Suppress and for a Franks Hearing, at 7-8 (citing *United States v. Lull*, 824 F.3d 109, 116 (4th Cir. 2016); *States v. Glover*, 755 F.3d 811, 814, 816 (7th Cir. 2014); *States v. Simmons*, 771 F. Supp. 2d 908, 922 (N.D. Ill. 2011); *United States v. Velazquez*, 2019 WL 3816722, at *1 (D. Ariz. Aug. 14, 2019); *United States v. Ramsey*, 165 F.3d 980, 989 (D.C. Cir. 1999)). The government fails to grapple with, or even acknowledge, any of these authorities in its response.

Instead, the government perpetuates its pattern of suppressing evidence bearing on Cooperating Company 1's lack of reliability. To this end, the government argues that the amount of money that Cooperating Company 1 expected to receive does not matter because Cooperating Company 1's *expectation* of payment is all that matters. ECF 64 at 11. The government's position is as troubling as it is meritless. First, as a matter of basic logic, the value of the benefit a cooperator stood to gain plainly bears on that cooperator's reliability and bias. In evaluating a cooperator's reliability and motivation, a factfinder is certainly entitled to know if that cooperator received a benefit of $100 versus $100,000 versus $1,000,000. Second, as a matter of law, the government's position is likewise frivolous. *See, e.g.*, *Ramsey*, 165 F.3d at 989 (D.C. Cir. 1999) ("A prosecutor is obligated to disclose *any* benefit conferred on any witness") (emphasis added). Third, this position reflects a cramped view of *Brady* and *Giglio* that is contrary to law,[2] and portends that the government will to continue to suppress evidence critical

---

[2] The government's claim that it "is aware of its disclosure obligations pursuant to *Giglio v. United States*, 450 U.S. 150 (1972), and will continue to satisfy those obligations as this matter proceeds," ECF 64 at 11, n.2, is highly dubious. This is a mantra that the government frequently invokes when defending against claims that it has suppressed exculpatory evidence. The facts here suggest that the government is not aware of its *Brady* and *Giglio* obligations, for several reasons. For example, the government apparently waited until January of 2025 to find out if Winney actually sought an OFAC license. This is both surprising and troubling, given that the gravamen of an IEEPA violation is the failure to seek a license. *United States v. Quinn*, 403 F. Supp. 2d 57, 64 (D.D.C. 2005). And the government learned that Winney *did* seek two OFAC

4

not only to Cooperating Company 1's bias but also the integrity of the government's investigation more broadly. *In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 894 n.6 (D.C. Cir. 1999) (noting that payments to a witness "may give a person a motive that the jury must be permitted to evaluate.") (*citing Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986); *United States v. Bagley*, 473 U.S. 667, 683 (1985); *Giglio v. United States*, 405 U.S. 150, 154–55 (1972); *United States v. Smith,* 77 F.3d 511, 513 (D.C. Cir. 1996)).

Finally, the government devotes two pages of its response to defending the affidavit's material omission of Cooperating Company 1's lie: denying that it knowingly did business with North Korea. The government has attempted to deflect, resorting to yet another assertion that this is a "self-serving" argument made through "rose-colored glasses." ECF 64 at 12. But the evidence is in black and white. Documents provided by Cooperating Company 1 to the government–which have been in the government's possession for close to six years now–leave no doubt that Cooperating Company 1 lied to the government in denying that the company knowingly did business with North Korea. Ex. 1–Email from Cooperating Company 1 sent to Han on August 22, 2018  (in negotiating an exclusivity contract with Han to sell supply to North Korea, Cooperating Company 1's employee wrote "I would like to ask you an exception, it

---

licenses.  But the government then withheld this information for months, withheld it past the Court's March 6, 2025 deadline for *Brady* disclosures, and disclosed it only on March 25, 2025.  Even then, the government took no steps to obtain the actual applications from OFAC until defense counsel requested them.  Moreover, Local Criminal Rule 5.1(a) states that "[b]eginning at the defendant's arraignment and continuing throughout the criminal proceeding, the government shall make good-faith efforts to disclose [*Brady*] information to the defense as soon as reasonably possible after its existence is known, so as to enable the defense to make effective use of the disclosed information in the preparation of its case."  And while Local Rule 5.1(c) governing *Giglio* "does not require the government to disclose such information before a trial date is set," a trial date in this matter was set nearly three months ago, and it is inconceivable that the government is at this point unsure whether it intends to call a witness or witnesses from Cooperating Company 1 to testify.

