UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    v.<br><br>JIN GUANGHUA,<br>             Defendant. | Criminal Action No. 23-91-2 (CKK) |

**MEMORANDUM OPINION**
(August 1, 2025)

Defendant Guanghua Jin faces a twelve-count indictment charging him with participation in a bank-fraud, money-laundering, and sanctions-evasion conspiracy. Jin moves the Court under the Fourth Amendment and *Franks v. Delaware*, 438 U.S. 154 (1978), to hold an evidentiary hearing to determine whether to exclude evidence seized in connection with the execution of a search and seizure warrant on his email account. For the reasons that follow, the Court shall **DENY** Jin's motion.

**I. BACKGROUND**

The Government alleges that Jin, a Chinese national and Australian resident, conspired with several others between 2009 and 2019 to commit bank fraud, launder money, and evade U.S. sanctions on North Korea. *See* Indictment, ECF No. 13. In simplified form, Jin's alleged scheme was as follows: Jin and his co-conspirators Qin Guoming and Han Linlin operated a series of companies, many of which had names including the word "Winney" (collectively, the "Winney Entities"). The Winney Entities brokered sales of products—principally bulk shipments of raw tobacco—from international suppliers to North Korean entities through U.S. dollar-denominated transactions that relied on correspondent banking services from U.S. financial institutions.

1

Because U.S. financial institutions would not knowingly process transactions for these entities due to anti-money laundering restrictions, and because the United States imposed country-wide sanctions against North Korea in 2016, Jin and the Winney Entities falsified shipping records and routed transactions through front companies in an effort to make it appear as if the shipments were being made in furtherance of legitimate trade with China. In sum, the Government alleges that, through the Winney Entities, Jin conspired to and did defraud U.S. financial institutions, helped North Korean entities illegally access the U.S. financial system, and launder the proceeds of those activities.

During its investigation into Jin and his co-conspirators, the Government sought a warrant to search and seize the contents of five email accounts, including the account identified as "jinguanghua2014@gmail.com." *See* Mot. to Suppress and for *Franks* Hearing Ex. 1, ECF No. 46-1 at 2–5 (March 14, 2025). In its warrant application, the Government represented that it had reason to believe the target email accounts contained evidence of a crime, namely violations of 50 U.S.C. § 1705 (evasion of sanctions under the International Emergency Economic Powers Act) and 18 U.S.C. § 1956 (money laundering). ECF No. 46-1 at 2. On December 10, 2019, Magistrate Judge Robin M. Merriweather determined that the Government had demonstrated probable cause for the search and issued a warrant authorizing the search and seizure of the target email accounts. *Id.* at 2.

In finding probable cause, Magistrate Judge Merriweather relied on an affidavit in support of the Government's warrant application sworn out by FBI Special Agent Joy Gallante. *See* ECF No. 46-1 at 3, 16-17. The Court will discuss the details of Agent Gallante's affidavit in greater detail below, but in broad strokes, and as relevant to Jin's email account, Agent Gallante's affidavit offers five categories of support for the warrant application: (1) background information about

2

North Korean commerce and U.S. sanctions against North Korea (*id.* ¶¶ 7–18); (2) information gleaned from Government interviews with Cooperating Company 1,[1] a bulk tobacco seller that had done business with the Winney Entities (*id.* ¶¶ 18–21); (3) information revealed from subpoena returns from Cooperating Company 1 and financial institutions (*id.* ¶¶ 26–29); (4) information learned during the course of an undercover investigation, including a meeting between Jin and undercover agents (*id.* ¶¶ 22–25); and (5) information returned from prior court orders under 18 U.S.C. § 2703(d) (*id.* ¶¶ 33–35).

Jin filed the instant [34] Motion for a *Franks* Hearing and to Suppress the Fruits of Email Search Warrant ("Def.'s Mot."), arguing that Agent Gallante's affidavit contains materially false statements and omissions that, if corrected, would have precluded Magistrate Judge Merriweather's probable-cause determination. The Government opposed Jin's motion. *See* Gov't's Opp'n, ECF No. 64. And Jin replied. *See* Def.'s Reply, ECF No. 73. The matter is ripe for review.

