**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JIN GUANGHUA,<br><br>         Defendant. | Criminal Action No. 23-091-2 (CKK) |

**MEMORANDUM OPINION**
(August 19, 2025)

Defendant Jin Guanghua faces a twelve-count indictment charging him with participation in a bank-fraud, sanctions-evasion, and money-laundering conspiracy. Jin has filed a set of interrelated motions to dismiss counts in this indictment on grounds related to the scope of the federal bank fraud statute, limits on the extraterritorial application of federal criminal law, and the constitutional right to proper venue. Collectively, these motions test the outer limits of the Government's powers to enforce economic sanctions through criminal prosecutions of people acting outside of the United States and to lay venue in such cases in this District.

For the reasons that follow, the Court shall **DENY** Jin's [45] Motion to Dismiss Count One, Conspiracy to Commit Bank Fraud, on grounds related to the substantive scope of the bank fraud statute because Count One successfully states an offense under the relevant statute and precedents. The Court shall **DENY** Jin's [52] Motion to Dismiss Counts One through Six for Failure to State an Offense as to Extraterritorial Conduct because each of those counts involves permissible domestic applications of the bank fraud statute and federal sanctions laws. The Court shall **GRANT IN PART** and **DENY IN PART** Jin's [53] Motions to Dismiss All Counts for Lack of Venue because there is an adequate basis for venue in this District for the charged bank-fraud conspiracy, sanctions-evasion conspiracy, substantive sanctions violations, and money-laundering

1

conspiracy offenses charged in Counts One through Seven; however, proper venue is lacking as to the substantive money-laundering offenses charged in Counts Eight through Twelve. Accordingly, the court shall **DISMISS** Counts Eight through Twelve, in which Jin is charged with Laundering of Monetary Instruments, for lack of proper venue. Finally, the Court shall **DENY** Jin's separate [54] Motion to Dismiss Money Laundering Counts because that motion relies on the premise that none of the conduct alleged in Counts One through Six was unlawful.

## I. BACKGROUND

The issues presented in Jin's motions turn on technical details about the international financial system, the United States's program of economic sanctions against North Korea, U.S. banking law, and the alleged conspiracy at issue in this case. The Court briefly summarizes the relevant details here.

### A. Correspondent Banking

Foreign financial institutions often complete transactions denominated in U.S. dollars by routing transactions through "correspondent banks" located in the United States. *See* Indictment, ECF No. 13, ¶ 9. A correspondent bank is a bank where multiple financial institutions hold "correspondent accounts," which are institutional bank accounts that allow financial institutions to send and receive funds to and from one another. *See id.* Relationships with correspondent banks allow foreign institutions to complete transactions in currencies—such as U.S. dollars—that those institutions do not hold in their own reserves. *Id.* Correspondent banking relationships also allow foreign financial institutions to complete cross-border transactions quickly and securely. *See id.*

The following exemplar illustrates how correspondent banking transactions work and why banks depend upon them to make certain transfers.

Suppose that a customer holds an account at a foreign bank, "Bank A," and she wants to send U.S. dollars to a person with an account at a different bank, "Bank B," which is located in a different foreign country.

This transaction presents two challenges for Bank A. First, unless Bank A holds U.S. dollars in its own reserves, it needs to exchange some of its customer's currency for dollars before it can begin the transfer. Second, sending dollars directly to Bank B to be deposited into the recipient's account may be both time-consuming and costly, and there may be a risk that the funds do not reach their intended destination.

Correspondent banking helps Bank A overcome both challenges. Suppose that Banks A and B each hold U.S. dollar-denominated accounts at a correspondent bank, "Bank C." Through this correspondent relationship, Bank A has a more efficient option for processing a transfer of U.S. dollars from its customer to the recipient at Bank B. First, Bank A can deduct the necessary funds from the sending customer's account on its own books. Next, Bank A can instruct Bank C to transfer dollars from Bank A's own correspondent account at Bank C directly into Bank B's correspondent account at Bank C. Based on these instructions, Bank C will deduct funds from Bank A's account and credit Bank B's account. Finally, Bank A can instruct Bank B to credit the recipient's account at Bank B by the amount of the transfer. The end result is that the recipient's account at Bank B is credited, the sender's account at Bank A is debited, and funds at Bank C have moved from Bank A's correspondent account to Bank B's correspondent account.

Correspondent banks located in the United States play an important role in U.S. dollar-denominated transactions around the world. *See* Indictment, ECF No. 13, ¶ 9. As alleged in the indictment, "international wire transfers for foreign customers" that are denominated in U.S. dollars are routed through correspondent banks "in the United States," where the transactions

"clear" or funds are "converted into other currencies." *Id.*; *see also id.* ¶ 10 (alleging that "[n]early all substantial U.S. dollar wire transactions conducted by foreign financial institutions" are processed by U.S. correspondent banks).

### B. IEEPA and U.S. Sanctions against North Korea

The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, authorizes the President to take certain measures "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). These measures may include "regulat[ing]" or "prohibit[ing] . . . any transactions in foreign exchange . . . by any person, or with respect to any property, subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(A). They may also include "prevent[ing] or prohibit[ing], any . . . transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States." *Id.* § 1702(a)(1)(B). IEEPA provides for criminal penalties against "a person" who, among other things, willfully "cause[s] a violation of any license, order, regulation, or prohibition" issued under its provisions. *Id.* § 1705(a), (c).

Since 1994, successive Presidents have declared that the "proliferation of nuclear, biological, and chemical weapons" (collectively, "weapons of mass destruction" or "WMD") and the "means of delivering such weapons" is a continuing national emergency.[1] In 2008, President George W. Bush further declared that "the current existence and risk of the proliferation of

---

[1] *See, e.g.*, Exec. Order No. 12,938, 59 Fed. Reg. 59,099 (Nov. 14, 1994); 63 Fed. Reg. 63,589 (Nov. 13, 1998); 67 Fed. Reg. 68,493 (Nov. 6, 2002); 71 Fed. Reg. 64,109 (Oct. 27, 2006); 75 Fed. Reg. 68,673 (Nov. 8, 2010); 79 Fed. Reg. 67,035 (Nov. 7, 2014); 83 Fed. Reg. 56,253 (Nov. 8, 2018); 87 Fed. Reg. 68,015 (Nov. 8, 2022); 89 Fed. Reg. 88,867 (Nov. 7, 2024).

weapons-usable fissile material on the Korean Peninsula" was a national emergency. *See* Exec. Order 13,466 (June 26, 2008).

In response to these emergencies, the United States has implemented a comprehensive program of economic sanctions aimed at preventing and deterring North Korea from proliferating nuclear weapons and other WMD. *See* Indictment, ECF No. 13, ¶ 19.

In 2005, President George W. Bush issued Executive Order 13,382, imposing sanctions that "blocked" the "property and interests of" certain individuals and entities determined to present a risk of directly or indirectly contributing to WMD proliferation, to the extent that those interests came within the United States or the "possession or control of United States persons." *See* Exec. Order No. 13,382, § 1 (June 28, 2005). Property and interests that are "blocked" under this Executive Order "may not be transferred, paid, exported, withdrawn, or otherwise dealt in" except under the authority of a license or other exemption from the federal government. *See id.*

President Bush also authorized the Secretary of the Treasury, in consultation with the Secretary of State, to promulgate regulations to address the threat presented by proliferation of weapons of mass destruction. *See* Exec. Order No. 13,382, § 6 (June 28, 2005). Exercising this authority, the Secretary of the Treasury promulgated the Weapons of Mass Destruction Proliferators Sanctions Regulations ("WMDPSR"). *See* 31 C.F.R. § 544.101 *et seq.* These regulations, like the 2005 Executive Order, prohibit transactions within the United States or with U.S. persons involving certain individuals and entities, except under the authority of a license or other exemption from the federal government. *See id.* § 544.201; *see also* Exec. Order No. 13,382, § 1 (June 28, 2005).

Pursuant to Executive Order 13,382 and its implementing regulations, the Department of the Treasury added the North Korean banks Korea Kwangson Banking Corp. ("KKBC") and the

5

Foreign Trade Bank ("FTB") to the list of "blocked" entities with whom U.S. persons were forbidden from doing business. *See* Indictment, ECF No. 13, ¶¶ 21–22. These banks allegedly contributed to WMD proliferation by providing financial services to sanctioned entities with ties to North Korean proliferation efforts. *See id.*

In 2008, in response to the national emergency related to "the proliferation of weapons-usable fissile material on the Korean Peninsula," President Bush authorized the Secretary of the Treasury, in consultation with the Secretary of State, to promulgate regulations levying new sanctions. *See* Exec. Order 13,466, § 5 (June 26, 2008). Exercising this authority, the Department of the Treasury promulgated the "North Korea Sanctions Regulations" ("NKSR"), 31 C.F.R. part 510.

Finally, in 2016, President Barack Obama issued Executive Order 13,722, which ordered comprehensive blocking sanctions against the North Korean government and associated entities in response to the national emergency declared in 2008. *See* Exec. Order 13,722 (Mar. 15, 2016). This Executive Order prohibits "the exportation or reexportation, direct or indirect, from the United States, or by a United States person, wherever located, of any goods, services, or technology to North Korea," except under the authority of a license or other exemption from the federal government. *See id.* § 3(a)(1). It also prohibits "[a]ny transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate" any of its provisions. *Id.* § 7(a). The Department of the Treasury later amended the NKSR to incorporate these prohibitions. *See* 31 C.F.R. §§ 510.206(a), 510.212(a).

The net effect of these sanctions, as relevant here, is that it is a violation of federal law for any U.S. bank to provide correspondent banking services to or on behalf of any North Korean

individuals or entities, including the North Korean banks KKBC and FTB. *See* Indictment, ECF No. 13, ¶¶ 21–23.

