# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | No. 23CR91-CKK |
| | ) | |
| GUANGHUA JIN. | ) | |

## **MOTION TO DISMISS FOR FLAGRANT GOVERNMENT MISCONDUCT**

Respectfully submitted,

By:/s/ Eugene Gorokhov
Eugene Gorokhov, Esq.
DC Bar No. 979785
Ziran Zhang, Esq.
DC Bar. No. 1019799
BURNHAM & GOROKHOV, PLLC
1634 I Street NW, Suite 575
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com

**INTRODUCTION**                                                                          4

**BACKGROUND**                                                                             5

**I. CTJ AND THE GOVERNMENT STRIKE A DEAL.**                                              5

**II. CTJ AND THE GOVERNMENT PARTNER UP AGAINST WINNEY, WITH
UNEXPECTED RESULTS.**                                                                      9

**III. THE GOVERNMENT FILES A FALSE SEARCH WARRANT AFFIDAVIT FOR
MR. JIN'S EMAIL ACCOUNT, OMITTING INFORMATION THAT CALLED INTO
QUESTION CTJ'S CREDIBILITY AND RELIABILITY**                                              12

**IV. CTJ ENTRENCHES ITSELF IN MORE LIES WHILE THE GOVERNMENT
LOOKS THE OTHER WAY.**                                                                    13

**V. BARTOLETTI MEETS WITH THE GOVERNMENT A SECOND TIME TO PEDDLE
THE SAME FALSEHOODS.**                                                                    14

**VI. A CHORUS OF LIES: THE GOVERNMENT SPONSORS BARTOLETTI'S FALSE
TESTIMONY BEFORE THE GRAND JURY, THEN REDACTS THEM FROM THE
TRANSCRIPT.**                                                                             15

    A. Bartoletti's false statements before the grand jury.                              15
    B. The government's redactions.                                                       17

**VII. DAWSON ANGLIN'S FALSE CRIMINAL COMPLAINT AND THE
INDICTMENT.**                                                                             19

    A. False attributions of CTJ's independent North Korean transactions to Winney.     19
    B. Anglin repeats Bartoletti's falsehoods to the grand jury.                          25
    C. Other falsehoods in the indictment.                                                25

**VIII. THE GOVERNMENT SUPPRESSES EXCULPATORY AND IMPEACHING
EVIDENCE RELATED TO CTJ.**                                                                26

    A. The government suppressed CTJ's role in changing the bills of lading.              26
    B. The government continues to suppress documentation from the undercover investigation.
                                                                                          27
    C. The government suppressed evidence that CTJ solicited the government's help to lie to
banks, and provided false or misleading data.                                             28
    D. The government suppressed evidence undermining the thoroughness and good faith of the

investigation.                                                                                    29

**IX. THE GOVERNMENT KNOWINGLY PRESENTS MISLEADING OR OUTRIGHT
FALSE TESTIMONY AT TRIAL AND SUPPRESSES EXCULPATORY
INFORMATION BY ALTERING AN EXHIBIT.**                                          **31**

A. AUSA Seifert alters a key exhibit to remove Carbuncle and Fully Max transactions during
Dawson Anglin's testimony, but does not notify defense counsel or the Court.        31

B. The government presented false and misleading testimony from Anglin.             32

C. The government presented other false and misleading evidence from Bartoletti.    34

**X. THE NEW TRIAL TEAM NEITHER CORRECTS THE FALSE ALLEGATIONS IN
THE INDICTMENT, NOR MAKES AN EFFORT TO COMPLY WITH BRADY.**     **36**

**ARGUMENT**                                                                         **37**

**I. APPLICABLE LAW.**                                                               **37**

A. Remedies for due process violations include dismissal of the indictment with prejudice. 37

B. Due process is violated by the suppression of favorable evidence and presentation of false
testimony.                                                                            38

C. Even in the absence of a due process violation, dismissal may be appropriate where
prosecutorial misconduct is egregious.                                                39

D. Other remedies that may be imposed for due process violations or to sanction government
misconduct.                                                                           41

**II. THE COURT SHOULD DISMISS THE INDICTMENT WITH PREJUDICE.**    **41**

A. The government committed multiple due process violations.                          42

a. The government suppressed exculpatory evidence relating to bills of lading and then
knowingly or recklessly presented false testimony in support of a false or misleading
allegation.                                                                           42

b. The government recklessly accepted or was willfully blind to CTJ's lies regarding its
lack of North Korean business, and sponsored it at the grand jury.                    43

c. Even after CTJ tried to coopt the government to lie to banks, the government continued
to reward CTJ while suppressing CTJ's misconduct.                                     45

d. The government presents false allegations relating to Carbuncle and Fully Max, then
silently retracts those allegations without notice to Mr. Jin.                        47

e. The government knowingly or recklessly presented false testimony from Bartoletti
relating to the exclusivity contract.                                                 48

f. The government continually suppressed favorable evidence and presented false
testimony in other matters.                                                           50

g. The government's Brady suppressions continue even while the parties prepare for
retrial.                                                                              51

h. The government's violations must be considered cumulatively.                       52

B. The government's misconduct was flagrant.                                    52

C. Only dismissal will cure the prejudice to Mr. Jin.                           57

**III. ALTERNATIVE REMEDIES TO DISMISSAL.                                       60**

Defendant Guanghua Jin, through counsel, respectfully moves the Court to dismiss the indictment against him based on pervasive and flagrant prosecutorial misconduct, including the repeated suppression of exculpatory evidence and the presentation of false testimony.

## INTRODUCTION

Cooperativa de Tabaleros de Jujuy ("CTJ") has been lying since the beginning of this case, and the prosecution team knew it. Thrilled at finally having the cooperation of a foreign company with direct contacts to Winney, a Chinese business suspected of purchasing tobacco on behalf of North Korea, the government overlooked every incredible statement and verifiable falsehood, so long as CTJ provided "cooperation" into its investigation. Those same lies wound their way into the criminal complaint and indictment, then were repeated in testimony to the jury.

But the government's due process violations did not end there. Aware of the credibility problems with its cooperator, as well as issues more generally with the thoroughness and good faith of the investigation, the government expended considerable efforts to shore up those weaknesses. Those efforts veered into suppression of exculpatory information and presentation of false testimony.

Under both the Due Process Clause and its own inherent authority, this Court is empowered to sanction the government's flagrant misconduct with the most serious remedy: dismissal with prejudice. The Court should exercise that power here, where severe flagrant misconduct has resulted in substantial prejudice, and a retrial will only reward the government for its Constitutional violations. Fundamental fairness and the interests of justice demand no less.

## BACKGROUND

**I.    CTJ AND THE GOVERNMENT STRIKE A DEAL.**

After years of selling tobacco to North Korea, CTJ found itself in dire straits.  Between March and April of 2019, the U.S. Attorney's Office for the District of Columbia sent a series of letters to major U.S. banks,[1] identifying the Argentinian cooperative (among other companies) as an "entity of concern." Exhibit 1 - Letter to Standard Chartered.[2]  The letters alleged that "the Entities of Concern have engaged in U.S. dollar transactions with suspected front companies of designated North Korean entities" and warned the banks that "future transactions would be subject to possible forfeiture." *Id.*  The letters ended with a request that the banks "immediately notify the undersigned should [they] receive a request to process funds for any of the Entities of Concern" and stated that "the U.S. Attorney's Office will then follow up with you regarding a court order to seize the funds." *Id.*  In effect, the government instructed banks to block funds transfer requests from CTJ.

The banks complied with the government's request.  As a result, CTJ saw millions of its incoming dollars frozen by U.S. banks.  This left CTJ on the verge of collapse, as it did not have sufficient funds on hand to pay for even basic operating expenses. Exhibit 2 - FD 302 of meeting on 5/1/2019 at 2 ("[redacted] estimated that CTJ faced default within the next two weeks without some kind of resolution between CTJ and DOJ.")  CTJ somehow learned of the U.S. Attorney's Office's role in freezing these funds.  CTJ hired a group of lawyers to arrange a secret meeting with the prosecutors on May 1, 2019.  Representing CTJ at this meeting was Fernando Bartoletti,

---

[1]    The banks include Standard Chartered, JPMorgan, Deutsche Bank, Bank of America, Citibank, HSBC, and Wells Fargo.

[2]    Due to the number and volume of exhibits in this Motion, the defense has opted to include only one example of the Entity of Concern letters.  These letters were previously filed as part of the defendant's Motion to Admit Extrinsic Evidence of Bias.  *See* ECF 284.

CTJ's director of finance.  His mission: negotiate a swift resolution that would avert CTJ's imminent demise.

The frozen funds included a $220,000 wire related to Winney's tobacco purchases. Nevertheless, CTJ had told Winney neither the reason its funds had been frozen nor the truth behind why it stopped delivering tobacco.  By contrast, prior to their formal meeting, CTJ had provided the government with approximately 4,000 pages of documents ostensibly related to its business with Winney.  Even then, the documentation was self-serving: FoA Dawson Anglin "traced the payments back to the original production and confirmed what they are saying. A number of those payments were simply noting that it was Winney money, but were actually CTJ to CTJ transfers."  Exhibit 3 - Email from Dawson Anglin to Nicholas Carlsen *et al.* dated 4/29/19. In other words, Anglin noted that CTJ had misattributed internal CTJ transfers to Winney.

At the meeting, CTJ wasted no time in making its desires known.  As soon as the meeting began, CTJ's lawyer asked for the immediate release of $1.9 million in frozen transactions as  "an initial step." Exhibit 2 at 2 ("As an initial step, [redacted] proposed the potential release of the $1.9 million from the US firm Premium Tobacco.")  The government's response was equally clear: "the potential release of any funds would first depend on the information provided by CTJ and their potential willingness to cooperate."  *Id.* at 2.

CTJ agreed to the government's condition.  Yet, CTJ also understood that it was in legal peril, given its extensive historical business involving North Korea.  To survive financially, and to escape any potential legal liability, Bartoletti did the predictable thing: he lied.  Bartoletti feigned ignorance of any business with North Korea, and shifted blame for the transactions entirely to Winney.

Luckily for CTJ and for Bartoletti, the DOJ proved a receptive and uncritical audience to its lies and deceptions. From the very beginning, it was readily apparent that Bartoletti was highly unreliable, at best. Bartoletti claimed that he only learned of CTJ's business with North Korea when problems with the payments began in 2019 (i.e., after the government sent out EOC letters). Exhibit 2 at 4. But CTJ's own records, including its bills of lading, showed deliveries of tobacco to North Korea beginning as early as 2013. When agents at the meeting confronted Bartoletti with contracts of sales to "Korea Carbuncle," and associated bills of lading with a consignee in North Korea, Bartoletti claimed not to have noticed those details and further "claimed not to be familiar with the meaning of consignee." He made these claims even though he was CTJ's head of finance and had signed countless export documents throughout his 15-year stint at CTJ. Exhibit 2 at 4; Exhibit 4 - Email from Nicholas Carlsen to Zia Faruqui *et al.* dated 5/3/2019 (summarizing 2019 meeting).

Bartoletti's statements at the meeting were irreconcilable with the numerous documents CTJ had already submitted to the government. As the government recently admitted, those records "evinc[ed] that CTJ knew its tobacco was destined for North Korea." ECF 298 at 3. For example, in a 2018 email, CTJ sales department manager Patricio Lyons clearly stated that CTJ did business in North Korea, despite sanctions: "we have customers in NK for a long time and only purchase us two containers per month and we wuold [sic] like to keep it. Would that be possible?" Exhibit 5 - Email from Lyons to Han dated 8/22/18 re: Exclusive Agreement. This email was exchanged during negotiations of an exclusivity agreement between CTJ and Winney for North Korea, which Bartoletti claimed was only discussed in anticipation of sanctions being lifted. Exhibit 2 at 4. This is undermined by language in the negotiation emails. Exhibit 6 - Email from Lyons to Han dated 8/3/2018 at 1 (stating that the "complex situation that NK is going through" affects the monthly

quantity"). More significantly, CTJ's lawyers proposed that the contract would become ineffective only if future sanctions were imposed. *Compare* Exhibit 2 at 4 (Bartoletti claiming "Han had sent a draft proposal…in the event US sanctions on North Korea were relaxed or lifted") *with* Exhibit 7 - Email from Lyons to Han dated 10/2/18 (("Please find attached exclusive contract with some amendments suggested by our attorney.") *and id.* at 4 (amendment in RED stating: "CTJ will not be obliged to make sales and dispatches if D.P.R.KOREA is sanctioned by international organizations.").

Bartoletti further claimed at this meeting that the proposed exclusivity agreement was "declined outright," *see* Exhibit 4 at 2 ("Bartoletti claims CTJ declined Han's offer outright."). The records provided by CTJ, however, included emails showing otherwise. CTJ initially agreed with the proposal and asked "to sign it asap," Exhibit 5 ("We agree with the exclusive agreement and we would like to move forward to sign it asap."), and subsequent negotiations went on for at least five months. Exhibit 8 - Email from Han to Lyons dated 12/6/2018 ("Here enclosed the agreement with estimated qty. change only.").

Only two days after this interview, an FBI analyst expressed skepticism about Bartoletti's representations. IA Nicholas Carlsen, reflecting on the meeting, wrote: "Bartoletti claims CTJ was not previously aware the tobacco sold by CTJ to Winney was destined for North Korea. When showed bills of lading CTJ had provided the FBI which unambiguously listed a buyer in North Korea as the consignee for CTJ's shipments, Bartoletti explained that he had never fully understood the shipping documents and assumed that because CTJ was shipping the product to China, that China was its final destination. However, James Han did propose to CTJ an overt business venture in late 2018 to try and enter the North Korean market in the even [sic] US sanctions were relaxed following the US-North Korea summit in Singapore. Bartoletti claims CTJ

declined Han's offer outright." Exhibit 4. Evidently, the government knew that there were problems with Bartoletti and CTJ, but determined that overlooking their mendacity was a small price to bring charges against Winney.

