**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | } | |
| | } | |
| **v.** | } | **Criminal No. 23-CR-91-CKK** |
| | } | |
| **GUANGHUA JIN,** | } | |
| | } | |
| **Defendant.** | } | |
| | } | |
| _____ | } | |

**DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION
TO DEFENDANT'S MOTIONS ECF 329, 330, 331**

Defendant Guanghua Jin, through counsel, respectfully submits this Reply to the government's Opposition to the Defendant's pending motions, ECF 329, 330 and 331.

**ARGUMENT**

**I.    THE GOVERNMENT HAS NOT ADVANCED A LEGITIMATE BASIS FOR PROCEEDING *EX PARTE* IN RESPONSE TO THE COURT'S ORDER**

The government does not contend that the omitted material must be kept secret for reasons of law enforcement or national security. Its only ground for proceeding ex parte is, in its words: "because the government does not believe the information in the filing was discoverable." ECF 333 at 2. In other words, so long as a filing implicates non-discoverable information, the government seems to say, then it is proper to engage in *ex parte* contact with the Court. That is a misreading of Rule 16.

Rule 16 permits a district court to "restrict" or "deny" discovery for good cause, and permits, but does not require, a Court to review a party's submission establishing good cause *ex parte*. But Rule 16 itself does not define "good cause," and the government seems to read "good cause" as meaning: whenever information is not subject to discovery. That is a misreading of Rule 16. "Good cause" is not synonymous with "not subject to discovery." For example, Mr. Jin would

not be entitled to discover the brand of coffee that the prosecutor drinks every morning, because this information would not be "material to his defense."  But that does not mean that the government should be entitled to submit information about the prosecutor's morning Joe in an *ex parte* filing.

Instead, "good cause" in this context must mean information protected by a rule of privilege.  This is confirmed both by common sense and by the principle that "*[e]x parte* communications between a district court and the prosecution in a criminal case are greatly discouraged, and should only be permitted in the rarest of circumstances." *United States v. Rezaq*, 899 F. Supp. 697, 707 (D.D.C. 1995); *see also, e.g.*, *Chekkouri v. Obama*, 158 F. Supp. 3d 4, 5-6 (D.D.C. 2016)("*Ex parte* submissions 'generally are disfavored because they conflict with a fundamental precept of our system of justice: a fair hearing requires a reasonable opportunity to know the claims of the opposing party and to meet them.'" (quoting *United States v. Microsoft Corp.*, 56 F.3d 1448, 1464 (D.C. Cir. 1995)).  Although permitted by Rule 16, "*[e]x parte* proceedings are generally disfavored, even when the federal rules expressly permit them." *United States v. George*, 786 F. Supp. 11, 16 (D.D.C. 1991). Furthermore, motions to submit *ex parte* "must be served on the defendant and then litigated in an adversarial hearing before this court." *Rezaq*, 899 F. Supp. at 707. Indeed, even when information is classified – which the government does not contend is the case – a pretrial conference is required. 18 U.S.C. app. 3 § 2. After violating this procedure, the government now asks the Court to bless its violation, without even explaining why.

"Exceptions to [the prohibition on *ex parte* submissions] 'are both few and tightly contained.'" *Chekkouri*, 158 F. Supp. 3d at 6 (quoting *Abourezk v. Reagan*, 785 F.2d 1043, 1061 (D.C. Cir. 1986)).  The government asserts that *ex parte* submissions may be necessary to protect

grand jury materials, taxpayer information, or "sensitive non-classified information that is not protected by rule or statute," ECF 333 at 2, but does not explain which are supposedly at issue here. The government's own case law makes clear that withholding information requires a compelling justification. *See United States v. Concord Mgmt. & Consulting, LLC*, 404 F. Supp. 3d 67, 75 (D.D.C. 2019)("It is well established that protective orders are appropriate where the disclosure of discovery could jeopardize the national security of the United States, compromise an ongoing investigation, or infringe on the privacy of uncharged third parties and others associated with a case."); *United States v. Innamorati*, 996 F.2d 456, 487 (1st Cir. 1993) ("Outside of emergencies,  the *ex parte* submission of information from a party to the court and the court's ruling on that information without notice to or participation of the opposing party is fundamentally at odds with our traditions of jurisprudence, and can be justified only in the most extraordinary circumstances." (citations omitted)).

