**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal Action No. 23-091-2 (CKK) |
| JIN GUANGHUA, | |
| Defendant. | |

**MEMORANDUM OPINION & ORDER**
(March 29, 2026)

Jury selection is now underway in Defendant Jin Guanghua's retrial on seven counts of an indictment charging him with participating in a bank-fraud, sanctions-evasion, and money-laundering conspiracy. *See* Indictment, Dkt. No. 13; Order, Dkt. No. 144 (dismissing certain counts for lack of proper venue). Mr. Jin's first trial on these charges ended with a hung jury. In advance of Mr. Jin's retrial, the parties have filed more than two dozen new pretrial motions. This Memorandum Opinion and Order resolves most of these motions,[1] deferring ruling on the parties' motions regarding final jury instructions and two other recently filed motions.[2]

---

[1] The Court's consideration has focused on the following documents, including the attachments and exhibits thereto:
- Mr. Jin's Motion to Direct the Government to Comply with its *Brady*, Rule 16, and Other Disclosure Obligations, Dkt. No. 267; and the Government's Response, Dkt. No. 274;
- Mr. Jin's Second Motion to Dismiss with Prejudice for Violation of His Sixth Amendment Speedy Trial Right, Dkt. No. 268; the Government's Response, Dkt. No. 297; and Mr. Jin's Reply, Dkt. No. 306;
- Mr. Jin's Motion *in Limine* to Exclude Hearsay Emails from the Google Search Warrant Return, Dkt. No. 269; the Government's Response, Dkt. No. 299; and Mr. Jin's Reply, Dkt. No. 304;
- Mr. Jin's Motion for Disclosure of Statements Under the Jencks Act, Dkt. No. 273; the Government's Response, Dkt. No. 283; and Mr. Jin's Supplement, Dkt. No. 312;
- the Government's Motion to Exclude Time under the Speedy Trial Act, Dkt. No. 275; and Mr. Jin's Response, Dkt. No. 279;
- Mr. Jin's Motion to Compel Production of *Brady* Information and for an Evidentiary Hearing, Dkt. No. 276; the Government's Response, Dkt. No. 292; and Mr. Jin's Reply, Dkt. No. 294;
- Mr. Jin's Motion *in Limine* to Permit Extrinsic Evidence of Bias, Dkt. No. 284; the Government's Response, Dkt. No. 301 at 5–6; and Mr. Jin's Reply, Dkt. No. 307 at 5–6;
- Mr. Jin's Motion *in Limine* Regarding the Scope of Cross-Examination Required by the Sixth Amendment and Fed. R. Evid. 611(b), Dkt. No. 285; the Government's Response, Dkt. No. 301 at 4–5; and Mr. Jin's Reply, Dkt. No. 307 at 4–5;

1

# I. BACKGROUND

## A.      Legal Background

The United States maintains a comprehensive regime of economic sanctions against

North Korea (formally, the Democratic People's Republic of Korea, or "DPRK") and many of its

affiliated entities.  *See generally North Korea Sanctions Program*, Office of Foreign Assets

---

- Mr. Jin's Motion to Exclude Business Records [of Cooperativa de Tabacaleros de Jujuy ("CTJ")], Dkt. No. 286; the Government's Response, Dkt. No. 298; and Mr. Jin's Reply, Dkt. No. 303;
- Mr. Jin's Motion *in Limine* Regarding Admissibility of Expert Opinions and the Scope of Expert Witness Cross-Examination, Dkt. No. 287; the Government's Response, Dkt. No. 301 at 7–9; and Mr. Jin's Reply, Dkt. No. 307 at 6–11;
- Mr. Jin's Motion *in Limine* to Permit Defense Arguments and Evidence on the Good Faith of the Investigation, Dkt. No. 288; the Government's Response, Dkt. No. 301 at 1–4; and Mr. Jin's Reply, Dkt. No. 307 at 1–4;
- Mr. Jin's Motion *in Limine* Regarding the Admissibility of Out-of-Court Statements [During the Government's Undercover Investigation] for a Non-Hearsay Purpose, Dkt. No. 289; the Government's Response, Dkt. No. 301 at 9–13; and Mr. Jin's Reply, Dkt. No. 307 at 11–12;
- Mr. Jin's Motion to Reconsider Motion to Suppress and for a *Franks* Hearing, Dkt No. 291; the Government's Response, Dkt. No. 296; and Mr. Jin's Reply, Dkt. No. 305;
- Mr. Jin's Motion for an Evidentiary Hearing, to Compel the Government to Comply with its *Brady* Obligations, and "to Compel the Government to Identify the Evidence that it Destroyed," Dkt. No. 308;
- Mr. Jin's Motion to Dismiss "for Flagrant Government Misconduct," Dkt. No. 309;
- Mr. Jin's Notice of Expert Testimony, Dkt. No. 313; and the Government's Response, Dkt. No. 321;
- Mr. Jin's Motion to Compel Production of *Brady* and *Giglio* Information "Related to False Testimony Regarding the Undercover Investigation and False Sworn Statements by Case Agent," Dkt. No. 317; the Government's Response, Dkt. No. 326; and Mr. Jin's Reply, Dkt. No. 328;
- Mr. Jin's Trial Brief, Dkt. No. 318; and *Ex Parte* Supplement, Dkt. No. 320;
- the Government's Trial Brief, Dkt. No. 319;
- the Government's *Ex Parte* Motion for a Protective Order, Dkt. No. 325;
- Mr. Jin's Motion to Unseal the Government's *Ex Parte* Submission, Dkt. No. 329; the Government's Response, Dkt. No. 333; and Mr. Jin's Reply, Dkt. No. 335;
- Mr. Jin's Motion to Compel Production of Carbuncle Exhibits and Communication of Dawson Anglin, Dkt. No. 330; the Government's Response, Dkt. No. 333; Mr. Jin's Reply, Dkt. No. 335; and Mr. Jin's Supplement, Dkt. No. 336;
- Mr. Jin's Motion to Compel the Government to "Identify Evidence That It Has Destroyed," Dkt. No. 331; the Government's Response, Dkt. No. 333; and Mr. Jin's Reply, Dkt. No. 335; and
- the Government's Motion *in Limine* to Admit Evidence Post-Dating the Conspiracy, Dkt. No. 332; and Mr. Jin's Response, Dkt. No. 334.

In an exercise of its discretion, the Court concludes that oral argument is not necessary to the resolution of the issues pending before the Court.  *See* LCvR 7(f).

[2] Specifically, the Court defers ruling on the following motions:
- the Government's Motion *in Limine* to Preclude a Separate Good Faith Jury Instruction, Dkt. No. 261;
- Mr. Jin's Motion to Reconsider Jury Instructions, Dkt. No. 290;
- Mr. Jin's Motion to Compel Production of Witnesses' Statements for *in Camera* Review, Dkt. No. 340; and
- Mr. Jin's Motion to Unseal [the Government's Submission of Redacted Affidavits], Dkt. No. 342.

Control ("OFAC") (Nov. 2, 2016), https://perma.cc/VS8K-343A.   Under the International Emergency Economic Powers Act ("IEEPA"), any person who "willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of," an act that "violate[s], attempt[s] to violate, . . . or causes a violation of" these sanctions is guilty of a federal crime punishable by up to 20 years' imprisonment.  50 U.S.C. § 1705(a), (c).

The stated purpose of this sanctions regime is to address the national security threat presented by North Korea's weapons of mass destruction ("WMD") programs, including its nuclear weapons and ballistic missiles programs.  *See, e.g.*, Exec. Order No. 13,722, 81 Fed. Reg. 14943 (Mar. 15, 2016); Exec. Order No. 13,466, 73 Fed. Reg. 36,787 (June 26, 2008).

Under this regime, it has been unlawful since March 2016 for any U.S. person, including any U.S. financial institution, to do business with any entity in North Korea, except under an exemption or license issued by the Office of Foreign Assets Control ("OFAC").  *See* Exec. Order No. 13,722, 81 Fed. Reg. 14943 (Mar. 15, 2016).  It is also unlawful for any U.S. person, including any U.S. financial institution, to do business with entities identified in a publicly available list, called the "Specially Designated Nationals and Blocked Persons" ("SDN") list, that is maintained by the U.S. Department of the Treasury.  Two North Korean banks that are relevant to this case are included in the SDN list: Korea Kwangson Banking Corp. ("KKBC"), which the Treasury Department added to the SDN list in August 2009; and North Korea's Foreign Trade Bank ("FTB"), which the Treasury Department added to the list in March 2013.

U.S. sanctions also prohibit transactions by U.S. persons or within the territory of the United States that evade or avoid, or have the purpose of evading or avoiding, the prohibition on providing services to sanctioned entities, including KKBC and FTB.

These sanctions prohibit U.S. financial institutions from providing services to or for the benefit of KKBC, FTB, and other North Korean entities.  Accordingly, U.S. financial institutions may not provide "correspondent" banking services—which include, as relevant here, services to facilitate U.S. dollar-denominated transactions between foreign banks—to any of these entities.[3]

The Bank Secrecy Act requires U.S. financial institutions to take certain measures to detect and prevent certain prohibited transactions, including transactions designed to evade or avoid U.S. sanctions.  Since November 2016, the required measures have prohibited U.S. financial institutions from operating correspondent accounts or processing transactions for any North Korean financial institutions.  U.S. financial institutions that violate these prohibitions may face civil and criminal penalties.  Because of these rules, U.S. financial institutions do not knowingly process U.S. dollar-denominated transactions involving entities in North Korea.

The United Nations Security Council has also adopted economic sanctions against North Korea.  As a matter of U.S. domestic law, these sanctions are not self-executing.  *See Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 718 (D.C. Cir. 2022).  However, as a matter of international law, they call upon Member States of the United Nations to prohibit the provision of financial services and the transfer of funds for the benefit of North Korea's WMD programs. *See* S.C. Res. 1874 ¶ 18 (June 12, 2009), https://perma.cc/UT2L-3T9F.  These sanctions also direct Member States to freeze the assets of anyone acting on behalf of KKBC and other entities identified as providing support for North Korea's WMD programs.  *See* S.C. Res. 2270 ¶ 10

---

[3] The Court explained the mechanics of correspondent banking transactions in a prior Memorandum Opinion. *See* Mem. Op., Dkt. No. 145 at 2–4.  In summary, in a typical transaction, a foreign bank wants to process a U.S. dollar-denominated transfer from one of its customers to a recipient with an account at another foreign bank.  To complete this transaction, the sender's bank sends transfer instructions to a U.S. correspondent bank at which both it and the recipient's bank have correspondent accounts.  The U.S. bank debits the account of the sender's bank and credits the account of the recipient's bank by a certain number of U.S. dollars.  The foreign banks process this transaction on their own books as a deduction from the account of the sender and a credit to the account of the recipient.  In this transaction, the U.S. bank exports financial services, but none of the banks necessarily send or receive any currency.

(Mar. 2, 2016), https://perma.cc/52JR-9BAQ; S.C. Res. 1718 ¶ 8(d) (Oct. 14, 2006), https://perma.cc/H3DY-F88Q.

### B.    Factual Background

#### 1.    The Government's allegations about North Korea's sanctions evasion

The Government alleges that North Korea has responded to U.S. and international sanctions by developing a large network of "front" companies, which it uses to facilitate trade with other countries.  These front companies are designed to conceal North Korea's involvement in transactions that would be frozen or blocked if the financial institutions involved know of their connection to North Korea.  According to the United States, preventing these front company transactions is important because foreign trade is a critical source of revenue for the North Korean government and its WMD programs.

Manufacturing counterfeit cigarettes and selling them on the international market is allegedly a major source of "hard currency" revenue for North Korea and its weapons programs. *See* Compl., Dkt. No. 1, ¶ 34.  The United States alleges that, to supply its cigarette manufacturers, North Korea uses front companies to pay in U.S. dollars for tobacco products from companies in other countries.  *See id.* ¶¶ 35–36.

According to the United States, entities associated with North Korea often conceal the nature of North Korea-bound shipments by arranging to ship goods first to Dalian, China—a busy port city near China's border with North Korea—before smuggling them into North Korea. *See* Compl. ¶ 42 n.1

#### 2.    The United States' allegations against Mr. Jin

In this case, the Government alleges that Mr. Jin and his co-defendant Qin Guoming were the chief executives of a group of trading companies, collectively known in this case as the "Winney Entities."  The Government alleges that Mr. Jin's co-defendant Han Linlin (also

identified as "Henry" or "James" Han) was an employee of the Winney Entities whom Mr. Jin trusted to act on his behalf.

According to the Government, the Winney Entities brokered sales of tobacco products and other goods to two state-owned cigarette manufacturers in North Korea: Naegohyang Joint Venture Company ("Naegohyang") and Korea Ryugyong ("Ryugyong"). The Government alleges that the Winney Entities received U.S. dollar-denominated payments for these tobacco products from front companies acting on behalf of the sanctioned North Korean bank KKBC, including the development company Dandong Hongxiang Industrial Development Company Ltd. ("DHID"). The Government also alleges that the Winney Entities received payments arranged by Mr. Jin's co-defendant Sim Hyon-Sop, who allegedly operates from the United Arab Emirates on behalf of the sanctioned North Korean bank FTB.

The Government alleges that the Winney Entities bought much of the tobacco that they supplied to Naegohyang and Ryugyong from Cooperativa de Tabacaleros de Jujuy ("CTJ"), a collective of tobacco farmers in Argentina. The Winney Entities allegedly paid CTJ for this tobacco in U.S. dollars and arranged to ship it to North Korean buyers via Dalian, China.

According to the Government, these U.S. dollar-denominated transactions—like nearly all such transactions around the world—were routed through correspondent banks in the United States. Accordingly, the Government alleges that each of these transactions involved the unlawful export of financial services from the United States for the benefit of KKBC, FTB, and other North Korean entities that are subject to U.S. sanctions.

The Government alleges that Mr. Jin and his co-conspirators used "Chinese front companies, false shipping records, and other means of deception to make it appear to U.S. financial institutions and others" that the raw tobacco that the Winney Entities purchased from

CTJ "was being shipped to China, not to North Korea, and that payments for the tobacco were being made in furtherance of legitimate trade with China, not prohibited trade with North Korea." *See, e.g.*, Gov't's Mot., Dkt. No. 33 at 3.

Specifically, the Government alleges that, from February 2009 until May 2016, the Winney Entities would typically list a company in North Korea as the "consignee," or recipient, on bills of lading for the tobacco shipments from CTJ that the Winney Entities arranged.[4] However, after the U.S. adopted comprehensive sanctions against North Korea in 2016, the Winney Entities allegedly dropped the name of the North Korean company.  In its place, the Government alleges that they substituted the name of a company with an address in China.  The Government alleges that this change was a ruse, and that the ultimate recipient of the shipments in North Korea remained unchanged.

Later, the Government alleges, Mr. Jin and his co-defendants arranged to change the legal names of two of the Winney Entities to more cryptic names to avoid bank scrutiny.  Specifically, the Government alleges that Winney FZCO changed its name to Bluebay FZCO, effective August 15, 2019, and that Winney Tobacco FZCO changed its name to Goldfield Tobacco FZCO, effective September 16, 2019.[5]

### 3. Other evidence regarding CTJ's dealings with the Winney Entities

In this case, Mr. Jin has not disputed that CTJ and the Winney Entities did business related to North Korea, but he argues that the Government's allegations omit facts that are

---

[4] A bill of lading is a type of shipping document that acknowledges the receipt of goods, specifies the terms of the contract for the goods' carriage to their destination, and shows the owner's title to the good while they are in transit. *See Bill of Lading*, *Black's Law Dictionary* (12th ed. 2024).

[5] Some documents in this case, including the indictment, use masked names for these entities.  Winney FZCO is the company identified in the indictment as "Entity 5."  Bluebay FZCO is "Entity 7," Winney Tobacco FZCO is "Entity 4," and Goldfield Tobacco FZCO is "Entity 6."

essential to understanding the full context of the companies' relationship. *See, e.g.*, Def.'s Mots., Dkt. Nos. 181, 212, 276, 286.

Specifically, Mr. Jin highlights evidence that CTJ's board of directors, executive director, and legal counsel were all aware of a months-long negotiation of a proposed contract under which the Winney Entities would become CTJ's exclusive agent for sales of tobacco to North Korea. CTJ's sales manager, Mr. Patricio Lyons, exchanged many emails with Mr. Han about this proposed contract between July and December 2018. *See* Def.'s Mot., Dkt. No. 181 at 3–4. During the parties' negotiations, CTJ's legal counsel proposed an amendment providing that "CTJ will not be obliged to make sales and dispatches if D.P.R. KOREA is sanctioned by international organizations." *Id.* Ex. 12, Dkt. No. 181-12 at 4. Mr. Jin argues that the parties' consideration of this amendment shows that as of 2018, neither CTJ nor the Winney Entities believed that it was unlawful for them to export tobacco to North Korea. *See, e.g.*, Def.'s Mots., Dkt. No. 181, 212, 286.

Mr. Jin also notes that CTJ was apparently engaged in exporting tobacco to North Korea outside of its business with the Winney Entities. During the negotiations of the proposed exclusivity agreement with the Winney Entities, Mr. Lyons represented to Mr. Han that CTJ had another existing customer for tobacco sales to North Korea that it hoped to retain as a client. Mr. Jin argues that this fact supports an inference that CTJ, as an experienced exporter to North Korea, may have instigated some or all of the actions

Finally, Mr. Jin argues that evidence shows that CTJ's sales manager, Mr. Lyons—not the Winney Entities—instigated changes to the bills of lading after the U.S. adopted comprehensive sanctions against North Korea in 2016. *See* Def.'s Mot, Dkt. No. 276. On the present record, it appears that Mr. Jin's only evidence for this claim is a statement by a

government agent acting in an undercover capacity, which the Court discusses in the following section. *See id.*

### 4. The Government's investigation

#### a. *Undercover investigation*

In March 2019, the Government informed several U.S. financial institutions that it suspected that CTJ and several of the Winney Entities were involved in U.S. dollar transactions for the benefit of North Korea. *See* Dkt. No. 284-3 at 17–58. As a result of these letters, U.S. banks froze millions of dollars in payments intended for CTJ, including a $1.9 million payment from the U.S. firm Premium Tobacco. *See* Dkt. No. 309-2 at 2. These freezes caused a fiscal crisis for CTJ, which was unable to pay its bills without the frozen payments. *See id.* By early May 2019, CTJ estimated that it would default on its obligations within two weeks if the banks did not lift the freezes. *Id.*

In an effort to resolve the freezes, CTJ arranged a meeting with the U.S. Attorney's Office for the District of Columbia on May 1, 2019. *See* Dkt. No. 309-2. CTJ's director of finance, Fernando Bartoletti, represented the company at this meeting, joined by CTJ's Argentinian and U.S. counsel. *See id.* at 1. The FBI's FD-302 interview report of this meeting states that when one of CTJ's representatives proposed releasing the $1.9 million payment from Premium Tobacco, an Assistant U.S. Attorney "noted that the potential release of any funds would first depend on the information provided by CTJ and their potential willingness to cooperate" with the Government's investigation. *Id.* at 2. Mr. Bartoletti then told the Government about CTJ's business with the Winney Entities and agreed to gather information from CTJ's records for the Government's use. *See id.* at 3.

Later in the meeting, Mr. Bartoletti told the Government's representatives that he did not know that some of CTJ's shipments were going to North Korea until after some of its payments had been frozen. Dkt. No. 309-2 at 4.

Following this meeting, the Government began an undercover investigation into the Winney Entities. Two agents from the Department of Homeland Security's investigative arm, Homeland Security Investigations ("HSI"), participated in the investigation. Special Agent Erick Tarango played the role of "Roberto Gonzalez," an intermediary hired by CTJ to help resolve the payments issue. Special Agent Chloe Huang played the role of an interpreter.

CTJ cooperated with the Government's investigation. At least two CTJ employees— Mr. Bartoletti and Patricio Lyons, CTJ's manager overseeing sales, marketing, and operations— met with the Government's agents to prepare them for their undercover roles.

During the Government's investigation, Agent Tarango, often joined by Agent Huang, contacted Mr. Han—and later Mr. Qin and Mr. Jin—proposing to discuss issues related to the blocked payment from the Winney Entities. *See generally* Dkt. Nos. 161-1 to 161-18.

As these conversations were taking place, CTJ had stopped all shipments of tobacco to the Winney Entities, even though the Winney Entities had prepaid for the shipments and had a positive balance on their account with CTJ despite the blocked payment. *See generally* Def.'s Mot., Dkt. No. 289; Gov't's Trial Ex. 404_T (Gov't's Sept. 2025 Trial Ex. 419T) at 32–33.

During their communications with Mr. Jin and his co-defendants, the undercover agents sought to elicit incriminating statements about the nature of the Winney Entities' dealings with CTJ, including the alleged fact that Mr. Han, Mr. Qin, and Mr. Jin were knowingly using the Winney Entities to purchase tobacco for the benefit of North Korea.

Because the agents' communications with Mr. Jin and his co-defendants are central to some of the parties' pending motions, the Court summarizes the relevant communications in detail here.

i.      *May 13 to 20, 2019: The agents propose paying a bribe and using a new front company; Agent Tarango arranges to speak with Mr. Jin*

Early in their investigation, the agents proposed that the Winney Entities pay all or part of a $20,000 bribe to a banker to resolve the issue with the blocked payment to CTJ.  *See, e.g.*, Gov't's Trial Ex. 400_T (Gov't's Sept. 2025 Trial Ex. 406T); Gov't's Trial Ex. 401_T (Gov't's Sept. 2025 Trial Ex. 405T); Gov't's Trial. Ex. 403_T (Gov't's Sept. 2025 Trial Ex. 407T).

Agent Tarango (in his undercover role as "Mr. Gonzalez") first raised the subject of the bribe with Mr. Han as early as May 13, telling Mr. Han that he had paid someone $20,000 to help resolve the payment issue of the blocked payment to CTJ.  *See* Gov't's Trial Ex. 400_T at 4. Agent Tarango asked Mr. Han to "help [him] pay this money."  *Id.* at 5.

In a later call, Agent Tarango and Mr. Han discussed the issue again.  *See* Gov't's Trial Ex. 401_T at 4–7.  Mr. Han suggested that because the payment related to CTJ's business, Agent Tarango should ask CTJ for help with the payment instead.  *See id.* at 6–7.

Agent Tarango raised the issue of the bribe with Mr. Han again on May 19, this time joined by Agent Huang, who acted as a translator.  *See* Def.'s Ex., Dkt. No. 161-11.  During this call, the agents described the proposed payment to the bank as a "special" fee that needed to be paid because of the Winney Entities' perceived connection with North Korea.  *See id.* at 13.  The agents stated that the Winney Entities would need to pay higher prices to CTJ if they did not pay the proposed bribe.  *See id.* at 34.

In the same series of calls, the agents also proposed that the Winney Entities continue doing business with CTJ by making payments through other entities with different names. *See* Def.'s Ex., Dkt. No. 161-11 at 16–17.

The undercover agents also discouraged Mr. Han and Mr. Jin from contacting CTJ directly, instructing them to communicate with the company only through them. *See, e.g.*, Def.'s Ex., Dkt. No. 161-15 at 2–3; Def.'s Ex., Dkt. No. 161-16 at 2–3.

Finally, in a call with Mr. Han on May 20, Agent Tarango asked Mr. Han to raise issues of the blocked payment and the proposed bribe with Mr. Jin, and Agent Tarango indicated that he would call Mr. Jin once Mr. Han had done so. *See* Def.'s Ex., Dkt. No. 161-12.

ii.        *May 21, 2019: Agent Tarango, acting undercover, says that Mr. Lyons directed the 2016 change to the bills of lading; Mr. Jin denies doing business with North Korea*

The next day, on May 21, Mr. Jin spoke by phone with Agent Tarango and Agent Huang. *See* Gov't's Trial Ex. 404_T (Sept. 2025 Trial Ex. 419T).   Early in this call, Agent Huang suggested that the payment to CTJ may have been blocked because "a bank employee in Argentina found out that they money originated from North Korea."  *Id.* at 3.  In response, Mr. Jin immediately denied that the Winney Entities do business with North Korea.  *Id.*  The agents then told Mr. Jin that up until about two years earlier, the bills of lading for the goods that CTJ was shipping for the Winney Entities showed that "the buyer of the goods is from North Korea."  *Id.* at 4.  Mr. Jin repeated his denial and said, "I didn't provide any such documents." *Id.* at 5.

Continuing to press the issue, the agents brought up the proposed exclusivity agreement for sales to North Korea that Mr. Han and Mr. Lyons had attempted to negotiate in 2018. Gov't's Trial Ex. 404_T at 5.  Agent Tarango then stated:

12

> Okay, the bill of lading uh, which [unintelligible] changed back in . . . what, what year? Two years ago [unintelligible]. But that's only which modified . . . [unintelligible] . . . Patricio instructed James to change the bill of lading from going to North Korea to going to Dalian.

*Id.* at 6. Translating this statement for Mr. Jin, Agent Huang said, in Mandarin:

> He said that two years ago, when the contract was sent, it was sent to Patricio, later Patricio said, if the goods were to go to North Korea, they could only be shipped to Dalian, not Pyongyang.

*Id.* at 7 (referring to Dalian, China, and Pyongyang, North Korea).

