**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | } | |
| | } | |
| | } | **Criminal No. 23-CR-91-CKK** |
| **v.** | } | |
| | } | |
| **GUANGHUA JIN,** | } | |
| | } | |
| **Defendant.** | } | |
| | } | |
| | } | |

**DEFENDANT'S MOTION TO COMPEL PRODUCTION OF *BRADY* AND JENCKS**
**MATERIAL AND FOR EVIDENTIARY HEARING**

Once more, the government's document productions reveal that it has not complied with its discovery obligations. Once more Mr. Jin, respectfully moves the Court to compel production of *Brady* and Jencks material and to hold a hearing on the government's noncompliance.

**PROCEDURAL HISTORY**

On March 27, 2026, Mr. Jin moved to compel production of (*inter alia*) all written communications relating to FoA Anglin's work in this case, including his communications with the prosecution team. ECF No. 340. On March 30, following the government's failure to respond by the Court's deadline, the Court granted Mr. Jin's motion. The government then moved for reconsideration of the Court's decision. ECF No. 355. In that motion, the government objected to the "onerous burden" of "requiring [it] to produce … significant amounts of communication records by Dawson Anglin, who has investigated this case for many years." *Id.* at 2. In subsequent emails to Chambers, the government expanded its opposition "to the extent [Mr. Jin's motion] asks the government to *gather* and produce 'all written communications of Dawson Anglin related to Anglin's work in this case.'" Ex. 1, Email from Magnani to Chambers (Mar. 30, 2026), at 1

1

(emphasis added). It elaborated: "Anglin has nearly a decade of statements across email, skype, and Teams on unclassified and classified systems. We have never gathered all of these materials and gathering them would be technically complicated. Reviewing them would take weeks." *Id.* at 1.

On March 31, the Court granted the government's motion and vacated its prior order, but ordered the government to file a supplement "briefly describ[ing] its process for reviewing FoA Anglin's prior case-related communications to determine whether any of those communications 'relate to the subject matter of the testimony of the witness.'"

At 10:33 pm on March 29 – that is, after Mr. Jin moved the Court, but before the government defaulted on the motion – the government produced 18 files that it had "found during [its] Jencks review for Anglin." This production included a few emails in their native format and a mixture of redacted emails, PowerPoint presentations, and spreadsheets in PDF formats. Two of the emails were redacted so thoroughly that it was impossible to ascertain even the date of the communications.

## ARGUMENT

With every purported effort at discovery, the government shows an even greater misunderstanding of – or disregard for – its discovery obligations. These communications show at least three deficiencies. Although we are aware of these deficiencies only as to this production, it is likely that they infect all of the government's responses.

I.   **THE GOVERNMENT HAS FAILED TO REVIEW ALL OF THE COMMUNICATIONS IN ITS POSSESSION. THEREFORE, IT HAS VIOLATED ITS OWN DISCOVERY OBLIGATIONS, AND HAS TRIGGERED THE COURT'S OBLIGATION TO INQUIRE INTO JENCKS ACT DISCLOSURES.**

The government has stated unequivocally that it has failed even to gather, let alone to review, all of Anglin's potentially relevant communications. Yet, under *Brady*, the government's

2

"broad obligation 'includes both *the failure to search for* Brady *material* and the failure to produce it.'" *United States v. Quinn*, 537 F. Supp. 2d 99, 108 (D.C. Cir. 2008)(emphasis added)(alteration omitted)(quoting *In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 892 (D.C. Cir. 1999)). "That includes a duty to search files maintained by branches of government closely aligned with the prosecution, if there is enough of a prospect of exculpatory materials to warrant a search." *United States v. Trump*, 753 F. Supp. 3d 17, 25 (D.D.C. 2024)(cleaned up); *see id.* at 44-47 (extending *Brady* obligations to files of prosecutors and investigators who had worked on the investigation). "[A] prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case." *United States v. Brooks*, 966 F.2d 1500, 1502 (D.C. Cir. 1992)(quoting *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir. 1984)). Likewise, if the government must produce "any statement … of the witness in the possession of the United States," it necessarily must locate every statement of the witness in its possession. 18 U.S.C. § 3500(b). In other words, it must search its records for all such statements. *See Trump*, 753 F. Supp. 3d at 34 (requiring the government to search records in its control under both *Brady* and the Jencks Act).

The government has made abundantly clear that is has not searched, and does not intend to search, all of the materials in its possession for *Brady* or Jencks information. That is a clear violation of its obligations.