5

happens that we have a customers in NK for a long time and only purchase us two containers per month and we would [sic] like to keep it. Would that be possible?").

```
Message
From:    ████████████████████████
Sent:    8/22/2018 11:04:52 AM
To:      jameshan7788 [jameshan7788@sina.cn]
Subject: Exclusive AGREEMENT

Dear Mr. James
            Hope you are fine

We agree with the exclusive agreement and we would like to move forward to sign it asap. But I would like to
ask you an exception, it happens that we have a customers in NK for a long time and only purchase us two
containers per month and we would like to keep it. Would that be possible?
Thank you in advance for your comprehension
Looking forward to hear back from you

Best regards

████████████████
```

And another email from Cooperating Company 1's employee shows Cooperating Company 1's intimate knowledge of exactly how much tobacco they sold to North Korea, and of its desire only to *increase* its sales to North Korea:

```
Message
From:    ████████████████████████
Sent:    8/30/2018 11:27:28 AM
To:      jameshan7788 [jameshan7788@sina.cn]
Subject: Re: Fwd: Fwd: SHIPMENTS

Dear Mr. James

                                    Top of Form
It is important to understand the following: a) My bosses are willing to continue with the contract, taking into
account the good relationship between both companies over these years b) On the other hand it is essential that
the signing of the contract means an increase in sales. Now, in the draft contract, which you sent me, there is an
intention on your part to buy us 120 qtrs per year, but it turns out that without a contract we are selling to NK an
average of 180 Qtrs per year. therefore I propose the following program of sales that start with estimated sales
of 180 Qtrs for the first year, reaching 200 Qtrs in the second year, 250 for the third year and so on, of course
we always talk about estimated sales. I'm sure that by putting it that way we solve it quickly
                                  Bottom of Form

Best Regards
```

Ex. 2–Email from Cooperating Company 1 sent to Han on 8-30-2018, at 1. None of this should be surprising, given that Cooperating Company 1 maintained numerous bills of lading clearly reflecting North Korea as the destination of its tobacco, and other clear evidence that Cooperating Company 1 lied and the government *knew* it lied, detailed in Mr. Jin's motion to suppress. ECF 46 at 9-10.

The government's continued refusal to acknowledge Cooperating Company 1's demonstrable lies on one hand, while treating any exculpatory statement or act by Mr. Jin as false and "self-serving" on the other, reflects a troubling double-standard borne of the motivation to win a conviction. This double-standard underscores why "[t]he primary reason for the warrant requirement is to interpose a neutral and detached magistrate between the citizen and the officer engaged in the often competitive enterprise of ferreting out crime." *United States v. Karo*, 468 U.S. 705, 717 (1984) (internal citation and quotation marks omitted).

Finally, as discussed in the motion to suppress, SA Gallante swore that "Cooperating Company 1 further stated that Winney was represented by James Han and Jin Guanghua." ECF 46 at 2. But in reality, Cooperating Company 1 said no such thing. And when shown a picture of Mr. Jin and asked if he came to meet with Cooperating Company 1, the employee said that he was "unsure but did not believe it was." ECF 46-2 at 3. This statement was simply false, and the fact that it was flat-out false is highly probative of the agent's intent in swearing out the warrant affidavit. See *Franks v. Delaware*, 438 U.S. 154, 15 (1978) (holding that knowingly false statements, or those made with reckless disregard for the truth, violate the Fourth Amendment).

Faced with this false statement, the government does not seek to explain why it was made. Instead, it spins out a convoluted footnote of 399 words, to defend the indefensible. ECF

7

64 at 14, n.4.  The government argues that "defendant asserts in his motion that it was a material omission from the affidavit that the employee of Cooperating Company 1 failed to identify Jin's photograph." *Id.* But that is not Mr. Jin's argument.  The argument is that in this instance the agent made a clearly false statement, not simply an omission.  The government then goes on to explain *why* there was not an affirmative identification of Mr. Jin, and *why* there was nevertheless evidence that Mr. Jin represented Winney. But the *why* never answered, or even acknowledged by the government, is why its agent made a patently false representation to the magistrate under oath.