## II. LEGAL STANDARD

The Fourth Amendment prohibits "unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. The Supreme Court has described the task of evaluating probable cause as "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "When police obtain evidence by way of an unlawful

---

[1] Cooperating Company 1 is Cooperativa de Tabacaleros de Jujuy. Elsewhere, the parties have agreed that Cooperating Company 1 need not be referred to pseudonymously moving forward. *See* Mem. Op. & Order, ECF No. 96, at 3–4. But Cooperating Company 1's identity is immaterial to Jin's motion. And Agent Gallante's affidavit and the parties' briefs use the pseudonym. So, for ease of reference, the Court does the same here.

search, the exclusionary rule may require exclusion of that evidence in some circumstances." *United States v. Glover*, 681 F.3d 411, 418 (D.C. Cir. 2012).

But "the exclusionary rule has limited force in cases involving a search with a search warrant." *Glover*, 681 F.3d at 418. In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court instructed that, subject to narrow exceptions, courts may not exclude evidence "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Id.* at 920. One exception to *Leon*'s default rule arises when "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth." *Leon*, 468 U.S. at 923.

That exception, which Jin invokes here, was originally set forth in *Franks v. Delaware*, 438 U.S. 154 (1978). Under *Franks*, if a defendant makes a "substantial preliminary showing," the court must hold an evidentiary hearing to determine whether the fruits of the warrant should be excluded. 438 U.S. at 155–56. In this Circuit, the substantial preliminary showing necessary to trigger a *Franks* hearing requires a defendant to show that (1) the warrant affidavit contained false statements or omitted certain facts; (2) the false statements or omitted facts were material to the finding of probable cause; and (3) the false statements or omissions were made knowingly and intentionally, or with reckless disregard for the truth. *United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010); *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008).

"An affidavit offered in support of a search warrant enjoys 'a presumption of validity.'" *United States v. Maynard*, 615 F.3d 544, 550 (D.C. Cir. 2010) (quoting *Franks*, 438 U.S. at 171). To overcome that presumption, the defendant must make a "substantial showing" that is "more than conclusory" and "accompanied by an offer of proof." *Id.* (quoting *United States v. Gaston*,

4

357 F.3d 77, 80 (D.C. Cir. 2004)).  Additionally, false statements are "material" if, when they are "set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks*, 438 U.S. at 156.  By extension, omissions are material if "their 'inclusion in the affidavit would defeat probable cause.'"  *Spencer*, 530 F.3d at 1007 (quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)).

### III. ANALYSIS

Jin argues that a *Franks* hearing is warranted because Agent Gallante's affidavit contains false statements and omissions related to the Government's dealings with Cooperating Company 1 and the Government's undercover investigation of the Winney Entities.  *See* Def.'s Mot. at 6–17.  Even assuming *arguendo* that Jin has identified false statements or omissions made intentionally or recklessly, Agent Gallante's affidavit contains sufficient independent and uncontested information to support a finding of probable cause.  For that reason, the statements and omissions with which Jin takes issue are not material, and Jin's motion must be denied.

### A. The Statements and Omissions

The Court begins by reviewing the four categories of statements and omissions in Agent Gallante's affidavit which Jin contends are bases for suppression.  First, Jin contends that the affidavit omitted facts that tended to show Cooperating Company 1 had a motive to curry favor with the Government.  Def.'s Mot. at 6–8.  Second, he argues the affidavit omitted that an employee of Cooperating Company 1 made false statements.  *Id.* at 9–11.  Third, he asserts that the affidavit falsely states that an employee of Cooperating Company 1 identified Jin as a representative of the Winney Entities.  *Id.* at 16–17.  And fourth, he asserts that the affidavit misrepresents the content of his discussion with undercover agents.  *Id.* at 11–17.

*First*, Jin posits that Agent Gallante's affidavit provides insufficient information regarding Cooperating Company 1's motive for cooperating with the Government. Agent Gallante's affidavit states, in relevant part:

> Subpoena returns revealed that between 2009 and 2017, Cooperating Company 1 also conducted approximately $27 million in wire transactions with [the Winney Entities]. Subsequent to U.S. correspondent banks freezing Cooperating Company 1's U.S. dollar transactions, Cooperating Company 1 agreed to meet with the government to account for those transactions.

ECF No. 46-1 ¶ 19. Jin contends that Agent Gallante should have included additional information contained in an FBI Form 302 memorializing the Government's meeting with Cooperating Company 1 (docketed under seal at ECF No. 49-1). Specifically, Jin asserts that Agent Gallante should have reported that:

- The employee representing Cooperating Company 1 was accompanied by attorneys. ECF No. 49-1 at 2.