### C.  The Bank Secrecy Act

The Bank Secrecy Act, 31 U.S.C. § 5311 *et seq.*, requires U.S. financial institutions to take certain measures to detect and prevent prohibited attempted money laundering and sanctions evasion, including uses of correspondent banking services that are prohibited by the NKSR. *See* Indictment, ECF No. 13, ¶ 11–13. The Government alleges that, in compliance with these requirements, U.S. financial institutions would decline to process transactions involving KKBC and FTB if the institutions were aware of those entities' involvement in the transactions. *See id.* ¶ 14. U.S. financial institutions' failure to comply with these requirements could result in "civil and criminal penalties." *Id.*

### D.  The Alleged Conspiracy

The Government alleges that Jin and others conspired to defraud U.S. financial institutions, evade U.S. sanctions, and launder funds for the benefit of entities in North Korea. Indictment, ECF No. 13, ¶ 1. Specifically, it alleges that Jin and his codefendants operated a group of companies that used funds from a North Korean bank and a network of front companies to purchase raw tobacco for North Korean companies. *Id.* ¶¶ 2–5. The North Korean companies allegedly used this tobacco to manufacture cigarettes, which they then sold to generate revenue for programs of the North Korean government, including its weapons of mass destruction ("WMD") proliferation programs. *Id.* ¶¶ 5–6.

The Government alleges that as part of this scheme, Jin and his codefendants "engaged in a multi-year scheme to . . . illegally access the U.S. financial system." Indictment, ECF No. 13, ¶¶ 6. In furtherance of this scheme, Jin and his codefendants allegedly deceived U.S. financial institutions into processing hundreds of U.S. dollar-denominated transactions that the institutions

would otherwise have "frozen, blocked, investigated, and/or declined." *Id.* ¶¶ 6–7. The Government further alleges that, as "part of the conspiracy" to accomplish these transactions, Jin and his coconspirators "transmitted and caused to be transmitted to U.S. financial institutions false information . . . about U.S. dollar transactions that were actually made on behalf of North Korea and North Korean entities." *Id.* ¶ 48(d). As alleged, the total value of these transactions was "approximately $74 million," and the transactions ultimately resulted in "nearly $700 million in revenue" for North Korean entities. *Id.* ¶ 7. The Government charges that by causing these transactions, Jin and his codefendants "caused the export of financial services by U.S. financial institutions for the benefit of North Korea without a license." *Id.* ¶ 8.

For this alleged conduct, the Government has charged Jin by indictment with Conspiracy to Commit Bank Fraud, in violation of 18 U.S.C. §§ 1344(1), 1344(2) and 1349; Conspiracy to Violate the International Emergency Economic Powers Act ("IEEPA"), in violation of 50 U.S.C. § 1705; four counts of substantive violations of IEEPA; Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h); and five counts of substantive money laundering offenses, in violation of 18 U.S.C. § 1956(a)(2)(A).

Jin has moved to dismiss each of these counts on grounds related to the scope of the federal bank fraud statute, limits on extraterritorial application of federal criminal law, and the constitutional right to proper venue. *See* Def.'s Mots., ECF Nos. 45, 52, 53, 54. The Government opposes each of these motions. Gov't Opp'ns, ECF Nos. 65, 69, 70. At the Court's request, the parties filed supplemental briefs regarding Jin's motions earlier this month. *See* Def.'s Supp., ECF No. 132; Gov't Supp., ECF No. 133; Def.'s Reply, ECF No. 137; Gov't Reply, ECF No. 138. The motions are now ripe for decision.

## II. LEGAL STANDARD

A defendant may challenge a defect in an indictment, including failure to state an offense, by filing a pretrial motion to dismiss one or more counts of the indictment.  *See* Fed. R. Crim. P. 12(b)(3)(B).  When evaluating a motion to dismiss an indictment, a reviewing court "assumes the truth" of the factual allegations contained therein.  *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015).

A defendant may also raise a venue objection through a pretrial motion.  Fed. R. Crim. P. 12(b)(3)(A).  "The Government bears the burden of establishing by a preponderance of the evidence that venue is proper with respect to each count charged against the defendant."  *United States v. Morgan*, 393 F.3d 192, 195 (D.C. Cir. 2004).

## III. ANALYSIS

Jin's pending motions raise four facial challenges to the indictment in this case.  First, he argues that Count One of the indictment fails to state an offense under the bank fraud statute. Second, he contends that the charges against him involve impermissible extraterritorial applications of U.S. federal law.  Third, he challenges the Government's decision to lay venue in the District of Columbia.  Fourth, he argues that the money-laundering charges against him must be dismissed because of defects in other charges.  The Court addresses these arguments in turn.

### A.  Substantive Scope of the Bank Fraud Statute

Jin first argues that Count One of the indictment, charging him with conspiracy to commit bank fraud, must be dismissed because his alleged conduct does not fall within the substantive scope of the bank fraud statute.  *See* Def.'s Mot, ECF No. 45.  This statute provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(1)    to defraud a financial institution; or

(2)    to obtain any of the moneys, funds, credits, assets, securities, or other

> property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

> shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344.  The Government alleges that Jin conspired to violate both prongs of this provision by causing false information about U.S. dollar-denominated transactions to be sent to correspondent banks in the United States, leading those banks to process transactions that the banks otherwise would have blocked or investigated.  *See* Indictment, ECF No. 13, ¶¶ 6–7, 9.

Jin argues that the first prong of the statute, Section 1344(1), covers only schemes to deprive banks of "traditional property interests."  *Id.* at 9 (quoting *Ciminelli v. United States*, 598 U.S. 306, 309 (2023)).  He further argues that the indictment, on its face, does not charge him with conspiring to deprive a bank of its property or intending to cause loss or other harm to any bank.  *Id.* at 10.  He argues that the indictment charges, at most, that he caused U.S. banks to transfer money between different customers' correspondent accounts.  *See id.* at 10–11

Next, Jin argues that the indictment fails to state an offense under the second prong of the statute, Section 1344(2), because it does not allege that he conspired to "obtain" the property of any U.S. bank "by means of false or fraudulent pretenses, representations, or premises."  *Id.* at 13 (quoting 18 U.S.C. § 1344(2) and citing *Loughrin v. United States*, 573 U.S. 351, 357 (2014)).

Jin's arguments for dismissal based on the substantive scope of the bank fraud statute are unsuccessful.  The Court shall take these arguments in turn.

1.  Count One states an offense under Section 1344(1) because it alleges that Jin conspired to deceive U.S. banks and deprive them of traditional property interests.

Jin argues that Count One fails to state an offense under Section 1344(1) because the indictment does not allege that he schemed to deprive banks of property or cause them losses, but

this argument relies on an overreading of relevant precedent. Jin is correct that the "the federal fraud statutes criminalize only schemes to deprive people of traditional property interests." *Ciminelli*, 598 U.S. at 309. However, as the Supreme Court helpfully clarified in a recent decision interpreting the wire fraud statute, that general rule does not impose an "economic-loss requirement" in federal fraud prosecutions. *Kousisis v. United States*, 145 S. Ct. 1382, 1391 (2025). Instead, it requires only that a traditional property interest "must be an *object* of the defendant's fraud." *Id.* That means that a defendant can commit fraud by causing a victim to transfer property, even if the victim receives property of equal or greater value in return. *See id.* at 1391–92.

The Supreme Court's recent decision about the meaning of the wire fraud statute reaffirms a related holding in an earlier case that the bank fraud statute "demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss." *Shaw v. United States*, 580 U.S. 63, 67 (2016). Instead, all that is required is a "scheme" to "deceive the bank and deprive it of something of value." *Id.* at 72. Importantly, funds in a bank customer's account are "something of value" to the bank, and the bank has a cognizable property right in those funds even though the customer also has similar rights. *Id.* at 66–67, 72. Even when a bank customer retains ownership of deposited funds and the bank merely assumes possession of them, the bank assumes the role of a bailee and has a property interest in "the right to possess the deposited funds against all the world but for the bailor" or the bailor's agent. *Id.* at 66.

Here, the indictment alleges that Jin conspired with others to "arrange for" the payment of certain purchases for the benefit of North Korea "to be paid in U.S. dollars through the U.S. financial system," in part by using several "means of deception" to conceal the involvement of North Korea in the transactions. Indictment, ECF No. 13, ¶ 6. The Government alleges that this

11

scheme caused "U.S. financial institutions [to] process[] at least 310 transactions worth approximately $74 million that they otherwise would have frozen, blocked, investigated, and/or declined, had they known that the transactions were being conducted in furtherance of trade with North Korea." *Id.* ¶ 7. The indictment also alleges that "U.S. dollar transactions clear and/or are converted into other currencies" through transfers between "correspondent accounts" that are held at "banks in the United States." *Id.* ¶ 9.

These allegations are sufficient to state an offense under Section 1344(1). As alleged, the charged scheme involved deceiving U.S. banks to cause them to execute transfers of U.S. dollars from certain customers' accounts into other accounts. *See* Indictment, ECF No. 13, ¶¶ 6–7, 9. The "objects" of this fraud were traditional property interests: interests in the U.S. dollars held in specific bank customers' correspondent accounts. *See Kousisis*, 145 S. Ct. at 1391. A central goal of the alleged scheme was, in relevant part, to deceive the banks into transferring dollars from one correspondent account to another. *See* Indictment, ECF No. 13, ¶¶ 6, 9; *cf. Kelly v. United States*, 590 U.S. 391, 402 (2020) (explaining that "property must play more than some bit part in a scheme" and be more than "an incidental byproduct" to sustain a property fraud conviction). Critically, even if these funds never left the relevant U.S. correspondent bank, each such transfer would have caused the bank to exchange "something of value"—its interest in the funds in one customer's correspondent account—for something else—an interest in funds in a different customer's correspondent account. *See Shaw*, 580 U.S. at 66–67, 72. Each such transfer caused the bank to give up something of value: "the right to possess the deposited funds against all the world but for" the customer in whose correspondent account the funds originated. *See id.* Although many transfers may have left the bank holding something of similar value—a right to possess a similar amount of deposited funds in a different customer's correspondent account,

enforceable "against all the world but for" that other customer—the presence of a like-for-like exchange does not defeat the fact that the bank was deprived of "something of value."  *See id.*; *see also Kousisis v. United States*, 145 S. Ct. at 1391–92.

Accordingly, the indictment adequately alleges that Jin conspired to deceive a bank and deprive it of a traditional property interest, in violation of Section 1344(1).  *See Shaw*, 580 U.S. at 72; *Kousisis*, 145 S. Ct. at 1391.  The Court shall therefore **DENY** Jin's [45] Motion to Dismiss Count One as to the charge under Section 1344(1).