## II.    CTJ AND THE GOVERNMENT PARTNER UP AGAINST WINNEY, WITH UNEXPECTED RESULTS.

Within days of the Bartoletti meeting, the government commenced its cross-border undercover investigation of Winney. It needed, and received, CTJ's cooperation. The benefits to CTJ were swift and significant. When the UC investigation was barely off the ground, the government informed the banks that had blocked CTJ's transactions that CTJ was "no longer an entity of concern."

The undercover investigation was led by DHS Agent Erick Tarango, with support from DHS Agent Chloe Huang. Agent Tarango's "legend" was that he was a fixer with banking connections, hired by CTJ to solve the problem relating to the $220,000 frozen payment. Agent Huang played an interpreter. At least two CTJ employees directly supported Agent Tarango's undercover work: Agent Tarango later testified that, to play his role believably, he relied on Mr. Bartoletti and Mr. Lyons.

On May 10, 2019, Patricio Lyons introduced Agent Tarango to Mr. Han by email as "Roberto Gonzalez," "a new member" that "recently we have incorporated to our commercial team." Exhibit 9 - Email from Lyons to Han dated 5/10/2019 at 2. Later that same day, Mr. Lyons and Mr. Bartoletti called Mr. Han, and arranged Agent Tarango's first direct conversation with Mr. Han. Exhibit 10 - Tr. of Recorded Call on 5/10/2019. Agent Tarango introduced himself as someone who would take over Mr. Lyons' duties, and exchanged contact information with Mr. Han. *Id.*

Three days later, Agent Tarango had his first substantive communication with Mr. Han. On this recorded call, Agent Tarango announced his pitch: he claimed to have paid $20,000 to an Argentinian banker, in order to get the bank to release the frozen $220,000 payment. Now, Winney needed to pay its half of this bribe. Exhibit 11 - Tr. of Recorded Call on 5/13/19 at 3. The purpose of the pitch was readily apparent: Winney's agreement to pay a bribe would have proved that it knew its payments to CTJ were illegal. Far from developing the incriminating evidence that the investigators were hoping for, the undercover operation generated a slew of exculpatory evidence. Winney repeatedly and persistently refused to pay the bribe. Mr. Han even contacted Mr. Lyons and Mr. Bartoletti directly, asking them whether it was proper for Agent Tarango to solicit this payment. Agent Tarango had to specifically instruct Mr. Han to not bring the issue to the attention of others at CTJ, as Mr. Han evidently did not understand that this was a matter to be concealed. Exhibit 12 - Email from Gonzalez to Han dated 5/17/19 at 2 ("The email i sent you that i had to Bribe a Banker you sent it to the cooperativa. This is not very smart. We need to avoid any attention.").

A similar episode occurred a few months later, when Agent Tarango eventually met with Mr. Jin in Argentina.[3] In order to communicate with Agent Tarango in Spanish, Mr. Jin brought along a court-certified interpreter that he hired directly in Argentina. [Exhibit D 330] at 9 ("I told him that I introduced myself as a certified interpreter in Argentina."). The ostensible purpose of the meeting was to discuss arranging future payments from Winney so that they would not be blocked by banks. Agent Tarango discouraged the presence of a third-party interpreter, stating multiple times that the meeting would involve "sensitive" matters. Exhibit 13 - Transcript of July 11, 2019 meeting at 3; *id.* at 9. Mr. Jin indicated that he had no qualms about the interpreter's

---

[3]    Agent Huang, Mr. Bartoletti, and Mr. Lyons were also present for this in-person meeting.

presence, and allowed the interpreter to remain for the whole meeting. *Id.* at 4. At the meeting, Mr. Jin also repeatedly stated that all business must be done legally, and disputed Agent Tarango's attempts to characterize their activity as illegal. *See, e.g., id.* at 15, 16, 19, 22, 23, 27, 48. At trial, the government concealed Mr. Jin's apparent belief in his innocence: it introduced only the fact that Agent Tarango could identify Mr. Jin as the one whom he met, Tr. 9/22/25 PM at 6-8, and prevented the defendant from introducing the rest of the meeting. *See* ECF 167 and ECF 177 (opposing Mr. Jin's motion to admit the recordings).

The government apparently uncovered other exculpatory information over the course of this undercover investigation, as well. Agent Tarango learned at some point that Mr. Lyons had not only corresponded with Winney about CTJ's existing business in North Korea, but also instructed Mr. Han to remove references to North Korea from the bills of lading. *See* ECF 276 at 3-4. Agent Tarango then repeated that fact on a May 21, 2019 recorded call with Mr. Jin: "Patricio [Lyons] instructed James [Han] to change the bill of lading from going to North Korea to going to Dalian." Exhibit 14 - Tr. of Recorded Call 5/21/2019 at 6. Despite the obviously exculpatory nature of this statement, which remains the subject of a pending motion, the government has not disclosed any reports or documentation of it. ECF 276.

When the undercover agents encountered these manifestations of innocence, they did not pause to reflect on the possibility that Winney might not be conspiring to evade sanctions. Instead, they resorted to financial pressure. *See* Exhibit 15 - Decl. of Michael Clarke at ¶14 ("Financial pressure was placed on defendant's company "Winney" when CTJ for months refused to explain why this payment was blocked, and CTJ was refusing to ship goods during this period."). At the time of the undercover investigation, refusing to explain the circumstances to Winney, CTJ had suspended tobacco delivery to Winney but kept a significant balance of Winney's money in its

8

account.[4]  In a formal letter to CTJ, with Agent Tarango copied, Mr. Jin sought redress for these actions, which had caused significant disruptions to Winney's business.  Exhibit 16 at 3 - Attachment to email from Jin to CTJ on 5/13/19.  Agent Tarango responded by accusing Winney of making "threats," and replied with warnings of his own.  *Id.* at 1. Even by December 3, 2019, CTJ apparently still owed Winney an outstanding balance.  *See* Exhibit 17 - Email from Gonzalez to Han dated 12/3/19 ("We can give you credit for future orders.").  Yet, Winney still refused to pay the requested bribe.

In fact, Agent Tarrango even directed the document alterations that it would later claim showed guilt.  He instructed Mr. Han that "[i]f we continue business you will need to use a different company to make payment."  Exhibit 16 at 1.  Later, he apparently successfully persuaded Winney to produce a new contract with a new buyer and new port for delivery.  *See* Exhibit 18 - Email from Han to Gonzalez dated 5/30/19 ("Here attached new contract for 3 containers with new format of contract, new buyer, new port to receive.").

## III.    THE GOVERNMENT FILES A FALSE SEARCH WARRANT AFFIDAVIT FOR MR. JIN'S EMAIL ACCOUNT, OMITTING INFORMATION THAT CALLED INTO QUESTION CTJ'S CREDIBILITY AND RELIABILITY .

Undeterred by the outcome of the undercover investigation, the government next sought a search warrant for Mr. Jin's Google account.  Taking a page out of CTJ's playbook, the government submitted a warrant affidavit replete with material omissions:

- The affidavit omitted Mr. Jin's refusal to pay a bribe, his disbelief that the business violated any law, and his insistence on doing business lawfully. *See generally* Exhibit 19 - Search Warrant Application.

---

[4]    As Mr. Bartoletti explained at trial, Winney essentially prepaid CTJ for the tobacco it contracted to purchase, and CTJ deducted the value of tobacco deliveries from the balance.  *See* Tr. 9/23/25 AM at 27 (explaining that accounting records included a column to reflect payments made before merchandise was delivered).

- The affidavit alleged that Winney altered bills of lading, but omitted the fact that a CTJ employee instructed Mr. Han not to list North Korea. *Id.* at 20, ¶20 ("In 2016, Winney changed its bills of lading to falsely reference sales to China and non-North Korean locations/customers").

- The affidavit minimized CTJ's motive for cooperation, stating that the company met with the government "[s]ubsequent to U.S. correspondent banks freezing Cooperating Company 1's U.S. dollar transactions . . . to account for these transactions." *Id.* at 20, ¶19. In reality, CTJ approached the government not to "account" for any transaction, but in a desperate effort to negotiate the release of frozen transactions.

- The affidavit omitted the government's *quid pro quo* with CTJ: that the release of funds (and CTJ's fate) depended upon "the information [CTJ] provided" and its "willingness to cooperate". *See generally id.*

- The affidavit likewise omitted mention of the significant benefits conferred on CTJ. Within weeks of the Bartoletti meeting, the government unfroze millions of dollars destined for CTJ by directing banks to remove CTJ from their internal watchlists. *See generally id.*

- The affidavit omitted details in CTJ's own records that contradicted Bartoletti's claims, despite the affidavit relying on Bartoletti's claims. *See generally id.*

These deceptive omissions reflected a pattern of suppressing CTJ's lack of credibility and wrongdoing, which would persist through the remainder of this case.

## IV. CTJ ENTRENCHES ITSELF IN MORE LIES WHILE THE GOVERNMENT LOOKS THE OTHER WAY.

By this point, CTJ had averted financial demise and earned millions of dollars through its cooperation with the government. Apparently, CTJ thought it could do even better. In April 2021, CTJ's lawyer drafted a letter to the U.S. Attorney's Office, which he asked an AUSA to apply to DOJ letterhead and sign. The letter was addressed to JPMorgan, and claimed that "the Department of Justice has determined that CTJ has never transacted business with customers in the DPRK." Exhibit 20 - Draft Letter by CTJ's attorney. In fact, CTJ had "extensive historical business" with North Korea. Exhibit 21 - Email from Dawson Anglin to AUSA Grady dated 4/5/21. The DOJ

had never determined otherwise.  In other words, CTJ not only wanted to tell a lie to a bank, it wanted that lie to come from the government.

FoA Dawson Anglin immediately responded: "We cannot agree to this letter the way it is written. They have extensive historical DPRK business." *Id.*  Yet beyond declining to sign the letter, the government did nothing to hold CTJ accountable for this brazen conduct.  To the contrary, FoA Anglin indicated that he was willing to introduce CTJ to JPMorgan employees, while the AUSA indicated that he would "prefer to contact banks on a one-off basis." *Id.*  Neither seemed disturbed by what CTJ might tell the banks after such an introduction.

## V.    BARTOLETTI MEETS WITH THE GOVERNMENT A SECOND TIME TO PEDDLE THE SAME FALSEHOODS.

By 2022, the government had three years to review documents provided by CTJ.  Setting aside CTJ's incentives to shift blame to Winney, and CTJ's attempt to enlist the government in committing bank fraud, the conflict between Bartoletti's claims and his company's records were obvious.  Indeed, the government had found more inconsistencies within CTJ's records. In April 2022, Anglin noted that "CTJ's table [of payments] . . . is missing a lot of payments that we got from the grand jury subpoenas." Exhibit 22 - Email from Anglin to AUSA Seifert dated 4/20/2022. Later, in response to a redacted email, Anglin stated, "The smaller number is what [CTJ] reported to us.  The bigger number is what subpoenas returned for [W]inney activity.  I don't know why [CTJ's] list is smaller." *Id.*    That is, CTJ was apparently underreporting the scope of its transactions.

Yet, the government invited CTJ, via Bartoletti, to present testimony before the grand jury. It even furnished him with a safe passage letter to the United States, granting him immunity for any past crimes.  The letter required him to refrain from further crimes, such as false statements and perjury, but the government apparently gave little weight to that requirement.

On May 5, 2022, Bartoletti met with the government to discuss his testimony. Again, Bartoletti was shown e-mails and draft contracts relating to the exclusive agency contract that Han and Lyons had been negotiating between 2018 and 2019. Again, he lied: the parties entered negotiations in anticipation of sanctions being lifted, and never signed a contract because the sanctions were not lifted. Exhibit 23 - FD 302 of Meeting on 5/5/2022. Bartoletti also claimed that the negotiations "died very quickly," *id.* at 6, which diverged from his previous account that the offer was rejected "outright," and (of course) was contradicted by records that the negotiations went on for five months. *See supra*, Section I.

Bartoletti was also questioned regarding the bills of lading. He claimed that "Han provided all the information (consignee, purchaser, and other information required) for the bill of lading, which included shipping the tobacco to Dalian port in China." *Id.* at 5. The government pointedly avoided any questions about Patricio Lyons' instructions to remove the references to North Korea. *See supra*, Section II.

The government did not confront Mr. Bartoletti on any of these falsehoods. It did not point out the contradictions between his version of events and the facts known to the government. Instead, it chose to present Mr. Bartoletti as a witness to the grand jury.

## VI.    A CHORUS OF LIES: THE GOVERNMENT SPONSORS BARTOLETTI'S FALSE TESTIMONY BEFORE THE GRAND JURY, THEN REDACTS THEM FROM THE TRANSCRIPT.

Mr. Bartoletti testified before the grand jury on May 9, 2022. He repeated, and even amplified, the false statements he had made to the government days before.

### A.    Bartoletti's false statements before the grand jury.

The documents that CTJ produced to the government tell the real story: CTJ has long had its own North Korean customers. Then, from July 2018 through December 2018, CTJ and Winney

negotiated a contract for Winney to act as CTJ's exclusive tobacco distributor in North Korea. During the course of negotiations, CTJ indicated that it had "customers in NK for a long time and…w[ou]ld like to keep it." Exhibit 24 - Email from Lyons to Han dated 8/22/18.  With respect to the proposed contract, CTJ's board approved the agreement "in principle" and "would only like to add a commitment [on Winney's] part to buy…a minimum volume."  Exhibit 25 - Email from Lyons to Han dated 8/3/18 at 2.  Lyons, CTJ's lawyers, and CTJ's board were all involved in extensive negotiations relating to this contract, and CTJ's lawyers proposed multiple amendments to the contract.  Exhibit 26 - Email from Lyons to Han dated 8/9/18 (noting that "the agreement is on right track" but "couldn't move forward since some member of the board are out of office."); Exhibit 25 (stating "we are sending the contract to our attorney for opinion.").

The story fed to the grand jury was an alternate reality.  Bartoletti claimed, first, that the Exclusive Agency Agreement did not even reach the stage of negotiations. According to Bartoletti, Han proposed the agreement "because those [NK] sanctions were on the cusp of being lifted." However, when the matter reached the management committee, "the subject did not progress" and "CTJ told [Han] that if and when those sanctions were lifted, then we could talk."  Exhibit 27 - Unredacted Bartoletti Grand Jury Tr. at 50-51.  In fact, according to Bartoletti, "this contract never even got to the consideration by the lawyers."  *Id.* at 52.