"[T]he Supreme Court has generally recognized that evidentiary privileges must be construed narrowly because they impede the search for truth. The party asserting the privilege generally bears the burden of proof as to the propriety of its application." *United States v. Wey*, 252 F. Supp. 3d 237, 252 (S.D.N.Y. 2017); *see Chekkouri*, 158 F. Supp. 3d at 6 ("The government has not demonstrated a 'compelling national security concern' sufficient to justify protecting the information from limited disclosure to petitioner's counsel."); *United States v. Matish*, 193 F. Supp. 3d at 597 ("Courts agree that the party asserting the law enforcement privilege bears the burden of showing that the privilege applies."). When the government does not even assert the grounds for privilege, it cannot meet that burden. *See, e.g.*, *Wey*, 252 F. Supp. 3d at 252 (rejecting application of law enforcement privilege where the party asserting privilege "has not even attempted to make an evidentiary showing of its need to invoke any privilege with respect to the

3

materials at issue. It has submitted no supporting affidavits or other competent proof, instead relying entirely on *ipse dixit* assertions—all by counsel . . . .”).

If the government has asserted such privileges in its *ex parte* filings, it must meet strict procedural requirements to do so. Invocation of the law enforcement privilege requires the following showing:

> (1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege.

*Buzzfeed, Inc. v. U.S. Dep't of Justice*, 318 F. Supp. 3d 347, 361 (D.D.C. 2018) (quoting *In re Sealed Case*, 856 F.2d 268, 271 (D.D.C. 2018). Invocation of the national security privilege requires “the Government must make “a ‘formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer.’” *J.G.G. v. Trump*, 775 F. Supp. 3d 375, 377 (D.D.C. 2025)(quoting *United States v. Reynolds*, 345 U.S. 1, 7-8 (1953)).

Even assuming that the government has met those requirements, the Court may not simply take the government's word that the materials are privileged. If it invokes the national security privilege, “this Court is obligated to determine whether the circumstances are appropriate for the claim of privilege, because judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers.” *J.G.G.*, 775 F. Supp. 3d at 378 (cleaned up)(quoting *Reynolds*, 346 U.S. at 8-10). The government must show “a reasonable danger that compulsion of the evidence will expose *military matters* which, in the interest of national security, should not be divulged.” *Reynolds*, 345 U.S. at 10 (emphasis added).

As for the law enforcement privilege, the government must show that the documents contain information that the law enforcement privilege is intended to protect, which includes information pertaining to law enforcement techniques and procedures, information that would undermine the confidentiality of sources, information that would endanger witness and law enforcement personnel or the privacy of individuals involved in an investigation, and information that would otherwise interfere with an investigation. *Matish*, 193 F. Supp. 3d at 597 (quotations and alterations omitted).

The Court "should remain cognizant of the fact that while the public's interest in effective law enforcement supports the creation of the privilege, it does not extinguish a criminal defendant's strong interest in effective cross-examination of adverse witnesses." *Id.* (cleaned up)(quoting *United States v. Green*, 670 F.2d 1148, 1155 (D.C. Cir. 1981)). It "therefore must weigh 'the public interest in nondisclosure against the need of a particular litigant for access to the privileged information.'" *Buzzfeed*, 318 F. Supp. 3d at 361-62 (alterations omitted)(quoting *In re Sealed Case*, 856 F.2d 268, 272 (D.C. Cir. 1988). " To make this determination, the court must consider a bevy of factors." *Id.* at 362.[1] Disclosure has been found warranted when necessary to a party's

---

[1]    (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any interdepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; [and] (10) the importance of the information sought to the plaintiff's case.

defense even while the investigation was ongoing, when much of the investigation had already been disclosed. *Id.* at 362-63. Here, not only has the investigation been disclosed through discovery documents and a public trial, but the investigation has been completed. Furthermore, unlike in *Buzzfeed*, Mr. Jin is not merely a civil but a criminal defendant. *See Matish*, 193 F. Supp. 3d at 597-98; *cf., e.g.*, *United States v. Fluitt*, 99 F.4th 753, 764 (5th Cir. 2024)(defendant in a criminal proceeding necessarily has need for disclosure of documents, which was sufficient to overcome assertions of privilege).