Throughout the remainder of the conversation, Mr. Jin continued to deny doing business with North Korea. *See, e.g.*, Gov't's Trial Ex. 404_T at 9 ("We haven't had any trade with North Korea since the UN sanctions have been implemented.").[6] He also stated that he "oppose[d]" having the Winney Entities bear the cost of the proposed bribe, "whether it's $10,000 or $20,000," explaining that in his view, the problem had "nothing to do with" the Winney Entities and should be CTJ's expense to bear. *Id.* at 14. Mr. Jin later stated that the Winney Entities were "barely making any profit" and could not afford to add a $10,000 payment to the bank for each transaction. *Id.* at 20. He therefore refused to make the payment. *Id.* at 34–35. However, Mr. Jin offered that the Winney Entities could make payment to CTJ through another entity "for the sake of continuing [its] cooperation with CTJ." *Id.* at 11; *see also id.* at 34–35. Mr. Jin told the agents that he hoped to visit CTJ in Argentina the following week and that he hoped to be able to discuss the issues in person. *Id.* at 15.

---

[6] All quotations attributed to Mr. Jin in this Memorandum Opinion are English translations of recorded comments originally made in Mandarin.

        iii.        *July 11, 2019: The agents meet Mr. Jin in person, and Mr. Jin denies wrongdoing*

Mr. Jin eventually traveled to Argentina in July 2019, and Agent Tarango and Agent Huang met with him in person on July 11. *See* Def.'s Ex., Dkt. No. 161-19.[7]  An interpreter who Mr. Jin hired in Argentina joined the meeting and translated most of the conversation, which the agents recorded. *See id.* at 7–10.

Early in the conversation, Mr. Jin reiterated his refusal of the undercover agents' suggestion that the Winney Entities should pay a bribe to a bank. *See* Def.'s Ex., Dkt. No. 161-19 at 12–13.  He then stated that if CTJ and the Winney Enterprises were to continue doing business, "it must be under the premise that it is reasonable and legal." *Id.* at 15.

In response to several of the undercover agents' efforts to elicit incriminating admissions, Mr. Jin denied that any laws were being violated. *See* Dkt. No. 161-19 at 16–19, 48.  For example, early in the conversation, Agent Tarango said, in Spanish, "We're basically laundering money, under certain laws." *Id.* at 16.  Mr. Jin responded, in Mandarin, "We are not laundering the money.  We're buying goods.  What's wrong with it?" *Id.*[8]  Mr. Jin also said, "[I]f the tobacco is presumably sold to North Korea, it doesn't violate U.N. against [unintelligible], so no international law is violated." *Id.* at 18.  Mr. Jin then stated that the Winney Entities had proposed paying CTJ through other companies because "[i]f we continue to use Winney, we will have to pay him [t]en [t]housand U.S. dollars." *Id.* at 20.

Mr. Jin next stated that he believed that the earlier payment to CTJ had been blocked because "the U.S. government will launch such an investigation into a large remittance from time

---

[7] There are at least two different transcriptions and translations of this conversation in the record. *Compare* Dkt. No. 161-19, *with* Dkt. No. 317-1.  The Court relies here on the English translation of the parties' conversation—originally in Spanish and Mandarin—that appears in the later-prepared version.

[8] As the Court will explain in the sections that follow, *infra* Section I.C.1 and III.B.5, the Government relied on an incorrect translation of this statement in the early stages of this case.

to time" and that the payment had been unblocked because "it was found that they were indeed not money laundering and they were exporting tobacco to China," not North Korea.  Dkt. No. 161-19 at 21.  When the undercover agents insisted that the transactions at issue were illegal, Mr. Jin responded, "The fact is we, we didn't do anything illegal," and that "[i]f he thinks we're doing something illegal, then there is no need for us to discuss it anymore."  *Id.* at 22.  He then stated, "Until now, the documents I have provided to the bank are genuine."  *Id.*  After the undercover agents suggested that Jin appeared to be objecting primarily to paying the proposed bribe, Mr. Jin responded, "My biggest concern is not [t]en [t]housand U.S. [d]ollars right now.  My biggest concern right now is that he thinks what we're doing now is violating Argentine law.  Then let's not do it."  *Id.* at 24.  When the agents tried to move on to another topic, Mr. Jin stated, "We are not going to do the illegal business."  *Id.* at 27.

Later, Mr. Jin reiterated his belief that the blocking of the earlier transaction from the Winney Entities to CTJ was routine, stating "[CTJ's] account has been in operation for several years, more than ten years, so it is the normal practice for the superior bank to inspect it."  Def.'s Ex. 18 at 48.  Mr. Jin and the undercover agents then discussed the possibility of reducing the amount of tobacco included in each transaction and using European bank accounts, euros, or renminbi for payment.  *Id.* at 50–52.

b.    *Search warrant*

During its investigation into Mr. Jin and his co-defendants, the Government sought a warrant to search and seize the contents of five email accounts, including a Gmail account that the Government alleges belongs to Mr. Jin.  *See* Def.'s Ex., Dkt. No. 291-2 at 2–5; *see also* Def.'s Ex., Dkt. No. 46-1 (same document).  In its warrant application, the Government represented that, based in part on its undercover investigation, it had reason to believe the target

email accounts contained evidence of violations of 50 U.S.C. § 1705 (evasion of sanctions under IEEPA) and 18 U.S.C. § 1956 (money laundering).  Dkt. No. 291-2 at 2.

On December 10, 2019, Magistrate Judge Robin M. Merriweather determined that the Government had demonstrated probable cause for the search and issued a warrant authorizing the search and seizure of the target email accounts.  Dkt. No. 291-2 at 2.

In finding probable cause, Magistrate Judge Merriweather relied on an affidavit in support of the Government's warrant application sworn out by FBI Special Agent Joy Gallante. *See* Dkt. No. 291-2 at 3, 16–17.  Agent Gallante's affidavit provided five categories of support for the warrant application: (1) background information about North Korean commerce and U.S. sanctions against North Korea, *id.* ¶¶ 7–18; (2) information gleaned from Government interviews with CTJ, which had cooperated in the Government's investigation; (3) information revealed from subpoena returns from CTJ and financial institutions, *id.* ¶¶ 26–29; (4) information learned during the Government's undercover investigation, including a meeting between Jin and undercover agents, *id.* ¶¶ 22–25; and (5) information returned from prior court orders under 18 U.S.C. § 2703(d), *id.* ¶¶ 33–35.

Mr. Jin disputes several representations in Agent Gallante's affidavit, arguing that they are either false or contain material omissions.  Specifically, Mr. Jin argues that the affidavit (1) omits facts that tend to show that CTJ had a motive to curry favor with the Government, (2) omits any mention of a relevant instance in which a CTJ employee made a statement that he argues was false, (3) falsely states that a CTJ employee identified Mr. Jin as a representative of the Winney Entities, (4) misrepresents the content of his July 2019 discussion with the undercover agents, and (5) misrepresents the Winney Entities' role in changing the bills of lading

after the U.S. adopted comprehensive sanctions against North Korea in 2016. *See* Def.'s Mot., Dkt. No. 46; Def.'s Mot., Dkt. No. 291.

c.  *Warrant returns*

The returns from the Google search warrant included—among other things—emails and attachments that appear to be related to the Winney Entities' export business. Among these documents are several messages and attachments that the Government alleges are essentially progress reports to Mr. Jin by subordinate officers employed by the Winney Entities.

**C. Procedural History**

  1. <u>Indictment</u>

On March 21, 2023, the Government obtained a grand jury indictment in this District against Mr. Jin and three co-defendants: Mr. Qin, Mr. Han, and Mr. Hyon-Sop. *See* Indictment, Dkt. No. 13. This indictment charges each of the Defendants with participating in a bank-fraud and money-laundering conspiracy beginning "at least in or around February 2009" and continuing until "in or around March 2019"; with participating in a conspiracy to violate IEEPA beginning "on or about March 15, 2016," until "in or around March 2019"; and with violating IEEPA's substantive prohibitions through four transactions occurring between June 20, 2018, and March 1, 2019. Indictment, Dkt. No. 13, ¶¶ 47, 77–78, 80, 82.

The March 2023 grand jury indictment contains certain factual allegations that the Government now concedes are not supported by the evidence. Specifically, the Government concedes that the indictment attributes to Mr. Jin a statement that was in fact made by his interpreter. *See* Gov't's Resp., Dkt. No. 326 at 1–5.

The Government also concedes that the indictment's allegations wrongly attributed to the Winney Entities certain payments made to CTJ from two alleged North Korean front companies with links to DHID, Carbuncle Business Company Limited ("Carbuncle") and Fully Max

17

Trading Limited ("Fully Max").  *See* Gov't's Resp., Dkt. No. 316 at 7.  The Government represents that this mistaken attribution was likely the result of wrongly assuming that CTJ only produced records related to its business with Winney when, in fact, CTJ also produced records related to another one of its customers that also did business in North Korea.  *Id.*

### 2.  Arrest and extradition

At the time of his indictment in this District, Mr. Jin was residing in Australia.  On March 21, 2023, the same day the grand jury returned its indictment, a magistrate in Australia issued an extradition arrest warrant, and Australian officials arrested Mr. Jin.  An Australian magistrate then remanded Mr. Jin to custody.

Lengthy extradition proceedings in an Australian court then ensued.  The United States formally requested extradition on May 11, 2023—51 days after Mr. Jin's arrest.  *See* Decl. of Jeffrey M. Olsen, Dkt. No. 94 ("Olsen Decl.") ¶ 21.  This request was timely under the Treaty on Extradition Between the United States of America and Australia (the "Extradition Treaty"), which required the United States to submit its request within 60 days of Jin's arrest.  *Id.* ¶ 7.

Mr. Jin formally consented to extradition on August 4, 2023—136 days after his arrest, and 85 days after the United States' request.  *See* Olsen Decl. ¶ 22(c).  Of these 85 days of delay, 48 days were attributable to scheduling decisions of the Australian court.  *See id.* ¶¶ 21, 22(a)–(c).  The remaining 37 days were the result of a request by Mr. Jin's counsel for an adjournment to allow Mr. Jin time to consider his position on extradition.  *Id.* ¶ 22(b).

After Mr. Jin consented to extradition, another 376 days passed before the Australian government formally approved his extradition.  *See* Olsen Decl. ¶ 22(b), (f).  This delay arose because, under the relevant Extradition Treaty, even after Mr. Jin consented to extradition, his case returned to the Australian Attorney General for a final determination on whether he should be surrendered to the United States.  *See id.* ¶¶ 12, 22.  Part of this delay—61 days—is

attributable to Mr. Jin, whose counsel requested time to make representations to the Australian government regarding his extradition. *Id.* ¶ 22(e). The remaining 315 days resulted from delays in the Australian legal system beyond the control of the United States. *See id.* ¶ 22(f)–(g). During this period, the United States sought and received updates from the Australian Attorney General and promptly responded to the Australian Attorney General's requests for information. *Id.*

There was a further delay of 47 days between the approval of Mr. Jin's extradition and his initial appearance in this District. *See* Olsen Decl. ¶ 23. The United States submitted a plan for Mr. Jin's surrender 36 days after the Australian government approved his extradition, and Mr. Jin was transferred to U.S. custody eight days after that. *Id.* ¶ 24. Mr. Jin was then held in U.S. custody for three days before his initial appearance. *See* Minute Entry (Sept. 30, 2024).

Mr. Jin ultimately made his initial appearance in this District on September 30, 2024. *See* Minute Entry (Sept. 30, 2024).

### 3. Pretrial proceedings

At his initial appearance and two early status hearings in this District, Mr. Jin consented to excluding time under the Speedy Trial Act to allow him time to obtain counsel, review discovery, and consider the Government's plea offer. *See* Minute Entry (Sept. 30, 2024); Minute Order (Oct. 8, 2024); Minute Order (Dec. 6, 2024).

In December 2024, Mr. Jin secured new counsel and requested that the Court set a prompt trial date. *See* Minute Order (Dec. 6, 2024). The Government then moved for a 180-day continuance to ensure adequate time for motions practice and for the parties and the Court to prepare this complex case for trial. Gov't's Mot., Dkt. No. 33.

Mr. Jin later moved to dismiss the indictment on the grounds that the Government had violated his Sixth Amendment right to a speedy trial. Def.'s Mot., Dkt. No. 44. This Court

denied that motion, concluding that the delays in bringing Mr. Jin's case to trial were either not attributable to the Government or were reasonable given the complexity of the case and the time necessary for diligent trial preparation. Mem. Op. & Order, Dkt. No. 98.

After extensive further motions practice, this Court issued a series of rulings that narrowed the issues for trial. The Court granted Mr. Jin's motion to dismiss five substantive money-laundering counts for lack of proper venue, concluding that those counts could only be properly brought in the District in which the alleged transactions took place. Order, Dkt. No. 144. The Court denied Mr. Jin's motion to dismiss other counts on grounds related to venue, extraterritoriality, and the substantive scope of the bank fraud statute. *Id.* The Court also resolved more than a dozen motions *in limine* addressing issues about evidentiary issues and the permissibility of certain arguments that the parties expected would be raised at trial. Mem. Op. & Order, Dkt. No. 152.

In one of these rulings, the Court noted that it would "carefully limit the extent to which [Mr.] Jin may inquire into the details of the Government's investigation of CTJ." *Id.* at 11. Recognizing that inquiry into these details could stray into improper selective prosecution and jury nullification arguments, the Court stated that it would limit the presentation of evidence and argument focusing on the thoroughness (or lack thereof) of the Government's investigation of CTJ's own conduct. *Id.* at 11–13. The Court also expressly prohibited Mr. Jin from presenting any evidence or argument about CTJ for "impermissible purposes untethered from credibility or the reliability of the Government's evidence about him." *Id.* at 13. However, the Court noted that it would allow Mr. Jin to present evidence of CTJ's cooperation with the Government and the Government's decision not to prosecute CTJ or its employees for sanctions evasion, both of which could properly be used to impeach the credibility of CTJ witnesses. *Id.* at 11–12. To

ensure the orderly presentation of such evidence, the Court required Mr. Jin to request an advance ruling on the admissibility of "any evidence or . . . argument regarding the Government's investigation into CTJ." *Id.* at 13.

4. September 2025 jury trial

Mr. Jin's first trial commenced with jury selection on September 11, 2025, and a jury was sworn in at the end of the day on September 15, 2025. *See* Minute Entry (Sept. 11, 2025); Minute Entry (Sept. 15, 2025).

On the evening before the jury was sworn in, Mr. Jin filed a trial brief in which he raised hearsay objections to many of the Government's exhibits. *See* Def.'s Trial Br. (Sept. 2025), Dkt. No. 199. To ensure the orderly resolution of these objections, the Court held an evidentiary hearing on the morning of September 16, which delayed the start of the Government's case by several hours. At this hearing, the Court heard evidence about the roles of various individuals, including Mr. Jin, in the Winney Entities' business. Following the hearing, the Court resolved Mr. Jin's principal hearsay objections in a detailed oral ruling, concluding that the statements at issue were not hearsay because they were statements of Mr. Jin's agents, made within the scope of the relevant agency relationship. *See* Trial Tr. (Sept. 16, 2025, p.m.) at 29:16–33:25; Trial Tr. (Sept. 18, 2025, a.m.) at 10:18–12:13; Fed. R. Evid. 802(d)(2)(D).

After the evidentiary hearing, the Government presented its case, which consisted of seven days of witness testimony and hundreds of pages of exhibits.

Among the Government's witnesses was FBI Forensic Accountant ("FoA") Dawson Anglin, whom the Court found was qualified to offer specialized opinion testimony "in the area of forensic accounting, including the analysis of banking records, identifying front companies and other money laundering techniques and patterns of the same used as related to North Korean

21

trade." Trial Tr. (Sept. 18, 2025, p.m.) at 28:9–14. FoA Anglin also testified as a fact witness about his role in the Government's investigation.

FoA Anglin sponsored several exhibits, including a spreadsheet of transactions that he testified included "all the related records" of transactions between CTJ and the Winney Entities. *See* Trial Tr. (Sept. 18, 2025 p.m.) at 33:11–36:10. This spreadsheet, which was admitted without objection, was marked as Government's Exhibit 352. *Id.* at 35:22–36:10.

Mr. Jin later highlighted that this spreadsheet included transactions involving two front companies that the Government now concedes are not related to the Winney Entities: Carbuncle Business Company Limited ("Carbuncle") and Fully Max Trading Limited ("Fully Max"). *See* Dkt. No. 332-2 at 2–3. Of the 364 transactions listed in the spreadsheet, four involve Carbuncle and two involve Fully Max. *See id.* Collectively, these transactions amount to less than two percent of the total dollar value of the transactions that the Government attributes to the Winney Entities. *See id.*; *see also* Gov't's Resp., Dkt. No. 316 at 7; Gov't's Resp., Dkt. No. 333 at 4–8.

The Government has represented that FoA Anglin realized the Government's mistake regarding Carbuncle and Fully Max while he was preparing for his testimony at Mr. Jin's first trial. *See* Gov't's Resp., Dkt. No. 333 at 4–8. Specifically, he noticed that CTJ's transactions with Carbuncle and Fully Max generally involved orders for grades of tobacco other than the grades that the Winney Entities ordered. *Id.* at 6–7. The Government represents that, the night before FoA Anglin's planned testimony, he notified one of the Government's trial attorneys— Assistant U.S. Attorney Karen Seifert—that he no longer believed that transactions involving these companies were properly attributable to the Winney Entities. *Id.* at 7. The Government further represents that FoA Anglin and AUSA Seifert they removed references to Carbuncle and Fully Max from other Government exhibits. *Id.* However, neither FoA Anglin nor any other

member of the Government's trial team removed the six transactions involving these two companies from Exhibit 352. *See id.* They also did not notify either the Court or the Defense of the issue during Mr. Jin's trial. Later, ahead of Mr. Jin's retrial, Mr. Jin proffered evidence that AUSA Seifert modified one of the Government's exhibits on the evening of September 14, 2025, which was four days before FoA Anglin testified. *See* Def.'s Supp., Dkt. No. 336.

Mr. Fernando Bartoletti, the finance manager of CTJ, also testified as a Government witness. Trial Tr. (Sept. 22, 2025, p.m.) at 14:20–16:22. Mr. Bartoletti testified that, among CTJ's senior officials, he is the person most familiar with CTJ's payment and banking records. Trial Tr. (Sept. 23, 2025, a.m.) at 45:24–47:8.

Mr. Jin presented no witnesses, but he moved in several exhibits for the jury's consideration. Trial Tr. (Sept. 25, 2025, a.m.) at 18:19–20:2.

The parties gave closing arguments on September 25, and the jury began deliberating the next day. *See* Minute Entry (Sept. 25, 2025).

The jury deliberated for five days, not counting a five-day recess over a weekend that the Court granted to accommodate some jurors' preexisting travel plans. The jury was ultimately unable to reach a verdict, and the Court declared a mistrial on October 7, 2025. *See* Minute Order (Oct. 7, 2025).

### 5. Proceedings following the September 2025 trial

After the Court declared a mistrial, the parties requested a series of continuances to allow them to discuss the possibility of a negotiated resolution short of retrial. *See* Mot. to Continue, Dkt. No. 223; Mot. to Continue, Dkt. No. 224; Mot. to Continue, Dkt. No. 229; Joint Status Report, Dkt. No. 231; Joint Status Report, Dkt. No. 232.

On December 12, 2025, the parties reported that they had been unable to reach an agreement to resolve the case and requested a hearing to discuss the setting of a trial date. Joint

Status Report, Dkt. No. 233.  The Court set a hearing for December 19, 2025, and found that the "ends of justice" served by granting the parties' requests for continuances to allow them time to consider a negotiated resolution outweighed the best interests of Mr. Jin and the community in a speedy trial.  Minute Order (Dec. 15, 2025).  Mr. Jin consented to excluding time from the Speedy Trial calculation during this period.  *See, e.g.*, Mot. to Continue, Dkt. No. 223.

At the hearing on December 19, Mr. Jin objected to further continuances and asked the Court to set a date for a prompt retrial.  *See* Minute Entry (Dec. 19, 2025).  The Government also noticed the appearances of a new trial team.  *See id.*  Recognizing that there would likely be extensive motions practice in advance of the retrial, the Court directed the parties to begin filing any new motions and provide pretrial scheduling proposals.  *See id.*

After receiving the parties' scheduling proposals, the Court granted the Government's request to set a firm trial date in March 2026.  *See* Pretrial Scheduling Order, Dkt. No. 270.  The Government requested this date to accommodate the availability of Mr. Fernando Bartoletti, CTJ's finance manager and a key witness in the Government's case-in-chief at Mr. Jin's first trial.  At the Court's direction, Government moved to exclude time under the Speedy Trial Act based on Mr. Bartoletti's unavailability and other statutory factors, including the pendency of pretrial motions.  *See* Gov't's Mot., Dkt. No. 275.

The Court also set out specific procedures for the preparation of exhibits and the filing of additional motions in advance of retrial.  *See* Pretrial Scheduling Order, Dkt. No. 270; Order, Dkt. No. 271.  The Court adopted its written orders issued before and during Mr. Jin's first trial as the law of the case, and it ordered that if either party wanted the Court to revisit a ruling in one of those orders, that party must file a motion for reconsideration.  Order, Dkt. No. 271.  The

Court also ordered the parties to file any reasonably foreseeable objections to exhibits as motions *in limine*, rather than waiting to raise those objections at trial.  *Id.*

The parties have now filed a series of pretrial motions, including several motions filed out-of-time.  These motions are ripe for decision.

## II. LEGAL STANDARDS

### A.    Speedy Trial

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI.   "Excessive delay in prosecuting a defendant after he is indicted or arrested violates this Sixth Amendment right." *United States v. Tchibassa*, 452 F.3d 918, 922 (D.C. Cir. 2006).

To decide whether a delay in bringing a defendant to trial exceeds the Sixth Amendment's bounds, the Court must apply the multifactor balancing test articulated in *Barker v. Wingo*, 407 U.S. 514 (1972).  Under *Barker*, the Court considers and balances (1) the length of the delay, (2) the reason for the delay, (3) whether the defendant has asserted his right to a speedy trial, and (4) the prejudice suffered by the defendant from the delay.  *Id.* at 530.  Under the *Barker* test, "none of the four factors" is "either a necessary or sufficient condition" to finding a deprivation of the speedy-trial right.  *Id.* at 533.  Instead, "they are related factors and must be considered together" as part of a "difficult and sensitive balancing process."  *Id.* Nonetheless, "[t]he flag that all litigants seek to capture is the second factor, the reason for delay."  *United States v. Loud Hawk*, 474 U.S. 302, 315 (1986); *see also United States v. Fernandes*, 618 F. Supp. 2d 62, 67 (D.D.C. 2009) (JDB) ("[T]he second factor . . . often dictates the outcome of cases.").

In parallel with the constitutional protections of the Sixth Amendment, the Speedy Trial Act provides that retrials are to commence within 70 days "from the date the action occasioning

the retrial becomes final." 18 U.S.C. § 3161(e). This 70-day countdown pauses during periods of delay attributable to the unavailability of an essential witness, the pendency of any pretrial motion, and continuances based on a finding that the "ends of justice" served by the continuance outweigh the best interests of the community and the defendant in a speedy trial. *Id.* § 3161(h)(1)(D), (3), (7).

## B.    Discovery Motions

The Government has a duty to disclose to the Defense all information known to the Government that is "favorable to an accused" and "material either to guilt or to punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also* LCrR 5.1; Order, ECF No. 29. This obligation includes a duty to disclose evidence bearing on the credibility of witnesses. *Giglio v. United States*, 405 U.S. 150, 154 (1972).

The Jencks Act requires the Court, upon motion of the defendant, to order the Government to produce to the defense "any statement" of a Government witness "in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b); *see also* Fed. R. Crim. P. 26.2. In this Circuit, a statement "relates to" a Government witness's testimony and is within the scope of this rule only if it "overlap[s] with the subject matter of the testimony" or otherwise would enable the defense to impeach the witness. *Norinsberg Corp. v. U.S. Dep't of Agric.*, 47 F.3d 1224, 1228–30 (D.C. Cir. 1995).

The Jencks Act provides that a statement within its scope is not subject to "subp[o]ena, discovery, or inspection" until the relevant witness "has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a). "This congressional determination is not to be disregarded by the courts." *United States v. Tarantino*, 846 F.2d 1384, 1414 (D.C. Cir. 1988). However, "trial judges, with the consent of the government, routinely fashion discovery

procedures that entail production of Jencks material before trial or prior to direct examination, in order to facilitate the defense's preparation for cross-examination." *Id.* at 1415 n.12.

Once the Government is ordered to produce a statement under the Jencks Act, "the court shall order the United States to deliver" any part of the statement that the Government claims does not relate to the subject matter of the testimony of the witness "for the inspection of the court *in camera.*" *Id.* § 3500(c).

### C.       Motion to Suppress

The Fourth Amendment prohibits "unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV.  The Supreme Court has described the task of evaluating probable cause as "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  "When police obtain evidence by way of an unlawful search, the exclusionary rule may require exclusion of that evidence in some circumstances."  *United States v. Glover*, 681 F.3d 411, 418 (D.C. Cir. 2012).  But "the exclusionary rule has limited force in cases involving a search with a search warrant."  *Glover*, 681 F.3d at 418.  In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court instructed that, subject to narrow exceptions, courts may not exclude evidence "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Id.* at 920.

One exception to *Leon*'s default rule arises when "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth." *Leon*, 468 U.S. at 923.

27

That exception, which Mr. Jin invokes in this case, was originally set forth in *Franks v. Delaware*, 438 U.S. 154 (1978).  Under *Franks*, if a defendant makes a "substantial preliminary showing," the court must hold an evidentiary hearing to determine whether the fruits of the warrant should be excluded. 438 U.S. at 155–56.  In this Circuit, the substantial preliminary showing necessary to trigger a Franks hearing requires a defendant to show that (1) the warrant affidavit contained false statements or omitted certain facts; (2) the false statements or omitted facts were material to the finding of probable cause; and (3) the false statements or omissions were made knowingly and intentionally, or with reckless disregard for the truth.  *United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010); *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008).