But not only the government has obligations. "The decision on discoverability is emphatically a judicial decision." *United States v. Harrison*, 524 F.2d 421, 428 (D.C. Cir. 1975). "This responsibility of the federal trial judge, it goes without saying, is not to be delegated to the prosecutor. Questions of production of statements are not to be solved through one party's

determination that they are not to be produced ….” *Id.* at 428 n.17. The same, of course, is true of one party's refusal even to make that determination.[1]

To prevent such an evasion, "established precedent requires the district court to engage in an adequate inquiry into the nature of the documents before ruling against Jencks Act production." *United States v. N. Am. Reporting, Inc.*, 740 F.2d 50, 55 (D.C. Cir. 1984) (remanding to district court to conduct inquiry); *see also, e.g.*, *United States v. Peters*, 625 F.2d 366, 370-71 (10th Cir. 1980) (citing authority from the Supreme Court and multiple circuit courts) ("Under the Jencks Act, the trial court has an affirmative duty to gather the material necessary in order to satisfy the requirements of the Act. … The impropriety of allowing the government to make the determination as to relevancy has been pointed out on many occasions."). Therefore, "a district judge 'has an affirmative duty to determine whether any [Jencks Act] statement exists and is in the possession of the Government and, if so, to order the production of the statement.'" *N. Am. Reporting*, 740 F.2d at 55 (alteration in original)(quoting *Saunders v. United States*, 316 F.2d 346, 349 (D.C. Cir. 1963))(citing *Hilliard v. United States*, 317 F.2d 150 (D.C. Cir. 1963)). Little could trigger such an inquiry more clearly than the government's unambiguous admission that it will not even look at potentially relevant witness statements.

The Court's inquiry "may involve the interrogation of the witness or of the government agent, or an in camera examination of what is purported to be a statement under the statute." *Id.* (quoting *Saunders*, 316 F.2d at 349). The Court should hold a hearing on the extent of the

---

[1] This refusal is not the first time the government has shirked its obligation to make decisions. Recently, for example, the government admitted that it had withheld information from the defense for no reason. "The decision to withhold the affiant's name was not much of a decision at all, and there was no specific reason to redact the affiant. After the Court encouraged the government to share portions of the *ex parte* affidavits with the defendant, the government just redacted the affidavits and then unredacted the portions the Court indicated the government should disclose." ECF 350.

unreviewed material, as well as the reasoning behind this lack of review, before determining an appropriate penalty.

## II.    THE GOVERNMENT HAS DELETED METADATA AND RENDERED DOCUMENTS BORDERLINE INCOMPREHENSIBLE.

The government has produced several spreadsheets in PDF format. This format presents two problems. One is, simply, that the documents are extremely difficult to read. The conversion from spreadsheet to PDFs has scattered each row across multiple pages, separated by pages of other rows. Thus, a document that would otherwise be readily comprehensible instead requires great time and effort even to read. In ruling on discovery obligations, courts require that electronic documentation "be produced in the forms in which it is ordinarily maintained or in a reasonably usable form or forms." *United States v. Briggs*, 831 F. Supp. 2d 623, 628 (W.D.N.Y. 2011)(quoting Fed. R. Civ. P. 34(b)(2)(E)(ii)). A PDF spreadsheet that cannot be read is neither. Furthermore, under that standard, it is "improper to take an electronically searchable document and either destroy or degrade the document's ability to be searched." *Covad Commc'ns Co. v. Revonet, Inc.*, 260 F.R.D. 5, 9 (D.D.C. 2009) (citing authority). Therefore, "spreadsheets are to be produced in their native format." *Dahl v. Bain Capital Partners, LLC*, 655 F. Supp. 2d 146, 150 (D. Mass. 2009). "[T]aking an electronic document such as a spreadsheet, … cutting it up, and telling one's opponent to paste it back together again, when the electronic document can be produced with a keystroke is madness in the world in which we live." *Covad Commc'ns Co.*, 260 F.R.D. at 9.

Second, the conversion to PDF has destroyed the file history and metadata. *See United States v. Shabudin*, No. 11–cr–00664–JSW–1 (NJV), 2014 WL 1379717, at *4 (N.D. Cal. Apr. 8, 2014) (finding that defendants would be prejudiced by the loss of their metadata); *United States v. Virgen-Nunez*, No. 4:09–CR–16–JEG–RAW, 2009 WL 10678145, at *2 (S.D. Iowa June 26, 2009) ("The metadata provided by the government does tend to confirm when the search warrant

application was prepared. Timing in this regard is material to the defense ….”); *cf. United States v. Saffarinia*, 424 F. Supp. 3d 46, 82-83 (D.D.C. 2020) (describing government's production of extensive metadata). That metadata, in and of itself, is potential *Brady* information. For example, in one of the spreadsheets, someone has highlighted the transactions involving Carbuncle and Fully Max. Given the government's knowledge that these transactions were unrelated to Winney, this highlighting supports the defense's position that the government intentionally brought false charges against Mr. Jin. To prove as much would seriously discredit the government's case, as well as the testimony of all involved. Yet, without the version history and metadata, Mr. Jin cannot ascertain when the squares were highlighted – and, thus, draw conclusions as to why – or by whom.