For all of these reasons, the affidavit presented false statements and omissions as to Cooperating Company 1.  The falsities and omissions with respect to Cooperating Company 1, alone, warrant a *Franks* hearing.  But as discussed in the motion to suppress and below, they are part of a larger pattern of false statements and omissions regarding the evidence.

B. **Material falsities and omissions regarding the undercover investigation.**

Like the false statement just discussed, the government does not acknowledge–let alone explain–why its agent quoted Mr. Jin as making statements he never actually made.  Instead, threaded throughout the government's arguments is its repeated justification for the agent's decision to exclude multiple statements and instances of conduct by Mr. Jin during the undercover operation that were highly probative of good faith, and to include only the evidence that supported the government's theory.

The government asserts that the affidavit accurately represented that Mr. Jin made statements reflecting his intent to engage in money laundering.  The government provides examples purporting to show that Mr. Jin discussed potential ways to engage in transactions that would decrease the chance of a bank blocking or investigating transactions.  ECF 64 at 15-16.

8

But merely engaging in transactions designed to avoid the blocking of funds, or of delays caused by investigations, is not money laundering–not without an intent to promote unlawful activity or knowledge that the funds were derived from unlawful activity. 18 U.S.C. § 1956(a)(2).[3] *See also United States v. Michel*, No. CR 19-148-1 (CKK), 2024 WL 1603362, at *18 (D.D.C. Apr. 12, 2024) (quoting *United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007)).

Here, there was crucial evidence that Mr. Jin in fact lacked such intent or knowledge, namely, Mr. Jin's repeated statements that all business must be done in accordance with the law–a statement that he made no fewer than *four times* during his meeting with the undercover agent. Similarly, his statement objecting to the claim that the parties were engaged in money laundering was directly relevant to his intent. Mr. Jin stated "We are not money laundering. We're buying goods. Are you sure? What is money laundering?" ECF 46-4 at 18–Government Translations and Transcriptions of 7-11-2019 meeting. Indeed, as to this point, during the undercover meeting, Mr. Jin specifically stated that he believed that an instance of payment from Winney to Cooperating Company 1 was blocked "not because of North Korea government problem" but because "[i]t's a large amount of money transfer triggering the suspicion of money laundering from US government." *Id.* at 23. Mr. Jin then concluded that "they cleaned the suspicion of money laundering. They exported cut tobacco to China. It's the money to buy cut tobacco. So, they cleared the wrongdoing." *Id*. The agent withheld all of these statements, and others, from the magistrate judge.

---

[3]     Though the government has ultimately charged Mr. Jin only under § 1956(a)(2)(A), colloquially called the "promotional" prong of the federal money laundering statute, the agent's affidavit reciting probable cause did not distinguish between promotional money laundering and concealment money laundering, which is codified at § 1956(a)(2)(B). Thus, for purposes of analyzing whether the warrant affidavit contained falsehoods or material omissions, evidence of the defendant's intent as to both types of money laundering is relevant.

The agent's omission of the exculpatory evidence from her sworn affidavit is precisely the type of "unilateral decision[] about the materiality of information" that is prohibited by the Fourth Amendment. The government's *ipse dixit* claims that Mr. Jin's "discussions with the UCs that establish his intent and willingness to launder payments," ECF 64 at 14, thus fails to serve as a defense to the affidavit's materially false statements and omissions, as does the government's efforts to justify the false representations by labeling contrary evidence as "self-serving."

Next, the government argues that "defendant refused to pay the so-called 'bribe' payment, not because he was a law abiding individual who believed he had done nothing illegal, but rather because he did not believe it was the responsibility of Winney to bear the costs of efforts to obfuscate from the banks and law enforcement authorities the illicit nature of the transactions." *Id.* at 17. Continuing the tactic employed by its agent with respect to the affidavit, the government fails to acknowledge the material fact that Mr. Jin openly asked whether it was "appropriate to pay $10,000 to investigate this thing." ECF 46-4 at 15. Mr. Jin further stated: "But under the reasonable and legal assumption, he proposed $10,000 USD for bank investigation fee. I won't agree on this. If you want to proceed the business, it's good. If not, just forget about it." *Id.* at 17. This plainly shows that Mr. Jin was concerned about the legality of the proposed payment. That the government only included (but never addressed) one of these quotes in its response does not excuse the fact that its agent omitted it from the affidavit. The agent's unilateral decision to exclude these statements bearing on Mr. Jin's intent, even assuming this was because she decided that his sole intent was to avoid bearing the cost, violates the Fourth Amendment. *Wilson,* 212 F.3d at 787.