- The employee explained that the freezing of its transactions "had caused extreme difficulties" and deprived Cooperating Company 1 of millions of dollars. *Id.* at 2–3.

- The employee estimated that Cooperating Company 1 "faced default within the next two weeks without some kind of resolution." *Id.* at 3.

- The employee "proposed the potential release" of $1.9 million. *Id.*

- The Government responded that "the potential release of any funds would first depend on the information provided by [Cooperating Company 1] and their potential willingness to cooperate." *Id.*

Jin argues that by omitting this detail, Agent Gallante obscured Cooperating Company 1's "strong financial motive to curry favor" with the Government, which motive would undermine Cooperating Company 1's credibility. Def.'s Mot. at 8.

*Second*, Jin argues that Agent Gallante's affidavit omits the fact that an employee of Cooperating Company 1 made false statements in a manner that undermines the employee's credibility and suggest Cooperating Company 1 had a motive to limit its criminal liability. Def.'s

6

Mot. at 9–11. Specifically, Jin argues that Agent Gallante should have reported that the employee "claimed not to have understood that some of [Cooperating Company 1's] shipments were going to North Korea until the problems with payments began" despite the fact that shipping documents showed North Korea as the destination of some shipments and that the employee "claimed not to be familiar with the meaning" of common shipping terms despite working for a company that regularly engages in international shipping. *Id.* at 9 (citing ECF No. 49-1 at 4).[2] Jin argues that these omissions undermined Magistrate Judge Merriweather's ability to assess Cooperating Company 1's credibility. *Id.* at 10.

*Third*, Jin asserts that the affidavit falsely states that an employee of Cooperating Company 1 identified Jin as a representative of the Winney Entities. Def.'s Mot. at 16–17. The affidavit reports: "Cooperating Company 1 further stated that Winney was represented by James Han and Jin Guanghua." ECF No. 46-1 ¶ 21. But the FBI 302 says no such thing. *See* ECF No. 49-1. Instead, the FBI 302 reports that the Cooperating Company 1 employee stated that "Winney is represented by an individual named James Han." *Id.* at 3. The employee further stated that when he last met with Han, "Han traveled with another individual from Winney whose name [the employee] doesn't recall." *Id.* at 4. When investigators showed the employee "a photograph of Jin Guanghua and asked if he was the man who traveled with Han," the employee stated that he "was unsure but did not believe it was." *Id.* The employee also stated that "Han has represented himself as if he were an independent buyer who controls Winney." *Id.* Accordingly, Jin argues that Agent Gallante's affidavit falsely stated that Cooperating Company 1 identified Jin as a

---

[2] Jin also argues that the employee falsely "claimed that Winney prepared all shipping documents" despite the fact that the Government possesses emails showing that Cooperating Company 1 had, at least on one occasion, offered to prepare such materials. Def.'s Mot. at 9–10 (citing ECF No. 49-2). But Jin misrepresents the employee's allegedly false claim. The FBI 302 states only that the employee explained that Winney "was usually responsible for arranging shipping and completing any associated documentation." ECF No. 49-1 at 5–6. That representation is entirely consistent with the emails Jin identifies.

7

representative of the Winney Entities when, in fact, the Cooperating Company 1 employee did not know Jin and made statements suggesting that Han was the only person in charge.

*Finally*, Jin argues that the affidavit misrepresents the nature of a meeting between Jin and undercover agents posing as employees of Cooperating Company 1. Def.'s Mot. at 11–16. Agent Gallante's affidavit reports:

> Undercover agents posing as Cooperating Company 1 employees subsequently began communicating with Winney.
>
> In those conversations, James Han (Han) and Jin Guanghua (Jin) discussed laundering payments via front companies.

ECF No. 46-1 ¶¶ 22–23. Jin contends that the representation that he discussed laundering payments via front companies is false. Def.'s Mot. at 11.