> 2.     <u>Count One states an offense under Section 1344(2) because it alleges that Jin sought to obtain bank property by means of misrepresentations.</u>

Jin next argues that Count One fails to state an offense under Section 1344(2) because the indictment does not allege that he schemed to "obtain" bank property "by means of false or fraudulent pretenses, representations, or promises," but this argument is similarly unsuccessful.

*First*, the indictment adequately alleges that it was an object of the conspiracy to "obtain" the property of a U.S. bank.  *See* 18 U.S.C. § 1344(2).  Specifically, the indictment alleges that it was an object of the conspiracy to "access the U.S. financial system to pay for [raw tobacco] in U.S. dollars . . . through the U.S. financial system."  Indictment, ECF No. 13, ¶ 6.

*Second*, the indictment adequately alleges that the charged scheme was carried out "by means of false or fraudulent pretenses, representations, or promises."  *See* 18 U.S.C. § 1344(2).

As detailed above, the indictment alleges that Jin conspired to use various means, including "Chinese front companies, false shipping records, and other means of deception" to deceive U.S. banks into processing transactions that they "would have frozen, blocked, investigated, and/or declined" if the banks knew that the transactions were being made for the benefit of North Korea.  Indictment, ECF No. 13, ¶¶ 6–7; *see also id.* ¶¶ 51–52 (alleging that Jin and coconspirators "repeatedly reincorporated their companies and changed the company names in order to avoid

bank scrutiny"), ¶ 54 (alleging uses of "front companies" to facilitate payments processed by U.S. financial institutions), ¶ 72 (alleging that a coconspirator told a foreign bank that there was "[n]o connection" between North Korea and a U.S. dollar-denominated transaction sent to one of the coconspirators' companies).

These alleged means of deception are sufficient to support a fraud charge under Section 1344(2) even though the indictment does not allege that Jin directly lied to any U.S. bank. Section 1344(2) requires only that the charged misrepresentations be "the mechanism naturally inducing a bank . . . to part with" money in its control. *See Loughrin*, 573 U.S. at 365. Accordingly, it is sufficient that "a false statement will naturally reach" a federally insured bank, even if the defendant did not communicate directly with the bank. *See id.* at 365 n.8. Here, the indictment alleges that Jin conspired to "us[e] Chinese front companies, false shipping records, and other means of deception *to make it appear to U.S. financial institutions* and others" that the U.S. dollar-denominated purchases they initiated were not associated with North Korea. Indictment, ECF No. 13, ¶ 6 (emphasis added). It further alleges that these misrepresentations led the financial institutions to process transactions "that they otherwise would have frozen, blocked, investigated, and/or declined" because of U.S. sanctions. *Id.* ¶ 7. Because the indictment alleges that Jin and others intended for the charged misrepresentations to affect U.S. banks' understanding of the transactions at issue and that the misrepresentations in fact led those banks to process transactions, it sufficiently alleges that those misrepresentations would "naturally reach" federally insured banks and "naturally induc[e]" them "to part with money in [their] control." *See Loughrin*, 573 U.S. at 363, 365 & n.8. Accordingly, the indictment adequately alleges that the charged scheme was carried out "by means of" the alleged misrepresentations. *See* 18 U.S.C. § 1344(2).

Finally, contrary to Jin's remaining argument, the indictment adequately alleges that the charged scheme involved "affirmative misrepresentations" to U.S. financial institutions, as is required to sustain a charge under Section 1344(2). *Cf.* Def.'s Mot., ECF No. 45, at 18; *see also United States v. Colton*, 231 F.3d 890, 904 (4th Cir. 2000) (concluding that a bank fraud charge involving no "affirmative misrepresentations" is properly analyzed under Section 1344(1), not Section 1344(2)); *United States v. Steffen*, 687 F.3d 1104, 1110–1 & n.5 (8th Cir. 2012) (similar, collecting cases). The indictment expressly alleges that Jin conspired with others to use, among other things, "*false* shipping records" to cause U.S. banks to process transactions for the benefit of North Korea. Indictment, ECF No. 13, ¶ 6 (emphasis added). It also alleges that as "part of the conspiracy," the alleged coconspirators and others "transmitted and caused to be transmitted to U.S. financial institutions *false information*" about the transactions at issue. *Id.* ¶ 48(d) (emphasis added). And it further alleges that one of Jin's conspirators falsely stated to a foreign bank that there was "[n]o connection" between North Korea and a particular transaction that had been flagged for review. *Id.* ¶ 72. These allegations clearly charge affirmative misrepresentations, rather than mere omissions or obfuscations. Whether there is sufficient evidence to conclude that these alleged misrepresentations would "naturally reach" federally insured banks and "naturally induc[e]" them "to part with money in [their] control" is an issue for a jury to decide based on the record developed at trial, not for the Court to resolve on a motion to dismiss the indictment. *See Loughrin*, 573 U.S. at 363, 365 & n.8; *see Ballestas*, 795 F.3d at 149 ("When considering a motion to dismiss an indictment, a court assumes the truth of [the indictment's] factual allegations.").

For these reasons, the indictment adequately alleges that Jin violated Section 1344(2) by scheming to "obtain" bank property "by means of false or fraudulent pretenses, representations, or

promises." *See* 18 U.S.C. § 1344(2).  Accordingly, the Court shall **DENY** Jin's [45] Motion to Dismiss Count One as to the charge under Section 1344(2).

In sum, Count One of the Indictment states an offense under both Section 1344(1) and Section 1344(2).  The Court shall therefore **DENY** Jin's [45] Motion to Dismiss **Count One**, **Conspiracy to Commit Bank Fraud**, on the grounds that this count fails to state an offense.

### B.  Extraterritoriality

Jin next argues that Counts One through Six of the indictment against him involve impermissible extraterritorial applications of IEEPA and the bank fraud statute—that is, improper applications of federal law to conduct occurring entirely outside the borders of this country.  *See* Def.'s Mot., ECF No. 52.  Specifically, Jin argues that neither the bank fraud statute nor IEEPA applies extraterritorially and that the charges against him involve purely extraterritorial applications of those statutes.  *Id.* at 5–15.  He contends that the Court must therefore dismiss these counts.  *Id.*  In response, the Government argues that there is no extraterritoriality problem because the relevant charges against Jin involve permissible *domestic* applications of both the bank fraud statute and IEEPA.[2]  *See* Gov't's Opp'n, ECF No. 65, at 5–9, 16–18.  For the reasons that follow, the Court concludes that both the bank fraud charge and the IEEPA charges in this case involve permissible domestic applications of the relevant statutes.  The Court shall therefore **DENY** Jin's motions to dismiss on extraterritoriality grounds.

---

[2] The Government also argues, in the alternative, that IEEPA applies extraterritorially.  Gov't's Opp'n, ECF No. 65, 9–16.  Because the Court concludes that the IEEPA charges in this case involve permissible domestic applications of the statute, it need not decide whether the statute applies extraterritorially.  *But cf. United States v. Tajideen*, 319 F. Supp. 3d 445, 457 (D.D.C. 2018) (RBW) (concluding that IEEPA does apply extraterritorially); *see also* 50 U.S.C. § 1702(a)(1)(A) (authorizing the President to regulate "*any transactions in foreign exchange* . . . by *any person*, or with respect to *any property*, subject to the jurisdiction of the United States."); *id.* § 1702(a)(1)(B) (similar).

1.    Courts apply a "presumption against extraterritoriality" when interpreting the scope of federal criminal law.

Jin's argument rests on a "canon of statutory construction" called "the presumption against extraterritoriality." *RJR Nabisco v. European Community*, 579 U.S. 325, 335 (2016).  Under this presumption, "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application."  *Id.*

When resolving extraterritoriality challenges, courts apply a "two-step framework."  *RJR Nabisco*, 579 U.S. at 337.

In step one of this analysis, a reviewing court must "ask whether the presumption against extraterritoriality has been rebutted" by "a clear, affirmative indication" in the statute "that it applies extraterritorially."  *Id.*  At this step, "[t]he question is not whether . . . 'Congress would have wanted' a statute to apply to foreign conduct 'if it had thought of the situation before the court,' but whether Congress has affirmatively and unmistakably instructed that the statute will do so."  *Id.* at 335 (quoting *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247, 261 (2010)).

In step two of the analysis, if the statute lacks extraterritorial reach, the court must "determine whether the case involves a domestic application of the statute," rather than an extraterritorial one.  *RJR Nabisco*, 579 U.S. at 337.  Courts distinguish domestic applications from extraterritorial applications by examining the locus of conduct relevant to "the statute's 'focus.'"  *Id.* (quoting *Morrison*, 561 U.S. at 267).  A statute's "focus" is "'the objec[t] of the statute's solicitude'—which can turn on the 'conduct,' 'parties,' or interests that it regulates or protects."  *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 416 (2018) (alteration in original) (quoting *Morrison*, 561 U.S. at 267).  "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad."  *RJR Nabisco*, 579 U.S. at 337.  However, "if the conduct relevant to the focus

occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.*

Although "a finding of extraterritoriality at step one will obviate step two's 'focus' inquiry" and it may therefore be "preferable" for courts to begin the analysis with step one, courts may "start[] at step two in appropriate cases." *RJR Nabisco*, 579 U.S. at 338 n.5. One reason for courts to "exercise that discretion" and begin at step two of the analysis is to avoid "resolving 'difficult questions'" implicated at step one "that do not change 'the outcome of the case,' but could have far-reaching effects in future cases." *WesternGeco*, 585 U.S. at 413 (quoting *id.,* at 236–37); *see also United States v. Harris*, 991 F.3d 552, 559 (4th Cir. 2021) (beginning at step two where deciding whether the presumption against extraterritoriality was rebutted would have presented "difficult issues" involving "an exceedingly complex statutory regime"); *United States v. McLellan*, 959 F.3d 442, 468 (1st Cir. 2020) (similar).