Next, Bartoletti testified that an August 30, 2019 email between Lyons and Han–wherein Lyons stated "without a contract, we are selling to NK in average of 180 [containers] per year"– did NOT indicate that Lyons therefore understood that Winney sold tobacco to North Korea. Instead, Bartoletti claimed that this was a "matter of language or translation," and Lyons was simply "trying to establish a difference in the operation that…because the customer will be the

same, it might as appear as though [CTJ] [was] selling to somebody other than the already existing customer." *Id.* at 53; Exhibit 28 - Email from Lyons to Han dated 8/30/18.

Bartoletti then testified that CTJ's management only learned of its tobacco being shipped to North Korea "after the funds were frozen" in the "Spring of 2019."  Exhibit 27 at 53-54 ("Q: And when did you learn that you–that Win[n]ey was likely providing that tobacco to North Korea? A: Well, we learned this, or figured this after the funds were frozen, and my first trip to Washington, when I met with the attorney general."); *see also id.* at 54 ("Q:...when did the management of CTJ learn that Winney was sending CTJ's product to North Korea? A: Right at that time. We all learned everything at the same time.").

The government knew these statements to be false. *See supra,* Section IV (government's knowledge of CTJ's "extensive historical DPRK business."); *see also* Exhibit 23 at (government questioning Bartoletti regarding proposed amendments to the contract).  But instead of correcting the false statements, the government endorsed them.  For instance, when Bartoletti falsely stated that the contract "never even got to the consideration by the lawyers," AUSA Seifert responded by apologizing: "Okay. My mistake." Exhibit 27 at 51-52.

### B.  The government's redactions.

The government then attempted to obscure Bartoletti's falsehoods by redacting the transcript of his grand jury testimony.  Only after much litigation was the defense able to obtain an unredacted version.  *See* ECF No. 193, at 4 n.2.  A comparison of the two is stunning.

The government redacted Bartoletti's answer to whether it was "illegal for CTJ to sell tobacco to North Korea": "I don't know that."  *Compare* Exhibit 29 - Redacted Bartoletti GJ Tr. at 17-18 with Exhibit 27 at 17-18.  This answer plainly supported the defense theory that lay persons engaged in the tobacco trade abroad did not know that US sanctions on North Korea

prohibited sale of such commodities as tobacco.  *See* ECF 104 - Defendant's Motion *in Limine* to Admit Foreign Law ("Mr. Jin has consistently asserted that he endeavored to comply with the law. The legality of transactions with North Korea under the laws of Argentina (where the transactions at issue occurred) and the U.N. sanctions regime will help to show the sincerity of that assertion.").

Likewise, the government redacted his subsequent testimony that "even though perhaps in a vague sense [CTJ] knew that there were sanctions and that sales would perhaps not be permitted, but that really didn't mean much to [CTJ] because, as far as we were concerned, all our operations were with China."  *Compare* Exhibit 29 at 18 with Exhibit 27 at 18.  Similarly, the government redacted Bartoletti's statement that the contract was not considered by its legal team.   *Compare* Exhibit 29 GJ at 52 *with* Exhibit 27 at 52.

Significantly, the government redacted multiple instances in which Bartoletti testified that Han supplied the information for the bills of lading to CTJ.  *Compare* Exhibit 29 at 39-40 *with* Exhibit 27 at 39-40 (redacting  testimony that "[Mr. Han] provided this information about who the ultimate customer was on the sale."); *compare also* Exhibit 29 at 41 *with* Exhibit 27 at 41(redacting testimony that bills of lading were prepared based on information "ultimately provided by the customer – in this case, Winney."); Exhibit 29 at 43 *with* Exhibit 27 at 43 (redacting testimony that "Korea Ryugyong 10 Corp" was a consignee "provided by Mr. Han to CTJ."); Exhibit 29 at 44 *with* Exhibit 27 at 44 (redacting testimony that Han provided "Complant International Transportation in Dalian, Liaoning, China" as notify party to CTJ); Exhibit 29 at 48-49 with Exhibit 27 at 48-49 (redacting testimony that "earlier Mr. Han had provided this North Korean company as the consignee, and now Mr. Han is providing Winney as the consignee.").  At the time of these redactions, the government knew that Lyons had instructed Winney to change the bills of lading.  Tellingly, one of those redactions directly involved testimony of a specific instance where

Mr. Han sent consignee information to Patricio Lyons. *Compare* Exhibit 29 at 49 *with* Exhibit 27 at 49.

In sum, the government knowingly sponsored a parade of lies from Bartoletti to the grand jury, and later covered up those lies when disclosing his testimony to the defense.

## VII.    DAWSON ANGLIN'S FALSE CRIMINAL COMPLAINT AND THE INDICTMENT.

The grand jury that heard Bartoletti's testimony was not the grand jury that returned the indictment. It was Forensic Accountant Dawson Anglin, testifying before a different grand jury, who eventually secured the indictment for the government.

### A.    False attributions of CTJ's independent North Korean transactions to Winney.

FoA Anglin was a key figure in the investigation and subsequent prosecution of Mr. Jin. He did not merely analyze financial data acquired by other agents. He also played a key role in drafting the criminal complaint. *See* Exhibit 30 - Email from Anglin to AUSA Grady dated 10/26/20 (stating about a draft of the complaint: "I'm not a fan of how it reads. Been so long since I wrote this."); Exhibit 31 - Email from Anglin to AUSA Faruqui dated 9/1/20 (suggesting revisions to a paragraph of the complaint); Exhibit 32 - Email from Anglin to AUSA Grady dated 10/26/20 (suggesting more changes to the complaint); Exhibit 33 at 1 - Email from AUSA Faruqui to Anglin dated 7/28/20 (instructing Anglin to "integrate in summary fashion the info below into the complaint."). That complaint was full of misleading and outright false allegations, which were then regurgitated in the indictment.

As noted earlier, CTJ has long had its own North Korean customers outside of the Winney relationship. *See supra*, Sections I and VI-A; *see also* Section IV. When it produced documents to the government in 2019, part of those documents included transaction records with two companies, Carbuncle Business Company Limited ("Carbuncle") and Fully Max Trading Co

Limited ("Fully Max"), both of which had links to DHID, a sanctioned Chinese company with ties to North Korea. Ex. 34 - Email from Anglin to AUSA Wasserman dated 2/6/25 (describing Carbuncle and Fully Max as DHID front companies).

CTJ produced documents for these transactions with those related to Winney. Yet the documents themselves appeared substantially different from other Winney related documents. A simple comparison demonstrates the difference.

For example, the document below is from a Carbuncle sales contract in 2013:

Ex. 200 p. 7

 **COOPERATIVA DE TABACALEROS DE JUJUY LTDA.**
Urquiza 708 - Ciudad de Perico - JUJUY - ARGENTINA - (Y4610ZAA)
Casilla de Correo N°15 - Tel.: 54-388-4911139/239/339 - Fax: 54-388-4911569
Web Site: www.ctj.com.ar - Empresa Certificada  ISO 9001:2008/ISO 14001:2004    

### PURCHASE CONTRACT

Date: Jan.23th, 2013          Contract No.: 01-2013KP

BUYER: CARBUNCLE BUSINESS COMPANY LIMITED.

A1.7F.,KIU FU COMMERCIAL BUILDING,300-306,LOCKHART ROAD HK

SELLER: COOPERATIVA DE TABACALEROS DE JUJUY LTDA.

Urquiza 708  4610 Ciudad de Perico - Jujuy – Argentina.

This contract is made by and between the Buyers and the Sellers; whereby the Buyers agree to buy and the Sellers agree to sell the under-mentioned goods subject to the terms and conditions as stipulated :

1) Name of Commodity : CUT-RAG VIRGINIA TOBACCO.

| GRADES | NICOTINE | SUGAR | HUMIDITY |
|--------|----------|-------|----------|
| KTA02 | 2,17 | 13,87 | 13,50% |
| KTA03 | 2,26 | 11,22 | 13,50% |

2) Quantity: 23.760 Mt. (each model for one container per month per
              12 months shipment, total of 285.120Mt)
3) Unit price:    USD 5.09 per Kg for KTA02

Exhibit 35 - Government Exhibit 200, p. 7 from first trial.

Meanwhile, the document below is from a Winney sales contract in 2012:



Ex. 200 p. 726

CX~415

## PURCHASE CONTRACT



Beijing, China, May 26, 2012

Contract No.:C-CTJ-A-120526

This contract is made by and between the Cooperativa de Tabacaleros de Jujuy Ltda as the Sellers (hereinafter called the sellers) and Winney International Business Co Ltd. as the Buyers (hereinafter called the Buyers), whereby the sellers agree to sell and the buyers agree to buy the under-mentioned goods on following terms and conditions:

1) Name of Commodity: TOBACCO AMERICAN BLEND IN CUT-RAG AJ007 (Same as goods delivered on May 29, 2009 with B/L no. COSU 8002418490)

   Specification:

   Nicotine: 2.07

   Sugar:  13.63

   Moisture: 13.5

2) Quantity: 83,160 kgs/ 7*40 FCL each month. Effective month: July 2012 to July 2014

3) Unit Price: USD 4.52 FOB Buenos Aires, Argentina

4) Total Value: USD 9,021,196.80

5) Payment terms:

   a. A deposit in an amount equal to 30% of the monthly Payment Amount (i.e., USD 112,765.96) (the "Deposit"), payable by wire transfer to Seller's designated account following the execution of this contract. The parties agree that the Deposit shall be applied pro rata against each monthly shipment and balance the payment for the last shipment. The Sellers deliver the original documents by DHL to the Buyers in 15 days after shipment.

   b. The Buyers remit 100% payment for monthly shipment (i.e. USD 375,883.20) before 1st week of each month. The Sellers must ship out commodity after receipt of monthly payment.

6) Packing: 120KG C48 craft box with interior bag of polypropylene and exterior locks, with individual bar code identification, 99 boxes per 1-40" HC container. Total kilograms per container 11,880kg. Outer packing would be neutral packing. Do not print the information of the manufacturer.

   Shipping tag Marks;

   TABACO GRADO AJ007

   PESO NETO 120KG

   PESOBRUTO 135KG

   BOX:

7) Country of Origin: Argentina

8) Shipment: Monthly shipment should be arranged by two steps,

   a. 35,640 kgs tobacco should be made in 1st week of each month.

   b. 47,520 kgs tobacco should be made after 10 days.

Exhibit 36 - Government Exhibit 200, p. 726 from first trial.

The terms of sale were also materially different.  For example, the Winney contract required Winney to make full payment prior to delivery, while the Carbuncle contract required full payment only after delivery.

The effective dates of the contracts also overlapped.  For example, the 2012 Winney contract stated that it would be effective from July 2012 to July 2014, *see* Exhibit 35, while the Carbuncle contract was for 2013.  *See* Exhibit 36.

Most significantly, when Bartoletti created a master spreadsheet of all payments received by CTJ for Winney related transactions from August 2009 through January 2019, the Carbuncle/Fully Max transactions were not on that list.  *See* Tr. 9/18/25 PM at 75 ("Q: And so CTJ produced one spreadsheet saying, here is what we have received; is that right?  A: Correct."); Exhibit 37 - Government Exhibit 200 at p. 1671 to 1695 from first trial (Bartoletti spreadsheet).

Indeed, even when Bartoletti was questioned about the Carbuncle and Fully Max payments in 2019, he claimed that he "did not remember who the contracted purchaser had been."  Exhibit 2 at 4.  Thus, the only ostensible link between the Carbuncle/Fully Max contracts and Winney was the fact that CTJ produced those contracts to the DOJ (presumably in response to a request for all Winney related documents).

Ignoring the mountain of evidence that Winney had no relation to the Carbuncle/Fully Max transactions, the government insisted on including those transactions in the criminal complaint, then the indictment.  In May 2022, AUSA Seifert asked Anglin for "the spreadsheet of all the payments to CTJ."[5] Ex.38 - Email chain between Anglin and AUSA Seifert from 5/4/2022 to 5/6/2022.  The next day, AUSA Seifert thanked Anglin–apparently for the spreadsheet–and stated, "I was sort of surprised Carbuncle wasn't on here - any thoughts on why that is."  *Id*.  Instead of pointing out that no evidence linked the Carbuncle transactions to Winney, Anglin replied, "You are right. They should be on there. We need to add them."  *Id*.

As a result, when Anglin drafted the criminal complaint, the supporting affidavit alleged:

---

[5]    As usual, the rest of this email is heavily redacted, as is the spreadsheet Anglin sent in response.

> "[CTJ] records show that WINNEY ENTITIES purchases of [CTJ]'s products was facilitated by the use of [Carbuncle]. In 2013, [CTJ] made various shipments to North Korean customers that were brokered by WINNEY ENTITIES, for which [CTJ] was paid by [Carbuncle].

ECF 1 at 21.

The complaint included numerous specific allegations relating to the Carbuncle transactions. *See id.* at 22  (alleging that Carbuncle was registered in a foreign country but bills of lading listed Dalian, China, as the destination, and that specific transactions from Carbuncle and Fully Max had "transited the U.S. financial system.").  The transactions were even set forth in a table.  *Id.*  SA Joy Gallante then signed the complaint under penalty of perjury.

Less than a year later, while testifying before the grand jury, FoA Anglin then repeated the false allegations:

> So DHID front company also made a limited number of payments directly to Company 1 for the Winney entities procurement.  These payments were related to shipments of North Korean tobacco -- or to North Korean companies.  So you'll see the list there where companies – DHID front companies [Carbuncle and Fully Max] combine to make almost $600,000 worth of payments directly to [CTJ], which -- what you typically -- like we talked about, Winney is that passed-through where they get the money first, and it goes to [CTJ]. But for whatever reason back in 2013, they decided that that needed to be made directly.

Exhibit 39 - Redacted version of Anglin's Grand Jury testimony at 61.[6]  Anglin also presented a PowerPoint setting forth these claims in a table.  Exhibit  40 - Exhibits used in Anglin's grand jury testimony at 40.