Thus, none of the government's cited caselaw is apposite to its position. Mr. Jin cannot see how the sealed information could relate to "sensitive law enforcement or intelligence collection techniques," "ongoing investigations," "the targets of such investigations," or "the identification of potential witnesses." *Concord Mgmt.*, 404 F. Supp. 3d at 76. The government has not identified risks to anyone's safety. *See United States v. Ramos-Cruz*, 667 F.3d 487, 492 (4th Cir. 2012) ("The court concluded that the potential threat to the officers' safety remained significant."); *Innamorati*, 996 F.2d at 488 ("[T]here was a substantial threat of serious harm warranting the initial examination by the district court without notice to defendants."); *United States v. Cerna*, No. CR 08-0730 WHA, 2010 WL 1459444, at *5 (N.D. Cal. Apr. 9, 2010)("The final protective order restricts the disclosure of information that would tend to reveal the identities or locations of particular civilian witnesses as to whom the government made an *ex parte* showing of danger.").

The government also contends that, after it produced redacted affidavits, "the defendant is now deprived only of the prosecutors' representations about how they went about discharging their duties." ECF 333 at 2. This is simply incorrect. At the very least, the defendant has been deprived

---

*Buzzfeed*, 318 F. Supp. 3d at 362 (quoting *Tuite v. Henry*, 98 F.3d 1411, 1417 (D.C. Cir. 1996)).

of statements by Agent Tarango – who, so far as we know, is not a prosecutor – and even the identity of one of the affiants. The government has not explained why these materials, and whatever else it has withheld, may be submitted *ex parte*.

The materials are relevant and disclosure is required. *See United States v. Blackman*, 407 F. Appx 591, 596 (3d Cir. 2011)("[T]he files are not probative of the truthfulness or untruthfulness of the officer witnesses, and therefore did not implicate *Giglio.*"); *United States v. Hamaker*, 455 F.3d 1316, 1327 (11th Cir. 2006)("[M]ost of the material was not *Brady* or Jencks Act material at all."). And, because Mr. Jin has timely raised the issue, the government must show more than that any "error was not plain" because nonbinding caselaw "at least implicitly supports the government's position . . . ." *United States v. Waldron*, 756 F. App'x 789, 797 (10th Cir. 2018)(citing previously cited caselaw); *see United States v. Preldakaj*, 456 F. Appx 56, 59 (2d Cir. 2012) ("Collazo did not object to the government's *ex parte* submissions . . . . We therefore review only for plain error."). To the extent that any of the cited cases could be interpreted as approving *ex parte* disclosure of *Giglio* evidence that was not material, those cases all took place after trial, and thus were subject to a materiality standard that does not apply "[i]n this pretrial setting." *United States v. Moore*, 867 F. Supp.2d 150, 151 (D.D.C. 2012)("The government misses the mark in focusing on materiality …. [T]he Court has no way to know what the rest of the record will show …. Hence, the better question is whether evidence is favorable to the defense or likely to lead to the discovery of favorable evidence." (citations omitted)).

II.     **THE GOVERNMENT'S PROFFER ON CARBUNCLE AND FULLY MAX FURTHER DEMONSTRATES THAT AN EVIDENTIARY HEARING IS NECESSARY.**

**A.  An Evidentiary Hearing is Necessary and Appropriate.**

In an effort to prevent further inquiry into this issue, the government offers a proffer of Anglin's expected testimony. The proffer leaves significant questions unanswered and raises new ones. The government has not shown that an evidentiary hearing is unnecessary; to the contrary, the government's Opposition shows that Anglin's live testimony is not just appropriate, but crucial.