"An affidavit offered in support of a search warrant enjoys 'a presumption of validity.'" *United States v. Maynard*, 615 F.3d 544, 550 (D.C. Cir. 2010) (quoting *Franks*, 438 U.S. at 171).  To overcome that presumption, the defendant must make a "substantial showing" that is "more than conclusory" and "accompanied by an offer of proof."  *Id.* (quoting *United States v. Gaston*, 357 F.3d 77, 80 (D.C. Cir. 2004)).  Additionally, false statements are "material" if, when they are "set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks*, 438 U.S. at 156.  By extension, omissions are material if "their 'inclusion in the affidavit would defeat probable cause.'"  *Spencer*, 530 F.3d at 1007 (quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)).

### D.      Motions *in Limine*

"Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings," trial courts may entertain and resolve motions *in limine* pursuant to their "inherent authority to manage the course of trials."  *Luce v. United States*, 469 U.S. 38, 41 (1984).  The Court has broad discretion both to render evidentiary rulings and to determine whether ruling in advance of

28

trial is appropriate.  *Graves v. District of Columbia*, 850 F. Supp. 2d 6, 11 (D.D.C. 2011) (CKK).

On a motion *in limine*, the Court evaluates the admissibility of evidence according to the relevance framework established by Federal Rules of Evidence 401 and 402.  *Daniels v. District of Columbia*, 15 F. Supp. 3d 62, 66 (D.D.C. 2014) (BAH).  The proponent of an item of evidence bears the burden of establishing its relevance.  *Dowling v. United States*, 493 U.S. 342, 351 n.3 (1990).  Evidence is relevant if it is probative (because it has "any tendency to make a fact more or less probable") and material (because that "fact is of consequence in determining the action").  Fed. R. Evid. 401.  Irrelevant evidence is inadmissible.  Fed. R. Evid. 402.

Relevant evidence is admissible unless "the United States Constitution; a federal statute; [the Federal Rules of Evidence]; or other rules prescribed by the Supreme Court" provide otherwise.  Fed. R. Evid. 402.  Relevant evidence may be excluded if its probative value is substantially outweighed by the risk of unfair prejudice, confusion of the issues, misleading the jury, or undue delay.  Fed. R. Evid. 403.  Similarly, relevant evidence that constitutes hearsay is inadmissible unless an exception to the prohibition on hearsay applies.  Fed. R. Evid. 801(c), 802.

This Court has discretion to limit a criminal defendant's presentation of evidence and cross-examination of witnesses.  *See United States v. Whitmore*, 359 F.3d 609, 615–16 (D.C. Cir. 2004).  However, that discretion is necessarily limited by the defendant's Constitutional right to present a complete defense.  *See Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).

### E.        Motions for Reconsideration

"Unlike the Federal Rules of Civil Procedure, neither the Federal Rules of Criminal Procedure nor the Local Criminal Rules for this district provide for motions for reconsideration." *United States v. Bagcho*, 227 F. Supp. 3d 28, 31 (D.D.C. 2017) (ESH).  Nonetheless, courts in this  District  "have  assumed,  without  deciding,  that  they  may  consider  motions  for

reconsideration in criminal cases." *Id.* In doing so, some courts have applied various standards applicable to analogous motions for reconsideration in civil cases, while others have analyzed the issues *de novo* and denied reconsideration without deciding the applicable standard of review. *See id.*; *see also, e.g.*, *Husayn v. Esper*, No. 08-cv-1360, 2020 WL 3035052, at *2 (D.D.C. June 6, 2020); *United States v. Hassanshahi*, 145 F. Supp. 3d 75, 80 (D.D.C. 2015) (RC)).

In a civil case, a court may grant an interlocutory motion to reconsider based on "(1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error in the first order." *United States v. All Assets Held at Bank Julius*, 502 F. Supp. 3d 91, 95 (D.D.C. 2020) (PLF) (quoting *Klayman v. Jud. Watch, Inc.*, 296 F. Supp. 3d 208, 213 (D.D.C. 2018) (CKK)), *aff'd sub nom. United States v. All Assets Held at Credit Suisse (Guernsey) Ltd.*, 45 F.4th 426 (D.C. Cir. 2022).

### III. ANALYSIS

#### A.    Speedy Trial

Mr. Jin has renewed his motion to dismiss the indictment against him on the grounds that the Government has violated his Sixth Amendment right to a speedy trial. Def.'s Mot., Dkt. No. 268. The Government has also moved to exclude certain periods from the computation of time under the Speedy Trial Act. Gov't's Mot., Dkt. No. 275. For the reasons that follow, the Court shall **DENY** Mr. Jin's motion to dismiss and **GRANT IN PART** and **DENY IN PART WITHOUT PREJUDICE** the Government's motion to exclude time. The Court concludes that the retrial in this matter commenced within the time required by the Sixth Amendment and the Speedy Trial Act.

1.   The Government has not violated Mr. Jin's Sixth Amendment right to a
     Speedy Trial.

Mr. Jin has now been in custody for more than three years. *See supra* Section I.C.1. Mr.

Jin argues that this protracted delay requires dismissal of the indictment with prejudice. Def.'s

Mot., Dkt. No. 268. Although the Court acknowledges that the substantial period between arrest

and trial has been costly to Mr. Jin and that the record supports an inference that the Government

could have proceeded with greater speed, the Court disagrees that dismissal of the indictment is

warranted.

When evaluating a claim of denial of the Sixth Amendment right to a speedy trial, the

Court considers (1) the length of the delay, (2) the reason for the delay, (3) whether the

Defendant asserted his right to a speedy trial, and (4) the prejudice suffered the Defendant from

the delay. *Barker v. Wingo*, 407 U.S. 514, 530 (1972).

Applying these factors, the Court previously concluded that the delay between Mr. Jin's

arrest and the commencement of his first trial in September 2025 did not violate his Sixth

Amendment right to a speedy trial. Mem. Op. & Order, Dkt. No. 98. A key factor in the Court's

analysis was that a substantial fraction of the delay is not attributable to the United States;

instead, much of it is properly attributable to Mr. Jin or to the government of Australia, which

delayed a final decision to approve Mr. Jin's extradition for more than one year. *See id.* at 7–9.

The Court further concluded that much of the delay attributable to the United States is justified

by the time necessary to secure extradition and prepare this factually and legally complex case

for trial. *See id.* at 7 (citing Mem. Op. & Order, Dkt. No. 35).

Mr. Jin argues that the record now before the Court requires a different result. He urges

the Court to hold that the nine-month delay between his first assertion of his right to a speedy

trial and his September 2025 trial, together with the roughly three-month delay between the

conclusion of the parties' subsequent plea negotiations and his March 2026 retrial, is an unreasonable and unjustifiable delay attributable to the Government.  He argues that the record shows that the Government would not have needed these delays if it had prepared diligently for trial while he was awaiting extradition in Australia and, later, while the parties were discussing the possibility of a plea.  *See* Def.'s Mot., Dkt. No. 268 at 6–7, 10 (collecting examples that Mr. Jin argues reflect a lack of diligence on the part of the Government).

The Court disagrees.  Upon careful consideration of Mr. Jin's submissions, the Court agrees that these periods of post-extradition delay during which he was actively asserting his right to a speedy trial are properly attributable to the United States.  However, the Court disagrees that these delays are so unreasonable as to warrant dismissal of the indictment.

a.    *Length of delay*

In reaching this conclusion, the Court begins by considering the length of the delay.  *See Doggett v. United States*, 505 U.S. 647, 651 (1992).  As the Court previously concluded, the length of the delay between indictment and trial in this case is obviously substantial and triggers the Sixth Amendment speedy-trial analysis. Mem. Op. & Order, Dkt. No. 98 at 3–4.  The length of that delay weighs in Mr. Jin's favor, but not decisively so; given the complexity of this international conspiracy case and the necessity of extradition proceedings, the length of the delay "does not strongly sway the ultimate outcome of the speedy trial issue."  *United States v. Fernandes*, 618 F. Supp. 2d 62, 68 (D.D.C. 2009) (JDB).

b.    *Reason for delay*

Next, the Court considers "the reason for the delay."  *Barker*, 407 U.S. at 531.  As the Court has already held, much of the delay in bringing this case to trial is not attributable to the United States. Mem. Op. & Order, Dkt. No. 98 at 4–8.  A total of 626 days elapsed between Mr. Jin's arrest and indictment on March 23, 2023, and his first assertion of his right to a speedy trial

and objection to further ends-of-justice continuances on December 6, 2024. Of those, 363 days are properly attributed to the government of Australia; 98 days are attributable to the diligent efforts of the United States to comply with its obligations under the relevant Extradition Treaty; 98 days are attributable to Mr. Jin's requests for reasonable continuances to address issues related to his extradition; and 67 days are attributable to the parties' requests for additional time to allow Mr. Jin to retain counsel, review discovery, and consider the Government's plea offer after his first appearance in this District. *Id.* at 5–7. None of these periods involved an unreasonable delay attributable to the United States.

In his renewed motion, Mr. Jin focuses on the reasons for the delay in the 473-day period between December 6, 2024, and his retrial that began on March 24, 2026. Some of this time is not chargeable to either party. Specifically, the 26-day period from the beginning of Mr. Jin's first trial on September 11, 2025, until the declaration of a mistrial due to a hung jury on October 7, 2025, weighs neutrally in the analysis. *See* Minute Order (Oct. 7, 2025). Similarly, neither party is to be faulted for the 66-day period from the declaration of a mistrial until December 12, 2025, during which the parties engaged in plea discussions that ultimately reached an impasse. *See* Joint Status Report, Dkt. No. 233.

Excluding the periods that weigh neutrally in the analysis leaves 381 days of delay attributable to the United States, during which Mr. Jin was actively asserting his right to a speedy trial. The Court assumes, without deciding, that some of this delay may be attributable to "negligence," in the sense that the Government could have done more during other periods— especially while Mr. Jin was awaiting extradition—to prepare the case for trial. *See Barker*, 407 U.S. at 531. Even under that assumption, the reasons for delay do not weigh decisively in Mr. Jin's favor. Although a delay due to negligence or an absence of diligence "should be

33

considered," it should be "weighted less heavily" than a "deliberate attempt to delay the trial in order to hamper the defense." *Id.*

The delay during this roughly year-long period has been reasonably justified. Notably, Mr. Jin does not allege that the Government has deliberately delayed trial to impede his case. *Cf. Barker*, 407 U.S. at 531. On the contrary, the record shows that the Government has gone to great effort to advance this case—consistent with Mr. Jin's interest in a speedy trial—by timely responding to numerous requests for specific discovery and a wide array of complex pretrial motions. By the Court's most recent count, there have been more than 90 such motions filed in this case, including 60 motions before his first trial and more than 30 before his retrial. Although Mr. Jin argues that the Government could and should have done more to prepare for and respond to his discovery requests and pretrial motions earlier, on the present record, this Court cannot say that the Government's efforts have been so deficient as to make the entire resulting period of delay unreasonable. Similarly, although Mr. Jin argues that the Government's new trial team could have done more to prepare for a potential retrial while the parties were still actively pursuing plea negotiations, the Government's request to begin the retrial in March 2026 was reasonable under the circumstances. Once the parties decided to proceed with a retrial, the Court and the parties set trial to begin on the first date that was reasonably available for the parties, their witnesses, and the Court. This date also ensured adequate time for the parties to file and respond to another round of pretrial motions—a task that has proven to be a significant undertaking for all involved. As the Court has noted, the parties have filed more than 30 additional motions since the end of the first trial, illustrating the breadth and depth of the legal issues that needed to be resolved before the parties could begin presenting their cases on retrial. In short, these periods of delay are justified by legitimate needs of this complex case.

In sum, each of the relevant periods of delay in the retrial of this case either is not attributable to the United States or is reasonably justified by the nature and circumstances of this prosecution. Accordingly, this second factor—"[t]he flag all litigants seek to capture"—weighs in the Government's favor. *See United States v. Loud Hawk*, 474 U.S. 302, 315 (1986).

c.    *Assertion of the right*

The Court next weighs "[w]hether and how" Mr. Jin has asserted his right to a speedy trial. *Barker*, 407 U.S. at 531. During the periods that are the primary focus of Mr. Jin's present motion, he consistently asserted his right to a speedy trial and asked the Court to set a trial at the first opportunity. As to these periods, Mr. Jin's assertion of his rights weighs in his favor. However, during other periods—collectively totaling nearly two years—Mr. Jin was not actively asserting these rights, and this factor weighs neutrally.

d.    *Prejudice*

Finally, the Court weighs the prejudice to Mr. Jin that has resulted from the delay in his trial. *See Barker*, 407 U.S. at 531. Although the record does not show that the delay has caused any specific prejudice to Mr. Jin's ability to mount a defense—the "most serious" kind of prejudice to be considered in this analysis—lengthy pretrial incarceration is an inherently serious cost and meaningful disadvantage to any defendant. *See id.* at 532–33. This factor weighs in Mr. Jin's favor.

e.    *Balancing the factors*

After considering each of the four relevant factors, the Court determines that the timing of Mr. Jin's retrial does not violate his Sixth Amendment right to a speedy trial. The length of time between Mr. Jin's arrest and the retrial is substantial, and the constitutional question is closer than it was when Mr. Jin first raised it before his first trial. However, the length of time it has taken the parties to prepare this complex case for trial is reasonably justified under the

circumstances. As the Court has explained, much of the delay was the result of extradition proceedings, during which the Government acted diligently. Since Mr. Jin's extradition, the parties have been actively engaged in robust discovery and pretrial motions practice producing more than 90 pretrial motions raising a variety of complex issues, tried the case to a jury once in full, attempted to resolve the case through plea negotiations, and prepared the case for a second jury trial with a new Government trial team. Under all the circumstances, this Court concludes that Mr. Jin's Sixth Amendment right to a speedy trial has not been violated. Accordingly, the Court shall **DENY** his motion to dismiss.

2.    Retrial has commenced within the time allowed under the Speedy Trial Act.

For many of the same reasons that the timing of the retrial in this case is consistent with Mr. Jin's Sixth Amendment rights, that timing is also consistent with the Speedy Trial Act. The Act provides that retrials are to commence within 70 days "from the date the action occasioning the retrial becomes final." 18 U.S.C. § 3161(e). This 70-day countdown pauses during periods of delay attributable to the unavailability of an essential witness, the pendency of any pretrial motion, and continuances based on a finding that the "ends of justice" served by the continuance outweigh the best interests of the community and the defendant in a speedy trial. *Id.* § 3161(h)(1)(D), (3), (7).

Here, the Speedy Trial Act clock for retrial began to run upon the declaration of a mistrial on October 7, 2025, and retrial commenced 197 days later, on March 24, 2026. *See* Minute Order (Oct. 7, 2025); Pretrial Scheduling Order, Dkt. No. 270.

The Court has already found that some of this time is properly excluded in the "ends of justice." 18 U.S.C. § 3161(h)(7). Specifically, with Mr. Jin's consent, the Court granted continuances and excluded time between October 17, 2025, and December 19, 2025, while the parties were actively engaged in plea discussions. *See* Minute Order (Dec. 15, 2025).

36

During most of the remaining time, the Speedy Trial Act clock has been paused due to the pendency of pretrial motions, which the Court ordered the parties to begin filing promptly upon the parties' decision to proceed with a retrial. The Speedy Trial Act excludes from its computation of time "[a]ny period of delay resulting from . . . any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(D). The Act also excludes "any period" up to 30 days during which such a motion "is actually under advisement by the court." *Id.* § 3161(h)(1)(H). All time since December 26, 2025, is properly excluded under these provisions. Beginning with a motion filed on that date, the parties have filed an extended series of more than two dozen pretrial motions, and they continue to file additional motions. *See, e.g.*, Gov't's Mot., Dkt. No. 261 (filed Dec. 26, 2025); Def.'s Mot., Dkt. No. 309 (filed Mar. 6, 2026); Def.'s Mot., Dkt. No. 340 (filed Mar. 27, 2026). The Court has already resolved some of these motions, is resolving nearly two dozen more today, and will resolve the remainder in the coming days. None of these motions will have been ripe for more than 30 days at time of its resolution. Accordingly, because of the pendency of these motions, all time between December 26, 2026, and the commencement of Mr. Jin's retrial on March 24, 2026, is properly excluded from the computation of time under the Speedy Trial Act. *See* 18 U.S.C. § 3161(h)(1)(D), (H).

Finally, some of the delay in Mr. Jin's retrial is properly excluded from the Speedy Trial Act computation because of the unavailability of Mr. Fernando Bartoletti, an essential witness for the Government. The Act expressly excludes "[a]ny period of delay resulting from the absence or unavailability of . . . an essential witness." 18 U.S.C. § 3161(h)(3)(A). An "essential witness" is "unavailable" when "his presence for trial cannot be obtained by due diligence or he resists appearing at or being returned for trial." *Id.* § 3161(h)(3)(B). An "essential witness" is

37

one whose testimony is "not only useful, but essential," in the sense that the witness is "uniquely" able "to establish some relevant fact." *United States v. McNeil*, 911 F.2d 768, 774 (D.C. Cir. 1990).

Here, the Government represents that the presence of one of its key witnesses, Mr. Bartoletti, cannot be "obtained by due diligence" without his voluntary cooperation because the witness lives in Argentina and cannot be compelled to testify by subpoena. *See id.*; Gov't's Mot., Dkt. No. 275, at 2–3. The Government explains that Mr. Bartoletti, CTJ's finance manager, was "unavailable" in January and February 2026 because of the "cyclical work demands" of CTJ's operations, but that he is willing to travel to the U.S. voluntarily for a trial beginning on March 24, 2026. Gov't's Mot., Dkt. No. 275 at 2–3.

Mr. Jin argues that Mr. Bartoletti is not an "essential" witness because another CTJ witness—Mr. Patricio Lyons—could testify to some of the same facts, but this argument is unavailing. *See* Def.'s Resp., Dkt. No. 2–3. Mr. Bartoletti testified at Mr. Jin's first trial that Mr. Lyons lacks personal knowledge about CTJ's payment and financial records, which are critical elements of the Government's case-in-chief. Sept. 2025 Trial Tr. (Sept. 23, 2025, p.m.) at 46:5–12. Mr. Bartoletti's testimony also established that he is the most senior official in CTJ's finance department and the individual best situated to testify about how CTJ made and recorded payments. *See id.* at 45:24–47:8. Based on this testimony, the Court finds that Mr. Bartoletti is an "essential" witness within the meaning of the Speedy Trial Act because he is "uniquely" able to establish relevant facts about CTJ's payment processes and recordkeeping that are central to the Government's case. *See McNeil*, 911 F.2d at 774.

Because Mr. Bartoletti is an essential witness for the Government whom the Government could not have compelled to testify in January and February 2026, a continuance of trial to align

38

with Mr. Bartoletti's voluntary presence is proper.  *See* 18 U.S.C. § 3161(h)(3)(A).  The Court shall therefore **GRANT** the Government's motion to exclude the period of Mr. Bartoletti's unavailability from the computation of time under the Speedy Trial Act.  Given this disposition, the Court does not reach the issue of whether two other witnesses identified in the Government's motion who were unavailable during the same period as Mr. Bartoletti are also "essential."  *See* Gov't's Mot., Dkt. No. 275, at 3.

Finally, on the present record, the Court shall **DENY WITHOUT PREJUDICE** the Government's request to exclude additional time under the "ends of justice" exception.  *See* Gov't's Mot., Dkt. No. 275, at 4.  As Mr. Jin correctly notes, the Government requested and received a significant "ends of justice" continuance in advance of the first trial, and the interests served by further continuances—apart from those justified by the parties' plea discussions, the pendency of pretrial motions, and the unavailability of an essential witness—do not obviously outweigh Mr. Jin's interest in a speedy trial.  *See* Def.'s Resp., Dkt. No. 279, at 8–11.

In sum, the Court shall **GRANT IN PART** and **DENY WITHOUT PREJUDICE IN PART** the Government's motion to exclude certain periods from the computation of time under the Speedy Trial Act.  Accounting for these exclusions and the "ends of justice" continuances the Court has already granted, the Court concludes that Mr. Jin's retrial has commenced within the time required by the Speedy Trial Act.

### B.      The Government's Discovery Productions

In the three months since the parties agreed to set this case for retrial, Mr. Jin has filed several discovery motions seeking orders to enforce the Government's discovery obligations, three of which this Court has already resolved.  He has recently filed several more such motions, for a total of ten new discovery motions filed since the conclusion of his first trial.

Mr. Jin first requested an order directing the Government to comply with the disclosure requirements of *Brady*, Rule 16, and the Jencks Act, without relying on the production decisions of prior Government counsel or declining to respond to requests that it suspects are dilatory "tactics." Def.'s Mot., Dkt. No. 267. He requested an order setting an early deadline for production of Jencks Act material and requiring the Government to produce unredacted versions of that material to the Court for its own, *in camera* review. Def.'s Mot., Dkt. No. 273. He also moved for an order directing the production of all documents in the Government's possession related to CTJ employee Patricio Lyons. Def.'s Mot., Dkt. No. 276. Finally, he requested an evidentiary hearing to develop a record regarding any potential violations of the Government's *Brady* obligations and to fashion an appropriate remedy. *Id.* To give timely guidance to the parties as they prepare for trial, the Court granted in part and denied in part these three discovery motions by prior order. *See* Order, Dkt. No. 315.

In response to the Court's prior order, the Government filed an *ex parte* motion for a protective order, seeking a ruling that Mr. Jin is not entitled to receive certain information that the Court ordered the Government to provide to the Court. Gov't's Mot., Dkt. No. 325 (*ex parte*, under seal).

Mr. Jin then filed six additional discovery motions. He moved to compel the Government to disclose certain email communications and other documents referenced in the Government's previous discovery productions. Def.'s Mot., Dkt. No. 308. He moved to dismiss this case in its entirety, alleging that the Government has engaged in "pervasive and flagrant prosecutorial misconduct, including the repeated suppression of exculpatory evidence and the presentation of false testimony." Def.'s Mot., Dkt. No. 309, at 1. He moved to compel the Government to produce information about FoA Anglin's grand jury testimony and Agent

40

Gallante's communications with the case team.  Def.'s Mot., Dkt. No. 317.  He moved to unseal the submission that the Government filed *ex parte*.  Def.'s Mot., Dkt. No. 329.  He moved to compel the Government to produce all versions of its exhibits related to Carbuncle and Fully Max, as well as all communications between FoA Anglin and the prosecution team regarding those exhibits.  Def.'s Mot. Dkt. No. 330.  And he moved to compel the Government to identify and explain any instances in which it destroyed or deleted relevant evidence.  Def.'s Mot., Dkt. No. 331.

Finally, two days ago, Mr. Jin filed a motion to compel the Government to produce additional Jencks Act statements and *Brady* material for the Court's *in camera* review.  Def.'s Mot., Dkt. No. 340.  The Court has ordered the Government to respond to this most recent motion by tomorrow morning.  Minute Order (Mar. 27, 2026).

Upon careful consideration of the parties' submissions, the Court shall **GRANT IN PART** and **DENY IN PART WITHOUT PREJUDICE** Mr. Jin's motions, except for his most recently filed motion to compel, on which the Court shall **DEFER RULING**.  Here, the Court explains its reasoning for both its prior ruling on Mr. Jin's first three discovery motions and today's ruling on six of Mr. Jin's seven later-filed motions on this topic.

1. The Government's obligations

Mr. Jin's first motion for an order directing the Government to comply with its discovery obligations was largely mooted by the Government's response, in which the Government's current counsel acknowledged the Government's ongoing obligation, confirmed multiple times by this Court, to produce all discoverable information to Mr. Jin.  *See* Gov't's Resp., Dkt. No. 274, at 3; *see also, e.g.*, Order, Dkt. No. 29; Mem. Op. & Order, Dkt. No. 146.  The Government correctly acknowledged that this obligation applies regardless of whether the Government's prior counsel considered a given item to be discoverable in advance of Mr. Jin's first trial.  *See*

41

Gov't's Resp., Dkt. No. 274, at 3.  Accordingly, the Court—by prior order—reaffirmed the Government's discovery obligations, which apply regardless of prior counsel's conclusions or the Government's assessment that a given request appears to be partly dilatory.  *See* Order, Dkt. No. 315.  As the Government is well aware, when it receives a "specific and relevant request" for discoverable information, "the failure to make any response is seldom, if ever, excusable." *United States v. Agurs*, 427 U.S. 97, 106 (1976).  Failing to produce discoverable material may result in sanctions, which may include granting continuances or ordering a new trial.  *See, e.g.*, *United States v. Moore*, 867 F. Supp. 2d 150, 152 (D.D.C. 2012) (JDB); *see also* Order, Dkt. No. 29.  The Court resolves each of Mr. Jin's remaining discovery motions with this framework in mind.

### 2.  Jencks Act material

Mr. Jin's second motion correctly emphasized the importance of the Government's Jencks Act obligations in this case, and the Court granted it in part.  *See* Def.'s Mot., Dkt. No. 273; Order, Dkt. No. 315.  Mr. Jin urged the Court to set an early deadline for the production of Jencks Act statements and to perform an *in camera* review of all such material that the Government withholds from disclosure on the grounds that it does not "relate to" the subject matter of the witness's testimony.  *Id.* (quoting 18 U.S.C. § 3500(b)).  The Government opposed these requests, stating that that it will comply with its obligations and arguing that Mr. Jin is not entitled to *in camera* review of withheld material because he has not carried his burden of raising a "colorable claim" that the Government has withheld Jencks statements.  Gov't's Resp., Dkt. No. 283, at 2 n.1 (quoting *United States v. Moore*, 651 F.3d 30, 75 (D.C. Cir. 2011), *aff'd sub nom. Smith v. United States*, 568 U.S. 106 (2013)).  The Government also represented that it will "aim to" to disclose any additional Jencks material "at least one day before the relevant witness completes his/her direct examination." *Id.* at 4.