Going forwards, the government should be required to produce all documents in native format whenever it is possible, and to maximize both utility and preservation when it is not.

## III. THE GOVERNMENT SUPPRESSED IMPEACHMENT MATERIAL UNDERMINING THE INTEGRITY OF THE INVESTIGATION.

The government must disclose grounds for potential impeachment. *See, e.g.*, *Giglio v. United States*, 405 U.S. 150 (1972). Furthermore, “[i]mpeachment evidence can be damaging when it allows defense counsel to attack the reliability of an investigation.” *United States v. Bagcho*, 151 F. Supp. 3d 60, 70 (D.D.C. 2015) (citing authority), *aff'd in part*, 923 F.3d 1331 (D.C. Cir. 2019); *see Kyles v. Whitley*, 514 U.S. 419, 446 & n.15 (1995) (explaining the importance of undermining the quality of an investigation); *Quinn*, 537 F. Supp. 2d at 115 (“[T]he jury might question why the lead case agent would not actively seek out the truth on this important point before continuing with a prosecution. . . . [This impeachment] would highlight a theme Quinn could have pursued ...: attacking the integrity of the government's investigation.”). Therefore, such evidence must be disclosed under *Brady*. *See Kyles*, 514 U.S. at 445-49 (finding such evidence favorable and material).

6

One of the disclosed emails reveal that, before the start of the first trial,[2] FoA Anglin became interested in two wire transfers to Winney from a California based entity called the Won Foundation. *See* Ex. 2, Email Correspondence from Anglin re: Dandong Winney. The two transfers occurred in 2015, totaled $56,500, and (according to Anglin) "stuck out…because [the Won Foundation] listed a US address in California." *Id.* at 3. Anglin knew from his preliminary research that the Won Foundation appeared to be a charitable organization, engaging in humanitarian aid to North Korea and other Asian countries. *Id.* at 3-4. Transactions with humanitarian aid organizations are permitted under IEEPA.31 C.F.R. § 510.512(b)(1).

Nevertheless, Anglin sought a subpoena for a representative of the Won Foundation, and documents related to the Won Foundation's wire transfers to Winney. Ex. 2 at 2 ("we would like to have a subpoena to be able to send to her"); *id.* at 3 (requests for various documentation). This inappropriate pursuit of third parties involved in (at least potentially) a legal transaction suggests either ignorance of the law or a determination to convict Mr. Jin at any cost. Either is potential impeachment material and, furthermore, undermines the investigation. Thus, this evidence should have been disclosed far earlier. "*Brady/Giglio* obligations always trump both the *Jencks* Act and any limiting language in Rule 16." *United States v. Daum*, 847 F. Supp. 2d 18, 20 (D.D.C. 2012).

Mr. Jin asks the Court to instruct the government that all impeachment material, and all material that could undermine the government's investigation, is favorable under *Brady*.

**CONCLUSION**

For all of the foregoing reasons, the Court should order the government to search all documents in its possession for *Brady* and *Jencks* material, and should hold an evidentiary hearing on its failure to do so. The Court should order the government to produce all documents in native

---

[2] The government redacted the email and has refused to identify the participants to the conversation, but confirmed that the communication occurred between August 27 and 28, 2025.

format whenever that is possible and, when it is not, to do so in a manner that is reasonably usable and preserves version history and metadata. Lastly, the Court should instruct the government on its obligations under *Brady* and *Giglio*.

Respectfully submitted,

By: /s/ Eugene Gorokhov
Eugene Gorokhov, Esq.
D.C. Bar No. 79785
Burnham & Gorokhov, PLLC
1634 I Street NW, Suite 575
Washington, DC 20006
(202) 386-6920 (phone)
(202) 765-2173 (fax)
eugene@burnhamgorokhov.com

8

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I served a copy of the foregoing motion via ECF which automatically sends a copy to all counsel of record.

Respectfully submitted,

By:/s/ Eugene Gorokhov
Eugene Gorokhov, Esq.