Finally, the government completely fails to address the fact that when its undercover agent claimed in writing that the business at issue violated US sanctions, Winney stopped doing

10

business with Cooperating Company 1. This too is a fact with significant bearing on Mr. Jin's intent. But in keeping with the pattern of "merely inform[ing] the magistrate or judge of inculpatory evidence," the agent decided to withhold this evidence as well.

### C. Stripped of its false statements and material omissions, the affidavit fails to support probable cause to justify the search of the target email account.

Having side-stepped the material falsities and omissions of its agent, the government argues that any omissions were immaterial. The government cites a total of one case to support its position. ECF 64 at 16, n.6 (citing *United States v. Sarras*, 575 F.3d 1191, 1219 (11th Cir. 2009)). But that case is inapposite.

In *Sarras*, the defendant–who had sex with his minor stepdaughter and took pornographic pictures of her–denied during a controlled phone call that he had done so. *Id*. The Eleventh Circuit held that the omission of this denial in the affidavit was immaterial and did not constitute a *Franks* violation because the affidavit established that Sarras in fact took the photos, and possessed them, which is a crime. *Id*. But unlike the crimes with which Sarras was charged, which are *malum in se*, there is nothing inherently criminal about the act of engaging in financial transactions. Instead, the criminality of the alleged offenses here is determined entirely by knowledge and intent. *See, e.g.*, *Ruan v. United States*, 597 U.S. 450, 451 (2022) (internal citations omitted) ("'knowingly' modified the statutory clause in question because that clause played a critical role in separating a defendant's wrongful from innocent conduct.").

In evaluating a defendant's knowledge and intent as to *malum prohibitum*, the defendant's statements (to an undercover agent who, no less) take on critical importance. This is in contrast to *Sarras*, where the dispute concerning the falsehoods in the warrant affidavits centered on whether the defendant performed the alleged acts. Indeed, the government admits that statements are probstive of intent, but only wants the Court to focus on those portions of Mr.

11

Jin's statements that purportedly show guilty knowledge. ECF 64 at 18 ("[s]uch statements constitute strong evidence of knowing and intentional money laundering by the defendant."). But when Mr. Jin's statements are read in the context of his insistence that they conduct business legally, these statements take on a wholly different meaning and tone. The agent's decision to present cherry-picked statements was material to the finding of probable cause.

The government also argues the materiality issue as if the key question is whether there was probable cause that Winney was doing business with North Korea. Instead, the question is whether there was probable cause that evidence of the criminal offense under investigation would be found in the target email account. *United States v. Griffith*, 867 F.3d 1265, 1271 (D.C. Cir. 2017) (Court must determine whether warrant affidavit establishes "a substantial basis for concluding that a search would uncover evidence of wrongdoing" by "demonstrat[ing] cause to believe that evidence is likely to be found at the place to be searched" and that "a nexus [exists] ... between the item to be seized and criminal behavior.") (cleaned up). Lacking any evidence to show that there is probable cause to search the target email account, the government instead seeks to substitute this showing with evidence that Winney did business with North Korea, and that Mr. Jin was among the individuals who represented Winney.

Let us consider the points that the government has proffered, *ad seriatim*:

> "Subpoena returns revealed that between 2009 and 2017, Cooperating Company 1 also conducted approximately $27 million in wire transactions with Winney International Trading Co., Ltd and Winney Trading. Subsequent to U.S. correspondent banks freezing Cooperating Company 1's U.S. dollar transactions, Cooperating Company 1 agreed to meet with the government to account for these Transactions." (citation omitted).

ECF 64 at 19. This point fails to establish any connection between the alleged offense and the target email account.

> "Bills of lading and invoices provided by Cooperating Company 1 from transactions between 2013 and 2016 involving Winney stated that the ultimate customer for these sales were companies in North Korea. In 2016, Winney changed its bills of lading to falsely reference sales to China and non-North Korean locations/customers."