The Court has carefully reviewed the documentary evidence before it regarding the undercover agents' interactions with Jin and summarizes those interactions here. Posing as employees of Cooperating Company 1, undercover agents made contact with Jin and the Winney Entities and expressed that their transactions had been frozen, that their lawyer had advised them that their dealings with the Winney Entities constituted fraud, that the company was scared, and that the company wanted to find a solution so they could keep doing business with the Winney Entities. *See* ECF No. 49-3 at 75. Jin and the undercover agents then met at a hotel to discuss the matter. *See generally* ECF No. 49-3.[3]

At the hotel, an undercover agent sought to establish as a baseline for the conversation that "we are committing fraud" and "we are laundering money" by obscuring the North Korean destination of certain shipments from banks. ECF No. 49-3 at 19. Jin refused to accept this premise, stating that they were "not money laundering," that Jin had "no idea where the goods'

---

[3] The conversation in the hotel was conducted in Spanish and Mandarin and later translated to English. The discussion that follows quotes the English translation the parties have provided.

destination" was, that their dealings "didn't violate any law," and that Jin "d[id]n't want to deal business with" Cooperating Company 1 if they thought otherwise. *Id.* at 19–22. Jin stated that "[t]he fact is we never violate the law" and called that fact "the foundation for today's conversation." *Id.* at 25. Jin reframed Cooperating Company 1's problem as one of perception rather than illegality. According to Jin, Cooperating Company 1's transactions were being frozen because the "large amount of money transfer" from Cooperating Company 1 to the Winney Entities "trigger[ed] the suspicion of money laundering from US government." *Id.* at 24.

The undercover agents proposed a solution to this problem: Cooperating Company 1 would pay a $10,000 bribe to a bank employee to turn a blind eye to its transactions with the Winney Entities, and the Winney Entities should bear this cost because their reputation was responsible for Cooperating Company 1's problems. *See* ECF No. 49-3 at 14–16. Jin refused to do so and offered three reasons for that refusal at various points during the conversation.

First, Jin gave some indications that he was concerned about the legality of such a payment. Jin questioned whether it was "appropriate to pay $10,000 to bank to investigate" the payments to the Winney Entities "under the reasonable and legal assumption" that the $10,000 was a "bank investigation fee." ECF No. 49-3 at 16–17.

Second, as a business matter, Jin expressed repeatedly that the cost of the bribe was Cooperating Company 1's burden to bear. For example, he stated that the payment is "your internal issue," so Cooperating Company 1 "shouldn't ask money from me." ECF No. 49-3 at 17. Elsewhere, Jin stated that if Cooperating Company 1 and Winney "want to do business, we shall bear our responsibility separately. You can't just raise the price for building up your firewall." *Id.* at 44. Jin explained that "[e]ven at normal situation[,] if you deal business with China Tobacco,

9

you might be investigated," that this risk was the cost of doing business, and that each party must "bear our own responsibility." *Id.* at 46.

Third, and most frequently, Jin related that bribing a bank was unnecessary because Jin could structure transactions to run between Cooperating Company 1 and front companies rather than Cooperating Company 1 and Winney. For example, Jin stated that "we don't have to pay $10,000" because "we can avoid the investigation by setting up another company in between" Cooperating Company 1 and Winney. ECF No. 49-3 at 25. Jin's statements suggest that the company or companies operating between Cooperating Company 1 and Winney would not be independent third parties, but rather companies under Jin's control.[4] Jin made clear that the purpose of using front companies as buyers was to obfuscate Winney's role in the transactions: "If you think We Need [phonetically, Winney] company is too popular, we can find another company to buy your goods." *Id.* at 52. And Jin further suggested that he viewed this option as a substitute solution for the $10,000 payment: "When you want to prevent this thing happen, you can set up one or ten companies. I won't spent money on this prevention procedure [the $10,00 payment]." *Id.* at 46.

Jin argues that, against this nuanced backdrop, Agent Gallante's simple statement that Jin "discussed laundering payments via front companies" is misleading because it ignores "a slew of other statements that add critical context and explain that Mr. Jin's intent was always to act legally." ECF No. 46 at 12 (citing ECF No. 46-1 at 21, 23).

**B. Materiality**

---

[4] "My company, can be in Dubai or Russia, buy goods from your company in Paraguay or in Bolivia. For example, the Russia company buys goods from you and you deliver the goods to Shanghai or any other related place." ECF No. 49-3 at 31.