### 2. Count One involves a domestic application of the bank fraud statute.

There is no "clear, affirmative" textual indication that the bank fraud statute under which Jin is charged "applies extraterritoriality." *See RJR Nabisco*, 579 U.S. at 337; *accord Bascuñán v. Elsaca*, 927 F.3d 108, 124 (2d Cir. 2019). The Government concedes as much. *See* Gov't's Opp'n, ECF No. 65, at 18 n.8. "When a statute gives no clear indication of an extraterritorial application, it has none." *Morrison*, 561 U.S. at 255. Accordingly, because the "extraterritorial reach" of a conspiracy offense is generally "coterminous with that of the underlying criminal statute," the presumption against extraterritoriality is not rebutted as to the offense of conspiracy to commit bank fraud charged in Count One. *See United States v. Ali*, 718 F.3d 929, 939 (D.C. Cir. 2013).

Because the offense of conspiracy to commit bank fraud lacks extraterritorial reach, the court must next "determine whether the case involves a domestic application" of the bank fraud conspiracy statute rather than an impermissible extraterritorial one. *RJR Nabisco*, 579 U.S. at 337.

To make this determination, the Court must identify the "focus" of the conspiracy statute and decide whether the "conduct relevant to the statute's focus" occurred within in the United States.  *Id.*  This analysis begins with the text.  *See Morrison*, 561 U.S. at 266–67.  The relevant statute provides that "[a]ny person who attempts or conspires to commit" an offense under the relevant chapter, which includes the bank fraud statute, "shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."  18 U.S.C. § 1349.

Although the D.C. Circuit does not appear to have decided the "focus" of this conspiracy statute in the context of a conspiracy formed outside the United States, the Fourth Circuit has held that the relevant "focus" is "the offense that the conspirators conspire to commit."  *See United States v. Elbaz*, 52 F.4th 593, 604 (4th Cir. 2022).  Therefore, if the underlying offense is domestic, then the conspiracy charge is a domestic application of the relevant statute, even if the conspiracy was allegedly formed extraterritorially.  *See id.*  The Ninth Circuit has expressed agreement with a similar rule.  *See United States v. Hussain*, 972 F.3d 1138, 1145 n.3 (9th Cir. 2020) (agreeing with the defendant that the "extraterritoriality analysis" for a wire fraud conspiracy charge "mirrors the analysis for the substantive wire fraud provision").  And the Supreme Court has assumed, without deciding, that a conspiracy provision's "extraterritoriality tracks that of the provision underlying the alleged conspiracy."  *See RJR Nabisco*, 579 U.S. at 341.

Consistent with the reasoning of these decisions, this Court will analyze the extraterritorial or domestic character of the conspiracy charge by determining whether the underlying bank fraud charge involves an extraterritorial or domestic application of the bank fraud statute. That statute provides:

Whoever knowingly executes, or attempts to execute, a scheme or artifice—

(3)    to defraud a financial institution; or

(4)    to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;

shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1344; *see* Indictment, ECF No. 13, at 30.

The parties disagree about the "focus" of these provisions.  As noted above, a statute's "focus" for purposes of extraterritoriality analysis is "'the objec[t] of the statute's solicitude'— which can turn on the 'conduct,' 'parties,' or interests that it regulates or protects." *WesternGeco*, 585 U.S. at 416 (alteration in original) (quoting *Morrison*, 561 U.S. at 267).  The Government suggests that the relevant "focus" is the financial interest of U.S. banks, which was one of the concerns that motivated Congress to enact the bank fraud statute.  *See* Gov't's Opp'n, ECF No. 65, at 17 (citing *United States v. Koh*, 199 F.3d 632, 638 (2d Cir. 1999)).  Jin disagrees, arguing that the "focus" of the bank fraud statute is instead the execution of a "scheme or artifice" to defraud a bank or obtain property under its control by false or fraudulent pretenses.  *See* Def.'s Mot., ECF No. 14 (citing *Bascuñán*, 927 F.3d at 124).

Although there appears to be scant authority on the question, Jin has the more persuasive position on this issue.  Accordingly, this Court is of the opinion that the "focus" of the bank fraud statute is the defendant's execution of a "scheme or artifice" to defraud or deceive a U.S. bank, not the bank's financial interest.  In the only case the parties have identified that squarely addresses this issue, the U.S. Court of Appeals for the Second Circuit reached the same conclusion, holding that "the conduct that § 1344(2) seeks to regulate, and its focus, is a scheme to obtain property owned or controlled by a bank under false or fraudulent pretenses."  *See Bascuñán*, 927 F.3d at

20

124. This conclusion is consistent with the reasoning of other courts that have concluded that the "focus" of the wire fraud statute for purposes of extraterritoriality analysis is its *actus reus*—the use of a wire in furtherance of a scheme to defraud—not the property interest of the victim harmed by the fraud. *See, e.g.*, *United States v. McLellan*, 959 F.3d 442, 469 (1st Cir. 2020); *Bascuñán*, 927 F.3d at 122 (2d Cir. 2019); *United States v. Elbaz*, 52 F.4th 593, 603 (4th Cir. 2022); *United States v. Hussain*, 972 F.3d 1138, 1145 (9th Cir. 2020).

Having identified the "focus" of the statute, the Court must next isolate the "conduct relevant to the statute's focus." *See RJR Nabisco*, 579 U.S. at 337. The Second Circuit has concluded that "the use of domestic mail or wires to direct the theft or misappropriation of" bank property is relevant conduct in this analysis. *Bascuñán*, 927 F.3d at 124. Consistent with the Second Circuit's approach, and in the absence of binding authority on the issue, this Court is of the opinion that the "conduct relevant to" the bank fraud statute's "focus" includes each of the defendant's alleged communications in furtherance of a "scheme or artifice" to defraud or deceive a U.S. bank. *See RJR Nabisco*, 579 U.S. at 337; 18 U.S.C. § 1344. If these communications "occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *See RJR Nabisco*, 579 U.S. at 337. However, if the defendant's communications "occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *See id.*

Applying these conclusions to the allegations in the indictment, the Court concludes that Count One involves a domestic application of the bank fraud statute.

The Government alleges that Jin, acting outside the territory of the United States, conspired with others to "access the U.S. financial system" to complete prohibited transactions using U.S. dollars. *See* Indictment, ECF No. 13, ¶ 6. It further alleges that as "part of the conspiracy" to

complete these transactions, Jin and his coconspirators "transmitted and caused to be transmitted to U.S. financial institutions false information . . . about U.S. dollar transactions that were actually made on behalf of North Korea and North Korean entities." *Id.* ¶ 48(d). The Government does not allege that Jin had any direct communication with U.S. banks or any U.S. persons. *Cf. id.* ¶¶ 53–54. Instead, Jin allegedly accessed the U.S. banking system by initiating dollar-denominated transfers at foreign banks located in foreign countries; those transfers were then processed by U.S. financial institutions. *See id.*

The Government's allegations about Jin's conduct are similar to allegations that the Second Circuit held, in *Bascuñán v. Elsaca*, are sufficient to show a domestic application of the bank fraud statute. *See* 927 F.3d at 124. In that case, the defendant allegedly committed bank fraud from outside the United States by "contacting [bank] employees located in New York using the mail or wires and authorizing them to send money from [a] New York bank account to [the defendant's] own accounts." *See* 927 F.3d at 112–13. The Second Circuit held that this alleged conduct was sufficient to establish a domestic application of the bank fraud statute. *See id.* at 124.

Although Jin's alleged contact with U.S. banks is somewhat more attenuated than the direct mail or wire communications alleged in *Bascuñán*, the Second Circuit's decision is instructive. Treating the kind of intentional, forum-directed communications alleged in *Bascuñán* as domestic, regardless of the location from which the defendant sent the communication, is consistent with the settled principle that the Government may lay venue in a mail or wire fraud prosecution in the place where the mail or wire is received. *See United States v. Fahnbulleh*, 752 F.3d 470, 477 (D.C. Cir. 2014). Here, the Government has not alleged that Jin directly used domestic mail or wires to communicate with a U.S. bank, but it has alleged that it was "part of the conspiracy" charged in this case that Jin and his coconspirators "transmitted and caused to be transmitted to U.S. financial

institutions false information . . . about U.S. dollar transactions that were actually made on behalf of North Korea and North Korean entities." *See* Indictment, ECF No. 13, ¶ 48(d). Because Jin is liable for criminal acts that he "willfully causes . . . to be done," 18 U.S.C. § 2(b), and for reasonably foreseeable acts of coconspirators taken in furtherance of and within the scope of a joint conspiracy, *Pinkerton v. United States*, 328 U.S. 640, 647 (1946), the indictment adequately alleges that Jin, like the defendant in *Bascuñán*, was responsible for a communication transmitted to a U.S. bank. *See* Indictment, ECF No. 13, ¶ 48(d). Accordingly, this Court concludes that "conduct relevant to" the "focus" of the bank fraud conspiracy charged in Count One occurred in the United States. *See RJR Nabisco*, 579 U.S. at 337.

In sum, conspiracy to commit bank fraud does not apply extraterritorially, but the allegations in Count One involve a permissible domestic application of the bank fraud statute. *See RJR Nabisco*, 579 U.S. at 337. Accordingly, the Court shall **DENY** Jin's [52] Motion to Dismiss as to **Count One**, **Conspiracy to Commit Bank Fraud**.

3.    Counts Two through Six involve domestic applications of IEEPA.

Jin next argues that Counts Two through Six involve extraterritorial applications of IEEPA, which he argues does not apply outside the territory of the United States. Def.'s Mot., ECF No. 52, at 5–12. Because Counts Two through Six involve domestic applications of IEEPA, not extraterritorial applications, the Court shall not dismiss these counts.

Count Two of the Indictment charges Jin with conspiring to "knowingly and willfully export, and cause . . . financial institutions located in the United States to export . . . financial services, with and for the benefit of" sanctioned entities in North Korea, in violation of IEEPA. Indictment, ECF No. 13, ¶¶ 76–78. Counts Three through Six charge him with substantive violations of IEEPA based on four specific transactions that were allegedly completed in 2018 and

2019. *Id.* ¶¶ 79–80. For the reasons that follow, the Court concludes that each of these alleged violations involves a permissible domestic application of IEEPA.

To determine whether Counts Two through Six involve domestic, rather than extraterritorial, applications of IEEPA, the Court begins again with the statutory "focus." *See RJR Nabisco*, 579 U.S. at 337.