Based on Anglin's testimony, the grand jury returned an indictment which charged the Carbuncle and Fully Max transactions as overt acts of the bank fraud conspiracy:

---

[6]    The version of Anglin's grand jury testimony produced by the government was not only redacted, but also had pages removed.  The page reference in this Motion refers to the page number appearing on the top right of the transcript, and not the actual page number of the exhibit itself.

The [Winney] ENTITIES also used Chinese front companies to facilitate the payments to [CTJ], including as follows:

a.    Between on or about February 25, 2013, and on or about June 13, 2013, [CTJ] sent five shipments for [Carbuncle], located in Hong Kong, the shipping documents related to the same which contained (i) the Consignee listed as [Carbuncle] with the word "Korea" in front of the company name and an address in Shenyang, China; (ii) the final destination of the goods listed as Dalian, China; and (iii) the total of the bills for the shipments was listed as $593,406.

b.    Related to these same shipments, between on or about January 25, 2013, and on or about August 8, 2013, [Carbuncle] and [Fully Max] made six payments to [CTJ] totaling $593,370. Carbuncle and Fully Max had no actual role in the tobacco transactions. Payments associated with these five shipments were processed by U.S. financial institutions . . .

ECF 13 ¶54. Like the complaint and Mr. Anglin's PowerPoint, the indictment featured a table laying out the Carbuncle and Fully Max transactions:

| Sub-¶ | Date | Originator | Beneficiary | Amount (USD) |
|---|---|---|---|---|
| a. | 1/25/13 | DHID Front Company 6 | Company 1 | $35,604.36 |
| b. | 3/15/13 | DHID Front Company 7 | Company 1 | $83,058.84 |
| c. | 4/11/13 | DHID Front Company 6 | Company 1 | $118,681.20 |
| d. | 5/23/13 | DHID Front Company 7 | Company 1 | $118,663.20 |
| e. | 6/21/13 | DHID Front Company 6 | Company 1 | $118,681.20 |
| f. | 8/08/13 | DHID Front Company 6 | Company 1 | $118,681.20 |

*Id.*

In short, based upon (at most) an implied representation by CTJ that the Carbuncle/Fully Max transactions were connected to Winney, the government included demonstrably false allegations in the criminal complaint and indictment.

**B. Anglin repeats Bartoletti's falsehoods to the grand jury.**

FoA Anglin offered other testimony before the grand jury, repeating the untruths that had been introduced through the testimony of Bartoletti. For example, when asked by a grand juror whether CTJ was "just a tobacco company that got looped into selling product to these front

companies," Anglin replied that it was. Exhibit 39 at 122 ("Correct . . . [Y]es, just a tobacco company that sells tobacco that happened to link up with or get connected with Winney."). That answer was belied by his own knowledge of CTJ's "extensive historical DPRK business." *Supra*, Section IV. He also reinforced the lie that CTJ's documentation was "based on information that Winney is providing." *Id.* at 70 (Q: "So Company 1 is issuing these documents, but it's all based on information that Winney is providing? A: Correct."); *see also id.* at 122 ("[T]hey had knowledge that these North Korean entities were listed on there. That's what they were being told to put. And we see that change overtime.").

**C. Other falsehoods in the indictment.**

The indictment's falsehoods did not stop with false testimony to the grand jury, or with attributions of CTJ's North Korean business to Winney.

For one thing, the indictment alleges that Winney "supplied false information to [CTJ], in order to remove references to North Korea from shipping records related to [CTJ's] tobacco sales." Indictment ¶ 58. But, again, Lyons from CTJ instructed Winney to change the bills of lading. By the time the indictment was drafted, the government was aware of this exculpatory fact.

For another, the indictment falsely attributes statements to Mr. Jin that he never made. In describing the July 2019 meeting in Argentina, for example, the indictment alleges that Mr. Jin stated "[CTJ] was 'the ones committing fraud" and "I'm simply buying merchandise." *See id*. at ¶66. But Mr. Jin did not make that statement. What Mr. Jin said was: "We are not money laundering. We're buying goods. Are you sure? What is money laundering?" Exhibit 41 - Original Translated Transcript of 7/11/2019 Meeting at 18. Although the government's own transcript

clearly identified that it was an interpreter who later made this statement, the indictment attributed it to Mr. Jin.[7]

Finally, the indictment omits numerous exculpatory statements by Mr. Jin that would have placed the remainder of his statements in context. For example, the indictment alleges that when Agent Tarango proposed that Winney pay a bribe, Mr. Jin responded, "Then we can avoid the investigation by setting up another company in between. Besides, we don't have to pay $10,000 or ten thousand USD." *Id.* The indictment, however, omits his refusal to pay the proposed bribe. *See* Indictment ¶ 66.

## VIII.    THE GOVERNMENT SUPPRESSES EXCULPATORY AND IMPEACHING EVIDENCE RELATED TO CTJ.

Having procured an indictment based upon false allegations from an unreliable cooperator, the government turned its attention to the next chapter of this misguided prosecution: concealing the fallout.

### A. The government suppressed CTJ's role in changing the bills of lading.

The government suppressed CTJ's role in directing changes to the bills of lading. The government first concealed CTJ's role by modifying the language of the indictment. The criminal complaint alleged that "[Agent Tarango] tried to discuss prior conversations between [CTJ] employees and JIN related to changing bills of lading." ECF No. 294, at 3. The indictment follows

---

[7]    The English translation of what the interpreter said in this version of the transcript was also incorrect. The interpreter said in Spanish: "Usted creo que está equivocado. Estoy comprando mercadería." As shown in the government's later, certified translation, the correct translation is: "I think you are mistaken. I'm buying merchandise." *See* Exhibit 13 at 16. But even if the government was working with a flawed translation at the time, it was immediately apparent from the original transcript that Mr. Jin's preceding statement did not indicate that he said anyone was committing fraud.

the allegation in the complaint nearly step by step, but omits mention of "conversations…related to changing bills of lading."  *Id.* at 3-4.

The call was later omitted from the government's first discovery production, which includes every other recording from the undercover operation.  The government even represented to the Court that no such evidence existed.  In a filing from April 11, 2025, the government wrote: "To be clear, if the government was aware of clear exculpatory evidence on its face–<u>such as a witness…claiming that the defendant was not involved in the criminal conduct alleged in the indictment</u>…or <u>a witness claiming that someone besides the defendant was a participant in the charged conspiracy</u>–the government would provide that information immediately.  However, <u>as far as the assigned prosecutors are aware, no such evidence exists in this case</u>."  ECF 71 at 3-4.

Later, when confronted, the government claimed the omission was inadvertent.  Even then, it did not immediately produce the translation, though metadata for the translation shows it was created in 2019.  *See* ECF No. 68 9 n.5.  And the government still has not disclosed the source of Agent Taragno's knowledge.

### B. The government continues to suppress documentation from the undercover investigation.

Although the government was eventually forced to produce the call itself, it has refused to produce the source of Agent Tarango's information about changing the bills of lading, let alone other documents from his undercover work.  "This is a sign of either inadequate documentation or without a legitimate reason to the contrary, a disregard by the government for disclosure."  Exhibit 15 at ¶ 30.

Such documentation of the undercover operation surely exists: undercover agents are required to document all contacts, no matter how informal, with a cooperating witness. *See id.* ¶¶

10-12, 27, 31.  Indeed, Anglin has specifically referred to it: "as seen in documentation previously provided, an undercover employee…."  Exhibit 42 - Email from Anglin to Rehrer dated 4/13/23.

The reports and documentation of the UC investigation itself would have provided strong evidence of CTJ's lack of credibility.  To justify the use of an undercover operation, there must be an assessment that standard investigative techniques, such as subpoenas and interviews, are insufficient.  Exhibit 15 at ¶22.  A common justification for UC operation is that the cooperator has credibility issues.  *Id.* at ¶23.  In other words, the undercover documentation may well have revealed that the government harbored doubts about CTJ's credibility.

Undercover reporting also includes an operational plan which evaluates the motivations of cooperating sources.  *Id.* at ¶12.  It is well known that when a cooperating source is under financial pressure, there is a heightened risk of fabrication.  *See id.* ¶15.  Thus, the reporting and documentation would likely show the government's awareness of these risks  (or willful blindness to them).

By suppressing the reports and documentation of the UC investigation, then, the government also assured itself that any impeaching information in those reports related to CTJ would have been hidden from the defense.

## C.  The government suppressed evidence that CTJ solicited the government's help to lie to banks, and provided false or misleading data.

The government also suppressed information that would have undermined CTJ's credibility as a cooperator.

The government suppressed evidence that CTJ elicited its help in committing bank fraud (the very crime Mr. Jin is charged with), twice over.  *See supra*, Section IV.  When the government first produced the email exchange between Anglin and the prosecutor, it did not include CTJ's draft letter asking it to lie to banks, and redacted all but "They have extensive DPRK business."

*Compare* Exhibit 43 - Redacted version of E-mail from Anglin to AUSA Grady dated 4/5/2021 *with* Exhibit 21 - Unredacted version of same email.  It thus omitted that Anglin made this comment in response to an overt request to help CTJ deceive U.S. banks.  When the government produced the unredacted email exchange, it still omitted the draft letter by CTJ's attorney, concealing the full extent of CTJ's fraudulent efforts.  *See* Exhibit 20 - Draft letter by CTJ's attorney.

The government also suppressed evidence that CTJ provided false, or at least misleading, data when cooperating with the government.  Anglin realized that CTJ had misattributed its own transactions to Winney.  *Supra*, Section I.  Yet, the government has disclosed neither documents that show how Anglin made this discovery, nor documentation of the underlying transactions.

CTJ also underreported its business with North Korea.  *Supra*, Section V.  Yet the government did not disclose any of the documentation showing what CTJ failed to report.  Indeed, the extensive redactions made to this email chain conceal much of the discussion that prompted FoA Anglin to make these statements, and likely would have shown that other members of the prosecution team shared concerns about the reliability of CTJ's records.

**D.  The government suppressed evidence undermining the thoroughness and good faith of the investigation.**

The government also extensively redacted its Jencks production, omitting information that seems to undermine the thoroughness and good faith of its investigation.

Early on in this case, Anglin noticed apparent errors in HSI's reporting of the undercover operation.  He informed AUSA Seifert that he had emailed HSI about the error.  Exhibit 44 - Updated version of Emails from Anglin to AUSA Seifert on 1/24/2022.  When the government initially produced the email, however, Anglin's entire statement about the error was redacted.  Exhibit 45 - Original version of Emails from Anglin to AUSA Seifert on 1/24/2022.   And when

the government eventually produced a partially unredacted version, in response to a motion to compel, it still failed to disclose the document containing the error and Anglin's email to HSI describing the error. The government continues to refuse to provide the Anglin email.

The government also initially redacted an email from Anglin to AUSA Wasserman, stating that "...*Any missing documents from internal emails about blocked or questioned transactions would have belonged to employees that no longer work for the Department of Justice and are therefore unavailable*." *Compare* Exhibit 46 - Redacted version of email from Anglin to AUSA Wasserman on 3/28/25 at 2 *with* Exhibit 47 - Updated version of same email at 2. It appears that the investigation did not retain e-mails when prosecution team members left for other jobs. Redacting that sentence thus concealed the fact that important and potentially exculpatory documents had been destroyed in an ongoing case, in clear violation of the DOJ's own record retention requirements.[8] At best, that destruction was inexcusably bad recordkeeping. At worst, it was intentional spoliation.

Last, but certainly not least, after the defense challenged the government's extensive redactions to its Jencks production, *see* ECF No. 182, the government's response was to make future productions with redactions in white instead of black (i.e., the same color for the redactions as the documents' background), making it impossible to determine the scope of the government's redactions. *See, e.g,* [Exhibit - updated Anglin Emails 3 at 3.].

---

[8] USAM § 9-5.004 ("Prosecution team members should preserve for later review and possible disclosure all substantive e-communications created or received by team members during the course of an investigation and prosecution, and <u>all</u> e-communications sent to or received from lay witnesses, regardless of content. E-communications should be preserved in their native electronic format; when that is not feasible, another method of preservation should be identified and used."), available at https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings#9-5.000

IX.  **THE GOVERNMENT KNOWINGLY PRESENTS MISLEADING OR OUTRIGHT FALSE TESTIMONY AT TRIAL AND SUPPRESSES EXCULPATORY INFORMATION BY ALTERING AN EXHIBIT.**

At trial, the government presented testimony and evidence that it knew to be misleading (or worse).  Where it could not sustain its false claims, the government sought to suppress information that showed it included baseless charges in the indictment, as well as information that would have allowed Mr. Jin to attack the reliability of its key witnesses and its investigation as a whole.

A.  **AUSA Seifert alters a key exhibit to remove Carbuncle and Fully Max transactions during Dawson Anglin's testimony, but does not notify defense counsel or the Court.**

As discussed in Section VII-A, the indictment falsely attributed to Winney a number of CTJ's transactions with Carbuncle and Fully Max.  When the government recognized that it could not adduce evidence to prove these attributions, it silently altered an exhibit pertaining to those transactions.

The government exhibits disclosed before trial included Exhibit 355, a summary chart of companies making payments to CTJ.  Three versions of this exhibit were produced, respectively, on August 6, September 1, and September 14.  See Exhibits 48, 49 and 50.  Before trial, the chart was updated with minor changes–adding headers or reformatting company names—but all versions listed Carbuncle and Full Max.  *Compare* Exhibit 48 *with* Exhibit 49 *and* Exhibit 50.

On the morning of September 19, during Dawson Anglin's direct testimony, the government introduced the trial version of Exhibit 355, 9/19/25 AM Tr. at 35.  This version, unlike the versions produced before trial, did not include Carbuncle or Fully Max.  Exhibit 51 - Government Exhibit 355 as admitted at trial.  The government had apparently altered the exhibit during the lunch break the previous day, minutes before Anglin took the stand.  It had notified

neither defense counsel nor the Court.[9]  Given that such a substantive modification to the exhibit would have required prior coordination between AUSA Seifert and FoA Anglin, the government's decision to make this change just minutes before Anglin was called to the stand, and to then keep silent about the change, reflects a deliberate decision to suppress *Brady* and *Giglio* information.