First, the government proffers that Anglin "realized" the false attribution of the Carbuncle transactions "less than one week before his testimony began." ECF 333 at 7. Yet Anglin purportedly failed to notify AUSA Seifert of this issue until "the night before his testimony." *Id.* The obvious question is: why? The proffer attributes this delay to Anglin's "trial preparation [being] continuously delayed." *Id.* But that simply begs the question of why Anglin had to wait until trial preparation, and was apparently unable to send an e-mail to AUSA Seifert (with whom he communicated regularly by e-mail) immediately upon realizing the error. It would also appear inconsistent with the fact that, in May 2022, i.e., years before Anglin purportedly realized this mistake, AUSA Seifert specifically asked Anglin why Anglin had failed to include Carbuncle on a list of Winney transactions. ECF 309-38.

As the author of these exhibits, Anglin also surely did not have to wait to correct the exhibits in person with AUSA Seifert, when they allegedly prepared for his testimony in the courthouse until midnight. He could have corrected the exhibit on his own computer, sent an electronic version of the corrected exhibit to AUSA Seifert, and explained the error.

Second, the proffer's representations about the timing of updates to the exhibit also raises questions. According to the proffer, Anglin and Seifert allegedly corrected the exhibits together the night before his testimony. *Id.* Yet the record is clear that the new exhibit was not uploaded until the following day in the afternoon, shortly before Anglin's testimony began. ECF 322 at 8 (noting that corrected exhibit was uploaded at 1:43 PM, while Anglin was called at 2:08 PM). If

the exhibit had already been corrected the night before, why was it not uploaded at that time? Further, the metadata in the exhibit indicates that it was modified at the same time it was uploaded, not the night before as the proffer claims, what accounts for this discrepancy?

The exhibit at issue was also continuously updated during the course of trial. One version of the exhibit, which still included the Carbuncle transactions, was updated four days before Anglin's testimony. ECF 355-50. If Anglin realized the false attribution "less than a week" before his testimony, the proffer naturally raises the question of whether he continued to send updated exhibits with the false attributions after he "realized" they were false.

The proffer also entirely ignores the reason for AUSA Seifert's silence regarding this issue. The government does not dispute that AUSA Seifert never notified the defense of any change to these exhibits either during or after trial. Surely something as important as the existence of false attributions to Winney was not something that would have escaped a prosecutor's notice. Indeed, AUSA Seifert made the decision to abandon the allegations because they were false. The lack of notice to the defense has gone entirely unanswered.

Beyond failing to explain ASUA Seifert's conduct, the proffer also makes the startling new claim that Anglin told the new trial team about this issue before Mr. Jin filed his Motion to Dismiss. ECF 333 at 7-8. If that is true, then that raises the question of why the new trial team never brought this issue to Mr. Jin's attention. After all, the new trial team surely must have appreciated the exculpatory character of this evidence. Regardless of whether Anglin's false attribution was malign or inadvertent, this was undoubtedly something that had to be disclosed to the defense.

The government's proffer regarding the timing of Anglin's disclosure to the new trial team is also in tension with its earlier statements on the subject. Compare the following:

9

| | |
|---|---|
| "Nor did the defendant notify the current team of this error or raise it before filing the MTD.'" <br><br> Upon just realizing this issue, the government will have to correct a proposed trial exhibit that erroneously includes Carbuncle and Fully Max." <br><br> ECF 316 at 7-8 (emphasis added) | "Anglin told undersigned counsel about the erroneous inclusion of Carbuncle and Fully Max in Exhibit 16 and corrected it in his spreadsheet before the defendant filed his Motion to Dismiss. After the filing of the Motion to Dismiss, undersigned counsel asked Anglin to reproduce a final corrected PDF of Exhibit 16." <br><br> ECF 333 at 7, ¶10 (emphasis added). |

In other words, where the government previously implied that it was Mr. Jin's Motion to Dismiss which alerted the new trial team of the Carbuncle issue, now it claims that Anglin brought the issue to the new trial team's attention before that. If so, how could Mr. Jin's Motion have been the factor that prompted the government to correct its proposed trial exhibit?

A hearing is necessary to resolve these contradictions and inconsistencies. The defense is also prepared to ask Anglin additional questions with evidence that appears to contradict the timeline proffered by the government in its Opposition. The Court should hold an evidentiary hearing as requested by the Defendant's Motion.