42

Because the Government did not consent to disclosure of Jencks Act material before the early deadline previously established in the Court's Trial Procedures Order, Dkt. No. 131, the Court lacks the power to set a still-earlier production deadline. *See Tarantino*, 846 F.2d at 1414–15 & n.12; 18 U.S.C. § 3500(a). However, in an exercise of discretion, the Court—by prior order—granted in part Mr. Jin's request for *in camera* review of the Government's Jencks productions. *See* Def.'s Mot., Dkt. No. 273. The Court assumes, without deciding, that Mr. Jin may raise a "colorable claim" that any redactions that the Government makes to its Jencks productions may obscure additional, discoverable material. *See Moore*, 651 F.3d at 75. Accordingly, to promote the orderly resolution of objections to the Government's Jencks Act productions, the Court has required the Government to provide the Court with an unredacted version of any Jencks statement that it produces to Mr. Jin in redacted form. The Government may provide the unredacted versions of these statements to the Court for *in camera* review at any time, but it must do so no later than the conclusion of direct examination for each witness.

3. Documentation of HSI's undercover investigation and the source of Agent Tarango's statement about the bills of lading

Mr. Jin's third motion presents a closer question. Mr. Jin argues that part of a phone call disclosed to him in discovery strongly suggests that the Government has withheld potentially exculpatory evidence about the Winney Entities' dealings with CTJ. *See* Def.'s Mot., Dkt. No. 276. He focuses on a recorded statement by HSI Agent Erick Tarango, acting in an undercover capacity, in which Agent Tarango stated the following:

> Okay, the bill of lading uh, which [unintelligible] changed back in . . . what, what year? Two years ago [unintelligible]. But that's only which modified . . . [unintelligible] . . . *Patricio instructed James to change the bill of lading* from going to North Korea to going to Dalian.

*Id.* at 3–4 (quoting Def.'s Ex., Dkt. No. 276-4, at 6). Mr. Jin argues that this statement is important exculpatory evidence because it suggests that the idea to change the bills of lading for

43

CTJ's tobacco shipments to remove references to North Korea came not from Mr. Jin's companies (represented here by Mr. "James" Han), but instead from a CTJ employee, Mr. Patricio Lyons. Def.'s Mot., Dkt. No. 276, at 4. The Government has alleged that the Winney Entities changed these bills of lading to obfuscate the transactions' ties to North Korea and evade U.S. sanctions. *See, e.g.*, Indictment, Dkt. No. 13, ¶ 58; Gallante Affidavit, Dkt. No. 291-2 at 15–22, ¶ 20. Mr. Jin argues that if the idea to make this change originated with Mr. Lyons of CTJ, then the Winney Entities—and by extension, Mr. Jin—are not responsible for the change. *Id.* at 4–7; *see also* Def.'s Mot., Dkt. No. 309 (arguing, under that assumption that this idea did in fact originate with Mr. Lyons, that the Government presented false testimony on this topic at Mr. Jin's first trial).

Mr. Jin argues that the Government has improperly suppressed discoverable evidence not only by delaying disclosure of the call in which Agent Tarango referred to Mr. Lyons directing Mr. Han to change a bill of lading, but also by failing to disclose the basis for Agent Tarango's statement. Def.'s Mot., Dkt. No. 276. He argues that the Government's failure to disclose the basis for this statement, together with its failure to produce *any* records regarding any information Mr. Lyons may have provided to the Government, supports an inference that the Government has suppressed exculpatory information. *Id.* He also notes that the Government has not produced contemporaneous reports documenting many of the undercover communications at issue in this case. *See id.*

In a one-page response brief, the Government responded tersely that, "[a]fter a diligent search," it is "unaware of additional information supporting" Mr. Jin's claim that Mr. Lyons instructed Mr. Han or other employees of the Winney Entities to change their bills of lading. Gov't's Resp., Dkt. No. 292. The Government did not state what actions it took as part of its

search, and it did not state whether it decided to withhold some relevant information on the grounds that the information is not favorable to Mr. Jin. *See id.* Later, at a telephone conference on March 12, 2026, the Government proffered that its counsel would be willing to make an *ex parte* representation to the Court about the Government's efforts to comply with its discovery obligations.

Based on the parties' submissions, the Court concluded that an evidentiary hearing was not warranted, but that other, narrower relief was appropriate to guard against the possibility that some discoverable material in the possession of the Government's investigators may not yet have been disclosed to Mr. Jin. *See, e.g.*, *United States v. Andrews*, 532 F.3d 900, 906 (D.C. Cir. 2008) (noting that the Government's *Brady* obligations extend to information "kept by the agent and never reviewed by the prosecutor").

Accordingly, the Court ordered the Government to file an affidavit by Agent Tarango that (1) identified with specificity the steps that Agent Tarango has taken, in the context of the Government's Brady review in this case, to: (a) locate copies of all written, case-related communications between members of the Government's investigative team and employees of CTJ, including Mr. Lyons; (b) locate all of the investigative team's reports, notes, and other documents about its undercover investigation and its communications with employees of CTJ, including Mr. Lyons, whether written or oral; and (c) describe any such communications that were not documented contemporaneously and explain why, in this specific case, these communications were not documented; (2) identified any communications, reports, notes, or other documents within the scope of paragraph (1) that are no longer accessible to Agent Tarango or the Government and explains why those documents are no longer accessible; (3) stated that Agent Tarango has provided the Government's counsel of record with copies of all

reports, notes, and other documents within the scope of paragraph (1) that are in his possession; and (4) stated whether Agent Tarango is aware of any information related to the communications described in paragraph (1) that has not been provided to the Government's counsel of record. Order, Dkt. No. 315, at 2–3. The Court also ordered the Government to file a notice stating whether or not it has withheld any of the information described in Agent Tarango's affidavit from Mr. Jin on the grounds that, in the Government's view, the information is not exculpatory or is otherwise not subject to disclosure. *Id.* at 3. The Court concluded that awarding this relief in advance of trial would allow a valuable opportunity to resolve any remaining disputes before trial begins.

The Government responded to the Court's order in an *ex parte* motion for a protective order in which it asked the Court to hold that its submissions, including Agent Tarango's affidavit, are not discoverable. *See* Gov't's Mot., Dkt. No. 325 (*ex parte*, under seal). The Court later encouraged the Government to provide at least some parts of its submission to Mr. Jin, and it did so. *See* Dkt. No. 337 (under seal).

In its production to Mr. Jin, the Government provided redacted versions of two affidavits. *See* Dkt. No. 337 (under seal). In the unredacted portion of the first affidavit, Agent Tarango addresses each of the topics directed by the Court's Order and states—among other things—that he is not in possession of any case-related communications or reports that he had not turned over to the Government's counsel in this case and that, consistent with DHS policy, he did not document any non-undercover communications with CTJ in this case. *Id.* at 1–6. However, the undercover communications in this case were documented by contemporaneous audio recordings and copies of emails exchanged during the operation, which the Government has produced.

46

The unredacted portion of the second affidavit states that HSI complies with DHS policies for undercover investigations. Dkt. No. 337 at 7–11. It further explains that those policies require the documentation and disclosure of exculpatory information, but they do not require agents to generate contemporaneous reports of individual investigative activities. *Id.* at 8. The name of the second affiant is redacted. *Id.* at 7.

Upon review of the Government's *ex parte* submission, including Agent Tarango's affidavit, the Court is satisfied that the Government has diligently searched for exculpatory documentation related to the undercover investigation that HSI conducted. It has also produced the primary documentation of that investigation that HSI produced, consistent with DHS policy: recordings of the undercover conversations themselves. Accordingly, the Court shall **DENY** Mr. Jin's requests for an order compelling further disclosures on this topic and his request for an evidentiary hearing to inquire further into Agent Tarango's knowledge. On the present record, the Court has no factual basis on which to conclude that Agent Tarango, HSI, or any other Government agent is withholding discoverable documentation about HSI's undercover investigation.

4. The Government's response to the Court's Order requiring an affidavit from Agent Tarango

Mr. Jin argues that the Court should unseal the Government's *ex parte* submission in response to the Court's order calling for an affidavit from Agent Tarango, docket the submission, and require the Government to provide a copy of it to him. Def.'s Mot., Dkt. No. 329. The Court shall deny this request in part, but it shall request additional information from the Government about its reason for withholding the name of one of its affiants.

In his motion to unseal the Government's submission in full, Mr. Jin protests that he "cannot see how the sealed information could relate to 'sensitive law enforcement or intelligence

47

collection techniques,' 'ongoing investigations,' 'the targets of such investigations,' or 'the identification of potential witnesses.'"  Def.'s Reply, Dkt. No. 335, at 6 (quoting *United States v. Concord Mgmt. & Consulting LLC*, 404 F. Supp. 3d 67, 76 (D.D.C. 2019) (DLF)).  That is understandable.  Because the information at issue is redacted, Mr. Jin has no way of knowing that it does, in fact, implicate these sensitive categories.

The Government has shown good cause to keep much of the material contained in its *ex parte* filing under seal.  Material in the Government's *ex parte* submission implicates sensitive law enforcement collection techniques and information regarding the internal processes of undercover operations.  *See Concord Mgmt.*, 404 F. Supp. 3d at 76.  Making these materials public would undermine the "necessity that information-gathering agencies protect from compromise 'intelligence sources and methods.'"  *United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989).  The Court is also mindful that in this area, even claims of privilege that do not make obvious sense to the Court and the Defendant may "make all too much sense to a foreign counter-intelligence specialist who could learn much about this nation's intelligence-gathering capabilities from what these documents revealed about sources and methods."  *Id*.  Meanwhile, Mr. Jin has already received the information that is most relevant to this case and his defenses: the recordings of the undercover meetings themselves and a statement from Agent Tarango clarifying that HSI did not create written reports of other communications.  *See generally* Dkt. No. 337 (under seal). Accordingly, most of the Government's *ex parte* submission shall remain under seal.

The Government has provided Mr. Jin with a redacted version of Agent Tarango's affidavit that addresses each of the topics contained in the Court's March 12 Order.  *See* Order, Dkt. No. 315 at 2–3; Redacted Affidavit, Dkt. No. 337 at 1–6.  Mr. Jin suggests that the

Government defied the Court's Order by filing its submission *ex parte* and producing to him only a redacted version, but the Court disagrees; the Order did not specify that the Government's response must be filed on the public docket. The Government's compliance with this Order is not undermined by its decision to provide additional context about sensitive matters of investigative technique and procedure *ex parte*, and the Court agrees with the Government that the redacted material is not discoverable. The Court therefore declines Mr. Jin's request to order the Government to "produce a new submission" containing only the Government's direct responses to the Court's Order. Def.'s Mot., Dkt. No. 329 at 3. Because Mr. Jin has already received the relevant information directly from the Government, requiring such a submission would serve no practical purpose.

However, the Court shall require the Government to explain its decision to withhold one detail of its submission from Mr. Jin. Specifically, the Government shall explain why it withheld the name of the affiant responsible for the second affidavit. On the present record, this detail does not obviously implicate the same compelling interests that support withholding the remainder of the information at issue. The Court will require the Government to address this issue in a brief response to this Memorandum Opinion and Order, which shall be filed no later than **9:00 a.m. ET on March 31, 2026**.

To this extent, the Court shall **GRANT IN PART** and **DEFER IN PART** the Government's [325] *Ex Parte* Motion for a Protective Order and **DENY IN PART** and **DEFER IN PART** Mr. Jin's [329] Motion to Unseal the Government's *Ex Parte* Submission.

> 5. <u>FoA Anglin's email to HSI regarding its report of the undercover investigation</u>

Beyond any records produced by HSI itself, Mr. Jin seeks a copy of a related email sent by FoA Anglin. As Mr. Jin notes in two of his discovery motions, FoA Anglin sent an email to

49

Assistant U.S. Attorney Karen Seifert and Special Agent Joy Gallante dated January 24, 2022, in which he stated, "I sent an email to HSI today to get clarification on a part in their UC meeting write up that I think was written incorrectly." *See* Dkt. No. 317-3 at 2; *see also* Def.'s Mots., Dkt. No. 309, 317.  Mr. Jin has not received a copy of this email.  The Government represents that it "did not produce Anglin's emails to HSI identifying what he thought was written incorrectly" because those emails "are not *Brady*, Jencks, or otherwise discoverable."  Gov't's Resp., Dkt. No. 316 at 9.

Because the context surrounding the material suggested that it could be at least marginally exculpatory or impeaching, the Court directed the Government to provide a copy of FoA Anglin's communications on this topic—along with any response from HSI—for the Court's *in camera* review.  *See* Minute Order (Mar. 23, 2026).  The Government complied with this order, and the Court has now reviewed the relevant communications.  *See* Dkt. No. 337 (*ex parte*, under seal).

Upon review of the relevant communications, the Court concludes that FoA Anglin's messages have some value as impeachment evidence.  Specifically, they could be used to support an argument that FoA Anglin knew or should have known that the translations that HSI provided were sometimes unreliable and sometimes contained material misattributions.  FoA Anglin's subsequent reliance on translations provided by HSI in preparing some of the Government's submissions could be used to impeach the reliability of his investigative work in this case.  Accordingly, the Court shall **GRANT IN PART** Mr. Jin's [308] Motion to Compel and direct the Government to produce these communications.

Although the Court concludes that this information should be produced because it is potentially favorable to Mr. Jin, the Court does not find that it is "material" in the sense that it

would have affected the outcome of Mr. Jin's first trial or will affect the outcome of his retrial. *See United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005) (PLF) (explaining that the post-trial "materiality" standard for evaluating *Brady* disclosures is "not the appropriate one for prosecutors to apply during the pretrial discovery phase").  Accordingly, the Court's conclusion here should not be mistaken for a finding that the Government violated *Brady* at Mr. Jin's first trial.

Nonetheless, the Court encourages the Government to consider whether, based on the Court's ruling, it may be prudent to produce additional communications to Mr. Jin voluntarily. Neither the Government nor the Court knows every detail of Mr. Jin's planned defenses, and neither the Government nor the Court can necessarily predict what information might appear later, with the benefit of hindsight, to have been discoverable as *Brady* or *Giglio* material.  Given the subject matter of these emails, producing them voluntarily now may help avoid issues at a later point.

### 6.  FoA Anglin's grand jury testimony

Mr. Jin also requests an order directing the Government to produce a transcript of FoA Anglin's grand jury testimony in which the Government concedes that FoA Anglin misquoted Mr. Jin as saying CTJ's employees were "the ones committing fraud" and that Mr. Jin was "simply buying merchandise."   Def.'s Mot., Dkt. No. 317.   The Government provided an unredacted version of this transcript to the Court for its *in camera* review on March 18, 2026.

The Government's transcription and translation of the conversation that FoA Anglin described in this testimony shows that some of the words that FoA Anglin quoted were spoken by an interpreter that Mr. Jin hired, and it shows that Mr. Jin said something different: "We are not money laundering.  We're buying goods.  Are you sure?  What is money laundering?" *See*

Dkt. No. 317-1 at 18; *cf.* Dkt. No. 161-19 at 16 (later, certified version transcribing and translating these comments differently).

The Government shall produce the transcript of FoA Anglin's grand jury testimony about the undercover investigation to Mr. Jin. The Government intends to call FoA Anglin as a witness at trial, and this transcript is relevant impeachment information. It appears that, in the misquotation that Mr. Jin has identified, FoA Anglin attributed to Mr. Jin an English translation of the transcribed statement of his interpreter, rather than directly quoting the English translation of the transcript of Mr. Jin's original statement in Mandarin. *See generally* Dkt. No. 317-1. It is understandable that a diligent investigator could make such a mistake, particularly given the volume and complexity of the translated evidence in this case. However, the mistake is important impeachment evidence because it involves evidence of Mr. Jin's *mens rea*, which is a central issue in this case. A reasonable juror could conclude that an investigator who previously gave mistaken testimony on an important issue in this case might do so again at trial, which could affect the juror's conclusions about the reliability of that witness's testimony.

As with FoA Anglin's communications with HSI, the Court concludes that FoA Anglin's grand jury testimony about the undercover is subject to disclosure because it is potentially helpful to Mr. Jin as impeachment evidence, but the Court does not find that this evidence is "material" in the sense that it has a reasonable probability of affecting trial outcomes. *See Safavian*, 233 F.R.D. at 16. Accordingly, the Court's decision that this testimony should be produced ahead of Mr. Jin's retrial should not be mistaken for a finding that the Government violated *Brady* at Mr. Jin's first trial by deciding not to do so.

Because the Court concludes that FoA Anglin's grand jury testimony about the disputed statement is relevant impeachment information, the Court shall **GRANT IN PART** Mr. Jin's

[317] Motion to Compel and order the Government to produce to Mr. Jin a transcript of FoA Anglin's grand jury testimony about the undercover investigation in this case, which the Government provided to the Court *ex parte* on March 18, 2026.

### 7.   Agent Gallante's communications with the prosecution team

Mr. Jin next requests a copy of former FBI case agent Joy Gallante's "communications with the prosecution team, including but not limited to [FoA] Anglin, regarding the warrant affidavits and criminal complaints she signed under oath."  Def.'s Mot., Dkt. No. 317.  The Government did not respond to this request in its opposition to Mr. Jin's motion.  *See* Gov't's Resp., Dkt. No. 326.  In the absence of a response from the Government, neither the Court nor Mr. Jin can evaluate the adequacy of the Government's efforts to search for potentially discoverable information in Agent Gallante's communications.  Accordingly, at a pretrial conference on March 23, 2026, the Court directed the Government to identify and review any communications between Agent Gallante and the prosecution team about her sworn statements in this case and inform the court of the basis for withholding those communications from Mr. Jin. The Court shall provide further guidance on its expectations for this review by separate order. To this extent, the Court shall **GRANT IN PART** Mr. Jin's [317] Motion to Compel.

### 8.   The draft letter that CTJ's attorney sent to DOJ

Mr. Jin next argues that the Government violated *Brady* (and *Napue*) at his first trial by failing to disclose a draft letter sent by CTJ's attorney to DOJ in which CTJ's attorney proposed that DOJ falsely tell U.S. financial institutions that CTJ had "never transacted business with customers in [North Korea]."  *See* Def.'s Mot., Dkt. No. 309 (referring to this letter as the "Peralta Letter").  The Government produced emails referring to this letter—including emails showing that DOJ refused to sign it—before Mr. Jin's first trial, but it did not disclose the letter itself until Mr. Jin renewed his request for it between trials.  *See* Gov't's Resp., Dkt. No. 316.

Given the Government's disclosure of the emails referring to the letter before the first trial and its subsequent disclosure of the letter itself, the primary issue for the Court to decide is whether the Government's failure to disclose the letter before the first trial was such a flagrant violation of Mr. Jin's right to due process that the indictment should be dismissed. *See* Def.'s Mot., Dkt No. 309.

The record does not support such a severe sanction. As the Government notes, the letter at issue is written by CTJ's attorney, and there is no indication that Mr. Bartoletti or any of the Government's witnesses were involved in drafting it or were even aware of its existence. Gov't's Resp., Dkt. No. 316. The letter itself therefore is not material, and because it likely would not be admissible at trial, reasonable minds could differ about its exculpatory value.

The record also does not support the conclusion that the Government is suppressing additional discoverable material about its handling of the letter. Mr. Jin argues that the Government should be compelled to produce, among other things, all "follow-up communications with CTJ relating to CTJ's request for a bank letter." Def.'s Mot., Dkt. No. 308. The Government responded to Mr. Jin that it is not aware of additional discoverable material on this topic. *See id.* Because there is no basis in the present record for the Court to conclude that the Government's search for responsive material or compliance with its production obligations has been inadequate, the Court declines to order further production.

Accordingly, the Court declines Mr. Jin's request to order additional productions or to dismiss the indictment based on the Peralta letter, and it shall **DENY** his [308] Motion to Compel and [309] Motion to Dismiss on these grounds.

9. Allegedly destroyed evidence

Finally, Mr. Jin requests an order directing the Government identify evidence that it has "destroyed," such as emails that are no longer in the Government's possession because they were

54

automatically discarded through the routine application of the Government's record retention policies. Def.'s Mot., Dkt. No. 331. On the present record, the Court is not aware of any factual basis for concluding that the Government has destroyed exculpatory or impeaching evidence. Accordingly, the Court shall **DENY WITHOUT PREJUDICE** Mr. Jin's [331] Motion to Compel the Government to "Identify Evidence That It Has Destroyed."

*     *     *

On the present record, the Court—like Mr. Jin—lacks any specific basis to conclude that the Government is continuing to withhold discoverable material. Although Mr. Jin has identified individual instances in which the Government has made mistakes or failed to produce marginally exculpatory or impeaching information, these individual instances do not support the conclusion that the current trial team is neglecting its discovery obligations. Given the scope and complexity of this case, it is likely that the Government has at least some additional information in its possession that is marginally exculpatory or impeaching. However, "the Government's duty to search for and produce information is bounded by," among other things, "the materiality of that information." *United States v. Trump*, 753 F. Supp. 3d 17, 27 (D.D.C. 2024) (TSC). Although courts in this District have often held that the Government must not withhold exculpatory or impeaching information before trial based on materiality alone, courts also have not required the Government to search its files endlessly for evidence that will ultimately be immaterial. *See, e.g.*, *id.*; *Safavian*, 233 F.R.D. at 18; *see also United States v. Brooks*, 966 F.2d 1500, 1504 (D.C. Cir. 1992). On the present record, Mr. Jin has not shown that the Government has been less than diligent in its search for exculpatory or impeaching information in this case, even if it has sometimes failed to produce documents that—under close scrutiny, informed by robust briefing and *ex parte* proffers—are recognizably helpful to Mr. Jin. In the absence of a

factual record that would support an inference that the Government is neglecting its discovery obligations, the Court will not order an evidentiary hearing to probe the Government's compliance with those obligations.

As the Court has previously noted, it is generally "in no better position than the parties to determine whether there exists some great body of *Brady* evidence that has not yet been produced." Mem. Op. & Order, Dkt. No. 146 at 6 (quoting *United States v. Blackley*, 986 F. Supp. 600, 607 (D.D.C. 1997) (RCL)). Moreover, it is generally not the Court's role to act as "referee" in pretrial disagreements about the exchange of specific items of *Brady* material. *See United States v. Trie*, 21 F. Supp. 2d 7, 24 (D.D.C. 1998) (PLF). Even assuming—without deciding—that the Government violated *Brady* at Mr. Jin's first trial by failing to disclose some of the evidence at issue, "[t]he remedy for a *Brady* violation is a new trial," not a judicial inquiry into the Government's manner of compliance with its obligations before that new trial begins. *See United States v. Robinson*, 68 F.4th 1340, 1351 (D.C. Cir. 2023).

Because Mr. Jin will have the benefit of a new trial regardless of the record developed at an evidentiary hearing, such a hearing is unlikely to lead to any additional relief. Mr. Jin argues that the Court should grant such a hearing because doing so could, in theory, establish *Brady* violations that are serious enough to warrant dismissal of the indictment. This suggestion is unpersuasive. Mr. Jin has certainly identified mistakes and apparent inconsistencies in the Government's presentation at the first trial. However, the present record does not suggest the kind of "[r]eckless disregard for the prosecution's constitutional obligations" that could warrant dismissal. *See United States v. Bundy*, 968 F.3d 1019, 1038 (9th Cir. 2020) (quoting *United States v. Chapman*, 524 F.3d 1073, 1085 (9th Cir. 2008)).

For all these reasons, this Court is of the opinion that, on the present record, neither dismissal of the indictment nor an evidentiary hearing on the issues presented in Mr. Jin's several discovery motions is warranted. The Court previously denied without prejudice Mr. Jin's initial request for an evidentiary hearing, concluding that he had not shown an entitlement to such a hearing before trial. *See* Order, Dkt. No. 315. After fully considering each of Mr. Jin's subsequent requests for the same relief, the Court now reaches the same conclusion. Accordingly, the Court shall **DENY WITHOUT PREJUDICE** each of Mr. Jin's requests for an evidentiary hearing to address the discovery issues that he has raised.

\*      \*      \*

The Court ends this discussion with a note of caution to the Government. In this Court's assessment, any information suggesting that Mr. Lyons or another CTJ employee proposed that the Winney Entities modify or remove references to North Korea from bills of lading or other documents would likely be exculpatory evidence. For example, if the Government possesses information that reveals that Agent Tarango had a factual basis for his statement that Mr. Lyons made such a proposal, that information would likely be exculpatory and subject to disclosure because it would corroborate Agent Tarango's statement. *See United States v. Robinson*, 68 F.4th 1340, 1351 (D.C. Cir. 2023) (finding a *Brady* violation and ordering a new trial after concluding that a defendant was prejudiced by the "inability to provide [a] more convincing source corroborating the information contained [in]" a separate exculpatory statement). Similarly, Mr. Jin is likely entitled to any information in the Government's possession that suggests that FoA Anglin or other investigators overlooked signs that CTJ—rather than Winney—instigated some of the conduct giving rise to the charges in this case. Although such evidence would not directly negate the Government's evidence of the Winney Entities'

57

culpability, it could affect a reasonable juror's assessment of whether Mr. Jin and others acted with the *mens rea* necessary to commit the offenses with which they are charged. Accordingly, the Government should ensure that it has searched diligently for all such material in its possession and has produced to Mr. Jin all the information that he is entitled to receive.