*Id*. Here again, no evidence is proffered to connect the target account to any bills of lading, or any communications regarding any bills of lading. Nor does this allegation establish any connection between the bills of lading and Mr. Jin. In fact, if the affidavit had truthfully recounted the statements of Cooperating Company 1 regarding Mr. Jin–the fact that the employee of Cooperating Company 1 could not even identify Mr. Jin from photos and stated that the prior substantive dealings were with Han–this would foreclose the inference that Mr. Jin had anything to do with creating or communicating about bills of lading.

> "In correspondence, Jin described himself as the general manager of Winney and Han was described as the director of Winney."

*Id*. There is no allegation here that Mr. Jin communicated with Cooperating Company 1 through the target email account.

> "Subpoena returns revealed multiple wire transfers for large amounts of U.S. dollars to Winney from multiple companies, including DHID, that had been sanctioned by OFAC for doing business with North Korean facilitators."

*Id*. No connection is mentioned to the target email account.

> "Facts establishing co-defendant Han's links to Winney, North Korean facilitators, sanctioned entities and to Jin."

*Id*. Here again, there is no attempt to connect this fact to the target email account.

The sole allegation in the affidavit that even comes close to touching on any potential nexus between the alleged offenses and the target email account is the final point, in which the government refers to "[f]acts establishing the Target Account's communications with entities

13

doing business in North Korea." ECF 64 at 19. But like the affidavit itself, the government's characterization of this showing is misleading. What the affidavit actually avers is that

> Target Account 1 communicated at least ten times between December 2018 and June 2019 with an account on a Chinese-based domain, which e-mail account is publically [sic] listed by multiple Chinese companies as their contact address. One such company using this address is Dandong Xinlu International Freight Forwarding Co. Ltd. (Xinlu). According to its website, Xinlu is a freight and shipping company located in Dandong, China. Xinlu's website publically [sic] advertises "...the company's business is based in North Korea... It provides services for many countries and cities in North Korea... The company's main business includes: North Korea, South Korea's import and export agent, transit cargo transport agent and trade, supervision of cargo transport... Our company has a special person in the railway to pick up the station, send the station, arrange goods from Dandong to Pyongyang railway express mail."

ECF 46-1 at 23-24, ¶35.

In other words, the information that the government was able to gather shows that the target email account was in contact with a Chinese freight forwarding company that does business in "many countries" including North Korea. But the affidavit does *not* aver that Xinlu was used as a freight forwarding company in connection with any business with Cooperating Company 1. Indeed, there is not even an allegation that Winney ever contracted Xinlu to deliver goods, or that such contracts were for delivery to North Korea, as opposed to any other location served by Xinlu.

This showing falls far short of probable cause that the target email account would contain evidence of the crimes under investigation. *See United States v. Ali*, 870 F. Supp. 2d 10, 37 (D.D.C. 2012) ("In concluding that warrants to search suspects' email accounts adequately establish a nexus, courts insist on a direct connection between the alleged criminal activity and the specific email account at issue, and that connection typically arises because the affidavit asserts that the account was used in the commission of the crime. To require anything less would be to authorize a general, exploratory rummaging in a person's belongings contrary to the Fourth Amendment's prohibition against general warrants.") (internal quotations and citations omitted).

14

*See also Warden, Md. Penitentiary v. Hayden,* 387 U.S. 294 (1967) ("There must, of course, be a nexus ... between the item to be seized and criminal behavior."); Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* § 3.7(d) (4th ed.2004 (explaining that there must be a connection between the criminal activity under investigation, the place to be searched, and the things to be seized). All of the evidence that was falsely presented from the affidavit, or omitted from the affidavit, would have served to undercut any potential nexus between the crime under investigation and the target email account.

D. **The *Leon* exception does not apply to warrants issued based on false statements and material omissions.**

Lastly, the government seeks refuge in *Leon'*s good faith exception, ECF 64 at 20. But that exception has no application where, as here, "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008). *See also United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) ("A warrant that violates *Franks* is not subject to the good-faith exception to the exclusionary rule announced.").

## CONCLUSION

For all of the foregoing reasons, a *Franks* hearing must be held.

Respectfully Submitted,

By:/s/ Eugene Gorokhov
Eugene Gorokhov VSB # 73582
BURNHAM & GOROKHOV, PLLC
1634 I Street NW, Suite 575
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com

15

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I served a copy of the foregoing motion via ECF which automatically sends a copy to all counsel of record.

>Respectfully submitted,
>
>By:/s/ Eugene Gorokhov
>Eugene Gorokhov, Esq.