Even assuming *arguendo*, without deciding, that all of the issues outlined above constitute knowingly or recklessly false statements or omissions, Jin must show that they were material to the finding of probable cause before the Court can order a *Franks* hearing. *United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010); *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008). False statements are "material" if, when they are "set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks*, 438 U.S. at 156. Similarly, omissions are material if "their 'inclusion in the affidavit would defeat probable cause.'" *Spencer*, 530 F.3d at 1007 (quoting *Colkley*, 899 F.2d at 301.)

As numbered above, Jin's first two issues with Agent Gallante's affidavit—that the affidavit omitted (i) facts tending to show Cooperating Company 1 had a motive to curry favor and (ii) the fact that an employee of Cooperating Company 1 made false statements—both go to the credibility of Cooperating Company 1. Def.'s Mot. 6–11. For purposes of this analysis, the Court will provide Jin with the maximally helpful result from a finding that Cooperating Company 1 is not credible. This means that the Court will strike from the affidavit any statements attributed to Cooperating Company 1 in making its materiality determination.

The only such statement attributable to Cooperating Company 1 in the affidavit is Paragraph 21, which states that "Cooperating Company 1 further stated that Winney was represented by James Han and Jin Guanghua." ECF No. 46-1 at 21, ¶ 21. Jin argues that the Court should strike the representations regarding the bills of lading and invoices provided by Cooperating Company 1, ECF No. 46 at 18, but the Court concludes otherwise because those representations pertain to physical documentation reviewed by investigating agents rather than the credibility of Cooperating Company 1. Because Paragraph 21 is the only portion of the affidavit relating to the credibility of Cooperating Company 1's representations, this case is entirely unlike the cases that

11

Jin relies on to show that credibility issues can be material. In those cases, warrants were issued based on affidavits that heavily relied on statements made by cooperators with credibility issues rather than documentary evidence. *See United States v. Lull*, 824 F.3d 109, 118 (4th Cir. 2016) ("Much of the information included in Investigator Welch's affidavit came solely from the informant."); *United States v. Glover*, 755 F.3d 811, 814–15 (7th Cir. 2014) (describing an affidavit based almost entirely on confidential informant's statements); *United States v. Simmons*, 771 F. Supp. 2d 908, 926 (N.D. Ill. 2011) ("In this case . . . all of the inculpatory information indicating that Simmons possessed a gun in the Trumbull residence came from a recently-arrested informant with a history of lying to the police."). Furthermore, the Court would strike Paragraph 21 of the affidavit regardless of this omitted material because the Government has not come forward with any evidence that anyone at Cooperating Company 1 made the relevant statement about Jin, and the evidence before the Court is to the contrary. *See* ECF No. 49-1.

Jin's remaining argument is that Agent Gallante's affidavit materially misrepresents a meeting Jin had with undercover agents because it represents that, during the meeting, Jin "discussed laundering payments via front companies" without providing more detail. ECF No. 46-1 at 21 ¶ 23. According to Jin, the affidavit omitted information about his conduct at the meeting that would have portrayed him in a more innocent light. Def.'s Mot. at 11–17. Assuming *arguendo* that the omissions alleged by Jin satisfy the rest of the requirements for a *Franks* hearing, the Court will analyze the materiality of these omissions by viewing the affidavit as though Paragraph 23 was replaced with a longer paragraph that articulates the nuance of Jin's meeting with the undercover agents.

A more nuanced paragraph would note the details discussed above. It would note Jin's rejection of the premise that Winney and Cooperating Company 1 were violating the law, his

statement that he had "no idea where the goods' destination was," and his statement that he did not want to do business with Cooperating Company 1 if they thought they were violating the law. ECF No. 49-3 at 19–22.  It would also note Jin's refusal of the idea to pay a $10,000 bribe to a bank employee and his three reasons for that refusal—namely, (i) that Jin was concerned about the legality of such a payment, (ii) that Jin believed the cost of the bribe was Cooperating Company 1's burden to bear, and (iii) that Jin considered the bribe to be unnecessary because he could structure transactions to run between Cooperating Company 1 and front companies rather than Cooperating Company 1 and Winney.  *Id*. at 16–52.  In relation to this last reason, the paragraph would mention that Jin appeared to recognize that the purpose of using a front company was to avoid suspicion and investigation of money laundering.  *Id*. at 46–52.