The statutory "focus" of IEEPA's criminal provisions—the "object[t] of the statute's solicitude"—is the act of willfully causing or conspiring to cause a "violation" of a "regulation" issued under its provisions. *See* 50 U.S.C. § 1705(a), (c); *WesternGeco*, 585 U.S. at 416 (alteration in original) (quoting *Morrison*, 561 U.S. at 267). IEEPA's criminal enforcement provision makes it a felony for any person to act willfully to "cause a violation of any license, order, regulation, or prohibition" issued pursuant to its provisions, or to conspire to do the same. 50 U.S.C. § 1705(a), (c). One such regulation, the NKSR, prohibits the "exportation or reexportation, directly or indirectly, from the United States, or by a U.S. person, wherever located, of any goods, services, or technology to North Korea." 31 C.F.R. § 510.206.

Accordingly, the relevant statutory "focus" of IEEPA for purposes of extraterritoriality analysis of Counts Two through Six in this case is the act of causing or conspiring to cause "exportation" of "goods, services, or technology to North Korea." *See WesternGeco*, 585 U.S. at 416; 31 C.F.R. § 510.206; *accord United States v. Zarrab*, No. 15-cr-867, 2016 WL 6820737, at *8 (S.D.N.Y. Oct. 17, 2016) (concluding that an indictment adequately alleged a "domestic nexus" for an IEEPA offense where it alleged "the exportation of services from the United States"). Therefore, there is no extraterritoriality defect in the indictment's IEEPA charges if "the conduct relevant to" the acts of causing or conspiring to cause the alleged exports to North Korea—

24

including the exports themselves—took place in the United States, "even if other conduct occurred abroad." *See RJR Nabisco*, 579 U.S. at 337.

Applying these principles, the charges in Counts Two through Six of the indictment in this case clearly involve domestic applications of IEEPA, not extraterritorial ones. The Government alleges that Jin and his codefendants "caused the export of financial services *by U.S. financial institutions* for the benefit of North Korea without a license." Indictment, ECF No. 13, ¶ 8 (emphasis added). It further alleges that Jin and his codefendants "knowingly and willfully . . . cause[d] . . . financial institutions *located in the United States*" to "export . . . financial services . . . for the benefit of [FTB], North Korea, and North Korean entities" and conspired to do the same, all without licenses or other authorization from the federal government. *Id.* ¶¶ 78, 80 (emphasis added). Because this alleged conduct was domestic, rather than extraterritorial, the associated charges involve domestic applications of IEEPA.

In sum, the charges in Counts Two through Six involve permissible domestic applications of IEEPA. *See RJR Nabisco*, 579 U.S. at 337. Accordingly, the Court shall **DENY** Jin's [52] Motion to Dismiss as to **Count Two**, **Conspiracy to Violate IEEPA**, and **Counts Three through Six**, **Violations of IEEPA**.

### C.  Venue

Jin next challenges the Government's decision to lay venue in this District. *See* Def.'s Mot., ECF No. 53. For the reasons that follow, the Court concludes that Jin's [53] Motion to Dismiss All Counts for Lack of Venue must be **GRANTED IN PART** as to Counts Eight through Twelve, which charge substantive money-laundering offenses that were committed within the United States but not within this District. Because there is an adequate basis for venue in this District for the remaining counts of the indictment, which charge conspiracies and substantive

sanctions-evasion offenses, the Court shall **DENY IN PART** Jin's [53] Motion as to those remaining counts.

      1.      <u>The Constitution guarantees criminal defendants the right to trial in a proper venue.</u>

"Proper venue in criminal proceedings was a matter of concern to the Nation's founders." *United States v. Cabrales*, 524 U.S. 1, 6 (1998). Article III provides that trials "shall be held in the State where the [charged] Crimes shall have been committed," subject to an exception for crimes "not committed within any State," U.S. Const. Art. III, § 2, cl. 3. The Sixth Amendment vicinage clause provides similarly that "the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. Finally, the Federal Rules of Criminal Procedure provide that, "[u]nless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed." Fed. R. Crim. P. 18.

To determine where venue for a criminal trial may be laid consistent with these principles, courts "must initially identify the conduct constituting the offense (the nature of the crime) and then discern the location of the commission of the criminal acts." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999). A crime is "committed," for venue purposes, where its "essential conduct elements" are completed. *See id.* at 280–81. To determine which elements of an offense are "essential conduct elements," courts must consider not only the "verbs of the statute," but also any other elements that the Government must prove to obtain a conviction. *See id.* at 280. Courts must also distinguish "conduct elements," which are the "critical part[s]" of an offense involving the defendant's own conduct that support venue, from mere "circumstance elements," which may involve conduct begun and completed by others and do not support venue. *See id.* at 280 n.4 (citing *United States v. Cabrales*, 524 U.S. 1, 7 (1998)).

2.    <u>Venue may constitutionally be laid in the District of Columbia for the conspiracy and sanctions-evasion charges, but not the substantive money-laundering charges.</u>

In this case, the Government argues that venue is proper in this District for three reasons. First, it argues that venue is proper for all counts under the so-called "high seas" venue statute, which provides for venue in the District of Columbia when an offense is "begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district" and certain other conditions are satisfied. *See* 18 U.S.C. § 3238; Gov't's Opp'n, ECF No. 70, at 8–9. Second, it argues that venue is proper for the sanctions-evasion counts (Counts Two through Six) because those alleged offenses were committed in part in the District of Columbia, where the Office of Foreign Assets Control ("OFAC") is located.   *See* 18 U.S.C. § 3237(a) (providing for venue in any district in which an offense "committed in more than one district" was "begun, continued, or completed").   Third, and finally, it argues that venue is proper for the money-laundering conspiracy charge under a specialized venue statute. Jin contests each of these theories, and the Court shall take them in turn.

a.   *Section 3238 supports venue in this District for offenses in which the "essential conduct elements" are completed outside the United States, including conspiracies allegedly formed abroad.*

The Government's primary venue theory, and the one that Jin contests most vigorously, depends on the scope of the so-called "high seas" venue statute, Section 3238, which provides special provisions for venue for offenses "begun or committed" outside the United States. *See* 18 U.S.C. § 3238; Gov't's Opp'n, ECF No. 70, at 3–4.  This section, which carries the positive-law title "Offenses not committed in any district," provides:

> The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence

of the offender or of any one of two or more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia.

18 U.S.C. § 3238.

The Government contends that venue for all counts in this case properly lies in this District under Section 3238. Gov't's Opp'n, ECF No. 70, at 8–9.  Specifically, the Government argues that venue is proper in the District of Columbia for the conspiracy counts—Counts One, Two, and Seven—because the indictment alleges that the conspiracies were "begun or committed" outside of any "State or district," none of the Defendants was arrested or "first brought" to another district, and none of the defendants is a resident of any other U.S. district.  *Id.*  Similarly, it argues that venue is proper as to each of the remaining counts because those offenses were "begun or committed" outside of any "State or district," the indictment was filed before Jin was arrested or brought into any other district, and Jin is not a resident of any U.S. district.  *Id.* at 9.

Jin does not dispute the factual predicates of the Government's venue argument under Section 3238.  There is no dispute that the offenses at issue, as alleged in the indictment, were "begun . . . out of the jurisdiction of any particular State or district," that none of the Defendants had been arrested or "brought" into the United States at the time the indictment was filed, and that none of the defendants is a resident of this country.  *See* 18 U.S.C. § 3238.

Instead, Jin argues that the Constitution requires a limiting construction of Section 3238.  *See* Def.'s Mot., ECF No. 3, at 4–5.  His argument relies on the criminal venue provision of Article III, which provides:

> The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed.

U.S. Const., art. III, § 2, cl. 3.  Jin argues that this provision means that if any part of a crime is committed within any State, venue is proper only in the district or districts in which the defendant

allegedly performed a criminal act.  Def.'s Mot., ECF No. 53, at 5.  Under Jin's theory, the final clause allowing Congress to specify the place of trial "by Law" applies only when no part of the alleged crime was "committed within *any* State"—that is, only when the Government alleges that the entire crime was completed outside the territory of the United States.  *See id.* (quoting U.S. Const., art. III, § 2, cl. 3).  He therefore urges the Court to decide that Section 3238 does not provide a proper basis for venue in the District of Columbia if *any* of the acts constituting the alleged crimes were committed in another district.  *Id.* at 6–7.  Instead, he argues, Section 3238 is constitutional only as applied to offenses that were not committed, even in part, within any State. *See id.*

Consistent with this theory, Jin argues that Section 3238 should be understood as a "gap-filler" provision that does not apply if a different venue statute allows the Government to lay venue in another district.  Def.'s Mot., ECF No. 53, at 6–7.  Jin's argument focuses on another venue statute, Section 3237, which carries the positive-law title "Offenses begun in one district and completed in another" and provides in relevant part:

> Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

18 U.S.C. § 3237(a).  Jin argues that Sections 3237 and 3238 must be read "in tandem" to be mutually exclusive.  *Id.* at 6.  Under his reading, if there is any district in which venue is proper under Section 3237, the gap-filler provisions of Section 3238 are not available.  *See id.*

As Jin candidly acknowledges, many courts, including courts in this District, have rejected the argument that the venue provisions of Sections 3237 and 3238 are mutually exclusive, at least

when the defendant's criminal conduct was "essentially foreign."[3]  *See* Def.'s Mot., ECF No. 53, at 8–9.