### B.  The government presented false and misleading testimony from Anglin.

The government also allowed Anglin to misrepresent his expert opinion and his reliance on others in forming that opinion.

At trial, the government asked Anglin what "significance" he placed on the presence of a blank account application for KKBC, a sanctioned North Korean bank, in Mr. Jin's email. Tr. 9/19/25 AM at 91-92.  Anglin was permitted to answer, over defense objection, *see id.* at 93-95, that he relied on this fact to conclude that money received by Winney came from North Korean front companies.  *Id.* at 98.  Yet in truth, Anglin had not placed any significance on the blank account application.  When he first encountered this document, Anglin asked an FBI Intelligence Analyst: "[i]s this stuff of any significance? Seems to be related to an account opening or something."  Exhibit 53 - Email from Anglin to Carlsen dated 5/22/20.  In other words, it was an analyst at the FBI who believed that the blank application showed that Winney received money from North Korea.  That belief was then dressed up in the guise of an expert opinion and presented through FoA Anglin at trial.  *See* Tr. 9/19/25 AM at 94-95.

Anglin also testified at length about transactions between Winney and CTJ, and his opinions were plainly dependent on the reliability of CTJ's records.  Yet, Anglin knew that CTJ

---

[9]    The record of the changes is reflected in a screenshot from USAFx, the system the government uses to upload exhibits. Exhibit 52 - USAFx screenshot with changes. The screenshot indicates that there were three versions of the exhibit uploaded by AUSA Seifert, beginning at 12:28 PM on September 18, and ending at 1:43 PM with the version that was admitted.

had tried to get the governments' help in lying to banks about its lack of trade with North Korea, and that CTJ underreported the extent of its transactions. *See supra*, Sections IV, V.  Even though Anglin had at least two reasons to think that CTJ was trying to hide its business in North Korea, at no point did he testify to that fact.

Another subject of Anglin's testimony concerned changes to the bills of lading.  Anglin testified that in the bills of lading he reviewed, "the consignee was changed.  It was . . . the North Korean company previously.  And after March of 2016, that changed to a different Chinese entity." Tr. 9/18/25 PM at 87.  He testified that "based on the fact that the business didn't change and only -- the only thing that changed was the name listed on the bill of lading, it was my understanding that the good[s] continued to go to North Korea."  *Id*. at 88.  Yet Anglin surely knew (as did the government) that Lyons had instructed Winney to change the bills of lading. After all, Mr. Anglin was the one who provided AUSA Seifert with documents and information relating to the May 21, 2019 call in which this fact was mentioned.  *See supra*, Sections VIII-A, VIII-B.  The government did not ask him any questions relating to the role of CTJ in changing the bills of lading.

Last, but not least, the government stymied defense efforts to expose the flaws of Anglin's testimony on cross-examination. For example, when the defense attempted to question Anglin about his prior opinion that Winney keeping the same name through various corporate entities is "unusual"–an opinion that materially contradicted the government's theory–the government objected that this was beyond the scope of direct, and the Court sustained the objection.  Tr. 9/19/25 PM at 48-53.  The prosecution likewise successfully prevented the defense from cross-examining Anglin about the documents and data he relied on and those he ignored from CTJ to form his opinions.  Tr. 9/18/25 at 17 ("[O]n cross-examination, defense may try to get into other issues with respect to the CTJ records that this witness is not testifying about, and so that's one issue.").

**C. The government presented other false and misleading evidence from Bartoletti.**

In a reprisal of Bartoletti's grand jury performance, the government again elicited false, misleading, and incomplete testimony from Bartoletti at trial.

Bartoletti twice testified that Winney provided information in the bills of lading. When asked "[w]ho fills out [a bill of lading]," he responded that the document "is issued by the shipping company and it includes data that the exporter has provided and *then the client fills in the document*." Tr. 9/22/25 AM at 28 (emphasis added); *see also* Tr. 9/23/25 AM at 53 (stating that Winney "supplied [CTJ] with the information that the consignee and the notify party were Complant"). But Patricio Lyons instructed Winney to make those changes. Whether or not Bartoletti knew about Lyons' role, the government did. AUSA Seifert did not correct Bartoletti's testimony.[10]

Bartoletti similarly mischaracterized CTJ's exclusivity contract with Winney. He again stated that the contract "didn't go forward" Tr. 9/23/25 AM at 56, and that "the premise [of the contract was] that [if] the sanctions would be lifted . . . [the contract] would be broached again in the future." Tr. 9/23/25 AM at 58; Tr. 9/23/25 PM at 49. The government not only introduced this testimony, but even solicited judicial notice of the date of the Trump-Kim Jong Un summit to bolster Bartoletti's testimony. By the point of trial, however, the government not only had ample time to review the CTJ records to come to its own realization that Bartoletti's testimony was false, but knew from defense filings that Bartoletti's testimony was false. *See, e.g,* ECF 181 at 3-4

---

[10]     During his testimony, Bartoletti claimed that CTJ had provided four years of email records, stating CTJ had produced "approximately four years" of emails. Tr. 9/23/25 AM at 22-23. While Bartoletti may have been confused because he lacked knowledge about what he had certified, AUSA Seifert elicited the inaccurate testimony a second time, asking why CTJ had omitted "four prior years of emails," when in reality it had omitted about nine. Tr. 9/23/25 PM at 42. While Bartoletti may have been ignorant, a prosecutor who had been involved in the investigation was almost certainly not, especially given that defense counsel had just elicited the truth on cross-examination that there were less than two years of emails produced.

(specifically describing evidence that contradicted Bartoletti's grand jury testimony regarding the exclusive agency agreement).  Tellingly, while responding to that motion, the government claimed that it was "not clearly false" and it was upon Bartoletti's personal knowledge.  *Id.* at 3; *see* also ECF 185 at 16 ("Mr. Bartoletti's statement of his personal recollection is not inconsistent with the documents, which show he was not copied on the emails regarding legal review.").  The government then fought mightily to impede Mr. Jin from presenting the truth in his defense, raising a host of meritless objections to the exclusivity contract emails.  The government argued that Bartoletti lacked personal knowledge of the negotiations (despite eliciting testimony about the subject from Bartoletti to the grand jury and then at trial), that the documents are not relevant to impeach Bartoletti (despite his demonstrably false statements regarding the same), and that, because CTJ is not on trial, CTJ's mental state is irrelevant (despite the obvious implication for Mr. Jin's mental state).  ECF 215 at 2-5.

Bartoletti's testimony also diverged from his prior statements in other material aspects.  For example, Bartoletti testified at trial that he had "reviewed [bills of lading] before" and was "familiar from [his] work as to whose information goes in the [the 'consignee'] box." Tr. 9/22/25 PM at 29.  Yet when he met with the government in 2019, he claimed that he did not know what a "consignee" is and was unfamiliar with bills of lading. 302 at 4.

Bartoletti testified regarding CTJ's cooperation.  Tr. 9/22/25 PM at 51–52. Naturally, he left out that CTJ had sought to enlist a former prosecutor to lie to U.S. banks regarding CTJ's trade with North Korea. *See supra*, Section IV.  As with the rest of Bartoletti's testimony, AUSA Seifert allowed this gap in testimony to go unchallenged.

## X.    THE NEW TRIAL TEAM NEITHER CORRECTS THE FALSE ALLEGATIONS IN THE INDICTMENT, NOR MAKES AN EFFORT TO COMPLY WITH *BRADY*.

Following the mistrial in October 2025, the government appointed a new team to prosecute this case on retrial. The new trial team's cavalier approach to *Brady* obligations, and apparent willingness to tolerate false allegations in the indictment, inspire no confidence that Mr. Jin will receive a fair trial on retrial.

Shortly after appointment, the new trial team stated that it would not "second guess a previously made decision" by the first trial team. ECF 267 at 3 (quoting email from second trial team to defense counsel in response to a *Brady* request). It also characterized a defense motion for *Brady* information as a "fishing expedition." *See* ECF 292 (describing *Brady* motion as "the defendant's third attempt to fish for undercover-related documents").

The record is replete with instances of the first team suppressing *Brady*. *See supra*, Section VIII. The new trial team appears disinclined to correct this suppression, or to fulfil its obligation to independently search for exculpatory evidence. The only new evidence produced by the retrial team is the letter showing that CTJ tried to lie to a bank, which was produced when the defense specifically identified the document withheld. The other instances of the first trial team's suppression of exculpatory evidence remain unaddressed.

Likewise, though the government knows that the indictment contains a number of false allegations, *see supra* Sections VII-A, VII-C, the new trial team appears to have made no plans to correct these false allegations (for example, by obtaining a superseding indictment). Either the government has failed to inform the new trial team of these falsities, or the new trial team is content to proceed with an indictment that contains false allegations.

## ARGUMENT

Given the foregoing course of conduct, a retrial in this case will only continue the steady accumulation of due process violations. Dismissal with prejudice is an appropriate remedy.

## I.    APPLICABLE LAW.

### A.    Remedies for due process violations include dismissal of the indictment with prejudice.

A district court has the authority to impose a range of remedies for due process violations, up to and including dismissal with prejudice. Dismissal with prejudice is an appropriate remedy where the government has systemically violated *Brady* or *Napue*, and "the lingering prejudice of [the] violation has removed all possibility that the defendant could receive a new trial that is fair." *United States v. Pasha*, 797 F.3d 1122, 1138 (D.C. Cir. 2015); *see United States v. Darui*, 614 F.Supp.2d 25, 36 (D.D.C. 2009)(finding dismissal improper remedy "absent government knowledge of Khouj's perjury," but noting that "dismissal of the indictment could be proper remedy for egregious actions by government prosecutors.").

Thus, when "a new trial alone does not cure the prejudice [of a due process violation], more is required." *Pasha*, 797 F.3d at 1138 (citing *California v. Trombetta*, 467 U.S. 479, 486 (1984)); *see also United States v. Chapman*, 524 F.3d 1073, 1084 (9th Cir. 2008) ("A district court may dismiss an indictment on the ground of outrageous government conduct if the conduct amounts to a due process violation.") (citation modified).

Short of dismissal, the court "may require striking evidence, a special jury instruction, or other additional curative measures, [such as exclusion of testimony or limitations on the scope of testimony,] tailored to address persistent prejudice" of the government's due process violations. *Pasha*, 797 F.3d at 1138, 1141.

### B.    Due process is violated by the suppression of favorable evidence and presentation of false testimony.

A *Brady* violation consists of three elements: (1) the evidence is favorable to the defense; (2) the evidence was suppressed by the prosecution; and (3) the evidence is material.  *United States*

*v. Quinn*, 537 F.Supp.2d 99, 108 (D.D.C. 2008) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

"The government commits a *Napue* violation 'when the government introduces false or misleading testimony or allows it to go uncorrected.'" *United States v. Ausby*, 916 F.3d 1089, 1092 (D.C. Cir. 2019) (quoting *United States v. Straker*, 800 F.3d 570, 603 (D.C. Cir. 2015)). The topic of the testimony does not matter: when it comes to *Napue*, "[a] lie is a lie, no matter what its subject." *Glossip v. Oklahoma*, 604 U.S. 226, 249 (2025) (citation omitted). Nor does it generally matter whether the witness knew the testimony was false or misleading. *See United States v. Wilson*, 720 F. Supp. 2d 51, 71 (D.D.C. 2010) (citations omitted).

What matters is the government's state of knowledge. *See Ausby*, 916 F.3d at 1092. The government violates *Napue* if it knew the testimony was false or misleading. *See id.* This knowledge includes imputed knowledge, such as when the government is willfully blind to the facts. *See Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011) ("Willful blindness is as culpable as actual knowledge.") (citation modified) *United States v. Quinn*, 403 F. Supp. 2d 57, 68 n.11 (D.D.C. 2005) ("[T]he law does not permit a defendant deliberately to close his eyes to the obvious and then plead ignorance of such readily ascertainable facts.") (citations and internal quotation marks omitted).

Even a mental state short of knowledge is sufficient for a *Napue* violation. It is enough if the government "should have known" the testimony was false or misleading. *See Ausby*, 916 F.3d at 1092; *United States v. Straker*, 800 F.3d 570, 603 (D.C. Cir. 2015) ("A *Napue* violation occurs when . . . the government knew or should have known.") (citing *United States v. Agurs*, 427 U.S. 97, 102 (1976)).

While the misleading testimony must also be material to violate *Napue*, "[t]his standard is quite easily satisfied." *Id*. at 1093 (citation omitted). "[*Napue's*] materiality standard requires 'the beneficiary of [the] constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Glossip*, 604 U.S. at 246 (2025) (quoting *United States v. Bagley*, 473 U.S. 667, 680, n. 9 (1985)).

### C.  Even in the absence of a due process violation, dismissal may be appropriate where prosecutorial misconduct is egregious.

"A district court can [also] dismiss an indictment under its supervisory powers even if 'the conduct does not rise to the level of a due process violation.'"[11] *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020) (quoting *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991)); *see also United States v. Sutton*, No. CR 21-0598 (PLF), 2024 WL 278070, at *21 (D.D.C. Jan. 25, 2024) ("It is established that 'serious prosecutorial misconduct may so pollute a criminal prosecution as to require dismissal of the indictment or a new trial.'") (first quoting *United States v. McCord*, 509 F.2d 334, 349 (D.C. Cir. 1974); and then citing *United States v. Ring*, 768 F. Supp. 2d 302, 310-12 (D.D.C. 2011)); *United States v. Slough*, 679 F. Supp. 2d 55, 60–61 (D.D.C. 2010) ("Under its supervisory powers, the court may dismiss an indictment with prejudice as a sanction for prosecutorial misconduct.") (citing *United States v. Kojayan*, 8 F.3d 1315, 1325 (9th Cir.1993)); *see also United States v. Rivera-Rivera*, 146 F.4th 59, 80-81 (1st Cir. 2025) ("The

---

[11]    One court in this Circuit has erroneously held that a court may only dismiss an indictment under its supervisory power if a "specific constitutional right of the defendant has been violated." *United States v. Rodriguez*, No. CR 19-224 (TJK), 2023 WL 5740493, at *10 (D.D.C. Sept. 6, 2023) (emphasis omitted) (quoting *United States v. Kelly*, 707 F.2d 1460, 1476 (D.C. Cir. 1983)). But this limit on the court's supervisory powers applies only to dismissal for "the conduct of *federal law enforcement agents*." *See Kelly*, 707 F.2d at 1476 (emphasis added). Indeed, another court in this Circuit has recognized out-of-circuit precedent holding that a court may exercise its supervisory powers to dismiss for prosecutorial misconduct without a due process violation. *See Darui*, 614 F.Supp.2d at 38 (quoting *Barrera-Moreno*, 951 F.2d at 1091).

district court has the power to [dismiss the indictment] when confronted with extreme misconduct and prejudice as a result of delayed disclosure.  Such a remedy might be warranted if the United States Attorney's Office demonstrated a consistent pattern and practice of negligent nondisclosure, resulting in actual prejudice to defendants.")(cleaned up), *cert. denied*,  No. 25-5922 (U.S. Nov. 24, 2025).