**B. The government had a *Brady* obligation to notify the defense when it realized that Anglin made false allegations against Winney.**

The government's Opposition is premised on the erroneous assumption that it had no obligation to inform the defense when Anglin "realized" that the Carbuncle and Fully Max allegations against Winney were false. ECF 333 at 8 ("Their relevancy is premised on a legally unsupported claim that the government had a duty to identify its basis for correcting an exhibit by removing falsely inculpatory information.") In order to prevent any future *Brady* violations, this Court should clearly refute that erroneous assumption: when the government discovers a false

allegation against the defendant by the prosecution team, the government must disclose the existence of the false allegation and the government's knowledge of its falsity to the defense.

The government's conduct with respect to the Carbuncle and Fully Max transactions is materially indistinguishable with the conduct that this Court found to have violated *Brady* in *Quinn*. There, the government's cooperator—a supervisor at Quinn's company—claimed that he had informed Quinn that indirect shipments to Iran were illegal. 537 F. Supp. 2d 99, 104 (D.D.C. 2008). The government was prepared to call Tatum to testify to this fact, as it showed Quinn's knowledge of illegality. *Id.* Then, a few days before trial, the government realized that Tatum had lied about this very issue, because contemporaneous e-mails from Tatum contradicted it. *Id.* at 105. The government decided not to call Tatum (i.e., not present false testimony), but it also failed to inform Quinn of its decision to not call Tatum, or the reason for that decision. *Id.* at 105 ("neither Quinn, Holland, nor their attorneys were informed of this significant change in the government's assessment of Tatum…or of the fact that Tatum would not be called as a trial witness.").

Here, as in *Quinn*, it is true that the government ultimately avoided introducing false testimony about Carbuncle and Fully Max at trial (albeit an exhibit referencing those transactions was nevertheless admitted at trial). *Cf. Quinn*, *id.* at 106 (noting that an investigator at trial volunteered Tatum's statement, although Tatum did not testify). Here, as in *Quinn*, what violated due process is not the government's decision to "correct" its exhibit, or its decision to not have Anglin testify falsely about Carbuncle. It is the government's deliberate silence about the witness's prior false accusation, and the government's failure to communicate to the defense that the government now knows the witness's prior accusations to be false. The Opposition fails to confront this reality, because it cannot explain AUSA Seifert's silence (or the new trial team's

silence, for that matter). In light of these clear violations, there can be no complete record, and no meaningful decision on a sanction without answering questions such as:

- What prevented Anglin from communicating the issue to the prosecution team.

- What prevented the prosecution team from communicating this issue to the defense.

- When did Anglin disclose this issue to the new trial team

- What prevented the new trial team from communicating this issue promptly to the defense.

### C. The *Brady* violation was material.

Previously, the government sought to recast the materiality of the suppressed evidence as an accounting error: 1% of the total transactions. Now, the government depicts materiality as "six lines on the master spreadsheet." ECF 333. The analysis focuses on the wrong thing.

The suppressed evidence is not that Anglin failed to correct six entries on his master spreadsheet after he allegedly discovered the Carbuncle error. The suppressed evidence is that Anglin, the forensic accountant in this case, had been falsely attributing front company transactions to Winney since 2022, and didn't even acknowledge or discover it until less than a week before his testimony. The materiality of the suppressed evidence must be assessed by asking whether there is a reasonable probability that the jury, which deadlocked 6-6, would have acquitted Mr. Jin if they had known this fact about Anglin. The answer is undoubtedly yes.

Likewise, the government again tries to portray the conduct as the prosecutors "doing the right thing" by correcting false evidence, and suggests that Mr. Jin's claim is no more than that he was "denied [] a line of compelling cross-examination."[2] ECF 333 at 5. We repeat it here again

---

[2] By characterizing a cross-examination along these lines as "compelling," the government almost appears ready to acknowledge that such evidence was material—i.e., it was reasonably probable that jurors would have voted differently had the fact been exposed.

lest there be any lingering misapprehension of the nature of the defendant's claim: when the first trial team realized that its main law enforcement witness had been making false allegations since 2022, they should have told the defendant. Instead, and because they did not want the defendant to find out, they buried it by secretly changing the relevant exhibits. That violated *Brady*.