The Government withholds potentially exculpatory material at its own peril. "[A]s the Government is well aware, 'if the sword of Damocles is hanging over the head of one of the two parties, it is hanging over the head of the [Government],' not the Defendant." *See* Mem. Op. & Order, Dkt. No. 146 at 6 (quoting *Blackley*, 986 F. Supp. at 607). Consistent with the Local Criminal Rules of this Court, if the Government fails to disclose material that is discoverable under *Brady* and its progeny, the Court may—among other things—impose evidentiary sanctions and grant any other relief that is just under the circumstances. *See* Order, Dkt. No. 29; LCrR 5.1. If the Government falls short of its obligations under *Brady* and its progeny, Mr. Jin's ultimate remedy may be the "overturning of a guilty verdict, should one be obtained." *Blackley*, 986 F. Supp. at 607. Accordingly, "the prudent prosecutor will resolve doubtful questions in favor of disclosure." *Kyles v. Whitley*, 514 U.S. 419, 439 (1995) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)).

To this extent, the Court has already granted in part and denied in part Mr. Jin's [267] Motion to Direct the Government to Comply with *Brady*, Rule 16, and Other Disclosure Obligations, his [273] Motion for Disclosure of Statements under the Jencks Act, and his [276] Motion to Compel Production of *Brady* Information. Order, Dkt. No. 315. The Court has also denied without prejudice Mr. Jin's previous request for an evidentiary hearing. *Id.* (resolving request for evidentiary hearing in Dkt. No. 276).

58

The Court shall now **GRANT IN PART** and **DENY WITHOUT PREJUDICE IN PART** Mr. Jin's [308] Motion for an Evidentiary Hearing, to Compel the Government to Comply with its *Brady* Obligations, and to Compel the Government to "Identify the Evidence That It Destroyed"; his [309] Motion to Dismiss "for Flagrant Government Misconduct"; his [317] Motion to Compel Production of *Brady* and *Giglio* Information "Relating to False Testimony Regarding the Undercover Investigation and False Sworn Statements by Case Agent"; his [329] Motion to Unseal the Government's *Ex Parte* Motion for Protective Order; his [330] Motion to Compel Production of Carbuncle Exhibits and Communication of Dawson Anglin; and his [331] Motion to Compel the Government to "Identify Evidence That It Has Destroyed."   The Court shall **GRANT IN PART** and **DENY AS MOOT IN PART** the Government's [325] *Ex Parte* Motion for a Protective Order.

### C.    Mr. Jin's Assertions of *Napue* Violations and Related Misconduct

Mr. Jin also raises a variety of challenges to the Government's conduct at and before his first trial, alleging that the Government has made false representations to the tribunal and has violated its *Napue* obligations by knowingly presenting false testimony.  *See* Def.'s Mot., Dkt. No. 309.   Mr. Jin argues that this misconduct warrants an evidentiary hearing, evidentiary sanctions, and dismissal of the indictment. *Id.*

For many of the same reasons the Court has already discussed in the context of the Government's discovery productions, on the present record, the Court concludes that none of this relief is warranted.  Just as with a *Brady* violation, "[a] new trial is the remedy for a *Napue* violation."  *See Glossip v. Oklahoma*, 604 U.S. 226, 258 (2025).  With Mr. Jin's retrial having commenced, this remedy is moot.  And although Mr. Jin argues that the Court should dismiss the indictment because the challenged conduct amounts to flagrant misconduct or a grievous violation of due process, the Court disagrees.  The present record does not support an inference

that any failure to correct false or misleading testimony to the grand jury or at Mr. Jin's first trial resulted from a "[r]eckless disregard for the prosecution's constitutional obligations." *See Bundy*, 968 F.3d at 1038. Moreover, on the present record, it does not appear that an evidentiary hearing would yield any additional grounds for the Court to grant the additional relief requested. Accordingly, the Court shall **DENY WITHOUT PREJUDICE** Mr. Jin's requests for an evidentiary hearing, evidentiary sanctions, and to dismiss the indictment on the grounds at issue here.

1. Mr. Bartoletti's testimony

First, Mr. Jin renews his argument that the Government has knowingly presented a false narrative about Mr. Bartoletti's knowledge of CTJ's negotiations of a proposed exclusivity agreement with the Winney Entities for sales to North Korea. *See* Def.'s Mot., Dkt No. 309. The Court previously concluded that there is no indication in the record that Mr. Bartoletti had personal knowledge of the content, extent, or duration of these negotiations. *See* Mem. Op. & Order, Dkt. No. 193. Neither the record developed at Mr. Jin's first trial nor any of the parties' subsequent submissions disturbs that finding. Accordingly, the Court declines to find that Mr. Bartoletti's testimony about his own understanding of the exclusivity contract negotiations was false. And because Mr. Jin's first trial did not result in a conviction, the Court need not reach the issue of whether the Government's *Napue* obligations required it to correct any allegedly false impression that Mr. Bartoletti's testimony may have created. The remedy for the failure to discharge that obligation would be a new trial. *See Glossip*, 604 U.S. at 258. Because Mr. Jin's new trial has begun, on the present record, there is nothing more for the Court to decide.

2.  CTJ's transactions with Carbuncle and Fully Max

Next, Mr. Jin challenges the Government's handling of information regarding CTJ's transactions with the alleged front companies "Carbuncle" and "Fully Max." As the Court has explained, the Government initially attributed these transactions to the Winney Entities, but FoA Anglin concluded while preparing for Mr. Jin's first trial that these transactions should have been attributed to a different CTJ customer. *See supra* I.C.4. After FoA Anglin notified one of the Government's attorneys of his conclusion, the Government modified some of its trial exhibits to remove references to Carbuncle and Fully Max. *See id.* However, the Government introduced and the Court admitted—without objection—one exhibit that included transactions involving these two companies. *See supra* I.C.4; Trial Tr. (Sept. 18, 2025, p.m.) at 35:22–36:10. The Government did not highlight these transactions to the jury, and they appeared in small print alongside hundreds of other, similar transactions. However, FoA Anglin testified inaccurately that the exhibit contained "all the related records" of transactions between CTJ and the Winney Entities. *See* Trial Tr. (Sept. 18, 2025, p.m.) at 33:11–36:10.

Although FoA Anglin identified the mistake about the Government's attribution of the Carbuncle and Fully Max transactions while preparing for his testimony in Mr. Jin's first trial, the Defense, the Court, and apparently even the current prosecution team did not fully appreciate the issue until much more recently. The Government did not highlight the changes to its exhibits during the first trial or notify the Defense or the Court of the reason for those changes. Mr. Jin first raised the issue in a late-filed motion to dismiss on March 6, 2026, and the Government indicated in its response that, "[u]pon just realizing this issue," its current trial team would "have to correct a proposed trial exhibit that erroneously include[d] Carbuncle and Fully Max." Gov't's Resp., Dkt. No. 316 at 8 n.7.

61

Mr. Jin strongly objects to the Government's handling of these transactions, arguing that it reflects malfeasance by the Government's former prosecution team, its current team, and FoA Anglin. *See, e.g.*, Def.'s Mot., Dkt. No. 309 at 16–21, 28–29, 43–44. However, after careful consideration of the issue and a further inquiry with Government counsel on the record at the recent pretrial conference, the Court disagrees. It appears to the Court that the changes to the Government's exhibits during Mr. Jin's first trial reflected a relatively prompt, good-faith effort to correct a factual mistake. Although the Government did not entirely succeed in correcting its exhibits to excise the mistake during Mr. Jin's first trial, and it may even have been on track to repeat the mistake in another exhibit prepared for Mr. Jin's retrial, the Court finds that these errors were the results of inadvertence, not malfeasance. Accordingly, on the present record, the Court shall **DENY** Mr. Jin's request to dismiss the indictment or to impose evidentiary sanctions based on these errors. Instead, Mr. Jin will be free to cross-examine FoA Anglin about the Government's handling of the Carbuncle and Fully Max transactions and to impeach him by highlighting the Government's inclusion of these transactions in an exhibit at a prior proceeding in this case.

<ol start="3"><li>Translations of statements recorded during the undercover investigation</li></ol>

Mr. Jin also correctly notes that some of the Government's early submissions in this case erroneously attributed to him certain statements that were made not by him, but by an interpreter. Specifically, a search warrant affidavit, the criminal complaint, and the indictment in this case each included statements that the Government incorrectly attributed to Mr. Jin. However, the Government did not attribute any of these statements to Mr. Jin at trial.

The Government's mistakes regarding these translations reflect negatively on the reliability of the investigators who helped prepare the search warrant affidavit, complaint, and

indictment.    Accordingly, the Court will allow Mr. Jin to cross-examine the Government's investigators about these mistakes.

However, on the present record, no further relief is warranted.  The Court does not find that any of the mistakes at issue were made knowingly or that they are likely to be repeated as this case proceeds.

### 4.   The source of changes to CTJ's bills of lading

Finally, Mr. Jin argues that the Government presented false allegations and evidence about the changes to CTJ's bills of lading that occurred after the U.S. adopted comprehensive sanctions against North Korea in 2016.  This argument is based on Agent Tarango's recorded statement that "Patricio [Lyons] instructed James [Han] to change the bill of lading from going to North Korea to going to Dalian."  *See* Def.'s Ex., Dkt. No. 276-4 at 6.  Mr. Jin argues that the Government has repeatedly misled the tribunal or the factfinder each time that it has argued or presented evidence that the Winney Entities were responsible for these changes.  *See, e.g.*, Def.'s Mot., Dkt. No. 309 at 10, 12, 16, 22, 30–32, 41.  However, Mr. Jin has not offered any evidence that directly corroborates Agent Tarango's statement that Mr. Lyons, rather than an employee of the Winney Entities, initiated the changes to the bills of lading.

On the present record, the Court declines to hold that any of the Government's evidence or argument regarding the bills of lading has been improper.  On the present record, it does not appear that the Government believes that Agent Tarango's statement—made while acting in an undercover capacity—had a basis in fact.  Accordingly, the Government's presentation of argument and evidence about the bills of lading does not appear to have violated any of its obligations or Mr. Jin's due process rights.

*     *     *

In sum, on the present record, the Court finds that there is no basis for relief based the presentation of allegedly false or misleading evidence at or before Mr. Jin's first trial, and an evidentiary hearing is unlikely to result in such relief. Accordingly, the Court shall **DENY WITHOUT PREJUDICE** Mr. Jin's request for an evidentiary hearing, for evidentiary sanctions, and to dismiss the indictment on the basis of that alleged misconduct.

### D.    The Gallante Affidavit

Mr. Jin next moves for reconsideration of the Court's prior ruling denying his motion for a *Franks* hearing to address whether the fruits of the search warrant served on Google in this case should be suppressed because the warrant was obtained through knowingly or recklessly false statement or omissions. Def.'s Mot., Dkt. No. 291. The premise of Mr. Jin's motion is that new information—not known to him or the Court at the time of the initial motion—calls into doubt one of two important details on which the Court relied to conclude that there was probable cause for the issuance of the warrant, notwithstanding any allegedly false statements or omissions. *See* Def.'s Mot., Dkt. No. 291. Because the evidence that Mr. Jin offers in support of this motion does not alter the conclusion that there was probable cause to support the warrant without any of the disputed statements, the Court shall **DENY** Mr. Jin's motion.

Magistrate Judge Meriweather approved the search warrant at issue here based on an affidavit sworn out by FBI Special Agent Joy Gallante. *See generally* Def.'s Ex., Dkt. No. 291-2; Gallante Affidavit, *id.* at 15–22; *see also* Dkt. No. 46-1 (same document).

This Court previously concluded that, even excluding the statements and omissions that Mr. Jin previously alleged were knowingly or recklessly false or misleading, this affidavit contains sufficient material to support a finding of probable cause to believe that the warrant would uncover evidence of a crime. *See* Mem. Op., Dkt. No. 130. In reaching this conclusion, the Court relied on two groups of allegations in the affidavit that showed probable cause to

believe that Winney Entities had engaged in money laundering. *Id.* First, the Court noted the affidavit's statement that the Winney Entities changed their bills of lading in 2016 to remove references to North Korea. *Id.* at 14 (citing Gallante Affidavit, ¶ 20). Second, the Court noted the affidavit's statements that the Winney Entities received numerous payments from front companies known to be associated with North Korean sanctions evasion. *Id.* at 14–15 (citing Gallante Affidavit, ¶¶ 26–27).

Mr. Jin now challenges the Gallante Affidavit's statement that the Winney Entities changed their bills of lading in 2016. Def.'s Mot., Dkt. No. 291. Mr. Jin's challenge relies on Agent Tarango's statement, made while acting in an undercover capacity during a recorded phone call in May 2019, that Mr. Lyons instructed Mr. Han to change a bill of lading. *See id.* Proceeding from the assumption that Agent Tarango's statement had a basis in fact, Mr. Jin argues that the affidavit's statement about the bills of lading was false or misleading because it failed to mention CTJ's role in changing the documents. *See id.*

Mr. Jin's challenge is unavailing, for two reasons.

*First*, even if the Court were to strike the statement about the change to the bills of lading from the affidavit completely, there would still be probable cause to conclude that the requested search warrant would uncover evidence of a crime. Entirely apart from its statement about the bills of lading, the affidavit states with specificity that the Winney Entities received substantial U.S. dollar payments from companies known to operate as front companies for the sanctioned North Korean banks KKBC and FTB, including DHID. It also explains that the Winney Entities' trade in tobacco is consistent with a known pattern of sanctions-evading transactions by entities with ties to North Korea. Although these allegations alone would not be sufficient to support a finding beyond a reasonable doubt that Mr. Jin or others acted with the requisite *mens*

65

*rea* to commit money-laundering or sanctions-evasion offenses, they do suffice to show probable cause that the search warrant would uncover evidence of those offenses.

*Second*, even if the Court were to correct the alleged omission by adding a statement that CTJ initiated the change to the bills of lading, the change to the bills of lading would still weigh in favor of a probable cause finding.  In the context of the affidavit's other statements about the Winney Entities, the fact—assumed for purposes of argument—that the Winney Entities merely *assented* to a misrepresentation about North Korea on the bills of lading does not negate a finding of probable cause.

In sum, just as the Court concluded before the first trial, Mr. Jin is not entitled to a *Franks* hearing or to the suppression of the fruits of the search warrant because he has not shown that the allegedly false statements or omissions were material to the probable cause determination.  *See* Mem. Op., Dkt. No. 130; *Becton*, 601 F.3d at 594; *Spencer*, 530 F.3d at 1007.  Even assuming, without deciding, that each of the alleged false statements and omissions was make knowingly or recklessly, Mr. Jin would not be entitled to suppression of the resulting evidence.  Accordingly, the Court shall **DENY** his motion for reconsideration of the denial of his motion for a *Franks* hearing and for suppression of the fruits of the Google search warrant.

### E.    FoA Anglin's Testimony

Next, Mr. Jin asks the Court to either "exclude the testimony of the government's proposed expert, FoA Anglin, as unreliable under *Daubert*," or, in the alternative, "address the appropriate scope of cross-examination as to Agent Anglin."  Def.'s Mot., Dkt. No. 287.  The Court shall not exclude the testimony of FoA Anglin.  However, it shall clarify the allowed scope of cross-examination.

1.  <u>FoA Anglin is qualified to offer specialized opinion testimony.</u>

At Mr. Jin's first trial, the Court found that FoA Anglin was "qualified to offer . . . specialized opinion testimony in the area of forensic accounting, including the analysis of banking records, identifying front companies and other money laundering techniques and patterns of the same used as related to North Korean trade."  Trial Tr. (Sept. 18, 2025, p.m.) at 28:9–14.  The Court reached this conclusion after counsel for the Government and counsel for Mr. Jin both had extensive colloquies with FoA Anglin regarding his qualifications.  Those colloquies established that FoA Anglin is a certified public accountant ("CPA") and a certified fraud examiner ("CFE").  *Id*. at 9:23–10:16.  They also established that FoA Anglin is a forensic accountant at the FBI who has worked on over 100 criminal investigations during his tenure.  *Id*. at 11:13–15.  Since 2015, Anglin has been assigned to a counterintelligence unit and estimates that "95 percent" of his time is spent working on cases related to North Korea.  *Id*. at 12:4–7.

Mr. Jin has not raised an issue with the underlying basis for FoA Anglin's specialized opinion testimony.  The Court shall therefore **DENY** Mr. Jin's [287] Motion *in Limine* insofar as it asks the Court to exclude FoA Anglin's testimony as unreliable.  As it did at the first trial, the Court will instruct the jury that they are "not bound to accept [FoA Anglin's] opinion," and that they may "completely or partially disregard [his] opinion" if they find that it is "not based on sufficient education or experience, that the reasons supporting the opinion are not sound, or that the opinion is outweighed by other evidence."  *Id*. at 28:24–29:6.

2.  <u>Mr. Jin may cross-examine FoA Anglin about the basis of his opinions and explore his potential bias.</u>

Mr. Jin argues that FoA Anglin must be "subject to vigorous cross-examination" if he is permitted to provide specialized opinion testimony.  Def.'s Mot., Dkt. No. 287 at 9.  Mr. Jin seeks to explore the following subjects in his cross-examination of FoA Anglin: (a) FoA

Anglin's bias "as someone who investigated the case," (b) FoA Anglin's "interactions with prosecutors," and (c) documents that FoA Anglin "chose to overlook or put aside." Def.'s Reply, Dkt. No. 307 at 10. The Court shall address each topic in turn.

a. *Mr. Jin may cross-examine FoA Anglin about his potential bias as someone who investigated Mr. Jin and worked closely with the prosecution team.*

Mr. Jin argues that he should be able to probe into FoA Anglin's potential bias by cross-examining FoA Anglin about his "role in the [Government's] investigation" and "the nature of his interactions and relationship with the prosecution." Def.'s Mot., Dkt. No. 287 at 11. The Government does not dispute that Mr. Jin can inquire into FoA Anglin's role in the Government's investigation and prosecution of Mr. Jin to probe bias. Indeed, the Government "expects that Anglin's direct examination will make clear that he is both an FBI employee who works with special agents and federal prosecutors on a daily basis and a member of the prosecution team who has worked with undersigned counsel on this case." Gov't's Resp., at 9. Accordingly, there is no dispute that Mr. Jin can probe FoA Anglin's employment and connection to the investigation and prosecution of Mr. Jin to explore bias.

b. *The Court shall allow appropriately tailored cross-examination of FoA Anglin based on his prior testimony.*

In his initial motion, Mr. Jin claimed that "the nature of [FoA Anglin's] interactions and relationship with the prosecution . . . fall squarely within the permissible scope of bias inquiry." Def.'s Mot., Dkt. No. 287 at 11. The Government, as explained above, agreed that FoA Anglin's role in the investigation was relevant to his bias and noted that "[i]f the defendant has something else he wants to cross-examine Anglin about, it is not in his Motion." Gov't's Resp., Dkt. No. 301 at 9. Mr. Jin filed that "something else" in his reply, where he identified two prior

statements made by FoA Anglin that he seeks to raise in cross-examination.  Def.'s Reply, Dkt. No. 307 at 10.

          i.          *Mr. Jin may cross-examine FoA Anglin about a 2020 email exchange between FoA Anglin and a colleague.*

The first statement involves what Mr. Jin claims is a prior inconsistent opinion given by FoA Anglin.  Mr. Jin argues that he should be allowed to cross-examine FoA Anglin about a 2020 email that FoA Anglin sent to a colleague in which FoA Anglin writes: "Going through some Winney stuff.  Is this stuff of any significance?  Seems to be related to an account opening or something?"  Def.'s Reply Ex. 1, Dkt. No. 307-1.  Mr. Jin claims that this email shows that FoA Anglin "was unsure of the 'significance' of a blank bank application in Mr. Jin's email account."  Def.'s Reply, Dkt. No. 307 at 10.  He argues that it is "evidence of [FoA Anglin's] bias" because, when FoA Anglin testified in 2025, "he had somehow learned its 'significance,'" namely, "that it showed a connection to North Korean banks."  *Id.* (citing Trial Tr. (Sept. 19, 2025, a.m.) at 91–92).

FoA Anglin's statement in this 2020 email is generally relevant because it connects to his investigation of Winney, which is part of the foundation for his opinion.  Fed. R. Evid. 401, 402.  Mr. Jin may argue that this email is probative of FoA Anglin's bias and the weight to be given to his opinion because it shows that he did not immediately recognize the significance of this bank application; instead, he formed the opinion that the bank application was evidence of a connection to North Korean banks only later, after conferring with colleagues.  Accordingly, the Court will allow Mr. Jin to use this email during his cross-examination of FoA Anglin to probe his bias.  *United States v. Abel*, 469 U.S. 45, 52 (1984) (explaining that the cross-examiner may show bias by extrinsic evidence, whereas they must "take the answer of the witness with respect to less favored forms of impeachment") (citation omitted).  Depending on the development of

FoA Anglin's testimony, Mr. Jin may also attempt to admit this evidence as evidence of a prior inconsistent statement, although this route would impose additional hurdles to Mr. Jin's use of extrinsic evidence. *See United States v. Bagcho*, 151 F. Supp. 3d 60, 72 (D.D.C. 2015) (ESH), *aff'd*, 923 F.3d 1131 (D.C. Cir. 2019); Fed. R. Evid. 613.

Accordingly, the Court shall **GRANT IN PART** Mr. Jin's [287] Motion insofar as it requests permission to use the 2020 email identified above during FoA Anglin's cross-examination.

ii.    *On the present record, the Court shall not permit Mr. Jin to cross-examine FoA Anglin about FoA Anglin's prior testimony that Mr. Jin claims is misleading.*

In his Reply to the Government's Opposition, Mr. Jin argues that FoA Anglin gave "misleading testimony" at the first trial by testifying "about the changes to the bills of lading . . . without mentioning that CTJ directed those changes." Def.'s Reply, Dkt. No. 307 at 10. Mr. Jin argues that this statement, too, is evidence of FoA Anglin's bias. *Id.*

On the present record, the Court shall not permit Mr. Jin to cross-examine FoA Anglin about this topic. To establish that FoA Anglin's testimony was misleading, Mr. Jin must provide evidence to support his claim that CTJ directed the changes to the bills of lading and that FoA Anglin knew it had done so at the time of his prior testimony. Mr. Jin does not identify that evidence here, let alone provide a theory of admissibility. More importantly, Mr. Jin does not explain why FoA Anglin's prior testimony would be misleading even if it was ultimately determined that CTJ directed the changes to the bills of lading. FoA Anglin testified that Winney purchased "a handful of grades" of tobacco from 2009 to 2019. Trial Tr. (Sept. 18, 2025, p.m.) at 88. From 2009 to 2016, the bills of lading indicated that the tobacco shipments were going to North Korea; from 2016 to 2019, the bills of lading indicated that the tobacco was going to China. *Id.* at 87. FoA Anglin testified that it was his specialized opinion that the

tobacco "continued to go to North Korea" even after the bills of lading indicated they were going to China because the grades of tobacco never changed between 2009 to 2019. *Id*. at 88. In other words, FoA Anglin's opinion was based entirely on the commercial substance of the shipments, which means that the identity of the entity that changed the destination shown on the bills of lading is not directly relevant to his opinion.

Accordingly, the Court shall **DENY IN PART** Mr. Jin's [287] Motion insofar as it requests permission to cross-examine FoA Anglin about his prior testimony on Mr. Jin's proffered basis that the testimony is misleading.

> c.    *Mr. Jin may cross-examine FoA Anglin about how he formed his opinions and whether he overlooked or improperly discounted relevant information, subject to Rule 403 limitations.*

Mr. Jin argues that he should be able to cross-examine FoA Anglin about "his methodology and the basis for his opinions." Def.'s Mot., Dkt. No. 287 at 11. The Government explains that FoA Anglin's direct examination will "include not only his opinions, but also the work he did to develop those opinions (i.e. his methodology and bases for his opinions)." Gov't's Resp., Dkt. No. 301 at 9. But this response does not address the crux of Mr. Jin's argument, which is that he "can test the reliability of Anglin's opinions not just based on evidence that FoA Anglin reviewed, but also based on facts, documents, and other evidence that he ignored." Def.'s Mot., Dkt. No. 287 at 12–13 (arguing that "the government cannot prevent the defense from cross-examining FoA Anglin as to documents and data that appear to contradict his conclusions by claiming that FoA Anglin only relied on a subset of those documents and data," and that FoA Anglin may be questioned about "documents he didn't rely on, why he didn't rely on them, and why they appear to contradict his opinions").

Generally, cross-examination "should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility." Fed. R. Evid. 611(b). But the

Court, in its discretion, "may allow inquiry into additional matters as if on direct examination." *Id*.; *see also United States v. Raper*, 676 F.2d 841, 846 (D.C. Cir. 1982) (approving on inquiry into additional matters). At the same time, the Court retains "wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). In short, the Court has broad discretion to manage the scope of cross-examination to ensure that the ends of justice are best served.

There is no dispute that Mr. Jin may cross-examine FoA Anglin "about how he formed his opinions and whether he overlooked or discounted data." Def.'s Reply, Dkt. No. 307 at 10; *Bazarian Int'l Fin. Assocs., LLC v. Desarrollos Aerohotelco, C.A.*, 315 F. Supp. 3d 101, 113 (D.D.C. 2018) (BAH) (adopting language from plaintiff's brief) (explaining that whether an expert "failed to adequately consider other facts" is generally a valid "basis for cross examination"). As for Mr. Jin's argument that he should be able to cross-examine FoA Anglin about "documents and data that appear to contradict his conclusions," he does not offer any examples of any such documents or data and therefore makes it difficult for the Court to conclusively determine whether such material would be admissible or not. One thing that is certain, however, is that any such documents or data must satisfy the evidentiary rules before they can be used to contradict FoA Anglin's opinions. These determinations can only be made by considering the specific documents or data at issue.