Viewing the affidavit as though Paragraph 21 were removed and Paragraph 23 were expanded, the Court determines that the affidavit would still be sufficient to create probable cause that the target email account—Target Account 1—would contain evidence of sanctions evasion and money laundering.  Removing Cooperating Company 1's statement in Paragraph 21 does not negate probable cause because the affidavit is built on a foundation of documentary evidence and findings from law enforcement's investigation, not the credibility of Cooperating Company 1. Furthermore, as the Court will explain in more detail below, the expansion of Paragraph 23 only *adds* support to a finding of probable cause because the additional details of Jin's meeting with the undercover agents strengthen the inference that Jin was a representative of Winney.  And while Jin argues that these additional details are necessary to understand his intent at the meeting, the fact of the matter is that Jin's intent is "not relevant" to the issue of whether there was probable cause to execute a search and seizure warrant on his email account.  *United States v. Ali*, 870 F. Supp. 2d 10, 31 (D.D.C. 2012) (ESH).

In analyzing whether Jin's hypothetically modified affidavit would provide probable cause to issue a warrant to search and seize his email account, we begin with the determination that Agent Gallante's affidavit contains undisputed representations that are sufficient to infer that the Winney entities engaged in money laundering. The affidavit explains that cigarettes—especially counterfeit cigarettes—are a large source of "hard currency revenue" for North Korea. ECF No. 46-1 at 21 ¶ 18. It then identifies Cooperating Company 1 as a company that sells unrefined tobacco products, *id.*, and states that, according to subpoena returns, the Winney entities conducted "approximately $27 million in wire transactions" with Cooperating Company 1 between 2009 and 2017. *Id.* ¶ 19. Based on bills of lading and invoices provided by Cooperating Company 1, the affidavit provides that Winney's bills of lading from 2013 to 2016 "stated the ultimate customer for these sales were companies in North Korea, including the official North Korean state-owned business that manufactures cigarettes." *Id.* ¶ 20. However, the affidavit states that in 2016—the year U.S. institutions were barred from engaging in correspondent banking transactions with North Korean financial institutions, *id.* at 20 ¶ 16—Winney "changed its bills of lading to [] reference sales to China and non-North Korean locations/customers." *Id.* at 21 ¶ 20.

The above allegations support the conclusion that there was a strong likelihood that the Winney entities were engaged in purchasing tobacco from Cooperating Company 1 and selling it to companies in North Korea between 2013 and 2016. Furthermore, allegations detailing "U.S. dollar transactions between Winney and multiple entities sanctioned or linked to North Korean evasion of sanctions" give rise to a reasonable likelihood that the Winney entities continued to conduct their North Korean business after the North Koren companies were removed from their bills of lading. *Id.* at 22 ¶ 26. One such company was Dandong Hongxiang Industrial Development Company Ltd. ("DHID"). S*ee id.* ¶ 27. OFAC designated DHID as a sanctioned

14

entity in 2016 on the basis that it operated an "illicit network of front companies" to facilitate transactions on behalf of Korea Kwangson Banking Corp. ("KKBC"), which was located in North Korea and had previously been designated "for providing financial services in support of WMD proliferators." *Id*. According to the affidavit, "[s]ubpoena returns from financial institutions which process international U.S. dollar wires revealed numerous wire transfers from DHID to Winney from approximately April 2012 to June 2014 totaling approximately $10,579,458.20." *Id*. Agent Gallante's affidavit provides two more instances of Winney conducting transactions with entities that law enforcement identified as evading North Korean sanctions. *See Id*. at 22-23 ¶ 28 (subpoena returns revealed "two wire transfers from [designated entity] to Winney in April and May 2015 totaling approximately $534,526.55"); *id*. at 23 ¶ 29 (noting that a company identified as a "front company" in a separate investigation made a wire transfer to Winney in October 2016 "totaling approximately $974,970.00"). Given the strong factual basis supporting the conclusion that Winney had a significant tobacco trade from Cooperating Company 1 to North Korea leading up to 2016 and the identified transactions between Winney and entities known to avoid sanctions, the affidavit provides probable cause to infer that the Winney entities were engaged in money laundering.