Although the D.C. Circuit has not yet had occasion to resolve this issue, this Court agrees with the Government that Sections 3237 and 3238, by their terms, are not mutually exclusive—at least in cases involving "essentially foreign" conduct.  By its terms, Section 3238 provides a basis for venue when an offense is "begun or committed" outside of any district, while Section 3237 applies when an offense is either "begun in one district and completed in another" or "committed in more than one district" and allows the Government to lay venue in any district where the offense was "begun, continued, or completed."  18 U.S.C. §§ 3237(a), 3238.  When an "essentially foreign" offense begins abroad and continues in the United States, these provisions overlap and, by their terms, may allow the Government to lay venue in more than one district.  *See id.*  The

---

[3] *See, e.g.*, *United States v. Miller*, 808 F.3d 607, 619–21 (2d Cir. 2015) (holding that venue in a prosecution for unlawfully removing a child from the United States was proper in the district of the defendant's arrest under Section 3238 where the charged crime was "essentially foreign" and "the underlying offense occurred in its essence abroad" when the defendant and victim crossed an international border, even though "certain offense conduct occurred in the United States"); *United States v. Pendleton*, 658 F.3d 299, 303–05 (3d Cir. 2011) (affirming decision allowing venue in prosecution for unlawfully traveling in foreign commerce and engaging in illicit sexual contact with a minor in the district of the defendant's arrest under Section 3238 where the "crux of [the defendant's] offense" was committed outside the United States and the defendant's criminal conduct was "essentially foreign," even though the defendant's unlawful travel began in the United States); *United States v. Levy Auto Parts of Canada*, 787 F.2d 946, 947, 952–53 (4th Cir. 1986) (concluding that venue in a prosecution for conspiracy to violate the Arms Export Control Act was proper in the district of the defendant's arrest under Section 3238 where the charged conspiracy was formed abroad and "essentially foreign," notwithstanding "speculation that venue might have been laid in [another district]" based on alleged overt acts in that district that were "only ancillary to the primary purpose of the conspiracy" and "at best, [were] slight and tangential"); *United States v. Williams*, 589 F.2d 210, 213 (5th Cir. 1979) (stating categorically that "[t]he venue statutes are not mutually exclusive, and a suggestion that venue is proper under [Section] 3237(a) will not serve to divest venue from another judicial district if venue is proper in that district under [Section] 3238"), *adopted in pertinent part*, 617 F.2d 1063, 1071 (5th Cir. 1980) (en banc); *United States v. Rivera-Niebla*, 37 F. Supp. 3d 374, 380–81 & n.4 (D.D.C. 2014) (JDB) (holding that venue in a prosecution for conspiracy to import cocaine into the United States was proper in the District of Columbia under Section 3238 where the conspiracy was formed abroad and the offense was "essentially foreign," even though at least one overt act occurred in another district); *United States v. Torres-Garcia*, No. 05-cr-267, 2007 WL 1207204, at *6–7 (D.D.C. Apr. 24, 2007) (RMC) (holding that venue was proper in a narcotics and money-laundering conspiracy in the District of Columbia under Section 3238 where "the conspiracy was foreign," even though some overt acts were committed in the United States); *see also United States v. Oseguera Gonzalez*, No. 20-cr-040, 2020 WL 6342948, at *3 (D.D.C. Oct. 29, 2020) (BAH) (concluding that Sections 3237(a) and 3238 are "not mutually exclusive"); 2 Charles A. Wright & Arthur R. Miller, Fed. Prac. & Proc. Crim. § 304 (4th ed. 2025) (stating that venue may be laid under Section 3238 "even though parts of the crime were committed in some other district so that venue might have been proper there").

possibility of overlap is not surprising: it is well-settled that "[v]enue may be proper in more than one district." *United States v. Lam Kwong-Wah*, 924 F.2d 298, 301 (D.C. Cir. 1991). And critically, eliminating the overlap—that is, holding that Section 3238 provides a basis for venue only for wholly extraterritorial offenses, despite its reference to offenses "begun or committed" outside of any district—would require "read[ing] the word 'begun' out of the statute." *See Rivera-Niebla*, 37 F. Supp. 3d at 380. This Court declines to adopt such a reading. *See Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698–99 (2022) (explaining that courts "must normally seek to construe Congress's work 'so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant'" (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009))). Accordingly, when an "essentially foreign" crime is "begun" overseas but continued in the United States, it is consistent with the text of Section 3238 to lay venue in this District under Section 3238's gap-filling provision, even if venue may also be properly laid in another district under Section 3237.

Jin argues that the titles of Sections 3237 and 3238 also suggest that the provisions are mutually exclusive, but this argument is similarly unavailing. The title of Section 3237 is "Offenses begun in one district and completed in another," while the title of Section 3238 is "Offenses not committed in any district." 18 U.S.C. §§ 3237–3238. Accordingly, Jin argues that Section 3238 is best understood as applying only "when a crime is not committed in any district." *See* Def.'s Mot., ECF No. 53, at 6. However, "when a statute is unambiguous, its title cannot be used to limit the plain meaning of the text." *Abuzeid v. Mayorkas*, 62 F.4th 578, 584 (D.C. Cir. 2023) (quoting *Murphy Expl. & Prod. Co. v. U.S. Dep't of Interior*, 252 F.3d 473, 481 (D.C. Cir. 2001)). Here, Section 3238's unambiguous coverage of offenses "begun or committed" outside the territory of the United States is not displaced by the less comprehensive description in its title.

Although the Court declines Jin's invitation to hold that Sections 3237 and 3238 are mutually exclusive in all cases, a more modest narrowing construction of Section 3238's language is appropriate.  To understand why, it will be helpful to review the history and context of the provision's enactment.

Section 3238 traces its history to the First Congress, which exercised its constitutional power to set venue for offenses "not committed within any State" by providing that crimes committed "upon the high seas, or in any place out of the jurisdiction of any particular state" were to be tried "in the district where the offender is apprehended, or into which he may first be brought."  1 Stat. 113–14 (1790); *see* U.S. Const. art. III, § 2, cl. 3; *see also Reid v. Covert*, 354 U.S. 1, 8 & n.9 (1957) (tracing this history).  Congress later enacted a slightly amended version of this statute in the Revised Statutes of the United States:

> The trial of all offenses committed upon the high seas or elsewhere, out of the jurisdiction of any particular State or district, shall be in the district where the offender is found, or into which he is first brought.

Rev. Stat. § 730 (1874); *see also* Judicial Code of 1911, ch. 231, § 40, 36 Stat. 1087, 1100 (reenacting same text).  By their terms, these early statutes applied only to offenses committed entirely outside of the United States.

Congress enacted the modern version of Section 3238 when it enacted Title 18 of the U.S. Code into positive law in 1948.   *See* ch. 645, § 1, 62 Stat. 683, 826 (1948).  This version of the statute was identical to its predecessor except for two words: as enacted into positive law in Title 18, the statute applied to "all offenses *begun or* committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district."  *Id.* (emphasis added).  On its face, this revision created the possibility that the Government could use the "high seas" venue statute to lay venue not only for purely extraterritorial offenses, but also for offenses "begun" outside the United States that include a mix of extraterritorial and domestic elements.  *See id.*

Finally, in 1963, Congress amended Section 3238 into its current form by adding provisions for laying venue when no defendant has yet been arrested or brought into any district. *See* Pub. L. No. 88-27, 77 Stat. 48 (1963).  In that circumstance, the amended statute provides that the Government may file an indictment or information in the district of a defendant's "last known residence."  *Id.*  "[I]f no such residence is known," the Government may file instead in the District of Columbia.  *Id.*  The amended statute retains the same scope as the 1948 revision, applying to "all offenses *begun or* committed . . . out of the jurisdiction of any particular State or district."  *See id.* (emphasis added).

For purposes of this case, the critical moment in the statute's evolution was the addition of the words "*begun or*" in 1948.  According to the Reviser's Note accompanying the 1948 revision, the "[w]ords 'begun or' were inserted to clarify the scope of this section and section 3237 of this title."  *See* H.R. Rep. No. 80-304, at A161 (1948).  Unfortunately, as other courts have recognized, this "cryptic" note provides "little clarification" of the intended scope of Section 3238.  *See United States v. Levy Auto Parts of Canada*, 787 F.2d 946, 950 (4th Cir. 1986); *United States v. Miller*, 808 F.3d 607, 619 (2d Cir. 2015).  One possible explanation that could be inferred from context is that the revisers added the words "begun or" to make the language of Section 3238 more parallel to that of Section 3237, which was "completely rewritten" in the 1948 enactment.  *See* H.R. Rep. No. 80-304, at A161 (1948); *Levy Auto Parts*, 787 F.2d at 950 (suggesting this explanation); *compare* ch. 645, § 1, 62 Stat. 683, 826 (1948), *with* Judicial Code of 1911, ch. 231, § 42, 36 Stat. 1087, 1100.

Whatever the revisers' intent in adding the words "begun or" to Section 3238, this Court must endeavor to interpret the amendment in a manner that is consistent with the constitutional limits on venue in criminal trials imposed in Article III.  *See United States v. Davis*, 588 U.S. 445,

463 n.6 (2019) (citing *Parsons v. Bedford*, 28 U.S. (3 Pet.) 433, 448–49 (1830)).  Those limits, as discussed above, include the constitutional rule that criminal trials must be "held in the State where the [charged] Crimes shall have been committed," except when those crimes are "not committed within any State."  U.S. Const., art. III, § 2, cl. 3.  For crimes "not committed within any State," Congress may specify the venue for trial "by Law."  *Id.*

There is an important ambiguity about the scope of Congress's power to specify the venue for criminal trials by statute under Article III.  Jin argues that a crime is "not committed within any State"—and therefore within Congress's constitutional power to set the venue for trial "by Law"— only when it is "committed" entirely outside of the United States.  *See* Def.'s Mot., ECF No. 53, at 5.  But in response to an invitation for supplemental briefing, the Government advanced another plausible interpretation of this provision: a crime could be "not committed within any State" whenever it is not "committed" entirely within the borders of any *individual* State.  *See* Gov't's Supp., ECF No. 133, at 1–2.

The weight of authority suggests that Congress may designate the venue for trial by statute only when an offense is "committed" outside the United States.  *See, e.g.*, *United States v. Jackalow*, 66 U.S. 484, 486 (1861) (stating that venue under the exception "depends upon," among other things, the fact "that the offence was committed out of the jurisdiction of *any other of* the States of the Union" (emphasis added)); *Reid v. Covert*, 354 U.S. 1, 8 (1957) (stating that the exception "is applicable to criminal trials *outside of the States as a group* without regard to where the offense is committed or the trial held" (emphasis added)).  The broader alternative interpretation would allow Congress to fix venue in an arbitrary location whenever a continuing offense is committed across the border of a State or district.  *See Cook v. United States*, 138 U.S. 157, 182 (1891) (holding that there is "no restriction" on the place of trial when the exception

applies). That result would be incongruous with Supreme Court precedent examining venue issues involved in multi-district offenses, which has historically focused on identifying the specific locations where the offenses were "committed." *See, e.g.*, *Smith v. United States*, 599 U.S. 236, 244 (2023).