"[A] court may dismiss an indictment based upon its inherent authority only if the Government engaged in misconduct, the defendant was prejudiced, and no less severe remedy was available to address the prejudice."  *United States v. Wright*, 913 F.3d 364, 371 (3d Cir. 2019)(collecting cases from the Supreme Court and the First, Fourth, Seventh, and Ninth Circuits).

To justify dismissal, the government's misconduct must be "flagrant."[12]  *See  United States v. Darden*, 688 F.3d 382, 387 (8th Cir. 2012); *United States v. Shelley*, 405 F.3d 1195, 1202 (11th Cir. 2005); *United States v. Fernandez*, 388 F.3d 1199, 1239 (9th Cir. 2004); *United States v. Ahrensfield*, No. 09-CR-3457, 2011 WL 13289665, at *2 (D.N.M. Feb. 25, 2011) (first citing *United States v. Anderson*, 778 F.2d 602 (10th Cir. 1985); and then citing *United States v. Ellis*, 298 Fed. Appx. 752, 755 (10th Cir. 2008)).  "Although flagrant misconduct cannot be [ ] accidental or merely negligent . . . , the misconduct need not be intentional.  Reckless disregard for the prosecution's constitutional obligations is sufficient to give rise to flagrant misconduct."  *Bundy*, 968 F.3d at 1038 (citation modified).

---

[12]    Another judge in this Court previously imputed the standard for law enforcement misconduct into the standard for prosecutorial misconduct, holding that misconduct must be more than "flagrant" and instead involve "coercion, violence or brutality."  *United States v. Jones*, No. CRIM. 05-386ESH, 2007 WL 3287536, at *1 (D.D.C. Nov. 6, 2007) (quoting *Kelly*, 707 F.2d at 1476).  This is erroneous because the coercion standard is for "misconduct on the part of the police."  *See United States v. Williamson*, No. CR 14-151 (RMC), 2014 WL 12695537, at *5 (D.D.C. Oct. 20, 2014) (quoting *Kelly*, 707 F.2d at 1476).

"[N]o lesser remedial action is available" when prosecutorial misconduct plagued grand jury proceedings, *Slough*, 679 F. Supp. 2d at 61 (collecting cases); when misconduct "infected the indictment itself," *Shelley*, 405 F.3d at 1208 n.7 (Tjoflat, J., concurring); or when the government would be advantaged by a new trial, "allowing it to salvage . . . a poorly conducted prosecution," *Bundy*, 968 F.3d at 1038 (citing *Chapman*, 524 F.3d at 1087). "[T]he government should not be permitted 'a chance to try out its case, identify any problem areas, and then correct those problems in a retrial). *Id.* (first quoting *Chapman*, 524 F.3d at 1087; and then quoting *United States v. Shafer*, 987 F.2d 1054, 1059 (4th Cir. 1993)); *see also United States v. Fitzgerald*, 615 F.Supp.2d 1156, 1162 (S.D.Cal 2009) ("Defendant would be prejudiced by a retrial because it will allow the Government to revise its case strategy."); *cf. Tibbs v. Florida*, 457 U.S. 31, 43 n.19 (1982) ("A second chance for the defendant, of course, inevitably affords the prosecutor a second try as well.").

### D. Other remedies that may be imposed for due process violations or to sanction government misconduct.

Even when dismissal is not warranted, the court has a range of remedies it can impose under its supervisory powers. For instance, "[t]he court may limit the witnesses or testimony offered by the government." *Id.* at 1031. It can also offer "curative instruction[s]" to the jury. *See United States v. Shelley*, 405 F.3d 1195, 1207 n.7 (11th Cir. 2005).

## II.    THE COURT SHOULD DISMISS THE INDICTMENT WITH PREJUDICE.

This case is a story of how the government initiated an investigation under erroneous premises, then relied on a lying cooperator that it knew to be unreliable, and finally did everything in its power to hide those errors from the jury, the defense, and the Court.

The Court should dismiss the indictment with prejudice under either the Due Process Clause or its supervisory authority. The government has repeatedly and flagrantly violated due

process, as well as professional standards for prosecutors. The violations were neither inadvertent nor isolated. Mr. Jin has been prejudiced, and a retrial would not cure the prejudice.

**A. The government committed multiple due process violations.**

    **a. The government suppressed exculpatory evidence relating to bills of lading and then knowingly or recklessly presented false testimony in support of a false or misleading allegation.**

The government knew a key allegation in the indictment–that Winney changed the bills of lading in order to evade sanctions–was false or misleading. *See supra*, Section II. Thus, if the bills of lading amounted to proof of anything at all, they would prove only that Lyons understood the implications of including North Korea on a bill of lading. The government employed various means to suppress this information, and then to mislead the jury about it. *See supra*, Sections VIII-A, IX-B, IX-C. The government also presented testimony it knew to be false or misleading through Bartoletti and Anglin, and it did so multiple times. *See supra*, Sections VI-A, VII-A, VII-B, IX-B. This false testimony was a parade of *Napue* violations.

The government used the false testimony to obtain an indictment. Thus, these falsehoods go to the very heart of proceedings against Mr. Jin. Furthermore, the government needed this false testimony to argue at trial that Winney was intentionally concealing its sales to North Korea. Tr. 9/16/25 AM at 134 ("But you'll see that after the United States imposed sanctions on the entire country of North Korea in 2016, the Winney businesses removed Ryugyong's name on these documents and falsely stated instead that the tobacco was only going to China"); Tr. 9/25/25 AM at 8 (referring to changes in the bills of lading); Id. at 28 ("Before 2016, you heard Mr. Anglin tell you he found 90 different transactions that he specifically tied back to a bill of lading that said North Korea. 90. After 2016, after the sanctions go into place, you heard -- oh, we're not going to put North Korea on the documents anymore.); Id. at 37, 43 (arguing that bills of lading were

material to banks); *see also* Tr. 9/24/25 AM at 71 (Zimmerly testimony that altering bills of a lading is a common method for sanctions evasion).

The government's suppression of exculpatory evidence and its presentation of false evidence relating to the bills of lading deprived Mr. Jin of a fair trial. This allegation formed a key pillar of the government's case and was charged in the indictment.  Reliance on this false allegation constitutes a violation of DOJ policy.  *See* U.S. Dep't of Justice, *Justice Manual* § 9-5.001(C)(1) (2024)("A prosecutor must disclose information that is inconsistent with any element of any crime charged against the defendant . . . regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime."); D.D.C. Crim. R. 5.1(b)(1)(requiring disclosure of any "[i]nformation that is inconsistent with or tends to negate the defendant's guilt as to any element"); *cf. United States v. George*, 786 F. Supp. 11, 13–15 (D.D.C. 1991) (finding material Rule 16 information referred to in the indictment).

> **b.   The government recklessly accepted or was willfully blind to CTJ's lies regarding its lack of North Korean business, and sponsored it at the grand jury.**

From almost the very beginning of Bartoletti's interactions with the government, it was apparent that his story was contradictory.  It revealed a pattern of minimizing CTJ's business contacts with North Korea, claiming ignorance, and blaming Winney.

The government knew (or, at best, was willfully blind to) the fact that Bartoletti's claims regarding CTJ's lack of business ties to North Korea were demonstrably false.  *See supra,* Sections I, V; *see also* Section IV (expressing knowledge of CTJ's "extensive historical DPRK business"). Ignoring the evidence that Bartoletti was telling a lie, the government presented Bartoletti's testimony to the grand jury.  *Supra,* Section VI-A.  The government also blithely accepted Bartoletti's incomprehensible testimony that, somehow, an email about CTJ's sales to North Korea

did not show that CTJ sold to North Korea. *Id.* Even if Bartoletti personally believed his statements to be true, which is highly doubtful, the government was at a minimum reckless and willfully blind to the truth: that CTJ had "extensive historical DPRK business."

Nor did Bartoletti confine his testimony to his *personal* knowledge, as the government sought to portray. He repeatedly claimed that "we" (i.e., CTJ) did not know about products going to North Korea until the Spring of 2019. ("*we* learned this, or figured this after the funds were frozen, and my first trip to Washington, when I met with the attorney general.") (emphasis added); *see also id.* at 54 ("Q:...*when did the management of CTJ learn* that Winney was sending CTJ's product to North Korea? A: Right at that time. *We all* learned everything at the same time.") (emphasis added). The government subborned this testimony from Bartoletti with, at minimum, reckless disregard and willful blindness to the truth.

If there was still any doubt that the government knew the falsity of Bartoletti's grand jury testimony, the redactions to his grand jury transcript all but proves it. In the grand jury transcript initially produced by the government, the government redacted not just Baroletti's testimony relating to the bills of lading, but also multiple sections of testimony involving Bartoletti's denial of CTJ's North Korean business. *See supra,* Section VI-B.

The government likewise had evidence that CTJ underreported its North Korea transactions, which is consistent with other instances where CTJ minimized its business relations with North Korea. *Supra,* Section V; *see also* Section I (describing Bartoletti's claim that no one at CTJ knew its products were being shipped to North Korea). Similarly, the government knew that CTJ had misattributed internal CTJ transfers (i.e., when CTJ moves money from one account to another), to Winney. *See supra*, Section I. Such evidence would have called into question the reliability of the records provided by CTJ, and also provided evidence of CTJ's potential motive

41

to falsify records.  *See United v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010)(noting that purpose of the business records exception is to ensure there is "no motive to falsify the record in question."). The government disclosed evidence of neither, in violation of *Brady*.

In sum, the government knew of its cooperator's propensity to fabricate, knowingly sponsored its false testimony in judicial proceedings, and sought to hide it by redacting the relevant evidence.

### c.  Even after CTJ tried to coopt the government to lie to banks, the government continued to reward CTJ while suppressing CTJ's misconduct.

The government's failure to confront CTJ with the many lies told by Bartoletti emboldened CTJ to test the limits of what the government was willing to overlook.  The government imposed no meaningful penalty for CTJ's solicitation of bank fraud, and merely sought a workaround to continue helping CTJ with its banking problems. *See supra*, Section IV.  More than this, the government formally declined prosecution and provided Bartoletti a safe passage letter, never enforcing the requirement that he tell the truth.  *Supra*, Section V.

However, CTJ's brazen request did create a newly inconvenient document that proved its mendacity.  Rather than disclose the document to defense counsel, the government opted to hide it.  The government scrupulously scrubbed the Jencks materials of any reference to CTJ having ever made this request.  And when the government later unredacted the clue that this occurred after extensive litigation over the Jencks redactions, it made the conscious choice to continue hiding the letter, which was an attachment to the very same email chain.  *See supra*, Section VIII-C.  The government continued to suppress the letter for well over a year, and intentionally deprived Mr. Jin of this highly exculpatory evidence at trial.

That suppressed letter vividly and irrefutably illustrated the full extent of the government's willful blindness to CTJ's criminality, and its willingness to look the other way at even the most

egregious conduct in order to win Mr. Jin's conviction, and ultimately its bad faith. *Quinn*, 403 F. Supp. 2d 57, 68 n.11 (D.D.C. 2005) ("[T]he law does not permit a defendant deliberately to close his eyes to the obvious and then plead ignorance of such readily ascertainable facts."); *United States v. Bisong*, 645 F.3d 384, 400 (D.C. Cir. 2011)(willful blindness is "when a defendant 'purposely contrived to avoid learning all the facts,' or the defendant 'was aware of a high probability [of the fact in dispute] and consciously avoided confirming that fact.'").

The suppression of evidence impeaching the credibility of an informant violates *Brady* regardless of whether the informant testifies at trial, so long as the informant provided information relevant to the investigation. *See Kyles v. Whitley*, 514 U.S. 419, 445 (1995)(suppression of contradictory statements by informant violated *Brady* where, although informant did not testify, he was "essential to [the] investigation and…'made the case' against Kyles."); *see also United States v. Quinn*, 537 F. Supp. 2d 99, 116 (finding *Brady* violation where government suppressed impeaching information about informant who did not testify). CTJ was not merely essential to the government's investigation. Its representative, Bartoletti, is viewed by the government as an "essential witness." ECF 275 at 2. The government's suppression of information that cast doubt on CTJ's credibility is another instance of its deliberate violation of due process. *See Justice Manual* § 9-5.001(C)(2) ("A prosecutor must disclose information that either casts a substantial doubt upon the accuracy of any evidence—including but not limited to witness testimony.")

### d. The government presents false allegations relating to Carbuncle and Fully Max, then silently retracts those allegations without notice to Mr. Jin.

While turning a blind eye to CTJ's repeated denials of its own North Korean business, the government was eager to pin any transactions between CTJ and North Korea on Winney. Thus, the complaint and the indictment both alleged that payments CTJ received from Carbuncle and Fully Max (two companies alleged to be front companies with ties to North Korea), were payments

that North Korea made for Winney's purchases of tobacco.   The government had no evidence that they were, had plenty of evidence that they were not, and knew it.  *See supra*, Section VII-A.  The government all but admitted as much when it surreptitiously removed those transactions from a trial exhibit.  *See supra*, Section IX-A.  Perhaps what motivated the government to effectuate this change was defense counsel's proffer to the Court earlier that day of its planned cross-examination of Anglin, in which the defense stated: "the focus of the cross-examination will just be about the conclusions that he drew…and the methodologies that he used…you know, 'garbage in, garbage out' type of scenario."  Tr. 9/18/25 AM at 29.