## III. THE GOVERNMENT OFFERS NO REASON WHY IT SHOULD NOT BE REQUIRED TO IDENTIFY AND EXPLAIN DESTROYED EVIDENCE.

The Defendant's pending discovery motions sought, *inter alia*, communications between former SA Joy Gallante and members of the prosecution team, and draft versions of exhibits related to Carbuncle/Fully Max.[3] The government not only opposes production, but now argues that it should not be required to identify any evidence it destroyed. ECF 333 at 8.

The documents sought by Mr. Jin's motions are obviously relevant. The government has conceded that the complaint, search warrant, and the indictment contained false allegations. Agent Gallante, as the agent who signed the affidavit for the complaint and search warrant, sponsored those false allegations under oath. Her communications with the prosecution team are thus relevant to establishing the circumstances under which these false allegations were made. Likewise, the draft exhibits pertaining to Carbuncle and Fully Max would illuminate the inconsistencies in, and possibly contradict, the timeline in the government's proffer.

The information is discoverable under *Brady*. *Kyles v. Whitley*, 514 U.S. 419, 445 (1995) (allowing the defense to attack the "thoroughness and even the good faith of the investigation"). The government's efforts to argue otherwise are unavailing. Its argument on this point consists of a single conclusory sentence: "the government is unaware and has no reason to believe any

---

[3]    He previously sought emails that Agent Tarango stated were lost. The government represents those emails were in fact turned over. *See* ECF 333 at 9 n.2.

exculpatory material has been destroyed." ECF 333 at 8.  The government makes this conclusory statement while proffering in the same filing that: (1) Anglin told the new trial team about false allegations relating to Carbuncle and Fully Max; (2) the new trial team didn't tell the Defendant about it; and (3) the new trial team waited until the Defendant filed a Motion to Dismiss to correct an exhibit that included the false allegation.  To put it simply, on this record, the government's representations about *Brady* should carry little weight.

The government also avers that granting the Defendant's motion would "incur non-trivial costs on the government's ability to effectively prepare for trial."  ECF 333 at 8-9.

First, "[t]he prosecutor's obligation to seek out exculpatory evidence in the government's possession is not tempered by considerations of reasonableness or undue burden. 'The failure to comply with a constitutional command to present evidence fairly at trial is not excused by any inconvenience, expense, annoyance or delay.'"  *United States v. W. R. Grace*, 401 F. Supp. 2d 1069, 1076 (D. Mont. 2005) (quoting *United States v. McVeigh*, 954 F. Supp. 1441, 1450 (D. Colo. 1997)).  Mr. Jin may have a legitimate *Trombetta* claim, and the government cannot nip the inquiry in the bud by refusing to identify destroyed documents.  *See United States v. George*, No. CR 17-201, 2020 WL 6392580, at *3 n.32 (E.D. La. Nov. 2, 2020) ("The government has an affirmative duty to search for Brady material and should actively do so.") (citing *Strickler v. Greene*, 527 U.S. 263, 281 (1999)); *see also Kuzma v. United States Dep't of Just.*, 692 F. App'x 30, 33 (2d Cir. 2017) (noting the government is only freed from its duty to search for "missing documents if it has made a diligent search") (citation omitted).

Second, the government also fails to explain how requiring it to identify destroyed evidence would be unduly burdensome.  Presumably the Department of Justice had, at the relevant times, policies in place to preserve important case-related communications or documents, even when

14

active personnel working on a given case may change over time. The defense is not in a position to know what has been preserved and what is lost to time. If, for example, the government did not preserve Agent Gallante's emails with prosecutors or fellow agents, because it deemed those emails unimportant, it can simply so state. The point is, only the government knows. The defense does not.

The Court should grant the Defendant's Motion.

Respectfully submitted,

By: /s/ Eugene Gorokhov
Eugene Gorokhov, Esq.
D.C. Bar No. 979785
Burnham & Gorokhov, PLLC
1634 I Street NW, Suite 575
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com

**CERTIFICATE OF SERVICE**

A copy of the foregoing motion was filed via ECF, which automatically sends a copy to all counsel of record.

Respectfully submitted,
By: /s/ Eugene Gorokhov
Eugene Gorokhov, Esq.
D.C. Bar No. 979785
Burnham & Gorokhov, PLLC
1634 I Street NW, Suite 575
Washington, D.C. 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com