Accordingly, on the present record, the Court shall **GRANT IN PART** Mr. Jin's [287] Motion insofar as it requests permission to cross-examine FoA Anglin about how he formed his opinions and whether he overlooked or discounted data and **DEFER IN PART** Mr. Jin's [287]

Motion insofar as it requests permission to cross-examine FoA Anglin about specific documents or data that contradict his opinions. Before examining FoA Anglin about any such documents or data, Mr. Jin shall approach the Court, outside the presence of the jury, and seek a ruling on the admissibility of the specific information that he proposes to introduce. This proffer may be made *ex parte*. To the greatest extent possible, this proffer should be presented in writing on the evening before the testimony at issue is expected to begin, adhering to the Court's procedures for the submission of mid-trial motions *in limine*. *See* Trial Procedures Order, Dkt. No. 131 at 2–3.

### F.     CTJ's Business Records

Next, the Court considers Mr. Jin's motion to exclude the business records of CTJ, which the Court admitted at Mr. Jin's first trial as Government Exhibit 200. Def.'s Mot., Dkt. No. 286. The Government proffers that these records are admissible under 18 U.S.C. § 3505. Gov't's Resp., Dkt. No. 298 at 1–2. This statute provides that a copy of "a foreign record of regularly conducted activity . . . shall not be excluded as evidence by the hearsay rule" if it is accompanied by a "foreign certification" satisfying the familiar requirements of the business records exception in Evidence Rule 803(6), "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." 18 U.S.C. § 3505. Mr. Jin argues that CTJ's records fail the last step of this analysis because they lack "trustworthiness." Def.'s Mot., Dkt. No. 286. This Court disagrees and shall **DENY** Mr. Jin's motion.

A record of "an act, event, condition, opinion, or diagnosis" is admissible as a business record if:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business; and
> (C) making the record was a regular practice of that activity.

73

Fed. R. Evid. 803(6).  These conditions must be shown "by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification."  *Id*.  Furthermore, the record will not be admissible if the opponent to its admission shows that "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."  *Id*.

Because the CTJ records are foreign records that the Government seeks to admit in a criminal case, the Government has the option of showing that the above conditions are satisfied through either the testimony of the custodian or another qualified witness, or through a statute permitting certification.  The Government proposes to proceed via the statutory route under 18 U.S.C. § 3505, which provides that "a foreign record of a regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule" in a criminal ease if there is a "foreign certification" attesting that:

> (1) such record was made at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;
> (2) such record was kept in the course of a regularly conducted business activity;
> (3) the business activity made such a record as a regular practice; and
> (4) if such record is not the original, such record is a duplicate of the original.

18 U.S.C. § 3505.  The statute defines a "foreign certification" as "a written declaration made and signed in a foreign country by the custodian of a foreign record of regularly conducted activity or another qualified person that, if falsely made, would subject the maker to criminal penalty under the laws of that country."  *Id*.  With a valid foreign certification that attests to the relevant requirements, a foreign record is admissible "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness."  *Id*.; *United States v. Khatallah*, 278 F. Supp. 3d 1, 5 (D.D.C. 2017) (CRC).

1.  The Government met its initial burdens under Rule 803(6) and 18 U.S.C. § 3505 by submitting the foreign certification of Mr. Bartoletti.

The Government bears the initial burden of showing, by a preponderance of the evidence, that the CTJ records meet the requirements of Rule 803(6) and that their proffered foreign certification meets the requirements of 18 U.S.C. § 3505. *See United States v. Al-Imam*, 382 F. Supp. 3d 51, 56 (D.D.C. 2019) (CRC). The relevant custodian of the certification "need not have personal knowledge of the actual creation of the document." *Khatallah*, 278 F. Supp. 3d at 6 (quoting *United States v. Adefchinti*, 510 F.3d 319, 325 (D.C. Cir. 2007)). Rather, the custodian need only be "familiar with the record-keeping procedures of the organization." *Id.* (quoting *United States v. Baker*, 458 F.3d 513, 518 (6th Cir. 2006)).

The Government plans to certify CTJ's records as business records through the foreign certification of Fernando Bartoletti. Gov't's Resp., Dkt. No. 298 at 1. Mr. Jin does not appear to mount a facial challenge to Mr. Bartoletti's certification. And for good reason, as it appears that Mr. Bartoletti's foreign certification meets all the requirements of 18 U.S.C. § 3505 and satisfies the Government's initial burden under Rule 803(6). *See* Bartoletti Certification, Dkt. No. 286-6. Mr. Bartoletti makes this certification "subject to criminal penalty under the laws of Argentina for an intentionally false declaration" and "under penalty of perjury." *Id.* And he attests that he is a qualified custodian of the CTJ records with knowledge of CTJ's record keeping system and an understanding of how the documents were created. *Id.* Mr. Bartoletti's certification that the remaining requirements of 18 U.S.C. § 3505 and Rule 803(6) have been met is therefore facially valid.

Accordingly, because Mr. Bartolleti's certification is facially valid and Mr. Jin does not raise any arguments as to its invalidity in and of itself, the Court determines that the Government has met its initial burden.

2.   Mr. Jin has not shown that the CTJ records lack trustworthiness.

The CTJ records will not be admissible if "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."  Fed. R. Evid. 803(6); 18 U.S.C. § 3505.  The purpose of the rule "is to ensure that documents were not created for personal purposes or in anticipation of any litigation so that the creator of the document had no motive to falsify the record in question."  *United States v. Kaiser*, 609 F.3d 556, 574 (2d Cir. 2010) (citing *United States v. Freidin*, 849 F.2d 716, 719 (2d Cir. 1988)) (citation modified).  Rule 803(6) "favors the admission of evidence rather than its exclusion if it has any probative value at all." *Id*. (quoting *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000)).  By meeting its initial burden under Rule 803(6) and 18 U.S.C. § 3505, "the Government has made a prima facie case for trustworthiness and the burden now shifts to [Mr. Jin], as the opponent of admission, to prove untrustworthiness."  *Khatallah*, 278 F. Supp. 3d at 7.

Mr. Jin argues that the CTJ records are not trustworthy because (a) they are incomplete; (b) CTJ, not Winney, falsely listed the destination on certain bills of lading; (c) CTJ was motivated to falsify the records; and (d) Mr. Bartoletti is not a trustworthy custodian.  *See* Def.'s Mot., Dkt. No. 286.  The Court shall consider each of these topics in turn.  After doing so, the Court concludes that the CTJ records are trustworthy.

a.      *The missing portions of the CTJ records do not render the CTJ records untrustworthy.*

Mr. Jin argues that the CTJ records are incomplete—and therefore not trustworthy— because they are "missing . . . bills of lading from 2009 to 2013" and only include "about 18 months of emails, leaving out nearly nine years' worth."  Def.'s Mot., Dkt. No. 286 at 7.  The Court shall address each of these claims in turn.

Mr. Jin argues that the missing bills of lading from 2009 to 2013 indicate a lack of trustworthiness because "the indictment alleges that bills of lading during this period referenced North Korea." Def.'s Mot., Dkt. No. 286 at 7. The subtext to Mr. Jin's argument is that the CTJ records are not trustworthy because they are missing inculpatory information for CTJ. But the CTJ records include a variety of other documents showing that CTJ was doing business involving North Korea. For instance, the CTJ records include the bills of lading from 2014 to 2016 that list North Korea as the destination for the tobacco products purchased by Winney. Gov't's Resp., Dkt. No. 298 at 3. Furthermore, the CTJ records include CTJ's ledgers recording each transaction with Winney, which presumably include the transactions from 2009 to 2013 in which tobacco was being shipped to North Korea. *Id.* Because the CTJ records openly convey instances of CTJ doing business involving North Korea, the missing bills of lading from 2009 to 2013 do not indicate a lack of trustworthiness.

Next, Mr. Jin argues that the CTJ records are not trustworthy because they are missing "nearly a decade of emails." Def.'s Mot., Dkt. No. 286 at 7. At trial, Mr. Bartoletti, the custodian of the CTJ records, testified that CTJ's IT department told him that CTJ could not produce emails before 2018 because CTJ had changed its internet service provider. *Id.* at 8. Mr. Jin argues that this is an "inadequate explanation" that "heightens the suspicion surrounding the omitted emails" because "changing internet service providers does not necessarily erase historical email date," as that data is "typically stored in an email server" and "can be archived." *Id.* But regardless of whether CTJ's explanation is adequate, Mr. Jin does not explain why the missing emails render untrustworthy the emails that were included or the other documents in the CTJ records. Generally, "missing records are not inherently an indication of fraud." *Ramirez v. United States*, 898 F. Supp. 2d 659, 672 (S.D.N.Y. 2012). Because "the fact that records might

be inaccurate and/or incomplete does not make them untrustworthy and, therefore, inadmissible," once a foundation is laid, "in the absence of specific and credible evidence of untrustworthiness, the proper approach is to admit the evidence and permit the fact finder to determine the weight to be given the records." *Morris v. B.C. Olympiakos*, *SFP*, 721 F. Supp. 2d 546, 552 (S.D. Tex. 2010) (citing *Crompton–Richmond Co., Inc. Factors v. Briggs*, 560 F.2d 1195, 1202 n.12 (5th Cir. 1977)).

Accordingly, the Court concludes that the missing documents from the CTJ records— namely, the bills of lading from 2009 to 2013 and the emails from before 2018—do not render the CTJ records untrustworthy.  Holes in a business record can certainly render the business record untrustworthy.  But an opponent of a business record must show why those holes indicate a lack of trustworthiness rather than rely on those holes alone.

> b.    *Even assuming the truth of Mr. Jin's allegations regarding CTJ's attempts to conceal its business involving North Korea, the CTJ records would still be admissible as business records.*

Mr. Jin also argues that the CTJ records are not trustworthy because CTJ has allegedly attempted to conceal its business involvement with North Korea several times.  Mr. Jin's primary argument is that CTJ cannot be trusted to produce valid business records because it allegedly directed Winney to change the destination on the bills of lading.  Def.'s Mot., Dkt. No. 286 at 8. At the outset, Mr. Jin's argument is premised on a contested point of fact.  In the Indictment and through testimony at trial, the Government argued that Winney changed the destination on the bills of lading from North Korea to China in 2016.  *Id.*  Mr. Jin, however, now points to evidence of a recorded call between Mr. Jin and Agent Erick Tarango, who was posing as an undercover CTJ employee, in which Agent Tarango says that CTJ's manager, Patricio Lyons, "instructed" James Han, a Winney employee, "to change the bill of lading from going to North Korea to going to [China]." *Id.* at 9 (quoting Def.'s Mot. Ex. 7, Dkt. No. 286-7).  While both stories could

be true—i.e., Winney could have changed the destination, but at the direction of CTJ—they are also in tension.

Assuming the facts alleged by Mr. Jin, his argument is essentially that the CTJ records cannot be trusted because CTJ directed Winney to create fraudulent bills of lading for 2016 through 2019 by lying about the ultimate destination of the tobacco that Winney was purchasing from CTJ. Mr. Jin does not argue that CTJ fraudulently altered its already-made records before producing them to the Government. Rather, Mr. Jin argues that CTJ had a hand in creating fraudulent records in the past. If true, this would call into question the underlying veracity of CTJ's records. But it would not undermine their trustworthiness as contemporaneous business records. Such a record would still provide evidence of what happened when it happened, which is the primary concern of this hearsay exception.

Mr. Jin identifies other instances where CTJ allegedly attempted to obfuscate its business in North Korea, but they do not change the Court's conclusion. For instance, in 2021, a lawyer for CTJ asked the Government to sign a letter to J.P. Morgan Chase Bank that stated that "the Department of Justice has determined that CTJ has never transacted business with customers in the DPRK." Def.'s Reply, Dkt. No. 303 at 3 (quoting Draft Letter, Dkt. No. 294-4). The Government did not sign the letter, however, due to CTJ's "extensive historical DPRK business." Dkt. No. 286-5 at 1. But this letter does not suggest that CTJ amended any of its business records after they were made to conceal its past business activity with North Korea. If anything, this exchange suggests that CTJ knew that the Government was well aware of their past business with North Korea, and therefore would have no reason to try and obfuscate that business from the Government. Mr. Jin also claims that, at some point around 2022, CTJ underreported its transactions with Winney to the Government. Def.'s Reply, Dkt. No. 303 at 3. But his evidence

in support of this claim is far from certain and, again, it does not relate to CTJ's contemporaneous practice of producing business records.

Accordingly, the Court concludes that, even assuming the truth of Mr. Jin's allegations regarding CTJ's attempts to conceal its business involving North Korea, the CTJ records would still be trustworthy as business records.

          c.      *CTJ's motivations do not render the CTJ records untrustworthy.*

Next, Mr. Jin argues that the CTJ records are not trustworthy because CTJ was "motivated to falsify the records." Def.'s Mot., Dkt. No. 286 at 10. Mr. Jin highlights two alleged motivations. First, Mr. Jin argues that CTJ was motivated to falsify the CTJ records because it produced the records after the Government froze its U.S. dollar transactions." *Id*. Second, Mr. Jin argues that CTJ was motivated to falsify the CTJ records because it "was a target of the government's investigation" and only "avoided charges because it agreed to cooperate." *Id*. The Court determines that Mr. Jin's argument is too speculative to prove untrustworthiness.

There is no doubt that CTJ had a motivation to cooperate with the Government. As Mr. Jin notes, CTJ was facing financial pressure and the threat of criminal prosecution when it decided to cooperate with the Government. This pressure will be a proper subject of cross-examination at trial.

However, CTJ's motive to cooperate does not equate to a motive to falsify its records. If anything, CTJ's cooperation leads to the inference that CTJ did *not* have a motive to falsify its records. CTJ knew that the Government had enough knowledge of CTJ's involvement with business in North Korea to freeze CTJ's U.S. dollar transactions and threaten criminal prosecution. Sharing falsified records with the Government, therefore, would have been a massive risk for CTJ, as CTJ had no way of knowing the extent of the Government's knowledge

of its business activities.  The risk of CTJ guessing at information that the Government did not yet have and providing falsified information in those areas would have been disproportionate to CTJ's potential reward of leniency for truthfully cooperating.  For if the Government had determined that CTJ was providing it with false information, then CTJ would have been facing far greater penalties than it would have if it just decided not to cooperate.

As the Government notes in its Opposition, the cases cited by Mr. Jin "do not address the facts here."  Gov't's Resp., Dkt. No. 298 at 5.  The Government has shown that the CTJ records in question were prepared in the regular course of business.  *See id.* at 4–5 (distinguishing this case from *United States v. Kaiser*, 609 F.3d 556 (2d Cir. 2010); *United States v. Casoni*, 950 F.2d 893, 912 (3d Cir. 1991)).  The Government has also satisfied the authentication requirements.  *See id.* at 5 (distinguishing this case from *United States v. Jackson*, 636 F.3d 687, 693 (5th Cir. 2011)).  These cases are therefore unhelpful.

Accordingly, because Mr. Jin has not shown that CTJ had a motive to falsify its records, the Court concludes that CTJ's motivations do not indicate that the CTJ records are untrustworthy.

> d.    *The CTJ records are not rendered untrustworthy by Mr. Bartoletti's testimony.*

Finally, Mr. Jin argues that the CTJ records are not trustworthy because their certifying custodian, Mr. Bartoletti, "lacked the knowledge required of a custodian" and thus provided a "false" certification.  Def.'s Mot., Dkt. No. 286 at 11.  Mr. Bartoletti signed a foreign certification under the penalty of perjury and subject to the criminal laws of Argentina swearing that: (1) the records were made at or near the time of the occurrence of the matters set forth; (2) they were kept in the course of a regularly conducted business activity; (3) the business activity made such records as a regular practice; and (4) if the records were not the original, they were a

duplicate of the original. Dkt. No. 286-6. Mr. Bartoletti also swore that he was authorized by CTJ to make this declaration, that he has knowledge of CTJ's record keeping system, and that he understands how the documents were created. *Id.*

When asked at the first trial why the CTJ records did not include emails prior to 2018, Mr. Bartoletti testified that CTJ's IT department had informed him that they could not access the emails because CTJ changed internet service providers in 2018. Def.'s Mot., Dkt. No. 286 at 8. Mr. Bartoletti's 2025 testimony also suggested that he did not recall how many years of emails CTJ produced to the Government in 2019. *Id.* at 3–4. From this, Mr. Jin argues that Mr. Bartoletti has exhibited a "willingness to make a false statement under oath" that undermines the trustworthiness of all the CTJ records. *Id.* at 11. But that conclusion is not warranted by the record.

Mr. Bartoletti is a qualified custodian so long as he has a "general familiarity with [CTJ's] record-keeping procedures," even if he "knows nothing about the creation of the particular record itself." *Al-Imam*, 382 F. Supp. 3d at 58 (citing *United States v. Fahnbulleh*, 752 F.3d 470, 478–79 (D.C. Cir. 2014)). Mr. Bartoletti has sworn that he is familiar with CTJ's procedures and was authorized by CTJ to do so. Contrary to what Mr. Jin argues, there is no basis to find that Mr. Bartoletti lied under oath. Mr. Bartoletti truthfully explained the reason why CTJ's emails only went back to 2018. And Mr. Bartoletti's incorrect estimate of the years of emails provided in the records, which he made more than five years after those emails were provided, cannot reasonably be characterized as a lie. Accordingly, the Court reaffirms that Mr. Bartoletti's certification is valid.

\*    \*    \*

In sum, the Court concludes that the CTJ records are sufficiently trustworthy to warrant admitting them into evidence under 18 U.S.C. § 3505, as the Court did at Mr. Jin's first trial. Accordingly, the Court shall **DENY** Mr. Jin's [286] Motion to Exclude Business Records.

### G. Statements of Winney Employees in Google Search Warrant Returns

Mr. Jin next moves to exclude, as inadmissible hearsay, several attachments to emails to Mr. Jin that the Government obtained from Google through a search warrant. Def.'s Mot., Dkt. No. 269. The Court admitted each of the disputed attachments into evidence at the first trial based on the record developed at an evidentiary hearing outside the presence of the jury. *See* Trial Tr. (Sept. 16, 2025, p.m.) at 29:16–33:25; Trial Tr. (Sept. 18, 2025, a.m.) at 10:18–12:13. For the reasons that follow, the Court shall deny Mr. Jin's motion and reaffirm its prior oral ruling that these exhibits are not hearsay because they fall within Rule 801(d)(2)(D)'s exclusion for statements of an opposing party's agent. *See* Fed. R. Evid. 801(d)(2)(D).

The disputed attachments each appear to be status reports, ledgers, or other business records related to the Winney Entities' export business. As the Court previously concluded, the record shows by a preponderance of the evidence that each of these attachments was (1) prepared by someone acting as an agent of Mr. Jin, within the scope of the relevant agency relationship, (2) adopted by an agent of Mr. Jin as the agent's own statement within the scope of the relevant agency relationship, or (3) prepared by someone else who was also acting as an agent of Mr. Jin within the scope of the relevant agency relationship, such as another employee of the Winney Entities. *See* Trial Tr. (Sept. 18, 2025, a.m.) at 10:18–12:13.

Several kinds of evidence in the record, including evidence extrinsic to each of the individual disputed exhibits, supports the conclusion that the relevant declarants were acting as Mr. Jin's agents when preparing the documents at issue. *See* Trial Tr. (Sept. 16, 2025, p.m.) at 29:16–33:25.

*First*, the Government proffered independent, admissible evidence showing that Mr. Jin is a director and 50% owner of at least one of the Winney Entities, including the official business registration records for one of the Winney Entities.  Mr. Jin's documented leadership role in the Winney Entities provides circumstantial support for an inference that individuals who are working in furtherance of the Winney Entities' business are doing so as agents of Mr. Jin.

*Second*, the Government proffered an email captured during the undercover investigation in this case in which one of Mr. Jin's co-defendants, Mr. Han, identified Mr. Jin as his "boss" and provided the email address "jinguanghua2014@gmail.com" as Mr. Jin's email address.  This evidence both supports the conclusion that Mr. Jin is the user of the email address at issue and shows that Mr. Jin was supervising at least one other Winney employee who was involved in the trade of tobacco.

*Third*, the Government has introduced emails from multiple purported agents of Mr. Jin sent to "jinguanghua2014@gmail.com."  These statements corroborate one another.  For example, multiple attachments to these emails—which the Court finds were adopted as statements of the sender of the emails—describe both the sender of the email and other purported agents of Mr. Jin as "Supervisors" within Winney's lines of business.  Consistent with the requirements of Rule 801(d)(2), the Court is not relying solely on these mutually corroborating statements to find that an agency relationship exists, but it finds that the presence of multiple such statements here is an unusually strong form of evidence found in the purported statements of agents themselves.

*Fourth*, there are non-hearsay features of the agents' proffered statements that support the conclusion that each of the statements was made within the scope of the same agency relationship.  Several of the statements have similar formatting and content, including letterhead

carrying the name of Winney Enterprises. Several of the emails also include salutations in which Mr. Jin is addressed as "General Manager Jin." These non-hearsay features offer further support for the Court's conclusion about the existence of the relevant agency relationships.

*Fifth*, with respect to the individual identified by the screen name "chupa chups," who is the user of the email address "630151839@qq.com," the Court previously found, and now reaffirms, that the Government has established the relevant agency relationship through an exhibit that includes Mr. Jin's own statement approving an expenditure that this individual proposed related to the Winney Entities' business. *See* Trial Tr. (Sept. 16, 2025, p.m.) at 13:20–14:21.

For all these reasons, the Court reaffirms its prior ruling that the statements at issue are not hearsay because they fall within Rule 801(d)(2)(D)'s exclusion for statements of an opposing party's agent. *See* Fed. R. Evid. 801(d)(2)(D). The Court shall therefore **DENY** Mr. Jin's [268] Motion *in Limine* to Exclude Hearsay Emails from the Google Search Warrant Return.

### H.    Mr. Jin's Evidence of His Own State of Mind

Mr. Jin has also filed a series of motions addressing issues that arose at the first trial, and are likely to arise again, about the admissibility of out-of-court statements that he and others made in connection with the Government's undercover investigation. First, Mr. Jin moves the Court to admit a "multitude of out-of-court statements that may be relevant to demonstrate the effect on [his] state of mind." Def.'s Mot., Dkt. No. 289 at 1–2. In this motion, Mr. Jin argues for the admission of broad categories of out-of-court statements, rather than identifying specific statements that should be admitted. Here, the Court shall focus on two categories of statements: (1) statements that provide context for Mr. Jin's own statements denying that he did business with North Korea, and (2) Mr. Jin's own exculpatory statements during the July 2019 in-person meeting between Mr. Jin and the undercover agents. Some statements in the former category

85

will be admissible if the Government admits evidence that Mr. Jin denied doing business with North Korea, but on the present record, statements in the latter category are not admissible.

1. If the Government admits evidence that Mr. Jin denied doing business with North Korea, Mr. Jin may admit evidence that provides context for that denial.

The Government represents that it is considering introducing the recording and transcript of a phone call with undercover agents that took place on May 21, 2019, in which Mr. Jin denied doing business with North Korea.   Gov't's Resp., Dkt. No. 289 at 12–13.   The Government elected not to introduce this call at Mr. Jin's first trial.  *See id.*  If the Government does introduce the call during Mr. Jin's retrial, the Court will allow Mr. Jin to admit certain evidence that may help explain why Mr. Jin denied that the Winney Entities did business with North Korea.  *See* Mem. Op. & Order, Dkt. No. 200 at 8.  That evidence may include statements admitted for the non-hearsay purpose of showing their "effect on the hearer's state of mind."  *See United States v. Thompson*, 279 F.3d 1043, 1047 (D.C. Cir. 2002).  However, the Court will not admit Mr. Jin's own out-of-court statements for this purpose.

If the Government introduces the May 21 call or other evidence that Mr. Jin denied doing business with North Korea, the Court will allow Mr. Jin to offer out-of-court statements to show four contextual facts that are relevant for their effect on his state of mind.

*First*, the undercover agents pressured the Winney Entities to pay a bribe to a banker, which the agents suggested was necessary only because the Winney Entities appeared to be doing business with North Korea.

*Second*, the agents suggested that because the Winney Entities did business with North Korea, they would need to pay a higher price for their tobacco purchases from CTJ in the future.

*Third*, the agents indicated that CTJ was withholding tobacco shipments because of the Winney Entities' apparent connections with North Korea.  The record shows that these shipment

86

delays had commercial consequences for the Winney Entities, leaving them unable to fulfill their contractual obligations to Naegohyang.

*Fourth*, although the agents were strangers to Mr. Jin and the Winney Entities, they insisted that the Winney Entities should deal with CTJ only through them, rather than communicating with Mr. Lyons or their other longtime contacts at CTJ.

These facts are relevant to offer alternative explanations for Mr. Jin's statements denying that he did business with North Korea, which the jury is likely to recognize are inconsistent with other evidence in the case. Given the agents' suggestions that the Winney Entities' connections to North Korea would lead to additional expenses and delayed shipments, Mr. Jin had a business reason for denying the existence of that connection. He may have believed that if he could convince the agents that his business had nothing to do with North Korea, he could avoid the additional expenses and induce CTJ to restart the delayed tobacco shipments. Meanwhile, he may have been suspicious that the agents' demands for a bribe or higher prices—both novel requests in his dealings with CTJ—amounted to mere extortion, rather than a genuine effort to resolve issues related to the blocked payment. A reasonable jury could conclude that each of these facts is relevant to the assessment of Mr. Jin's state of mind.