Agent Gallante's affidavit also contains undisputed representations sufficient to infer that Jin was involved with the Winney entities. The affidavit represents that undercover agents posing as employees of Cooperating Company 1 "began communicating with Winney" and were subsequently brought into conversation with Jin. ECF No. 46-1 at 21 ¶¶ 22–23. Paragraph 23 of the affidavit establishes that Jin then had a meeting with the undercover agents, and the additional details brought into Paragraph 23 by Jin's motion—which, as detailed above, show that Jin was negotiating on behalf of Winney—only serve to enhance the inference that Jin was meeting with

15

these undercover agents as a representative of Winney. *Id*. ¶ 23.  Furthermore, the affidavit represents that "Jin described himself as the General Manager of Winney" in correspondence with the undercover agents. *Id*. ¶ 24.  These representations create probable cause to infer that Jin was involved with the Winney entities.

Finally, the affidavit contains undisputed representations sufficient to infer that Jin controlled Target Account 1—i.e., the email address "jinguanghua2014@gmail.com," ECF No. 46-1 at 16 ¶ 1—and used it in matters related to Winney's business.  The affidavit represents that James Han—the director of Winney, according to documents referenced in the affidavit, *id*. at 21 ¶ 24—provided an undercover agent with Target Account 1 "as the contact information for Jin" after the undercover agent asked for Jin's contact information to further discuss matters relating to Winney, *id*. at 24 ¶¶ 30–32.  Furthermore, Section 2703(d) returns revealed that Target Account 1 was subscribed to a "GH Jin" and established with an IP address resolving to Shenyang, China, where Jin was known to operate out of based on undercover communications.  *Id*. ¶ 33.  Those same Section 2703(d) returns revealed that Target Account 1 had "communicated at least ten times between December 2018 and June 2019" with an account on a Chinese-based domain that was publicly listed by multiple Chinese companies as their contact address.  *Id*. ¶ 35.  One such company was Dandong Xinlu International Freight Forwarding Co. Ltd. ("Xinlu"), which advertised itself on its public website as a freight and shipping company in Dandong, China, that had its business "based in North Korea."  *Id*.  Based on these representations, there is probable cause to infer that Jin controlled Target Account 1 and used it to discuss matters relating to Winney's business.[5]

---

[5] The Court also notes that Jin does not dispute any of the affidavit's representations pertaining to James Han.  The affidavit does more than enough establish an inference that Jin and Han were involved together with Winney, *see, e.g.*, ECF No. 46-1 at 21 ¶¶ 18–25, and further provides representations showing that Han was directly implicated in sanctions evasion, *id*. at 25 ¶ 36 et seq.

The above representations, viewed in their totality, are sufficient to establish probable cause that evidence of a crime would be found in Target Account 1. Jin's arguments to the contrary mistakenly apply a higher standard than is necessary for a finding of probable cause, which "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 245 n. 13 (1983). There is a "large difference" between guilt and probable cause, "and therefore a like difference in the *quanta* and modes of proof required to establish them." *Draper v. United States*, 358 U.S. 307, 312 (1959) (citing *Brinegar v. United States*, 338 U.S. 160, 173 (1949)). And "[o]nce it is established that probable cause exists to believe a federal crime has been committed a warrant may issue for the search of any property which the magistrate has probable cause to believe may be the place of concealment of evidence of the crime." *Zurcher v. Stanford Daily*, 436 U.S. 547, 558 (1978) (quoting *United States v. Mfrs. Nat'l Bank of Detroit*, 536 F.2d 699, 703 (6th Cir.1976)). Finally, regarding Jin's arguments about his intent, Jin's intent is "not relevant to the magistrates' determinations of probable cause." *Ali*, 870 F. Supp. 2d at 31.

In sum, even crediting all of Jin's arguments regarding misrepresentations and omissions in Agent Gallante's affidavit, the Court concludes that the affidavit would still establish probable cause to search and seize Target Account 1 if the affidavit were amended to exclude the information Jin challenges and add the information he argues was improperly omitted. The affidavit contains sufficient representations to infer (i) that the Winney entities were engaged in money laundering, (ii) that Jin was connected to the Winney entities, and (iii) that Jin controlled Target Account 1 and used it in connection with the Winney entities. Accordingly, the alleged misrepresentations and omissions identified by Jin were not "material" and his motion for a *Franks* hearing must be denied.

## IV. CONCLUSION & ORDER

Accordingly, the Court shall deny Jin's motion for a *Franks* hearing by separate order.

**Dated: August 1, 2025**

_____
COLLEEN KOLLAR-KOTELLY
United States District Judge