However, even under this narrower interpretation of Congress's power to specify venue under Article III, the Constitution does not compel as strict a limiting construction of Section 3238 as Jin proposes. It is not necessary to hold that Section 3238 is inapplicable whenever *some* conduct occurs in the United States.

Instead, this Court agrees with the U.S. Court of Appeals for the Second Circuit that if "the acts constituting the crime and the nature of the crime charged implicate more than one location," the Constitution "requires only that the venue chosen be determined from the nature of the crime charged as well as from the location of the act or acts constituting it, and that it not be contrary to an explicit policy underlying venue law." *Miller*, 808 F.3d at 616 (quoting *United States v. Reed*, 773 F.2d 477, 480 (2d Cir. 1985)).

Consistent with these principles, this Court is of the opinion that a charged offense comes within Congress's power to fix the place of trial for offenses "not committed within any State" if the "essential conduct elements" of the offense were completed outside the United States, even if some relevant conduct also occurred within the United States. *See* U.S. Const. Art. III, § 2, cl. 3; *Rodriguez-Moreno*, 526 U.S. at 279–80. Accordingly, the Court will interpret the phrase "offenses begun or committed . . . out of the jurisdiction of any particular State or district" in Section 3238 to refer to offenses for which the "essential conduct elements" were completed outside the United States.

In this case, the three charged conspiracy offenses fall within the constitutionally permissible scope of Section 3238 because the "essential conduct elements" of those offenses were completed outside the United States. *See Rodriguez-Moreno*, 526 U.S. at 279–80. The parties agree that the "essential conduct element" of each of these offenses is the act of entering into an unlawful agreement. *See* Def.'s Supp., ECF No. 132, at 4–7, 9; Gov't's Supp., ECF No. 133, at 3–5. They also agree that Jin allegedly joined these agreements from outside the United States. *See* Def.'s Supp., ECF No. 132, at 4–7, 9; Gov't's Supp., ECF No. 133, at 3–5. Therefore, laying venue for these conspiracy offenses in the District of Columbia under Section 3238 is consistent with Congress's power to set venue for offenses "not committed within any State." *See* U.S. Const. Art. III, § 2, cl. 3.

This conclusion is consistent with the D.C. Circuit's recent decision in *United States v. Campos*, 137 F.4th 840 (D.C. Cir. 2025). In *Campos*, the court rejected—at least under the "plain error" standard of review—a constitutional venue challenge to a conspiracy prosecution where the charged conspiracy was formed abroad, with overt acts committed in part in Arizona and part in Mississippi, but not committed in any relevant part in the District of Columbia. *Id.* at 848–49. The court held that it was not a plain error to lay venue in the District of Columbia under Section 3238 because the charged conspiracy offense was "committed outside of the United States" when the unlawful agreement was formed abroad, regardless of where later overt acts took place. *Id.*

In this case, as in *Campos*, the indictment alleges conspiracies that were formed abroad, with subsequent overt acts occurring in the United States. *See* Indictment, ECF No. 13, ¶¶ 1–8, 48(d), 51, 53, 72, 77–78, 80, 82, 84. Therefore, as in *Campos*, the conspiracy offenses were "committed" outside the United States at the time of Jin's alleged entry into the conspiracies, and

the offenses fall within Congress's constitutional power to fix venue by statute, regardless of the locations of the subsequent overt acts. *See Campos*, 137 F.4th at 848–49.

Jin argues that the existence of subsequent overt acts within the United States means that the alleged conspiracies were also "committed" within the United States at the locations of those overt acts, taking them outside the scope of Congress's power to set venue for offenses "not committed within any State." *See* Def.'s Mot., ECF No. 53, at 10–11; Def.'s Supp., ECF No. 132, at 5.  However, the D.C. Circuit rejected that reasoning in *Campos*, and this Court declines to adopt it here. *See Campos*, 137 F.4th at 848–49.  Because the indictment adequately alleges that the three charged conspiracy offenses were "committed" outside the United States, venue for those offenses may be laid in this District under Section 3238.

In sum, because Section 3238 provides a proper basis for laying venue in this District for the conspiracy offenses alleged in Counts One, Two, and Seven, the Court shall **DENY** Jin's motion to dismiss for lack of proper venue as to those counts.

However, the same reasoning does not extend to the alleged substantive offenses under IEEPA and the money-laundering statute in Counts Three through Six and Eight through Twelve. For the substantive IEEPA offenses, the parties agree that one "essential conduct element" is violating or causing a violation of the NKSR—in this case, by causing the export of financial services. *See* Def.'s Supp., ECF No. 132, at 7; Gov't's Supp., ECF No. 133, at 5.  Similarly, for the substantive money-laundering offenses, the parties agree that transporting, transmitting, or transferring a monetary instrument or funds is an "essential conduct element." *See* Def.'s Supp. at 9; Gov't's Supp. at 6.  Some of this conduct occurred in the United States. *See* Gov't's Supp. at 5–6; Def.'s Supp. at 9; *cf.* Def.'s Supp. at 7 (arguing first that "the better view is to treat the alleged violations of IEEPA as performed abroad," but also arguing in the alternative that venue

37

may be proper in the district where the correspondent banks that allegedly exported financial services were located).  Specifically, the indictment alleges that Jin and his codefendants caused correspondent banks in the United States to process transactions for foreign banks, causing both the export of financial services from and movement of money through the districts in which those U.S. banks were located.  *See* Indictment, ECF No. 13, ¶¶ 6–8, 80, 84.  Therefore, these alleged offenses lie outside of Congress's plenary power to specify the venue for offenses "not committed within any State."  *See* U.S. Const. art. III, § 2, cl. 3.

Accordingly, venue for the alleged substantive offenses under IEEPA charged in Counts Three through Six and the alleged substantive money-laundering offenses charged in Counts Eight through Twelve lies in this District, if at all, only if "essential conduct elements" of those offenses were completed within this District.  *See* U.S. Const. art. III, § 2, cl. 3.  The Court considers arguments to that effect in the next section.

> b. *Venue for the alleged IEEPA offenses is proper in this District because the failure to obtain a license for the exports at issue is an "essential conduct element" of those offenses.*

The Government next argues that because the offices of the Department of the Treasury's Office of Foreign Assets Control ("OFAC") are located in this District, the omission of failing to obtain a license from OFAC is criminal conduct that supports laying venue for the IEEPA charges in this District under Section 3237(a).  Gov't's Opp'n, ECF No. 70, at 9–10; *see* 18 U.S.C. § 3237(a) (providing that venue for an offense "begun in one district and completed in another, or committed in more than one district" is proper in any district in which the charged offense "was begun, continued, or completed").

These arguments rely on the premise that the failure to secure an OFAC license is an "essential conduct element" that is relevant to determining "the location of the commission" of an offense under IEEPA.  *See Rodriguez-Moreno*, 526 U.S. at 279–80.  Two judges in this District

have accepted this premise and held that venue for IEEPA charges may properly be laid in the District of Columbia based on the failure to secure OFAC licenses. *See United States v. Hassanshahi*, 185 F. Supp. 3d 55, 57–58 (D.D.C. 2016) (RC); *United States v. Montgomery*, 441 F. Supp. 2d 58, 60 (D.D.C. 2006) (RCL); *see also United States v. Quinn*, 401 F. Supp. 2d 80, 87 (D.D.C. 2005) (JDB) (noting that the parties "d[id] not dispute that venue [was] proper [in this District] because of the alleged omissions that are part of the crimes charged (namely the failure to secure licenses for exports to Iran from OFAC)"); *United States v. Oseguera Gonzalez*, No. 20-cr-040, 2020 WL 6342948, at *3 (D.D.C. Oct. 29, 2020) (BAH) (agreeing with the holdings of the courts in *Hassanshahi*, *Montgomery*, and *Quinn* and reaching an analogous conclusion under another statute).

Jin disputes this premise and contends that other judges in this District have erred by relying upon it in IEEPA cases. Def.'s Mot., ECF No. 53, at 12–14. He correctly notes that each of these decisions relied on precedents involving failures to comply with mandatory duties, rather than omissions involving discretionary matters. *See, e.g.*, *Rumely v. McCarthy*, 250 U.S. 283 (1919) (duty to report possession of property of a hostile government); *Johnston v. United States*, 351 U.S. 215, 223 (1956) (duty of conscientious objectors to report for civilian service at state hospitals in lieu of military service). He then argues that IEEPA and the relevant regulations do not impose a mandatory duty to obtain a license from OFAC; instead, under IEEPA and the NKSR, there is a general prohibition on transactions with certain entities, subject to exceptions that the federal government may make by granting licenses. *See* Def.'s Mot., ECF No. 53, at 12–13; *see also* 31 C.F.R. § 510.206. In contrast to some other statutory regimes, IEEPA is not "a licensing statute that contemplates the general granting of licenses, subject to restrictions," but rather a system of prohibitions that "contemplates the possible creation of a licensing regime, but by no

means requires it."  Def.'s Mot., ECF No. 53, at 12–13 (quoting *United States v. Quinn*, 403 F. Supp. 2d 57, 62 (D.D.C. 2005) (JDB)).  According to Jin, the act of obtaining a license *removes* a prohibition; the failure to obtain a license is not itself a criminal act.  *See id.* at 14; *see also Quinn*, 403 F. Supp. 2d at 63 ("An export to Iran does not become illegal under IEEPA and the ITR by virtue of the failure to obtain OFAC authorization in the form of a license.").  Therefore, Jin argues, the failure to obtain a license is not an "essential conduct element" of an IEEPA offense and cannot provide a basis for laying venue in this District.  *Id.* at 14 (quoting *Rodriguez-Moreno*, 526 U.S. at 280).