The government was right to be worried. The fact that FoA Anglin unquestioningly added the Carbuncle and Fully Max transactions to the complaint at AUSA Seifert's suggestion, when he was supposed to be the expert, was certainly impeaching.  It demonstrated a lack of independent judgment and an eagerness to please the prosecution. The involvement of AUSA Seifert added another level of impeachment, considering that the same prosecutor had just conducted the direct examination of the same supposed expert.   Yet that impeachment was incomplete without the government's acknowledgement that it had erred.  *See Quinn*, 537 F. Supp. 2d at 115.

Under *Brady*,  furtive "disclosures" of favorable evidence are no better than suppression. In *Nejad*, the district court found a *Brady* violation where the prosecution discovered a letter that the bank had sent to OFAC which supported the defense theory, and decided to produce the letter "burying" it in other evidence it produced at the same time, in hopes that the defense would not notice it.  *See United States v. Nejad*, 487 F. Supp. 3d 206, 225 (S.D.N.Y. 2020); *Justice Manual* § 9-5.001(B)(1) ("[T]his policy encourages prosecutors to err on the side of disclosure.")  The Court in that case found the government's conduct troubling, and a violation of *Brady*.   The conduct in this case is indistinguishable.

44

### e. The government knowingly or recklessly presented false testimony from Bartoletti relating to the exclusivity contract.

From his first meeting with the government, but especially by 2022, the government (at least) should have known that Bartoletti's claims regarding the exclusivity contract were directly contradicted by a small mountain of records. Turning a blind eye to the patent contradictions, the government presented Bartoletti's testimony on the subject to the grand jury. Rather than attempt to correct Bartoletti's misstatements, the government endorsed them, violating DOJ guidance in the process. *See supra*, Section VI-A; *Justice Manual* § 9-11.233 ("[W]hen a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence that directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person.")

And after knowingly presenting the false testimony to the grand jury, the government did so again at trial. There, again in response to the questioning of AUSA Seifert, Bartoletti falsely testified that the exclusivity contract "didn't go forward," Tr. 9/23/25 AM at 56, because negotiations were done in anticipation of sanctions being lifted. Tr. 9/23/25 AM at 58; Tr. 9/23/25 PM at 49. The government then fought to keep this falsehood from the jury. *See supra*, Section IX-C.

Even if, as this Court previously found, Bartoletti lacked personal knowledge of the subject, *see* ECF No. 193, at 6-7, a due process violation depends not on what Bartoletti knew, but on what the government knew or should have known. *See Ausby*, 916 F.3d at 1092. It certainly knew that Bartoletti's testimony regarding the exclusivity contract was false, but knowledge is not even required. Recklessness, or being willfully blind to the truth, is sufficient for a *Napue* violation. That is amply demonstrated here. Contrary to Bartoletti's testimony, contemporaneous CTJ emails and multiple drafts of the contract itself showed that it was reviewed and approved by

45

CTJ's board and lawyers, with the only condition being that Winney commit to a "minimum volume" of sales. *See supra*, Section VI-A. The language regarding sanctions reflected that any concern about sanctions was focused on sanctions being imposed in the future, with the clear implication that the parties did not believe any sanctions to apply at the time of drafting. And though the negotiations ultimately did not result in an agreement, throughout this process there was never an email from CTJ wherein it indicated that it believed the proposed agreement would violate sanctions.

The government's presentation of testimony with reckless disregard or willful blindness for the truth is as much a violation of *Napue* as the knowing presentation of false testimony. It is enough if the government "should have known" the testimony was false or misleading. *See Ausby*, 916 F.3d at 1092; *United States v. Straker*, 800 F.3d 570, 603 (D.C. Cir. 2015) ("A *Napue* violation occurs when . . . the government knew or should have known.") (citing *United States v. Agurs*, 427 U.S. 97, 102 (1976)). Likewise, willful blindness is the equivalent of actual knowledge.

Both reckless disregard for the truth and willful blindness were on full display when the government sponsored Bartoletti's testimony. After all, Bartoletti's prior false testimony on the exclusivity contract was the subject of a detailed motion to dismiss, in which defense counsel carefully pointed out each lie and the evidence contradicting them. *See* ECF 181 at 11. Despite having notice of the many lies from Bartoletti, the government deliberately closed its eyes and contrived to avoid the truth. That is willful blindness. *Bisong*, 645 F.3d 384, 400 (willful blindness is "when a defendant 'purposely contrived to avoid learning all the facts,' or the defendant 'was aware of a high probability [of the fact in dispute] and consciously avoided confirming that fact.'").

Thus, even if the Court finds that the government did not have actual knowledge of the falsity of Bartoletti's testimony, at a minimum, the government knew or should have known that

Bartoletti's testimony regarding the exclusivity contract was false.  That is sufficient for a *Napue*

violation.

> **f.  The government continually suppressed favorable evidence and presented false testimony in other matters.**

The government also redacted documents produced under the Jencks Act to remove any

statements that would have undermined the thoroughness and good faith of its investigation.  *See*

*Kyles v. Whitley*, 514 U.S. 419, 445 (1995); *Quinn*, 537 F. Supp. 2d at 115.  These include

redactions to internal communications that revealed errors in HSI's reporting of the undercover

operation, and a failure to retain emails about blocked transactions.  *Supra*, Section VIII-D.  The

thoroughness and good faith of the government's investigation are favorable facts which should

have been produced.  *See Quinn*, 537 F. Supp. 2d at 115; *United States v. Bagcho*, 151 F. Supp.

3d 60, 70 (D.D.C. 2015), *aff'd*, 923 F.3d 1131 (D.C. Cir. 2019).

Finally, the government allowed Bartoletti to misrepresent CTJ's cooperation agreement.

Though he testified at length about CTJ's decision to cooperate with the government, *see, e.g.*, Tr.

9/22/25 PM at 51–52, at no point did he mention the fact that CTJ tried to coopt the government

into lying to banks on its behalf.  Even if he did not lie about CTJ's cooperation agreement, his

misleading omission is enough to violate *Napue*.  *See Welch v. Johnson*, 934 F. Supp. 1417, 1435

(E.D. Tex. 1996), *rev'd on other grounds sub nom. Cockrum v. Johnson*, 119 F.3d 297 (5th Cir.

1997) (collecting cases) (noting that testimony violates *Napue* when it misrepresents a cooperation

agreement).

> **g.  The government's *Brady* suppressions continue even while the parties prepare for retrial.**

Remarkably, the government continues to suppress exculpatory evidence even now.  The

government has not disclosed many important items of evidence that have been highlighted in this

motion, many of which are certain to exist.  For example, the government has not disclosed any follow-up communications between the government and CTJ regarding its request to lie to banks, even though the government evidently must have at least communicated to CTJ regarding its intended disposition for the letter.  Likewise, the government has not disclosed any information regarding the nature of the reporting error that Anglin identified, even though Anglin had stated that he sent an email about the error to HSI.   In response to a defense request for this information, the government has claimed that it has "no responsive information," without clarification of the circumstances for why there is no responsive information.   The government's continued suppression of *Brady* is the subject of pending motions to compel, but also factors into the Court's determination of whether the due process violations in this case are sufficiently flagrant to warrant dismissal.

The government likewise continues to act as if "there's nothing to see here" as to CTJ and Bartoletti's persistent malfeasance, and its own willful blindness to it.  More than this, the government continues to endorse CTJ's documents and Bartoletti's testimony as reliable, even as it claims that his limited knowledge is the reason his testimony cannot be squared with the evidence his own company has provided.

### h.  The government's violations must be considered cumulatively.

The due process violations in this case consist of the government's repeated and pervasive suppression of favorable evidence, and its presentation of false testimony at trial.  The government engaged in this conduct knowingly, or at least recklessly and with willful blindness to the truth.  Any violation, standing alone, is sufficient to warrant dismissal with prejudice.  But the Court must consider these violations cumulatively.  *See United States v. Conrad*, 320 F.3d 851, 856 (8th Cir. 2003)(finding that cumulative effect of multiple improper comments by the prosecutor

48

"substantially impaired the defendant's right to a fair trial."); *United States v. Moore*, 651 F.3d 30, 62 (D.C. Cir. 2011)(considering cumulative effect of prosecutorial misconduct); *United States v. Jones*, 482 F.2d 747, 755 (D.C. Cir. 1973)(same); *Parle v. Runnels,* 505 F.3d 922, 927 (9th Cir. 2007)("The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal."); *Justice Manual*, § 9-5.001(C)(4) ("While items of information viewed in isolation may not reasonably be seen as meeting the standards [requiring disclosure] several items together can have such an effect. If this is the case, all such items must be disclosed.").

### B.  The government's misconduct was flagrant.

Again, flagrant misconduct does not need to be intentional.  Even "'[r]eckless disregard for the prosecution's constitutional obligations' is sufficient to give rise to flagrant misconduct." *Bundy*, 968 F.3d at 1038 (quoting *Chapman*, 524 F.3d at 1085).  Nor does flagrant misconduct need to rise to the level of "professional misconduct."  *Bundy*, 968 F.3d at 1042 n.9.  Due process violations, even if they stem from prosecutors' "misjudgments," are enough.  *See id*.

In *Chapman*, the Ninth Circuit held that prosecutors' reckless behavior constituted flagrant misconduct.  *See* 524 F.3d at 1085.  There, the misbehavior consisted of the prosecution's "failure to produce documents and to record what had or had not been disclosed, along with the affirmative misrepresentations to the court of full compliance."  *Id.*  This was sufficient to support a finding of "flagrant" misconduct "even if the documents themselves were not intentionally withheld from the defense."  *Id*.

The violations in *Chapman* are mild compared to those in this case.  A brief recap of the government's violations make this clear: The government suppressed favorable information about the bills of lading and then sponsored misleading testimony on the topic, at both the grand jury

and at trial, through both Anglin and Bartoletti.  *See supra*, Section II.A.a.  It failed to correct

Bartoletti's misleading testimony at the grand jury and at trial about the exclusivity contract and

about CTJ's knowledge that it was doing business in North Korea.  *See supra*, Section II.A.b;

Section II.A.e.  And when it produced transcripts of Bartoletti's grand jury testimony, it redacted

the portions showing it sponsored this misleading testimony.  *See supra*, Section II.A.b.  It

suppressed a letter showing that its chief cooperator asked the government to lie to banks on its

behalf.  *See supra*, Section II.A.c.  It included unsubstantiated allegations in the complaint and

indictment, and at the last minute, removed evidence of those allegations.  *See supra*, Section

II.A.d.  It heavily redacted the documents it produced under the Jencks Act, obscuring mistakes in

the undercover investigation.  *See supra*, Section II.A.f.  And it continues to suppress

documentation of that investigation.  *See supra*, Section VIII.B.

 These violations do not stand in isolation.  Each instance of misconduct fed into the next,

amplifying the violations' force.  For example, the government's suppression of favorable

evidence about the bills of lading prevented the defense from effectively challenging the allegation

at trial, where witnesses falsely testified that Winney changed the bills of lading.  Likewise, the

government's suppression of the Peralta letter–evidence that CTJ tried to induce the government

to tell a lie to banks–deprived the defense of powerful evidence impeaching not just the credibility

of CTJ, but also attacking the thoroughness and good faith of the investigation.  Again, the

government's misconduct, and the flagrancy of that misconduct, was cumulative.  *See Moore*, 651

F.3d 30, 62

 Many of these violations were intentional, if not at least reckless.  When Bartoletti and

Anglin implied, at the grand jury and at trial, that Winney changed the bills of lading on its own,

the government was aware of that fact.  AUSA Seifert corresponded with Anglin about the call

revealing this information years earlier.  And when Bartoletti misleadingly testified at the grand jury and trial about the exclusivity contract, the government possessed documents contradicting his testimony; in fact, prosecutors had confronted Bartoletti with some of those documents in prior meetings.  With these documents in hand, the government likely knew it was committing these *Napue* violations, or at least should have.

The government's suppression of *Brady* material likewise appears intentional, if not incredibly reckless.  Otherwise, it is difficult to explain the government's repeated suppression of the same information.  Take the Peralta letter.  The government first produced a highly redacted email exchange, with only the sentence: "They have extensive DPRK business." [Exhibit - Anglin emails 5 final at 33].  It then produced the full email exchange, but withheld the attached letter.  Only last month did it produce the letter itself, in which CTJ asked the government to lie on its behalf.  *See supra*, Section I.C. Or take the 2019 call about CTJ's instruction to change the bills of lading.  The government first produced all calls but that one, and then produced the call, but not the translation it had had since 2019.  The government has still not produced the source for the information on the call.  *See supra*, Section VII.A.  Or take the unsubstantiated allegations linking Winney to the front company Carbuncle.  Though no data linked the two companies, AUSA Seifert pressed Anglin to include the transactions in the criminal complaint, presented them to the grand jury, included them in the indictment, and then removed them minutes before Anglin's testimony, without informing the defense.  *See supra*, Section IX.A.  That the government withheld the same information over the life of the case suggests it knew what it was doing.

The government's faulty record-keeping practices show that if these violations weren't intentional, they were at least reckless.  For example, the current trial team averred that it wasn't sure whether it had ever had the Peralta letter.  *See* Exhibit 54 - Email from C. Magnani to E.

Gorokhov dated 2/16/26. ("I haven't been able to find it (or even confirm whether there actually was an attachment)."). Nor was it sure whether Anglin, who was on the original email chain between AUSA Grady and CTJ's attorney, would still have retained a copy of the letter. *See id.* The new trial team thus failed to keep track of *Brady* information or to undertake a meaningful search, if any at all.

The government's faulty record keeping goes beyond this one item. Anglin himself noted to a prosecutor that the DOJ did not retain emails about blocked financial transactions after prosecutors left the DOJ for other jobs. Exhibit 47 ("Any missing documents from internal emails about blocked or questioned transactions would have belonged to employees that no longer work for the Department of Justice and are therefore unavailable."). The government was thus aware of its administrative shortcomings and let them continue, recklessly obscuring potential *Brady* material in the process. These failures in record keeping amount to flagrant misconduct. *See Chapman*, 524 F.3d at 1085.