Although the Court will allow Mr. Jin to introduce relevant statements to establish each of these facts and provide context for his statements denying that the Winney Entities did business with North Korea, it will impose reasonable limits on such evidence to avoid wasting time and confusing the issues. For example, the Court will limit any evidence or argument that improperly suggests that financial pressure from the undercover agents induced Mr. Jin or others to commit the specific offenses charged in the indictment. *See* Mem. Op. & Order, Dkt. No. 152

at 8.  Furthermore, as discussed in the following section, the Court will not allow Mr. Jin to admit his own subsequent statements to bolster his argument about his state of mind.

Before presenting evidence or eliciting testimony to show the contextual facts identified in this section, Mr. Jin shall approach the Court, outside the presence of the jury, and seek a ruling on the admissibility of the specific information that he proposes to introduce or elicit from a witness.  This proffer may be made *ex parte*.  To the greatest extent possible, this proffer should be presented in writing on the evening before the testimony at issue is expected to begin, adhering to the Court's procedures for the submission of mid-trial motions *in limine*.  *See* Trial Procedures Order, Dkt. No. 131 at 2–3.

> *2.*  On the present record, the Court shall not admit Mr. Jin's own statements from the July 11, 2019, meeting with CTJ and undercover agents.

Mr. Jin also argues that some of his own statements from the undercover investigation are admissible to show his state of mind.  Each of the statements that Mr. Jin identifies comes from a July 11, 2019, meeting between Mr. Jin, undercover agents, and officers of CTJ.  Def.'s Mot., Dkt. No. 289 at 5.

As the Court has explained, Mr. Jin made several exculpatory statements during the in-person meeting on July 11, 2019.  *See supra* Section I.B.4.a.vi.  The Government represents that it will not admit any part of the July 11 meeting at trial.  Gov't's Resp., Dkt. No. 301 at 10.  However, Mr. Jin argues that he should be permitted to admit these statements as relevant non-hearsay because they "reflect[] his state of mind."  Def.'s Mot., Dkt. No. 289 at 5.

At Mr. Jin's first trial, the Court denied Mr. Jin's request to admit his own statements from the July 11 meeting as non-hearsay statements that reflect his state of mind.  *See* Mem. Op. & Order, Dkt. No. 192; Mem. Op. & Order, Dkt. No. 200.  The Court begins with these prior decisions, which are "the law of the case."  *See* Order, Dkt. No. 271.

Mr. Jin's present request to admit his statements from the July 2019 meeting suffers from the same "three fundamental problems" that the Court identified with the same request ahead of his first trial. *See* Mem. Op. & Order, Dkt. No. 192 at 9. First, the fact that these statements occurred "multiple months after the period of the charged conspiracies . . . greatly diminishes the probative value of that evidence and casts doubt on the reliability of Jin's statements therein." *Id*. at 10. Second, admitting Mr. Jin's self-serving statements from the July 11 meeting "'could effectuate an end-run around the adversarial process' by allowing Jin, 'in effect, [to] testify[] without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury.'" *Id*. (quoting *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005)). And third, the lack of precision in Mr. Jin's proffered non-hearsay purpose for admitting these statements—showing his own "state of mind"—makes it "difficult for the Court to craft an appropriate limiting instruction and assess the likelihood of juror confusion that may result." *Id*. at 11.

The admissibility of Mr. Jin's statements from the July 11 meeting depends on the evidence the Government introduces at trial. Ahead of the first trial, the Court ruled on this issue in a context in which the Government represented that it would be introducing evidence from the undercover operation that included statements made by Mr. Jin—including exculpatory statements—at various times before the July 11, 2019, meeting. *See* Mem. Op. & Order, Dkt. No. 192. In this context, the Court explained that "[t]he probative value of Jin's proposed evidence of his own statements denying wrongdoing" was "diminished" by the fact that the Government would introduce other statements to the same effect. *Id*. at 13. The Government later revised its exhibits to remove any exhibits that contained Mr. Jin's inculpatory statements to the undercover agents, including statements in which he denied doing business with North

89

Korea.  *See* Mem. Op. & Order, Dkt. No. 200 at 3–6.  "This fact," the Court explained, "greatly reduce[d] the probative value of and necessity for other instances of Jin's own statements from the undercover investigation to provide context for evidence introduced in the Government's case-in-chief," which "reinforc[ed] the Court's prior conclusion that Jin should not be permitted to introduce his own out-of-court statements."  *Id*. at 6.

The Government represents that it intends to introduce the same exhibits from the undercover investigation as it did at the first trial.  Gov't's Resp., Dkt. No. 301 at 12.  These exhibits include (i) a recording of a May 13, 2019, call between undercover agents and Mr. Han; (ii) a May 13, 2019, email from Mr. Jin to undercover agents and CTJ in which Mr. Jin sends a letter outlining his concerns regarding CTJ's failure to ship the tobacco purchased by Winney; and (iii) a June 11, 2019, email from Mr. Han to undercover agents in which Mr. Han provides Mr. Jin's email address.  *Id*.  The Government also represents that it "may" introduce a second collection of exhibits from the undercover operation.  *Id*.  These include (i) another May 13, 2019, call between an undercover agent and Mr. Han, in which the agent discussed bribing a bank official; (ii) a May 14, 2019, call between an undercover agent and Mr. Han, discussing the possibility of a meeting with Mr. Jin and revisit the subject of the purported bribe; (iii) an email thread between the undercover agent and Han ending May 31, 2019, in which Mr. Han sends the undercover agent an updated purchase contract; and (iv) an email thread between Mr. Han, the undercover agent, and CTJ personnel, in which they schedule the date for Mr. Jin to fly to Argentina to meet with CTJ and the undercover agents.  *Id*.  Finally, as discussed above, the Government is "also considering" introducing a recording of a May 21, 2019, phone call between Mr. Jin and the undercover agents in which Mr. Jin denied doing business with North

Korea and repeatedly rebuffed the agents' attempts to have the Winney Entities pay for all or part of the purported bribe. *Id.* at 12–13.

Only two of these proposed exhibits include statements by Mr. Jin. The first exhibit is this May 13 email from Mr. Jin to CTJ and the undercover agents, in which Mr. Jin expressed his concern that CTJ had not made its scheduled shipment and stated that the Winney Entities "reserve[d] the right to hold your company liable for default." Dkt. No. 301-3 at 4. The second exhibit, as discussed in the preceding section, is the recording of the May 21 phone call between Mr. Jin and the undercover agents, which the Government is "considering" admitting. Gov't's Resp., Dkt. No. 301 at 12–13.

None of Mr. Jin's statements during the July 11 in-person meeting are necessary to provide context for his statements in the Government's proposed exhibits. Accordingly, even if these statements are technically admissible for a non-hearsay purpose of showing Mr. Jin's state of mind, they are properly excluded under Rule 403. As the Court has previously explained, the fact that Mr. Jin made these statements "multiple months after the period of the charged conspiracies . . . greatly diminishes the probative value" of those statements as evidence of his state of mind at the relevant times and "casts doubt on" their reliability. Mem. Op. & Order, Dkt. No. 192 at 10. Meanwhile, admitting the statements would be unfairly prejudicial because it would circumvent the ordinary "adversarial process," which requires a party offering an account of his state of mind in his own words to submit to cross-examination and "first-hand scrutiny by the jury." *See id.* (quoting *McDaniel*, 398 F.3d at 545).

Accordingly, on the present record, the Court will not allow Mr. Jin to admit his own statements from the July 11 meeting as evidence of his own state of mind, even if the Government admits evidence of his statements from the May 21 phone call.

\*       \*       \*

In sum, if the Government admits the May 21 phone call in which Mr. Jin denied doing business with North Korea, the Court shall allow Mr. Jin to admit statements by the undercover agents that provide context for this denial.  However, on the present record the Court will not allow Mr. Jin to admit his own subsequent statements, including his statements during the in-person meeting on July 11.  To this extent, the Court shall **GRANT IN PART** and **DENY IN PART** Mr. Jin's [289] Motion *in Limine* Regarding the Admissibility of Out-of-Court Statements for a Non-Hearsay Purpose.

## I.       Mr. Jin's Challenge to the Reliability of the Government's Investigation

Mr. Jin next seeks leave to present a general challenge to the thoroughness and good faith of the Government's investigation.  *See* Def.'s Mot., Dkt. No. 288.  He also proposes to present specific evidence about CTJ's conduct to undermine the Government's theory regarding his *mens rea*.  *See id.*; *see also* Def.'s Mot., Dkt. No. 284.  The Court addressed these issues at some length before Mr. Jin's first trial.  *See* Mem. Op. & Order, Dkt. No. 152 at 10–13.  Given the importance of the issues presented, the Court expands on that discussion here.  In summary, the Court will allow Mr. Jin to challenge the thoroughness and good faith of the Government's investigation, subject to the ordinary limits of relevance and other evidentiary rules.

Mr. Jin argues that he should be permitted to "make a general attack on the thoroughness and good faith" of the Government's investigation because it "undermines the reliability of any conclusions produced by that investigation." Def.'s Mot., Dkt. No. 288 at 2.  Mr. Jin argues that evidence regarding the thoroughness or good faith of the Government's investigation "is admissible not only when it directly relates to the defendant's guilt or innocence, or the credibility of any particular witness, but also when it casts doubt on the conduct of the investigation as a whole." *Id*. at 5.  For example, Mr. Jin argues that "[e]vidence that

investigators were sloppy, careless, or even acted in bad faith, is admissible to generally impugn the caliber of the investigation." *Id*. at 6 (citation omitted).

As the Court held before Mr. Jin's first trial, Mr. Jin may present evidence and argument aimed at discrediting the thoroughness and good faith of the Government's investigation. However, this line of attack is subject to all the ordinary limits of the Rules of Evidence. Most importantly, evidence that is probative of the Government's thoroughness and good faith will only be admissible if it is relevant to the issue properly before the jury: Mr. Jin's guilt or innocence of the offenses charged in the indictment. *See* Fed. R. Evid. 401, 402.

For example, as the Court explained before Mr. Jin's first trial, "argument and evidence regarding the thoroughness of the Government's investigation into an alternative suspect is permissible because it is directly relevant to the defendant's guilt or innocence of the crime charged." Mem. Op. & Order, Dkt. No. 152 at 12. Although the offenses charged in this case are not amenable to a simple "alternative suspect" defense because they can be committed by multiple parties simultaneously, Mr. Jin presents an analogous theory that merits close attention. Throughout his pretrial motions, Mr. Jin cites a recording of a phone call in which Agent Tarango told Mr. Jin that "Patricio [Lyons] instructed James [Han] to change the bill of lading from going to North Korea to going to Dalian." *See* Def.'s Ex., Dkt. No. 276-4 at 6. The issue of who initiated the change to the bills of lading that Agent Tarango mentioned in this call is relevant because it goes to *mens rea*: A reasonable jury could infer that whoever initiated this change did so for the purpose of evading the U.S.'s newly adopted comprehensive sanctions on North Korea. Meanwhile, a jury might conclude that a counterparty who merely *assented* to a proposed change to a bill of lading did not know the reason for the change and was not aware of the connection to U.S. sanctions. Because of the heightened *mens rea* requirements for the

93

offenses charged in this case, this issue is central to determining which of the possible subjects of the Government's investigation had committed a crime. Accordingly, it is proper for Mr. Jin to present argument and evidence about whether the Government thoroughly investigated the issue of who initiated the change to the bills of lading.

Similarly, evidence regarding the thoroughness or good faith of the Government's investigation is admissible if it bears on the credibility and reliability of the Government's evidence or is used to impeach a Government witness. *See* Mem. Op. & Order, Dkt. No. 152 at 10–13. For example, Mr. Jin has argued that the CTJ records are unreliable because they are missing years of emails and some of the bills of lading from the relevant period. *See* Def.'s Mot., Dkt. No. 286. Argument and evidence regarding the thoroughness of the Government's investigation into these missing records is admissible because it goes to the weight that jurors should assign to those records. Mr. Jin may also impeach those of the Government's investigators who testify as witnesses by highlighting various mistakes that they made during their investigation and the ensuing prosecution. Mr. Jin can introduce argument and evidence regarding these mistakes to test whether the investigation into him was "initiated on the basis of what later turned out to be false evidence" and to probe a given witness's bias—that is, their "investment in the case and [their] motivation to have a successful prosecution to cover what could be perceived as crucial mistakes made during the beginning of the process," such as "rel[iance] on . . . false statements." *United States v. Quinn*, 537 F. Supp. 2d 99, 114 (D.D.C. 2008) (JDB).

But not all evidence regarding the thoroughness or good faith of the Government's investigation is relevant. For instance, "evidence about the thoroughness of the Government's investigation of a similar crime committed by someone else on a different occasion is not

directly relevant to the defendant's guilt or innocence." Mem. Op. & Order, Dkt. No. 152 at 12. And even if such evidence were relevant, the Court would be careful to guard against the risk that it would "improperly invite the jury to second-guess the Government's exercise of its prosecutorial discretion." *Id*. (citing *United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983)). Indeed, the Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Much of the available evidence in this case is also subject to exclusion under the hearsay rules.

Ultimately, the Rules of Evidence govern the admissibility of evidence relating to the thoroughness or good faith of the Government's investigation. While such evidence may no doubt be important, it is only relevant if it makes a fact of consequence more or less probable than it would be without the evidence. Generalized attacks on the character of the Government's investigators and the exercise of prosecutorial discretion are not relevant to any question properly before the jury. And even when evidence relating to the thoroughness or good faith of the Government's investigation is relevant, the Court may nonetheless exclude that evidence when its probative value is substantially outweighed by any of the Rule 403 dangers or another evidentiary rule prohibits its admission.

Accordingly, the Court shall **GRANT IN PART** and **DENY IN PART** Mr. Jin's [288] Motion *in Limine* to Permit Defense Arguments and Evidence on the Good Faith of the Investigation. Mr. Jin may inquire into the thoroughness and good faith of the Government's investigation to probe the reliability of the Government's investigation and the credibility of its witnesses, but he may not make a generalized attack on the character of the Government's

investigators or its exercise of prosecutorial discretion without first making a threshold showing of relevance.

To ensure the orderly presentation of evidence targeting the good faith and integrity of the Government's investigation, Mr. Jin shall first proffer any such evidence to the Court, outside the presence of the jury, and seek a ruling on its admissibility. This proffer may be made *ex parte*. To the greatest extent possible, this proffer should be presented in writing on the evening before the testimony at issue is expected to begin, adhering to the Court's procedures for the submission of mid-trial motions *in limine*. *See* Trial Procedures Order, Dkt. No. 131 at 2–3.

### J.     Evidence Regarding CTJ's Culpability

The parties agree that Mr. Jin cannot present argument or evidence to show the relative culpability of CTJ. Def.'s Mot., Dkt. No. 288 at 6; Gov't's Resp., Dkt. No. 301 at 3. In other words, there is no dispute that inviting the jury to weigh Mr. Jin's culpability against CTJ's culpability would be "irrelevant and improper." *United States v. Baez*, 695 F. Supp. 3d 94, 109 (D.D.C. 2023) (PLF); *see also United States v. Carter*, No. 00-3037, 2001 WL 311223, at *1 (D.C. Cir. Mar. 23, 2001) (citing *United States v. Gaviria*, 116 F.3d 1498, 1518 (D.C. Cir. 1997)) (explaining at the sentencing stage that "[n]ot only is the district court not required to determine the relative culpability of offenders, but the law of this circuit makes clear that even the least culpable defendant can play an active role in the offense").

However, some evidence of CTJ's conduct may be relevant to the jury's assessment of Mr. Jin's *mens rea*. The clearest example of potentially relevant evidence of this topic is evidence regarding CTJ's business with other North Korean entities. As noted above, Mr. Jin intends to elicit evidence regarding his May 21, 2019, phone call with undercover agents Tarango and Huang in which Agent Tarango told Mr. Jin that Patricio Lyons of CTJ "instructed" Mr. Jin's Winney employee James Han "to change the bill of lading from going to North Korea

96

to going to [China]." Gov't's Trial Ex. 404_T at 6–7.[9]  This evidence is relevant to Mr. Jin's *mens rea*.  One of the Government's key allegations regarding Mr. Jin's criminal intent is that, after the U.S. adopted comprehensive sanctions against North Korea in 2016, the Winney Entities changed the recipient listed on their bills of lading from a company in North Korea to a company in China.  If Mr. Jin can show that it was CTJ, not Winney, that directed the change to the bills of lading in 2016, then he can undermine a crucial allegation against him.  Mr. Jin is not precluded from bringing out Agent Tarango's statement just because it implicates potential wrongdoing on the part of CTJ.

Nor is Mr. Jin precluded from bringing out other evidence of CTJ's conduct if that evidence is relevant to determining his own culpability, including whether he possessed the requisite *mens rea* to commit the charged offenses.  Indeed, Mr. Jin's "constitutional right to present a complete defense . . . includes presenting reasonable third-party-perpetrator evidence." *United States v. Benbow*, 709 F. App'x 25, 27 (D.C. Cir. 2018) (citing *Holmes v. South Carolina*, 547 U.S. 319, 324-27 (2006)); *United States v. Moore*, 590 F. Supp. 3d 277, 281 (D.D.C. 2022) (JEB) ("The constitutional right to present a complete defense undergirds a defendant's right to present evidence that a third party committed the crime of which he is accused.").  For example, Mr. Jin may seek to corroborate Agent Tarango's statement about the source of the change to the bills of lading with other evidence from CTJ's business records.  Such evidence may prove especially probative considering Agent Tarango evidently can neither recall telling Mr. Jin that CTJ directed this change nor articulate a basis for why he might have done so.

---

[9] Translating this statement for Mr. Jin, Agent Huang said, in Mandarin: "He said that two years ago, when the contract was sent, it was sent to Patricio, later Patricio said, if the goods were to go to North Korea, they could only be shipped to Dalian, not Pyongyang." *Id*. at 7 (referring to Dalian, China, and Pyongyang, North Korea).

Mr. Jin identifies at least one kind of evidence that he may use to support the inference that CTJ directed Winney to change the destination on the bills of lading: documents showing that CTJ received payments from Carbuncle and Fully Max, two alleged North Korean front companies with known links to DHID. *See, e.g.,* Gov't's Resp., Dkt. No. 316 at 7.

The introduction of Agent Tarango's statement that CTJ directed the changes to the bills of lading coupled with Agent Tarango's lack of recollection leaves the jury to make a judgment call as to whether CTJ did in fact initiate the change. The Government will argue that CTJ did not direct the changes to the bills of lading despite Agent Tarango's statement to the contrary, and in support it will likely emphasize evidence of Winney doing business with North Korean front companies. Mr. Jin will naturally argue that CTJ *did* direct the changes to the bills of lading, per Agent Tarango's statement, and in support of that position. he "must be permitted to argue all reasonable inferences from the facts in the record." *United States v. Hoffman*, 964 F.2d 21, 24 (D.C. Cir. 1992); *United States v. DeLoach*, 504 F.2d 185, 190 (D.C. Cir. 1974) (explaining that "in every criminal case, defense counsel should have wide latitude in drawing inferences from the record"). "It is always open in a criminal case for the defendant to explain away the force of specific items of the government's proof by showing the existence of other hypotheses." *United States v. Hayes*, 369 F.3d 564, 568 (D.C. Cir. 2004) (quoting *United States v. Foster*, 986 F.2d 541, 545 (D.C. Cir. 1993)).

The apparent fact that CTJ did business with alleged North Korean front companies may make it more probable that Mr. Lyons did, in fact, direct the change to the bills of lading in 2016. A reasonable jury could conclude that because CTJ did business with these other front companies, CTJ was likely aware of sanctions on North Korea and potential means of evading them. CTJ's business with alleged North Korean front companies is relevant, in other words, for

98

the same reasons that the Winney Entities' business with alleged North Korean front companies is relevant. Although CTJ is not on trial, evidence regarding its conduct is relevant if "[t]he focus is not on proof of [CTJ's] guilt or innocence, but on the effect the evidence has upon [Mr. Jin's] culpability." *Eastridge v. United States*, 372 F. Supp. 2d 26, 58 (D.D.C. 2005) (RMC). Here, evidence of CTJ's business with alleged North Korean front companies could be appropriately focused Mr. Jin's culpability by linking that evidence to the issue of which party was responsible for the change to the bills of lading in 2016—and by extension, to the issue of whether Mr. Jin had the *mens rea* to commit the charged offenses.

As the Court has already explained, however, if the evidence presents a danger that substantially outweighs its probative value. Fed. R. Evid. 403; *United States v. Lighty*, 616 F.3d 321, 358 (4th Cir. 2010) ("Alternative perpetrator cases thus balance two evidentiary values: the admission of relevant evidence probative of defendant's guilt or innocence under Rule 401 with the exclusion of prejudicial, misleading, and confusing evidence under Rule 403."). The primary danger regarding evidence of CTJ's transactions with alleged North Korean front companies is that it might suggest to the jury that Mr. Jin and Winney are less culpable than CTJ, which could improperly invite jury nullification. *See, e.g.*, *United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1985). On the present record, this risk appears to be manageable. Mr. Jin has repeatedly represented that he will not present such an argument to the jury, and the Court can adequately protect against such impermissible inferences by regulating the scope of the parties' presentations during trial. *See* Def.'s Mot., Dkt. No. 288 at 6–7.

Accordingly, on the present record, the probative value of evidence showing that CTJ conducted business with alleged North Korean front companies does not appear to be substantially outweighed by any of the Rule 403 dangers. Because the Government has already

admitted that CTJ conducted independent business with Carbuncle and Fully Max, there is no reason to conclude that this evidence will create "a mini-trial about matters unrelated to the elements of the charged crimes" that wastes time and confuses the issues. *See* Gov't's Resp., Dkt. No. 301 at 4. Furthermore, there is minimal risk that evidence of CTJ's business with alleged North Korean front companies will mislead the jury. Most of the evidence in question comes from a source the Government believes is trustworthy—CTJ's business records—and it is closely related to the issue of Mr. Jin's *mens rea*. Finally, the Court can manage any danger of wasting time through the presentation of cumulative evidence by regulating the parties' presentations during trial.

Accordingly, although Mr. Jin *may not* present argument or evidence regarding the conduct of CTJ for the purpose of arguing that CTJ is more culpable than him or the Winney Entities, he *may* introduce argument or evidence regarding the conduct of CTJ for the purpose of showing that he lacked the *mens rea* to commit the charged offenses.

### K.    Mr. Jin's proffered expert witness

On March 12, 2026, Mr. Jin gave notice that he "may" call Michael Clarke, a retired FBI Special Agent employed by the FBI from 1988 to 2020, to testify about "documentation guidelines applicable to undercover investigations involving the FBI, including joint investigations between the FBI and DHS." Def.'s Notice, Dkt. No. 313 at 1–2. The Government objects, arguing that Agent Clarke's proposed testimony is not relevant because the undercover investigation in this case was conducted by DHS, not the FBI. Gov't's Resp., Dkt. No. 321. The Government adds that even if Agent Clarke's testimony has some probative value, it would be substantially outweighed by the danger that it "will turn the undercover operation into a sideshow for the jury." *Id.*

100

"The twin requirements for expert testimony are relevance and reliability." *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 34–35 (D.D.C. 2004) (ESH) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149–50 (1999)).  Regarding the relevance of expert testimony, "[t]he party offering the expert's testimony must establish by a preponderance of the evidence that the expert testimony is admissible."  *McReynolds*, 349 F. Supp. 2d at 35.

On the present record, Mr. Jin has not yet established that his proffered expert testimony is relevant.  Although Agent Clarke appears to have significant experience conducting undercover investigations with the FBI, it is not yet clear that his specialized knowledge with respect to FBI undercover investigations is relevant to the jury's evaluation of the undercover investigations conducted by DHS in this case.  Mr. Jin's notice and Agent Clarke's accompanying declaration state that Agent Clarke's experience includes joint investigations with DHS.  But this fact alone does not explain whether the FBI's documentation practices—the subject of Agent Clarke's proffered opinion—have any relation to or effect the DHS documentation practices applicable to the undercover agents in this case.  For Agent Clarke's testimony to be relevant, Mr. Jin must show a connection between the FBI's practices and the practices applicable to the investigation undertaken in this case.  Only then can the Court appropriately address the admissibility of Agent Clarke's testimony by weighing its probative value against the dangers expressed in Rule 403.

Accordingly, the Court shall defer its determination regarding the admissibility of Mr. Jin's proposed expert testimony.  Before introducing this testimony, Mr. Jin must make the threshold showings of relevance described in this section.  To do so, Mr. Jin shall file a written supplement to his expert notice, no later than the evening before the testimony at issue is

expected to begin, adhering to the Court's procedures for the submission of mid-trial motions *in limine*. *See* Trial Procedures Order, Dkt. No. 131 at 2–3. The Court may then require a *voir dire* of the proposed expert witness, outside the presence of the jury, before making a final ruling on admissibility.

### L. The Government's Evidence Post-Dating the Charged Conspiracy

Mr. Jin is charged with participating in a conspiracy that ended in or around March 2019.[10] The Government has submitted a late-filed motion to admit evidence that post-dates the charged conspiracy. Gov't's Mot., Dkt. No. 332. Specifically, the Government seeks to introduce (i) a July 8, 2019, email from Mr. Jin's co-defendant, Mr. Han, responding to an inquiry from Emirates National Bank of Dubai, and (ii) a November 3, 2019, email from Mr. Han responding to an inquiry from Abu Dhabi Commercial Bank. *Id.* at 2. Han received these inquiries while opening accounts for Winney at each bank. Both banks asked Mr. Han to list Winney's biggest buyers; in response, Mr. Han provided a list of buyers that did not include Naegohyang, Ryugyong, or any other North Korean entity.