Contrary to Jin's arguments, this Court agrees with the conclusions of multiple other judges of this District that the failure to obtain a license from OFAC is an "essential conduct element" of an IEEPA offense that supports laying venue here.  Binding precedent holds that venue in a case involving a late filing with the Securities and Exchange Commission ("SEC") lies in the District of Columbia because a statute provides that public companies must file such reports with the SEC in this District.  *See Invs. Funding Corp. of New York v. Jones*, 495 F.2d 1000, 1003 (D.C. Cir. 1974).  Jin attempts to distinguish this precedent by arguing that being a public company that offers securities is a "status" that creates an "independent duty to report" to the SEC, while being an exporter of goods to sanctioned countries does not create a similar independent obligation to seek a license from OFAC.  *See* Def.'s Mot., ECF No. 53, at 13–14.  However, this attempted distinction is unpersuasive.  Just as a public company offering securities has a duty to file certain reports with the SEC, so too an exporter conducting transactions with North Korea has a duty to seek a license from OFAC.  In both cases, the failure to perform the duty is sufficient to support venue in the place for performance: the District of Columbia.  *See Invs. Funding Corp. of New York*, 495 F.2d at 1003.

Because the failure to obtain a license from OFAC for the exports at issue is an "essential conduct element" of the IEEPA offenses charged in Counts Two through Six and the District of Columbia is the place where such a license must be obtained, venue for these offenses may properly be laid in the District of Columbia. *See Rodriguez-Moreno*, 526 U.S. at 279–80; 18 U.S.C. § 3237(a). The Court shall therefore **DENY** Jin's motion to dismiss for lack of proper venue as to Counts Two through Six.

> c. *Because venue for the money laundering conspiracy is proper under Section 3238, the Court need not decide whether venue is proper in this District under a different, specialized venue provision.*

Finally, relying on the specialized rule that venue for a money laundering conspiracy lies in any district in which "an act in furtherance of the . . . conspiracy took place," the Government argues that venue for the money laundering conspiracy charge (Count Seven) is proper in this District. *See* Gov't's Opp'n, ECF No. 70, at 10–11 (quoting 18 U.S.C. § 1956(i)(2)); *see also Whitfield v. United States*, 543 U.S. 209, 218 (2005) ("[V]enue is proper in any district in which an overt act in furtherance of the conspiracy was committed, even where an overt act is not a required element of the conspiracy offense."). The alleged "act in furtherance" on which the Government relies for this argument is the same one it cites to support laying venue for the sanctions-evasion charges in this District: the failure to obtain a license from OFAC. *See id.*

Jin argues persuasively that the Government's argument cannot succeed because the venue provision it cites requires an act in furtherance of a *money-laundering* conspiracy, but the omission on which it relies—failing to obtain a license from OFAC—is unrelated to money-laundering. Def.'s Reply, ECF No. 79, at 15.

However, the Court need not resolve the parties' dispute on this issue because it has already held that venue for the charged money-laundering conspiracy is proper in this District on other grounds: the alleged conspiracy was formed abroad, so venue lies under Section 3238. *See supra*

Section III.C.2.a; 18 U.S.C. § 3238.  Accordingly, the Court does not reach the Government's alternative argument under the specialized venue provision for money-laundering conspiracies. *See* 18 U.S.C. § 1956(i)(2).

> d.  *The Court shall dismiss the substantive money-laundering charges for lack of proper venue.*

Finally, Jin challenges the Government's decision to lay venue in this District for the substantive money-laundering offenses charged in Counts Seven through Twelve.  Because the Government does not allege that any of the "essential conduct elements" of the substantive money-laundering offenses were completed in this District, the Government's venue argument for these provisions rests entirely on Section 3238.  *See* Gov't's Opp'n, ECF No. 70, at 5–11; Gov't's Supp., ECF No. 138, at 3.

For the reasons explained above, this Court is of the opinion that Section 3238 may constitutionally be applied only to offenses for which the "essential conduct elements" were completed outside of the United States.  *See supra* Section III.C.2.a.  If some of the essential conduct elements of an offense are completed in the United States, then the offense lies outside of Congress's constitutional authority to specify a venue other than the place where a charged crime was committed: the power to set venue for offenses "not committed within any State."  *See* U.S. Const. art. III, § 2, cl. 3.  To avoid an unconstitutional application of Section 3238, the Court must interpret the statute to apply only to offenses that are sufficiently "begun or committed" outside the United States that the "essential conduct elements" of the offense are completed abroad.  *See Rodriguez-Moreno*, 526 U.S. at 279–80; 18 U.S.C. § 3238.

The parties agree that the "essential conduct element" for the substantive money-laundering offenses is transporting, transmitting, or transferring a monetary instrument or funds. *See* Def.'s Supp., ECF No. 132, at 9; Gov't's Supp. at 6.  The Government does not argue or

plausibly allege that any of this conduct occurred in this District. Instead, it appears from the indictment and the parties' presentations to date that each of the alleged movements of funds involved U.S. financial institutions that are not located in this District. *See* Indictment, ECF No. 13, ¶¶ 6–9, 84; *see also* Def.'s Mot., ECF No. 128 (listing financial institutions); Def.'s Supp., ECF No. 132, at 6 n.1 (listing locations). The U.S. financial institutions through which Jin allegedly caused the unlawful movement of funds "to," "from," or "through" the United States have their headquarters in various locations—including California, Delaware, New York, Michigan, Ohio, South Dakota, Texas, and Virginia—but none of them is headquartered in this District. *See* Def.'s Supp., ECF No. 132, at 6 n.1; 18 U.S.C. § 1956(a)(2)(A). Accordingly, the "essential conduct element" of the substantive money-laundering offenses was allegedly completed in the United States, but not in the District of Columbia. Therefore, Section 3238 does not afford a proper basis for venue in this District for the money-laundering offenses charged in Counts Eight through Twelve. Because the Government has not identified any other basis for venue for these counts, they must be **DISMISSED**.

In summary, the Court concludes that the criminal venue provision of Article III of the Constitution requires a limiting construction of the "high seas" venue statute, Section 3238, as amended in 1948 to cover offenses "begun" outside the United States. *See* U.S. Const., art. III, § 2, cl. 3. This Court is of the opinion that venue lies under Section 3238 only when the "essential conduct elements" of the charged offense were completed outside the United States. In this case, three of the charged offenses are conspiracies that were allegedly formed abroad: a bank-fraud conspiracy (Count One), a sanctions-evasion conspiracy (Count Two), and a money-laundering conspiracy (Count Seven). Because the essential conduct element of a conspiracy is the entry into an unlawful agreement and Jin allegedly entered each of the alleged conspiracies while outside the

United States, it is constitutionally permissible to lay venue for those offenses in this District under Section 3238, even if later overt acts in furtherance of the conspiracies occurred in other districts. *See Campos*, 137 F.4th at 848–47.  Venue also lies in this District for the alleged sanctions-evasion offenses because failing to obtain a license from OFAC is an essential conduct element of those alleged crimes.  *See* 18 U.S.C. § 3237(a); *Hassanshahi*, 185 F. Supp. 3d at 57–58; *Montgomery*, 441 F. Supp. 2d at 60.  However, as to the substantive money-laundering charges, the Government has not shown either that the "essential conduct elements" of the charged offenses were completed entirely outside the United States or that any of those elements was completed in this District.

Accordingly, the Court shall **DENY** Jin's [53] Motion to Dismiss as to **Count One**, **Conspiracy to Commit Bank Fraud**; **Count Two**, **Conspiracy to Violate IEEPA**; **Counts Three through Six**, **Violations of IEEPA**; and **Count Seven**, **Conspiracy to Launder Monetary Instruments**, but the Court shall **GRANT** Jin's [53] Motion as to **Counts Eight through Twelve, Laundering of Monetary Instruments,** which the Court shall **DISMISS** for lack of proper venue.

### D.  Money Laundering Counts

Finally, in a related motion, Jin argues that the money-laundering offenses charged in Counts Seven through Twelve of the indictment must also be dismissed because those counts are predicated on the charged bank fraud and IEEPA offenses, which he argues must be dismissed on grounds related to extraterritoriality, venue, and the substantive scope of the bank fraud statute. *See* Def.'s Mot., ECF No. 54.  The Court shall **DENY** this motion.

For the reasons explained in the foregoing sections, the Court has concluded that dismissal of the charged bank-fraud and IEEPA offenses (Counts One through Six) is not warranted.  The Court has also determined that venue for the alleged money-laundering conspiracy offense (Count Seven) is proper in this District.  However, the Court will dismiss the substantive money-laundering counts (Counts Eight through Twelve) for lack of proper venue.  Accordingly, the Court

shall **DENY** Jin's [54] Motion on the merits as to **Count Seven, Conspiracy to Launder Monetary Instruments**, and **DENY** the [54] Motion as **MOOT** as to the substantive counts, **Counts Eight through Twelve, Laundering of Monetary Instruments**.

\*    \*    \*

### IV. CONCLUSION

For the foregoing reasons:

- Jin's [45] Motion to Dismiss **Count One**, **Conspiracy to Commit Bank Fraud**, on the grounds that it fails to state an offense under the bank fraud statute, shall be **DENIED**;

- Jin's [52] Motion to Dismiss **Count One**, **Conspiracy to Commit Bank Fraud**; **Count Two**, **Conspiracy to Violate IEEPA**; and **Counts Three through Six**, **Violations of IEEPA**, on the grounds that they fail to state offenses as to extraterritorial conduct, shall be **DENIED**;

- Jin's [53] Motion to Dismiss **All Counts** for lack of proper venue shall be **GRANTED IN PART** and **DENIED IN PART**, as follows:

  - Jin's [53] Motion shall be **DENIED** as to **Count One**, **Conspiracy to Commit Bank Fraud**; **Count Two**, **Conspiracy to Violate IEEPA**; **Counts Three through Six**, **Violations of IEEPA**; and **Count Seven**, **Conspiracy to Launder Monetary Instruments**; and

  - Jin's [53] Motion shall be **GRANTED** as to **Counts Eight through Twelve, Laundering of Monetary Instruments**, which shall be **DISMISSED** for lack of proper venue; and

- Jin's [54] Motion to Dismiss Money Laundering Counts shall be **DENIED** on the merits as to **Count Seven**, **Conspiracy to Launder Monetary Instruments**, and **DENIED AS MOOT** as to **Counts Eight through Twelve, Laundering of Monetary Instruments**, which the Court shall dismiss for lack of proper venue.

An appropriate Order accompanies this Memorandum Opinion.

**Dated:** August 19, 2025

COLLEEN KOLLAR-KOTELLY
United States District Judge