In sponsoring misleading testimony and suppressing favorable information, the government has violated not just the due process clause, but also professional standards, making its misconduct all the more flagrant. *See Bundy*, 968 F.3d at 1042 n.9. Its violations of *Napue* amount to violations of DOJ guidelines, as well as local rules. *See* U.S. Dep't of Justice, *Justice Manual* § 9-5.001(C)(2) (2024) ("A prosecutor must disclose information that either casts a substantial doubt upon the accuracy of any evidence–including but not limited to witness testimony."); D.D.C. Crim. R. 5.1(b)(4) (requiring prosecutors to disclose "[i]nformation that casts doubt on the credibility or accuracy of any evidence, including witness testimony"). Its violations of *Brady* also violate local rules, *see* D.D.C. Crim. R. 5.1(a)-(b), and a slew of DOJ guidance. *See Justice Manual* § 9-11.233 (disclosure of exculpatory information to grand jury); *see id.* § 9-

5.001(C)(1) (disclosure of exculpatory information that undermines charges); *see id.* § 9-5.001(C)(4) (disclosure of cumulatively exculpatory information).

Confronted with similar circumstances, courts in other jurisdictions have found the requisite flagrant misconduct to justify dismissal with prejudice. *See United States v. Govey*, 284. Supp. 3d 1054, 1062, 1064 (C.D. Cal. 2018)(dismissing with prejudice where government acted with "blatant indifference and reckless disregard" by belated disclosure of 100,000 pages of documents); *United States v. Aguilar*, 831 F.Supp.2d 1180, 1181 (C.D. Cal 2011)(dismissing with prejudice where among other things, "the Government team allowed a key FBI agent to testify untruthfully before the grand jury, inserted material falsehoods into affidavits submitted to magistrate judges in support of applications for search warrants and seizure warrants…recklessly failed to comply with its discovery obligations…and even made misrepresentations to the court.").

In sum, the government knew of, or at least should have known of, documents contradicting Bartoletti's and Anglin's testimony.  It suppressed favorable information, seemingly on purpose, given it repeatedly suppressed the same information, or at least recklessly, given its poor record keeping.  These intentional or reckless violations of due process–which also constitute violations of DOJ professional guidelines–amount to flagrant misconduct.

### C.  Only dismissal will cure the prejudice to Mr. Jin.

Mr. Jin was prejudiced by the government's flagrant misconduct.  The government turned a blind eye to evidence that contradicted its case, took substantial steps to bury the facts that contradicted its case, and then presented false and misleading testimony at trial while impeding Mr. Jin's attempts to defend himself.  These violations were not the result of an oversight.  Rather, they were the result of persistent efforts to suppress the truth and obtain a conviction at all costs.  Still, six jurors rejected every single count against Mr. Jin.  On these facts, the Court should dismiss

the indictment with prejudice.  Mr. Jin should not be put through a second trial when he almost certainly would have prevailed in his first trial had he been able to defend himself with the benefit of the due process rights to which he is entitled.  Even setting aside the interrelated and compounding due process violations to which he was subjected, and continues to be subjected, the Court should not permit the government to get a second bite at the apple in these circumstances as a matter of the Court's inherent power to see justice done.

One reason why a retrial would be prejudicial is that it gives the government an unfair opportunity to shore up weaknesses in its case.  In *Chapman*, the Ninth Circuit upheld a dismissal after the prosecutor recklessly withheld documents the defense could have used to impeach several government witnesses.  524 F.3d at 1078-79, 1084-88.  Core to the court's analysis was its concern that "were [the case] to be retried," rather than dismissed, "the government and its witnesses [would] not make that mistake again."  *Id*. at 1087.  The government would have "a chance to try out its case, identify any problem areas, and then correct those problems in a retrial."  *Id*. (citation modified).

Here, as in *Chapman*, retrial would grant the government the same advantage by preparing for evidence impeaching CTJ, Bartoletti, and Anglin.  The government could, for example, explain away Bartoletti's misunderstanding of the exclusivity contract or adjust its theory of the case to account for the fact that CTJ instructed Winney to change the bills of lading.  It should not be afforded this advantage, which is the direct result of its persistent *Brady* and *Napue* violations.  *See id*. ("[Retrial is] an advantage the government should not be permitted to enjoy.").

A separate consideration for prejudice is the weakness of the government's case.  As the Ninth Circuit has explained: "[An] important factor contributing to the prejudicial effect of improper statements is the strength of the case against a defendant.  When a case is particularly

54

strong, the likelihood that prosecutorial misconduct will affect the defendant's substantial rights is lessened because the jury's deliberations are less apt to be influenced.  But as the case becomes progressively weaker, the possibility of prejudicial effect grows correspondingly."  *United States v. Weatherspoon*, 410 F.3d 142, 1151 (9th Cir. 2005); *see also United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996)("In those cases where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors.")

Applying these principles, the district court found prejudicial misconduct in *United States v. Aguilar*, 831 F.Supp. 2d 1180 (C.D.Cal. 2011), where on the issue of knowledge and intent, "[t]here were no oral admissions (secretly recorded or otherwise); no writings acknowledging the payments were corrupt; no evidence of furtive conduct…[and] [t]he circumstantial evidence, at best, was murky."  *Id.*  The evidence found to be "murky" in *Aguilar* exactly describes this case, where, during the undercover meeting on July 11, 2019, Mr. Jin repeatedly stated that business must be done in accordance with the law.  Exhibit 13.

Some Courts have also found prejudice where the government's *Brady* violation delayed the defendant's day in court.  *See United States v. Govey*, 284 F.Supp. 3d 1054, 1063 (C.D. Cal 2018)(finding that defendant suffered "substantial prejudice" due to government's late disclosure of "almost 100,000 documents" because it would require continuing the trial beyond the Speedy Trial Act deadline for defense counsel to review those documents, and dismissing with prejudice.).  Here, Mr. Jin has to endure a trial more than three years after his arrest resulting, in large part, to the government's misconduct in the years leading up to, and including, his first trial.

In the context of voluntary dismissals under Rule 48, this Court has also observed that a dismissal should be with prejudice when "reprosecution would go against the concept of fundamental fairness.  Relevant considerations include the strain on the defendant, [the presence

of] multiple mistrials, that retrials tend to be unsatisfactory, that witnesses are subjected to repeated inconvenience…[and] the urgency of more significant court business." *United States v. Karake*, 02-CR-256-ESH, 2007 WL 8045732 (D.D.C. Feb. 7, 2007)(internal quotations omitted). Echoing these concerns, this Court previously barred retrial after two mistrials from deadlocked juries, finding that the government's interest in a third trial is outweighed by the "strain on defendant, burden on…defense counsel, the inconvenience to [witnesses] and the urgency of [] more significant court business.")(internal quotations omitted). *United States v. Ingram*, 412 F. Supp. 384, 386 (D.D.C. 1976); *see also United States v. Wqas Khan*, 2:10-CR-175 KJM, 2014 WL 1330681 (E.D.Cal. April 1, 2014)(observing that "under its inherent authority a court may act to effectuate, as far as possible, the speedy and orderly administration of justice and to ensure fundamental fairness" by dismissing with prejudice "when the government has not been able to secure a conviction following multiple trials.")(citing *United States v. Rossoff*, 806 F. Supp. 200, 202 (C.D.Ill. 1992) *and United States v. Ingram*, 412 F.Supp. 384, 385-86 (D.D.C. 1976)).

The government's due process violations detailed in this motion contributed to the mistrial. Given the government's flagrant misconduct, fundamental fairness also demands dismissal with prejudice.

Finally, the "lingering prejudice" of the government's due process violations would rob Mr. Jin of "all possibility" of "receiv[ing] a new trial that is fair." *Pasha*, 797 F.3d at 1138. This too calls for dismissal with prejudice. The government has still not produced documentation from its undercover investigation into Winney, including the source of Agent Tarango's information that CTJ controlled the bills of lading. This *Brady* violation alone would significantly impair Mr. Jin and his ability to mount a defense. In addition, the government has admitted it deleted relevant communications but has not specified  the full extent of the spoliation.

56

III.    ALTERNATIVE REMEDIES TO DISMISSAL.

Even if this Court finds that dismissal is not warranted, it must consider other remedies. *Chapman*, 524 F.3d at 1083 ("The record demonstrates that the district judge understood, and considered, a wide range of alternative remedies."). Such measures should be "not only corrective, but [ ] also highly deterrent." *Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 255 (3d Cir. 2005) (considering sanctions for willful misconduct). "The intentional character of the government's misconduct affects the appropriate remedy." *Id.* "[A] pattern of recurring violations . . . might warrant the imposition of a more extreme remedy in order to deter further lawlessness." *Id.* (quoting *United States v. Morrison*, 449 U.S. 361, 365 n.2 (1981)).

One alternative to dismissal is exclusion of testimony. *See, e.g.*, *United States v. Cloud*, 590 F. Supp. 3d 1364, 1372-73 (E.D. Wash. 2022) (excluding testimony of witness, and ordering costs and legal fees against government, because government suppressed evidence that witness would testify in exchange for benefits), *aff'd*, 102 F.4th 968 (9th Cir. 2024). This Court may, and should, consider excluding any evidence subject to, or related to, the government's due process violations. In *Pasha*, for example, the D.C. Circuit concluded that an appropriate remedy for the government's *Brady* violations may include entirely precluding any testimony regarding the defendant's presence at an allegedly incriminating event, or alternatively, precluding cross-examination of a defense witness. 797 F.3d at 1140-41 ("[T]he district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.") Here, the Court may properly exclude the testimony of Bartoletti and Anglin as a sanction for the government's repeated *Brady* and *Napue* violations with these two witnesses.

This Court may also consider excluding documents. The recurring theme behind the government's *Brady* and *Napue* violations is, in effect, sponsoring CTJ's lies while suppressing

evidence that would undercut the credibility of CTJ. An appropriate remedy short of dismissal may be to exclude all records obtained from CTJ, and to preclude any testimony based on information furnished by CTJ. This is justified given the government's pattern of suppressing exculpatory and impeaching evidence related to CTJ. *See United States v. Struckman*, 611 F.3d 560, 571 (9th Cir. 2010) (affirming district court's decision to "exclude[] evidence attributed to [informant], preclude[] [another informant] from appearing as a witness at trial . . . require[] the government to assure that the evidence produced at trial was not derived from suppressed evidence.") (internal quotation marks omitted); *United States v. Frazier*, 203 F. Supp. 3d 1128, 1134 (W.D. Wash. 2016) ("[T]he proper remedy here is exclusion and suppression of all evidence derived from [the government's informant].").

The Court should also consider excluding all evidence obtained from the government's undercover investigation into Winney. These remedies are especially warranted given that the government continues to suppress information and documentation related to the undercover operation. Further, such remedy is appropriate given the government's efforts to preclude the defense from introducing any of the exculpatory evidence developed through its undercover investigation.

The Court should consider adverse inference instructions. Such instructions should caution the jury to treat Bartoletti and Anglin skeptically. *See* Exhibit 55 - Order regarding Testimony in *United States v. W.R. Grace*, 9:05-CR-07, ECF 1147 (D. Mont. Apr. 28, 2009) at 12-13 (striking prosecution witness's testimony as to one defendant, and instructing jury to "view [the witness's] entire testimony with skepticism" as to remaining defendants.); Exhibit 56 - Special Jury Instruction in *United States v. W.R. Grace*, 9:05-CR-07, ECF 1150 (D. Mont. Apr. 28, 2009) (Instructing jury that "[i]n this case, the Department of Justice and the United States Attorney's

Office have violated their constitutional obligations to the defendants . . . The suppression by the prosecution of evidence favorable to an accused violates the due process of the law…[striking testimony as to one defendant and instructing that as to remaining defendants the jury should] examine [the witness's] entire testimony with great skepticism. . . . In evaluating his testimony you should consider the bias that he has displayed toward W.R. Grace, his relationship with the prosecution team and the extent to which those matters may have influenced his testimony.").

The Court should also give an adverse inference instruction about the undercover investigation, as the government has failed to provide the source of the exculpatory information that CTJ directed the changes to the bills of lading. *See Zhi Chen v. District of Columbia*, 839 F. Supp. 2d 7, 15 (D.D.C. 2011) (issuing adverse inference instruction when party failed to preserve evidence).

Finally, the Court should order the disclosure of all evidence, in unredacted form, that was previously redacted. The government's redactions have been a source of mischief, concealing much of the favorable evidence that was withheld in this case. And while the Court has previously reviewed the unredacted version of the government's productions *in camera*, that proved inadequate in the face of the government's determined resistance to comply with *Brady*.

Finally, if the Court does not dismiss based on the misconduct set forth in this motion, the Court should hold an evidentiary hearing to (1) determine what steps, if any, the government has taken to comply with its disclosure obligations, (2) to determine the facts and circumstances of the government's due process violations, which would shed further light on the seriousness of the government's misconduct, and (3) determine the full extent to which those due process violations have infected and continue to infect this case. There is more than ample basis in the record to require such a hearing. *See, e.g.*, *United States v. Koubriti*, 297 F. Supp. 2d 955, 958 (E.D. Mich.

2004) (ordering an evidentiary hearing based on just one suppressed document); ECF 276–Motion to Compel Production of *Brady* and for an Evidentiary Hearing, at 14-22 (and authorities cited therein).

## CONCLUSION

For all of the foregoing reasons, the Court should dismiss the indictment with prejudice. In the alternative, the Court to impose the remedies set forth in the Motion, and hold an evidentiary hearing.

Respectfully submitted,

By: /s/ Eugene Gorokhov
Eugene Gorokhov, Esq.
D.C. Bar No. 979785
Burnham & Gorokhov, PLLC
1634 I Street NW, Suite 575
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com

## CERTIFICATE OF SERVICE

A copy of the foregoing motion was filed via ECF, which automatically sends a copy to all counsel of record.

Respectfully submitted,
By: /s/ Eugene Gorokhov
Eugene Gorokhov, Esq.
D.C. Bar No. 979785
Burnham & Gorokhov, PLLC
1634 I Street NW, Suite 575
Washington, D.C. 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com