At the prior trial, the Government admitted Mr. Han's July 8, 2019, email to Emirates National Bank of Dubai for the limited purpose of proving that Mr. Han opened a bank account. Now, however, the Government seeks to admit Mr. Han's emails from July 8, 2019, and November 3, 2019, as direct evidence of Mr. Han's (1) intent to defraud banks, (2) knowledge of sanctions, and (3) coordination with co-defendant Sim Hyon-Sop. Gov't's Mot., Dkt. No. 332 at 2–3.

---

[10] Specifically, the Indictment charges Mr. Jin with participating in a bank-fraud and money-laundering conspiracy beginning "at least in or around February 2009" and continuing until "in or around March 2019"; with participating in a conspiracy to violate IEEPA beginning "on or about March 15, 2016," until "in or around March 2019"; and with violating IEEPA's substantive prohibitions through four transactions occurring between June 20, 2018, and March 1, 2019. Indictment, Dkt. No. 13, ¶¶ 47, 77–78, 80, 82.

Mr. Jin objects to the admission of Mr. Han's emails that post-date the charged conspiracy on procedural and substantive grounds. Def.'s Resp., Dkt. No. 334. The Court shall first address the procedural issues raised by Mr. Jin. In doing so, the Court concludes these issues do not bar the Government's argument for admissibility. The Court shall therefore analyze the substance of the Government's proffered evidence. In doing so, the Court concludes that the Government's proffered evidence is not admissible under Rule 404(b) because the minimal probative value of the evidence is substantially outweighed by the risks of undue prejudice, confusing the issues, misleading the jury, and needlessly presenting cumulative evidence.

      1.   The procedural issues that Mr. Jin raises do not bar the Government's Motion.

Mr. Jin argues that the Court should preclude the Government from offering Mr. Han's post-conspiracy emails under either the principle of waiver or the doctrine of judicial estoppel. Def.'s Resp., Dkt. No. 334 at 2–5. The Government did not address these topics in its Motion, and it did not file a reply to Mr. Jin's Opposition. Accordingly, after considering Mr. Jin's arguments, the Court concludes that they do not warrant bypassing the merits of the Government's Motion.

      a.   *The Government did not waive its ability to offer Mr. Han's post-conspiracy emails as substantive evidence of guilt at retrial by relying on a different theory of admissibility for these emails at the first trial.*

Mr. Jin argues that the Government has waived its ability to offer Mr. Han's post-conspiracy emails as substantive evidence of guilt because the Government "deliberately abandoned" this theory of admissibility at the first trial and chose instead to admit Mr. Han's July 8, 2019, email for the limited purpose of proving that Mr. Han opened a bank account. Def.'s Resp., Dkt. No. 334 at 3.

Even assuming, for the sake of argument, that the Government waived its right to argue for the admission of Mr. Han's post-conspiracy statements as substantive evidence at the first trial, Mr. Jin has provided no authority to support the conclusion that this waiver carries over to the upcoming retrial. Mr. Jin's arguments elsewhere, in fact, suggest that a strategic decision at the first trial does not bind the parties to the same strategy at the retrial. For example, Mr. Jin seeks to introduce argument and evidence regarding Agent Tarango's statement to Mr. Jin that Patricio Lyons of CTJ told Mr. Han to change the destination on the bills of lading. *See* Def.'s Mot., Dkt. No. 276 at 3–4. Mr. Jin did not raise this issue at the first trial. Accordingly, the Court shall not preclude the Government from offering Mr. Han's post-conspiracy statements as substantive evidence of guilt on the basis that the Government waived this theory of admissibility by not relying on it at the first trial.

      b.     *The doctrine of judicial estoppel does not preclude the Government from admitting evidence of Mr. Han's post-conspiracy communications with foreign banks.*

Mr. Jin also argues that the doctrine of judicial estoppel warrants the Court precluding the Government from offering Mr. Han's post-conspiracy statements as substantive evidence of guilt. Def.'s Resp., Dkt. No. 334 at 3–5.

The doctrine of judicial estoppel "prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting 18 Moore's Federal Practice § 134.30, p. 134–62 (3d ed. 2000)). The doctrine "protect[s] the integrity of the judicial process" and "prevent[s] improper use of judicial machinery," and therefore it may be "invoked by a court at its discretion." *Rogler v. Gallin*, 402 F. App'x 530 (D.C. Cir. 2010) (per curiam) (quoting *Maine*, 532 U.S. 742, 750). The D.C. Circuit has explained that

> There are at least three questions that a court should answer in deciding whether to apply judicial estoppel: (1) Is a party's later position clearly inconsistent with its earlier position? (2) Has the party succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled? (3) Will the party seeking to assert an inconsistent position derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped?

*Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 798 (D.C. Cir. 2010).

The Court determines that the doctrine of judicial estoppel does not warrant precluding the Government from seeking to admit evidence of Mr. Han's post-conspiracy statements as substantive evidence of guilt.

First, the Government's current position is not "clearly inconsistent" with its earlier position. *Moses*, 606 F.3d at 798. At the first trial, the Government argued that Mr. Han's post-conspiracy emails were admissible for the limited purpose of showing that Mr. Han engaged in the conduct of opening new accounts for Winney. *See* Trial Tr. (Sept. 17, 2025, a.m.) at 47:25–48:2 (arguing that "what's relevant is the conduct, which is the opening of the new accounts"). While the Government also suggested that it did not "think it [was] relevant that after the time period of the conspiracy that Mr. Han might have lied to the bank," *id*. at 47:24–25, this statement was made within the context of the Government's attempt to establish that it was "not intending to argue that the information that Mr. Han submitted to [the bank] was false," *id*. at 49:10–18. The Government's current plan to argue that the information Mr. Han submitted to the bank was indeed false may be different from its prior argument, but it is not inconsistent. In essence, the Government is making a strategic decision to pursue an avenue of admissibility that it decided not to explore at the first trial. This is consistent with the general proposition that "[e]vidence may properly be used in different proceedings for different purposes." *Ashcraft & Gerel v. Coady*, 244 F.3d 948, 953 (D.C. Cir. 2001).

105

Second, the Court's acceptance of the Government's current position would not "create the perception" that the Court was "misled" in the first trial. *Moses*, 606 F.3d at 798. As explained above, the Court relied on a different theory of admissibility when it admitted Mr. Han's post-conspiracy statements at the first trial. In accepting the Government's theory of admissibility at the first trial, the Court in no way rendered a determination on the admissibility of the same evidence under a different theory.

Finally, the Court determines that the Government will not obtain an unfair advantage, nor will Mr. Jin suffer an unfair detriment, if the Court does not preclude the Government's current argument regarding the admissibility of Mr. Han's post-conspiracy statements. *Moses*, 606 F.3d at 798. Mr. Jin knew that the Government would likely seek to introduce evidence of Mr. Han's post-conspiracy communications with foreign banks because it did so at the first trial. Given the nature of the evidentiary rules, Mr. Jin was also on notice of the fact that the Government may seek to admit the same evidence as it did at the first trial for different purposes.

Accordingly, the Court shall not invoke the doctrine of judicial estoppel to prevent the Government from admitting its proffered evidence of Mr. Han's post-conspiracy statements.

*    *    *

In sum, the Court determines that the Government's proffered evidence is not precluded on the two procural grounds cited by Mr. Jin. The Court will therefore turn to the merits of the Government's Motion.

> 2. <u>The Court shall deny the Government's Motion on the merits because it has not established the admissibility of its proffered evidence under Rule 404(b).</u>

Rule 404(b) provides that evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. Fed. R. Evid. 404(b)(1). Such evidence, however, may be

106

admissible for another purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* at 404(b)(2). "A prosecutor seeking to use evidence of other criminal or bad acts for one of those permitted purposes must, upon request, provide the defendant with reasonable notice, usually pretrial, of the anticipated evidence." *United States v. McGill*, 815 F.3d 846, 879 (D.C. Cir. 2016) (citing Fed. R. Evid. 404(b)(2)).

"A threshold question in determining the admissibility of evidence of other crimes and bad acts is whether the evidence, in actuality, relates to acts unconnected with those for which the defendant is charged, or instead is intertwined with the commission of charged crimes." *McGill*, 815 F.3d at 879. Rule 404(b) "only applies to truly 'other' crimes and bad acts; it does not apply to 'evidence . . . of an act that is part of the charged offense' or of 'uncharged acts performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime.'" *Id.* (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)); *United States v. Roberson*, 581 F. Supp. 3d 65, 71 (D.D.C. 2022) (JDB) (explaining that the two circumstances where Rule 404(b) does not apply are "narrow"). As the D.C. Circuit has explained, however, "the only consequences" of finding that an act is intertwined with the commission of the charged crimes "are to relieve the prosecution of Rule 404(b)'s notice requirement and the court of its obligation to give an appropriate limiting instruction upon defense counsel's request." *Bowie*, 232 F.3d at 927.

a.      *The admissibility of the Government's proffered evidence of Mr. Han's post-conspiracy communications is governed under Rule 404(b).*

As a threshold matter, the Court determines that the Government's proffered evidence of Mr. Han's post-conspiracy communications falls within the ambit of Rule 404(b). The Government argues that Mr. Han's post-conspiracy emails are "inextricably intertwined with the

107

charged offenses," and therefore not governed by Rule 404(b), because the emails "discuss front companies discussed in other exhibits." Gov't's Mot., Dkt. No. 332 at 3. The Government also argues that Mr. Han's July 8, 2019, email is "well within the date range of misconduct alleged in the indictment," and that Mr. Han's November 3, 2019, email does not post-date the July 8 email by much. *Id.* Because Mr. Han's emails were sent months after the final date of the charged conspiracy, however, they are not evidence "of an act that is part of the charged offense." *Bowie*, 232 F.3d at 929. Nor are they "uncharged acts performed contemporaneously with the charged crime" that "facilitate[d] the commission of the charged crime," as they occurred after the charged crime. *Id.* Accordingly, to admit Mr. Han's post-conspiracy statements, the Government must satisfy the requirements of Rule 404(b).

> b.    *The Government's proffered evidence of Mr. Han's post-conspiracy statements is not admissible under Rule 404(b).*

To determine whether the Government's proffered evidence of Mr. Han's post-conspiracy statements is admissible under Rule 404(b), the Court first "considers whether the evidence is 'probative of some material issue other than character.'"[11]    *United States v. Fitzsimons*, 605 F. Supp. 3d 92, 98 (D.D.C. 2022) (RC) (quoting *United States v. Clarke*, 24 F.3d 257, 264 (D.C. Cir. 1994)). If the Court determines that the evidence is relevant for a permissible purpose, then it shall "conduct a balancing test under Rule 403 and exclude the evidence if its probative value 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Id.* (quoting *United States v. King*, 254 F.3d 1098, 1100 (D.C. Cir. 2001)).

---

[11] Although Rule 404(b) includes a list of permissible uses for other act evidence, the D.C. Circuit has explained that "[t]he rule was intended not to define the set of permissible purposes for which bad-acts evidence may be admitted but rather to define the *one impermissible* purpose for such evidence." *United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990) (emphasis in original) ("In other words, under Rule 404(b), any purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered solely to prove character.").

The Government seeks to admit Mr. Han's emails from July 8, 2019, and November 3, 2019, as direct evidence of Mr. Han's (1) intent to defraud banks, (2) knowledge of sanctions, and (3) coordination with co-defendant Sim Hyon-Sop. Gov't's Mot., Dkt. No. 332 at 2–3. Mr. Jin argues that "the [G]overnment's proffered theories of relevance are pretextual" and that "[t]he only purpose for introducing this evidence is to show Mr. Han's character." Def.'s Resp., Dkt. No. 334 at 7. The Court shall address each of the Government's proffered theories of relevance and, where necessary, balance the probative value of the Government's evidence against its potential for prejudice. After doing so, the Court concludes that the Government's proffered evidence is not admissible under Rule 404(b) because its probative value is substantially outweighed by the risk of undue prejudice, confusing the issues, misleading the jury, and the presentation of cumulative evidence.

i.      *The Government's proffered exhibits of Mr. Han's post-conspiracy communications with banks are not admissible to show Han's general intent to defraud banks and engage in bad-faith dealings with banks generally.*

The Government argues that its proffered evidence of Mr. Han's post-conspiracy emails—the July 8, 2019, email to Emirates National Bank of Dubai and the November 3, 2019, email to Abu Dhabi Commercial Bank—reveal that Han sent the banks "information he knew to be false" and therefore show that Han "intended to defraud the banks." Gov't's Mot., Dkt. No. 332 at 2. Mr. Han's intent to defraud these two banks is relevant, the Government argues, because showing this intent "would undercut the defense that the conspirators' interactions with banks were conducted in good faith." *Id*. Mr. Jin disagrees, emphasizing that the Government must prove that Mr. Han intended to defraud "the *U.S. banks* that processed wire transfers for Winney," and that proof of Mr. Han lying "to a foreign bank, after the charged conspiracy ended, for the purpose of opening a Winney account, does not make it any more or less likely that

109

Mr. Han intended to defraud U.S. correspondent banks during the conspiracy period." Def.'s Resp., Dkt. No. 334 at 5 (emphasis in original). Mr. Jin claims that "the only chain of reasoning a jury can use to infer an intent to defraud U.S. banks is that Mr. Han's act of allegedly lying to a bank in Dubai shows that he has a dishonest character." *Id*. at 6.

Under the Government's theory of admissibility, Mr. Han's post-conspiracy emails have little probative value. The Government does not explain why Mr. Han's post-conspiracy intent is probative of his intent during the conspiracy. Generally, "[t]he temporal (as well as the logical) relationship between a defendant's later act and his earlier state of mind attenuates the relevance of such proof." *United States v. Watson*, 894 F.2d 1345, 1349 (D.C. Cir. 1990). The Government has emphasized this principle in opposing Mr. Jin's request to introduce his own statements from the July 11, 2019, meeting with CTJ and undercover agents. *See, e.g.,* Gov't's Resp., Dkt. No. 301 at 10–11. While there are different hearsay rules for the admission of a defendant's own statements and the admission of statements made by a party-opponent, the relevance standard is the same. The probative value of Mr. Han's post-conspiracy emails is also weakened by the fact that they involve a different context from the charged conduct. The relevant charges involve wire transfers through U.S. correspondent banks, whereas Mr. Han's post-conspiracy emails involve the opening of bank accounts at foreign banks.

The minimal probative value of Mr. Han's post-conspiracy emails is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury. Fed. R. Evid. 403. Here, the Court is wary of the fact that "the line between evidence admitted to demonstrate intent and evidence admitted to demonstrate propensity is hardly clear." *United States v. Matthews*, 431 F.3d 1296, 1313, n.1 (11th Cir. 2005). The Government's proffered use of Mr. Han's post-conspiracy statements is not remedied by the "considerable leeway" afforded

to the prosecution to offer other act evidence to "inform the jury of the background of the conspiracy charged . . . and to help explain to the jury how the illegal relationship between the participants in the crime developed."  *United States v. Machado-Erazo*, 47 F.4th 721, 728 (D.C. Cir. 2018) (quoting *United States v. Mathis*, 216 F.3d 18, 26 (D.C. Cir. 2000)).  The Government is not offering this evidence to link a defendant to other defendants, *United States v. Gaviria*, 116 F.3d 1498, 1532 (D.C. Cir. 1997) (per curiam); or to show the nature of a conspiracy and "the kind of organizational control" a defendant exercised, *United States v. Mahdi*, 598 F.3d 883, 891 (D.C. Cir. 2010); or to show the defendants' intent to act in concert, *Mathis*, 216 F.3d at 26. Instead, the Government is offering this evidence to show that Mr. Han apparently attempt to defraud two foreign banks after the charged conspiracy in order to establish that the defendants generally interacted with banks in bad faith.  This risk that this approach will lead the jury to make a propensity inference substantially outweighs the slight probative value of the evidence.

      ii.   *The Government's proffered exhibits of Mr. Han's post-conspiracy communications with banks are not admissible to show Mr. Han's knowledge of sanctions.*

   The Government also argues that Mr. Han's post-conspiracy statements should be admitted because they "show that [he] understood that the banks would not open bank accounts with Winney if [he] told them their largest customers were in North Korea, which indicates that [he] knew about the sanctions on North Korea."  Gov't's Mot., Dkt. No. 332 at 2.  Mr. Jin agrees that Mr. Han's post-conspiracy statements "may show that [Mr.] Han was aware of the existence of sanctions on North Korea," but argues that these statements are not probative of the "relevant knowledge" that the Government must prove, which is that Mr. Han knew "that it was unlawful 'to engage in financial transactions that involved U.S. banks.'"  Def.'s Resp., Dkt. No. 334 at 6 (quoting Gov't's Proposed Jury Instructions on "Willfully," Dkt. No. 324 at 72).

Again, the probative value of this evidence under the Government's theory of admissibility is slight.  The Government faces the same temporal problem that the Court discussed above—Mr. Han's post-conspiracy knowledge of North Korean sanctions is not especially probative of his knowledge during the conspiracy.  This temporal problem is particularly acute here because the emails at issue came near the end of the undercover operation, during which undercover agents informed Mr. Han and Mr. Jin about sanctions on North Korea.  This slight probative value is substantially outweighed by the danger of unfair prejudice and confusing the issues.  This theory of admissibility presents the same propensity dangers as the Court discussed above.  Furthermore, it presents a risk that the jury could be confused regarding the appropriate level of knowledge Mr. Han had to have about U.S. sanctions on North Korea.  These risks substantially outweigh the minimal probative value of this evidence under the Government's lead theory.

> iii.  *The Government's proffered exhibits showing Mr. Han's post-conspiracy communications with banks are not admissible to show Mr. Han's coordination with Mr. Sim.*

Finally, the Government argues that Mr. Han's post-conspiracy communications suggest that he "closely coordinates" with his co-defendant, Mr. Sim, because some of the customers he lists for the Winney Entities were "listed on a ledger recovered from [Mr.] Sim's iCloud."  Gov't's Mot., Dkt. No. 332 at 2–3.  The Government's final theory of admissibility requires a large inferential leap that dilutes the probative value of this evidence.  Whatever probative value this evidence has is substantially outweighed by the danger of unfair prejudice and the presentation of cumulative evidence.  As Mr. Jin notes, the Government has "ample evidence" of the connection between Mr. Han and Mr. Sim beyond the post-conspiracy emails from Mr. Han.  Def.'s Resp., Dkt. No. 334 at 7.  There are, for example, payment notices in the CTJ records that show these same companies were making payments to CTJ on behalf of the Winney Entities.  *Id*.

There are also U.S. correspondent bank wire transfer records showing that these companies sent money to Winney. *Id.* Accordingly, the Court shall preclude the Government from offering the post-conspiracy emails of Mr. Han for the purpose of showing his connection to Mr. Sim.

*        *        *

In sum, the Court concludes that the Government's proffered evidence of Mr. Han's July 8, 2019, and November 3, 2019, emails to banks are not admissible under Rule 404(b). This evidence has minimal probative value under each of the Government's theories of admissibility. Whatever probative value this evidence has is substantially outweighed by the dangers listed in Rule 403. Accordingly, the Court shall **DENY** the Government's [332] Motion *in Limine* to Admit Evidence Post-Dating the Conspiracy. However, the Court would allow the Government to introduce a redacted version of these emails that omits any allegedly false representations to the banks, as it proposed to do at Mr. Jin's first trial. *See* Gov't's Mot., Dkt. No. 332 at 3.

*        *        *

## IV. CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, consistent with this Court's prior [315] Order, that Mr. Jin's [267] Motion to Direct the Government to Comply with its *Brady*, Rule 16, and Other Disclosure Obligations is **GRANTED IN PART** and **DENIED AS MOOT IN PART**; and further

**ORDERED** that Mr. Jin's [268] Second Motion to Dismiss with Prejudice for Violation of His Sixth Amendment Speedy Trial Right is **DENIED**; and further

**ORDERED** that Mr. Jin's [269] Motion *in Limine* to Exclude Hearsay Emails from the Google Search Warrant Return is **DENIED**; and further

**ORDERED**, consistent with this Court's prior [315] Order, that Mr. Jin's [273] Motion for Disclosure of Statements Under the Jencks Act is **GRANTED IN PART** and **DENIED IN PART**; and further

**ORDERED** that the Government's [275] Motion to Exclude Time under the Speedy Trial Act is **GRANTED IN PART** and **DENIED IN PART WITHOUT PREJUDICE**; and further

**ORDERED**, consistent with this Court's prior [315] Order, that Mr. Jin's [276] Motion to Compel Production of *Brady* Information and for an Evidentiary Hearing is **GRANTED IN PART** and **DENIED IN PART WITHOUT PREJUDICE**; and further

**ORDERED** that Mr. Jin's [284] Motion *in Limine* to Permit Extrinsic Evidence of Bias is **GRANTED IN PART** and **DENIED IN PART**; and further

**ORDERED** that Mr. Jin's [285] Motion *in Limine* Regarding the Scope of Cross-Examination Required by the Sixth Amendment and Fed. R. Evid. 611(b) is **GRANTED IN PART** and **DENIED IN PART**; and further

114

**ORDERED** that Mr. Jin's [286] Motion to Exclude Business Records [of Cooperativa de Tabacaleros de Jujuy ("CTJ")] is **DENIED**; and further

**ORDERED** that Mr. Jin's [287] Motion *in Limine* Regarding Admissibility of Expert Opinions and the Scope of Expert Witness Cross-Examination is **GRANTED IN PART** and **DENIED IN PART**; and further

**ORDERED** that Mr. Jin's [288] Motion *in Limine* to Permit Defense Arguments and Evidence on the Good Faith of the Investigation is **GRANTED IN PART** and **DENIED IN PART**; and further

**ORDERED** that Mr. Jin's [289] Motion *in Limine* Regarding the Admissibility of Out-of-Court Statements [During the Government's Undercover Investigation] for a Non-Hearsay Purpose is **GRANTED IN PART** and **DENIED IN PART**; and further

**ORDERED** that Mr. Jin's [299] Motion to Reconsider Motion to Suppress and for a *Franks* Hearing is **DENIED**; and further

**ORDERED** that Mr. Jin's [308] Motion for an Evidentiary Hearing, to Compel the Government to Comply with its *Brady* Obligations, and "to Compel the Government to Identify the Evidence that it Destroyed" is **DENIED WITHOUT PREJUDICE**; and further

**ORDERED** that Mr. Jin's [309] Motion to Dismiss "for Flagrant Government Misconduct" is **DENIED**; and further

**ORDERED** that Mr. Jin's [317] Motion to Compel Production of *Brady* and *Giglio* Information "Related to False Testimony Regarding the Undercover Investigation and False Sworn Statements by Case Agent" is **GRANTED IN PART** and **DENIED IN PART**; and further

115

**ORDERED** that the Government's [325] *Ex Parte* Motion for a Protective Order is **GRANTED IN PART** and **DEFERRED IN PART**; and further

**ORDERED** Mr. Jin's [325] Motion to Unseal the Government's *Ex Parte* Submission is **DENIED IN PART** and **DEFERRED IN PART**; and further

**ORDERED** that Mr. Jin's [330] Motion to Compel Production of *Brady* Information [Related to Carbuncle and Fully Max Transactions] and For an Evidentiary Hearing is **GRANTED IN PART** and **DENIED WITHOUT PREJUDICE IN PART**; and further

**ORDERED** that Mr. Jin's [331] Motion to Compel the Government to Identify Evidence that it Has Destroyed is **DENIED WITHOUT PREJUDICE**; and further

**ORDERED** that the Government's [332] Motion *in Limine* to Admit Evidence Post-Dating the Conspiracy is **DENIED**; and further

**ORDERED** that Mr. Jin's requests for an evidentiary hearing are **DENIED WITHOUT PREJUDICE**; and further

**ORDERED** that the Government shall file, no later than **9:00 a.m. ET on March 31, 2026**, a brief response to this Memorandum Opinion and Order explaining its decision to withhold from Mr. Jin the name of the affiant responsible for the second affidavit filed with its [325] *Ex Parte* Motion for a Protective Order; and further

**ORDERED** that the Government shall promptly produce to Mr. Jin a copy of the email that Forensic Accountant ("FoA") Dawson Anglin sent to investigators at Homeland Security Investigations ("HSI") on January 24, 2022, along with the response that FoA Anglin received from HSI; and further

**ORDERED** that the Government shall promptly produce to Mr. Jin a transcript of FoA Anglin's grand jury testimony about the undercover investigation in this case.

116

The Court **DEFERS RULING** on the admissibility of the opinion testimony of Mr. Jin's proffered expert witness, Mr. Michael Clarke, pending further development of the record during the Government's case-in-chief.

For those matters on which the Court has deferred ruling, the proponent of evidence must approach the Court outside the presence of the jury to obtain a ruling on admissibility before presenting the evidence at issue. To the greatest extent possible, this proffer should be presented in writing on the evening before the testimony at issue is expected to begin, adhering to the Court's procedures for the submission of mid-trial motions *in limine*. *See* Trial Procedures Order, Dkt. No. 131 at 2–3.

Having resolved each of the parties' pretrial motions regarding discovery disputes and reasonably foreseeable evidentiary issues, the Court further **ORDERS** that any further motion or objection on these topics must be accompanied by a short and plain statement showing cause for failure to file a timely motion. If the proponent of any such motion or objection fails to show good cause for not raising the issue earlier, the Court may strike the motion or objection without reaching its merits.

**SO ORDERED.**

**Dated:** March 29, 2026

COLLEEN KOLLAR-KOTELLY
United States District Judge

117